Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

| | | |
|---|---|---|
| DROPBOX, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. C 15-1741 EMC |
| | ) | |
| THRU, INC., | ) | |
| | ) | San Francisco, California |
| Defendant. | ) | Thursday |
| | ) | June 9, 2016 |
| _____ | ) | 1:30 p.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:            WILSON, SONSINI, GOODRICH & ROSATI
                          650 Page Mill Road
                          Palo Alto, California  94304
                   BY:  **JOHN LAWRENCE SLAFSKY, ESQ.**
                        **KEVIN SPARK, ESQ.**


For Defendant:            FERGUSON BRASWELL FRASER
                          2500 DALLAS PARKWAY
                          Suite 501
                          Plano, Texas 75093
                   BY:  **JOHN MORANT CONE, ESQ.**


                          HARVEY SISKIND, LLP
                          Four Embarcadero Center
                          39th Floor
                          San Francisco, California 94111
                   BY:  **IAN K. BOYD, ESQ.**


*Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR*
          *Official Reporter - US District Court*
          *Computerized Transcription By Eclipse*

**P R O C E E D I N G S**

**JUNE 9, 2016**                                              **2:18 P.M.**

THE CLERK:  Calling Case C15-1741, Dropbox versus Thru.

Counsel, please come to the podium and state your name for the record.

MR. SLASKY:  Good afternoon, your Honor.  For the declaratory judgment plaintiff Dropbox my name is John Slasky.  I'm with Wilson Sonsini.  And I'm here with my colleague Kevin Spark.

THE COURT:  All right.  Thank you, Mr. Slasky.

MR. CONE:  Good afternoon, your Honor.  Here for Thru, Inc., the counter plaintiff, John Cone from Ferguson Braswell and Fraser in Dallas.  And with me, Ian Boyd from Harvey Siskind.

THE COURT:  Thank you, Mr. Cohen, Mr. Boyd.

We're not far from trial.  We're not far from close of discovery.  I guess I -- I am having trouble understanding why this amendment of the complaint to bring in false advertising claims and a claim for damages, which had not been at issue in the original pleading, right?  There is no damages claim?

MR. SLASKY:  We did not make a damages claim in the original pleading.

THE COURT:  Right.

MR. SLASKY:  But I can provide some context and

background here, your Honor.

THE COURT: So I guess I'd like to know why -- and I don't -- there doesn't seem to be an obvious overlap to me in evidence, but maybe you can explain to me why this is not a significant 11th hour expansion of the case were this to be allowed.

MR. SLASKY: Sure. So let me take your second question on first, about the connection between the two categories of claims.

Having reviewed the documents and taken some deposition testimony now, it's clear to us that Thru, over a period of years, has engaged in a pattern of false and misleading statements directed at customers of Dropbox. Those are claims generally about the security capabilities and the alleged superiority of the Thru products and those are claims that denigrate the same security capabilities of the Dropbox functionality. Those claims are directly linked to the trademark claims.

What, apparently, has happened over a period of years is that Thru has gone out to the marketplace and they have targeted Dropbox customers and potential customers of Dropbox and they have made comparative advertising claims about Thru and Dropbox. And in the course of doing that, they have repeatedly invoked the trademark, the term "Dropbox," to refer to Dropbox and not to their own product or service.

And I know, for example -- I have a document in front of me about a webinar, for example, that Thru put together, an online seminar for potential customers.  It was called the "Hidden Cost Behind Dropbox and the Enterprise."  And the promotional material leads off with:

      "Is your company willing to compromise on security and put an organization's network in jeopardy for the convenience that solutions like Dropbox provide?"

So, apparently, behind the scenes, your Honor, there was chatter and discussion and deliberation at Thru about how to use the term "Dropbox" in a way that made sense and who owned the term "Dropbox."

And so I have an email here, for example.  This is just illustrative.  This is an internal email from Thru:

      "We have filed a trademark with the USPTO in the use of 'Dropbox.'  No one owns the trademark.  Our legal team has told us as long as we don't use the Dropbox, Inc. name we can slam the Dropbox name."

So that's an example, thematically of what they are doing.  They are slamming the Dropbox name.  They are using the Dropbox name systemically --

      **THE COURT:**  Slam the Dropbox name to slam Dropbox.

      **MR. SLASKY:**  Correct.  At the same time they are claiming in the trademark context that this is a term that is

exclusively associated with their product, with their technology and their functionality.

They are going out and competing with Dropbox, they say. They are targeting our customers.  They are using --

**THE COURT:**  So all those use and attribution to the term "Dropbox" -- to Dropbox might be admissible in this case, in the original trademark case, but the trademark case wouldn't get into whether or not its claims of better security and certification are, in fact, inflated or -- that would have nothing to do, unless I'm missing something, with who owns the trademark.

**MR. SLASKY:**  It would relate to the trademark insofar as the trademark is a symbol of reputation and goodwill.  And to the extent in the trademark context, we're digging into who associates the "Dropbox" term in the marketplace with which company, what does it represent, what does it signify?  And we will be taking --

**THE COURT:**  And their attribution of Dropbox to Dropbox, disparagingly or not, would seem to undercut their case.  They are creating their own market confusion.  It's their problem.  So you have a pretty good piece of evidence, perhaps, on the trademark case.

What I don't understand is whether the truth of the matter of assertions of:  Our product is better.  Their product sucks. What does that have to do with trademark?

MR. SLASKY: This is not a claim that we would have brought in the first instance in connection with the declaratory judgment claim that we brought; that it was not directly related.

What happened was, is we served document demands in November. We ended up having to chase Thru down over and over and over again. This is well documented in the docket. You can take a look at the various discovery orders that have been entered by Judge James.

They were directed to produce documents at the end of February. They produced a bunch of documents. Then they were directed to make other disclosures, to serve interrogatories, to provide a privilege log. And it took them 10 weeks after the Court-ordered deadline to do what they were supposed to do.

THE COURT: I understand the delay issue and diligence issue and maybe you're satisfied that there has not been undue delay because of the way things have unfolded. I mean, we can debate that.

I didn't start with that because I think the critical question is whether this is late in the day and such a significant expansion that it wouldn't -- it wouldn't make sense. It would be too disruptive to try to now fold it into this case. That's the question.

MR. SLASKY: What I'm struggling to follow -- this is an argument that Thru made in their papers -- is they suggest

that Dropbox is somehow trying to extend the scope and duration of the litigation by bringing these claims in here.

If your Honor is pre-disposed to deny our motion for leave to amend, we are going to assert these claims in any event. It's going to be in a separate, parallel, related lawsuit.  It could be down the hall.  It could come back to your Honor.  It could be in state court.  That's going to go on for years.

And so really the only question for the Court today is whether it makes most sense as a matter of judicial economy, for efficiency for the parties to bring the claims, to integrate them into this preexisting proceeding or to proceed in two parallel litigations.

I would respectfully suggest to you that the witnesses are going to be the same.  The documents are going to overlap significantly.  We know that because we've reviewed hundreds of thousands of documents already.  And this is a case where no party depositions have been taken.  There have been no substantive rulings in this case.  There was no deadline to amend the pleadings and we proceeded as expeditiously as possible, your Honor.

THE COURT:  What evidence will you need to put on to show that the advertising claims -- not just the attribution of the use of the name Dropbox, but it's actually in a typical case that, one, these claims are made; two, that they were false, exaggerated; and then, three, the big question is going

to probably be damages.  How much time is it going to take to develop damages models?  Are you going to have experts?  Are you going to have, you know, a *Daubert* question?  Is this going to be turned into a typical false -- fraudulent false advertising case with lots of surveys?  What is it going to look like?

MR. SLASKY:  So my vision of what the case would look like going forward, your Honor, is as follows.

First of all, they have already produced hundreds of thousands, if not millions, of documents and they have produced documents that make their advertising claims demonstrably false.  They produced documents showing that they have suffered data breaches, data loss.  They have had security incidents, or they have been advised that they have significant security vulnerabilities in their system.  That is directly contrary to the statements they are making in the marketplace.

THE COURT:  Do you have all you need?

MR. SLASKY:  No, we don't have all we need.

THE COURT:  Well, what would you --

MR. SLASKY:  So what I envision is that we would serve some targeted written discovery.

THE COURT:  Can you give me an example?  What -- what --

MR. SLASKY:  So, for example --

THE COURT:  -- what kinds of documents do you still

need?

MR. SLASKY:  Documents concerning -- these are documents that were produced to us ad hoc.  I don't know if we have everything on data loss, data security, on security vulnerabilities.

We know that they produced a bunch of stuff because it's related to the trademark claims and there, apparently, was some overlap so they shared it with them.  I don't know that we have everything, so we would want to assure ourselves that we have all those documents.

We would take a deposition of their chief technology officer.  We've already noticed that.  We would probably take a 30(b)6.  Could probably be the same 30(b)6 as for the trademark claims.  And we may or may not need to bring in an expert, but I'm not anticipating that this would be some huge litigation exercise.

I feel like we've been already benefited from the disclosures made to date.  We have a fairly informed view of what's happened and this could be done on an expedited basis.

THE COURT:  Well, can it be done within the discovery closure and expert discovery closure dates that we've set forth?

MR. SLASKY:  I don't think it can because the fact discovery cut-off is July 21.  So if our complaint is accepted and they have three weeks or so to respond, they may or may not

move.  If they move, we would be at the mercy of some motion calendar.  And if they answer, we very quickly send some targeted discovery.  And I think that would take us to, at minimum, August, which would be beyond the current deadline.

We're not looking to push the calendar back significantly, but we do think we need a little bit of wiggle room.  And we're certain that we would not be asking the Court for that extra time but for the dilatory behavior by Thru.

THE COURT:  Well, let's talk about practicalities.

MR. SLASKY:  So the current deadline is July 21st.  We've asked for a three-month extension.  If the Court is not open to that, I think, you know, two months would probably --

THE COURT:  That would mean a new trial date.

MR. SLASKY:  That's correct, your Honor.  We've asked to push everything back by three months.

THE COURT:  Well, all right.  Is it your view that by adding this claim, this case could not be tried on January 23rd?

MR. SLASKY:  So we gave some thought to that and we played around with the dates and we had a very difficult time crunching everything into the existing schedule.  You know, we do think we're going to need a little bit of extra time for written discovery, a little bit of extra time for depositions.  In my mind that's a minimum of two months.  We asked for three, but we would be prepared to work within the Court's schedule.

**THE COURT:**  This is scheduled for how many days?

**MR. SLASKY:**  January is the trial.

**THE COURT:**  How many days?

**MR. SLASKY:**  Five days, your Honor.

**THE COURT:**  Would this case be triable in five days with these new claims?

**MR. SLASKY:**  I believe so, your Honor.

**THE COURT:**  So you would be willing to commit to whatever limits that I -- which I always apply in civil cases, to whatever I was going to do?

**MR. SLASKY:**  I think that's not unreasonable.

**THE COURT:**  All right.  So then it's a matter of whether or not it is the appropriate thing to do to extend -- I mean, okay.  So you're hearing that there is going to be this claim no matter what.

**MR. CONE:**  Yes, your Honor.

**THE COURT:**  I kind of believe it.  I don't know if you do, but --

**MR. CONE:**  I'm not sure, but it's possible.

**THE COURT:**  So it does make some sense.  To the extent -- and I -- I -- I think there may be some overlap, but it's clear this is an expansion.  By the mere fact that they need more months of discovery itself tells you this is an expanded case.

On the other hand, he says he's willing to abide by the

time limits that would apply to a five-day trial.  So it's not going to expand the trial.  It's not going to turn this into a three-week trial.  But what it does mean is some extended discovery and a new trial date.

MR. CONE:  Yes, your Honor.

THE COURT:  What's your reaction to that?

MR. CONE:  I think the only thing I agreed -- that I heard opposing counsel say that I agreed with was that if we amend the complaint, we cannot stick to the present schedule. It could not be done.  I think three months is necessary.  I don't think you could do it with an extra two months.

But I started off agreeing entirely with your Honor's view, which this is a totally unrelated claim.  Counsel has made an attempt to do this, but the two claims are totally different.  Who owns the trademark has nothing to do with whether we have said that we haven't had any security breaches or that their claim, their system has security breaches.

We don't believe there is any merit to their claims of false advertising.  It's not been inappropriate for us to address the merits of those claims up until now, but if we have to, we will do so, your Honor, and we will show the Court that they have absolutely no merit.  We believe it would be better to keep this -- these two matters separate.

Your Honor, what we see here is a large company based in San Francisco that took this case and took this matter away

from the Trademark Office, which was a sort of a neutral ground, brought it here to their home ground.  Now unsufficiently satisfied with the cost and expense they have imposed on my client by a bench trial before your Honor, they want to bring in a jury trial, make it a jury trial, add a question of damages, which is certainly going to require enormous amounts of discovery, expert witnesses on both sides.

Plus, if they are serious that they are saying that the claims we made were misleading, they probably need survey -- expert survey evidence to show that the claims were misleading because that doesn't -- that's not something they can prove just on the words that they say were uttered themselves.

So we think this is just an attempt by Dropbox to add delay, cost and expense to my client, to take the case away from the --

THE COURT:  They are threatening to do that anyway if it's not folded in, so you may incur -- although I won't say double, but whatever cost savings there would have been of trying one case, you're now going to try two.  You're ready to take that on?

MR. CONE:  Well, the trademark is much more important, we believe, than these alleged false advertising claims.  We will be happy to go ahead and do the trademark case, get that resolved and, if necessary, go on with the false advertising.

**THE COURT:**  Let me ask:  What's the dimension of damages here?  I understand you haven't retained experts and all that, but given the thousands of documents that you have and the importance now that you believe of bringing in -- adding this into the lawsuit and bringing its own, what kind of damages do you -- is this a five, six figure case?  Seven, eight, nine figure case?

**MR. SLASKY:**  Short answer, your Honor, is I don't know.

**THE COURT:**  Do you have any idea?  Between a five and an eight figure case?

**MR. SLASKY:**  You know, Thru is a company that has held itself out in its advertising as doing business in 170 countries around the world.  I don't know how many customers they have had.  I don't know what the reach of this advertising and marketing was.  So I have no sense at this point what the scope of the monetary damages would be.

We have asked in our prayer, I think, for an order concerning corrective advertising.  We've asked for treble damages under the Lanham Act.  And we have asked for compensatory damages generally.  But I -- I don't have a sense right now what the order of magnitude is.

**MR. CONE:**  Your Honor, I think, if I might just say, somewhat typical of what we're faced with here, Thru has not said that it does business in 170 countries.  It says it has

been -- it is trusted in 170 countries, which is really rather different.  And it's going to be very difficult for them to prove that that was either false or misleading.

These are not strong claims, your Honor.  That's why we would be happy to face them separately.

THE COURT:  Well, I don't know what's been disclosed and I don't want to force you to reveal any trade secrets, but I would be curious what the dimension -- what the potential liability is here.  I mean, I have no idea whether Thru is a company that does millions, billions of sales.

MR. CONE:  We wish we did billions, your Honor.  We do not.  We do millions.

MR. SLASKY:  Your Honor, can I raise a procedural point, too?

THE COURT:  Yeah.

MR. SLASKY:  You know, if for some reason the Court declines to grant us leave to amend here, as I indicated, we intend to move forward separately.

There is a procedural nuance here, which is we would need to get leave from the provision under the protective order that limits our ability to use information gleaned in the course of this lawsuit outside of this proceeding.  We don't think the protective order should be used to frustrate our ability to bring well-founded claims or should be used as a shield against claims on Thru's part.

**THE COURT:**  Well, so you would need to get relief from the protective order in order to fashion a new action.

**MR. SLASKY:**  Correct.  I'm just anticipating that possibility.

**THE COURT:**  Have you all met-and-conferred about that?

**MR. SLASKY:**  We have not.  I would be happy to do that.

**THE COURT:**  Okay.  Well, I am not convinced at this point that amending the complaint is warranted.  I think this is -- although there is some relationship and, obviously, the suspicions which give rise to this claim now have arisen out of discovery in this case, the nature of the claims and nature of the facts, the nature of documents, nature of the testimony, while perhaps sort of transactionally related, are legally not related except in a very distant sense.

And the fact that this is going to have to take three more months of discovery and delay the trial in this case is exactly the kind of prejudice that affords the Court justification to deny otherwise liberality in amending under Rule 15 because trial dates are hard to find here.

If I move this back, try to find another date at this point in March or April, I'm now triple and quadruple stacked and -- which is a much worse condition than your current trial date.

So I'm going to deny the motion to leave -- for leave to amend the complaint.  I'm going to direct the parties to meet-and-confer to see if you can work out something, something subject to the protective order, some amendment that would allow Dropbox, if it wishes, to bring its -- a new claim in whatever form is appropriate.

And if you can't resolve that, I guess since it's an order of this Court, you'll have to bring me that dispute and I'll have to decide.  I hope you can -- I would think you can fashion something because I don't think you can prevent a lawsuit, you know, entirely because of the protective order.

**MR. CONE:**  Yes, your Honor.

**THE COURT:**  So, hopefully, you can work that out, but we need to adhere to the dates that are set forth herein.  And they are set so that there is not a -- there may be a little bit of room if you can't complete a depo by July 21st, but you can by the end of July or something like that.  There is some room there.

But as we look backwards from the trial date, the pretrial conference on December 20th, I do need to hear dispositive motions, if there are going to be any, around that October 13 timeline because often I need to -- I may need to take it under submission, rule on it in time for you to then meet-and-confer. You get 35 days in advance, or something, in order to get the motions on file, in limine motions and everything else.

So I have structured this so there's a little bit of play, but not, like, months kind of play.

MR. CONE:  Yes, your Honor.

THE COURT:  So I intend to keep this on track and for -- on the trial calendar here.

And so I guess my last question, sort of shifting to the CMC is, I know you've tried -- you've gone through one form of mediation back in October.  And although Dropbox doesn't think further A.D.R. would be productive, I want to raise that question again.

As you go through discovery and you complete your trial process, what your current thinking and possible openness to any further A.D.R. efforts in this case?

MR. SLASKY:  Your Honor, we would reconsider it after the summary judgment motion, but we don't think it would be productive at this time.

THE COURT:  All right.  And so the summary judgment motion that we're anticipating, both parties, you say?  Both parties are expecting summary judgment motions?

MR. CONE:  Yes, your Honor.

THE COURT:  Is that on the theory that there is no factual issues in dispute on the critical question, or maybe give me a little preview?  What are your summary judgment motions?

MR. CONE:  I think that may be a question of not

closing doors that we have possibly opened for us.  I suspect that the Court would find on both sides that there are fact issues involved.

THE COURT:  All right.  Well, I would suspect that that's the case, too, and would urge you -- in fact, I'm going to direct you to meet-and-confer before you file your motions and cross motions to make sure that you think that there is enough there that warrants the filing and -- because it's not obvious to me what the grounds would be, unless there is some legal impediment or theory or something.  It's not obvious to me.  But I would urge you not to file a motion just reflexively on a long shot.

MR. CONE:  Your Honor, may we ask about the -- it's presently, I think, set on the jury trial docket.  It has been -- Dropbox asked for a jury trial originally.  We pointed out from time to time that there is no issue that requires a jury or is entitled to a jury.  And I just want to make sure that the Court has taken notice of that and it's on the non-jury docket.

THE COURT:  Well, so what's being sought is a declaratory injunctive relief, correct?

MR. SLASKY:  (Nodding.)

THE COURT:  And you're not counterclaiming for damages?

MR. CONE:  No, your Honor.

**THE COURT:**  So since it appears to be one for equitable relief, there is no entitlement to a jury, correct?

**MR. SLASKY:**  So I think if Thru were to, your Honor, unequivocally and for in perpetuity waive any claim to damages, that might be right.  I'd have to think through the analysis a little bit.  But I don't think we're quite there yet.

**MR. CONE:**  Your Honor, I don't think we have to waive in perpetuity all claims and damages.  If we don't have a claim for damages, if the only relief requested is equitable, there is no right to a jury trial.

**THE COURT:**  Well, I would be judging on the basis of your counterclaim.  Your counterclaim, as I recall, your relief section does not seek damages.

But I think it's fair to make sure that when you ask for such further and other relief, legal or equitable, that this Court finds just that word "legal" --

**MR. CONE:**  We would be perfectly happy to make it clear, then, that we're seeking only equitable relief.

**THE COURT:**  All right.

**MR. CONE:**  Either by formal amendment or by this statement to the Court today.

**THE COURT:**  All right.  So you're now representing to the Court that in this action you are seeking only equitable relief.

**MR. CONE:**  Yes, your Honor.

**THE COURT:**  All right.  Accomplish that, they are not seeking damages here in this court, at least in this case.

**MR. CONE:**  Thank you, your Honor.

**THE COURT:**  All right.  So that would suggest that there is no right to a jury trial.

Now, of course, if you want to stipulate to a jury trial, I might not object to that.  But at least as it stands, there is no entitlement.  Neither party has an entitlement to a jury.

**MR. CONE:**  We're content with your Honor being the finder of fact as well as the judge of the law, your Honor.

**THE COURT:**  You haven't made your decision yet.

**MR. SLASKY:**  I've got to confirm everything with my client, your Honor.

**THE COURT:**  Okay.  Well, again, why don't you meet-and-confer.  If you can reach an understanding, send in either a stip to the Court so it's clear for the record or even a letter so we have that.

If not, if it means we have to now litigate that motion. I hope we don't have to spend time on that, but I think you know my -- at least my intuitive views on that question.

All right?  So with respect to where we go from here, I don't think we need to do anything further in this matter unless something else comes up.  Otherwise, I'll see you either at the motion or at the pretrial conference.

My memory is suffering.  What did we say about A.D.R.?

MR. SLASKY:  So I suggested, your Honor, that we would reconsider it as an alternative after the summary judgment motions.

THE COURT:  That's why I raised the question about is there a summary judgment motion.

Well, why don't we do this, because I do want to revisit. Let's say a status conference for the date in which we would normally have -- if we do have a time and date for dispositive motions, is October 13th.  So why don't we have a status conference that date whether you have a motion or not, so I can revisit with you the issue of A.D.R.

THE CLERK:  October 13th at 1:30, counsel.

MR. CONE:  Thank you, your Honor.

THE COURT:  What was that date again abet?

THE CLERK:  October 13th at 1:30.

THE COURT:  I would appreciate it if you would talk amongst yourselves and prepare to talk about A.D.R. at that point.

MR. CONE:  Yes, your Honor.

THE COURT:  Okay.

MR. SLASKY:  Thank you.

MR. CONE:  Thank you, your Honor.

(Proceedings adjourned.)

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, June 20, 2016