DAVID H. KRAMER, State Bar No. 168452
JOHN L. SLAFSKY, State Bar No. 195513
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California  94304-1050
Telephone:  (650) 493-9300
Facsimile:  (650) 565-5100
dkramer@wsgr.com
jslafsky@wsgr.com

COLLEEN BAL, State Bar No. 167637
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower, Suite 3300
San Francisco, California  94105
Telephone:  (415)947-2000
Facsimile:  (415) 947-2099
cbal@wsgr.com

Attorneys for Plaintiff and Counter-Defendant
DROPBOX, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DROPBOX, INC., a Delaware corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>THRU INC., a Delaware corporation,<br><br>　　　　　Defendant.<br>_____<br><br>THRU INC., a Delaware corporation,<br><br>　　　　　Counterclaimant,<br><br>　　v.<br><br>DROPBOX, INC., a Delaware corporation,<br><br>　　　　　Counter-Defendant.<br>_____ | Case No. 3:15-CV-01741-EMC (MEJ)<br><br>**DROPBOX, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:　　　October 27, 2016<br>Time:　　　1:30 p.m.<br>Before:　　Honorable Edward M. Chen<br>Dept:　　　Courtroom 5, 17th Floor<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ..................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ........................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

INTRODUCTION ....................................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................................... 2

      A.    Dropbox, Inc. and Its Trademark DROPBOX ....................................... 2

      B.    Others Claim Rights in the Word "Dropbox" ........................................ 4

      C.    Thru Inc. and its Use of the Word "Dropbox" ..................................... 4

      D.    Thru's Knowledge of Dropbox, Inc. and Thru's Strategic Delay ......................... 6

ARGUMENT ............................................................................................................................. 10

I.     THE SUMMARY JUDGMENT STANDARD ................................................. 10

II.    THRU HAS NO RIGHTS TO ASSERT AGAINST DROPBOX. ................................. 11

      A.    Thru Did Not Use "Dropbox" as a Trademark. ................................... 11

      B.    "Dropbox" is Descriptive and Thru Has Not Established Secondary
           Meaning ................................................................................................ 13

           1.    "Dropbox" Is Merely Descriptive. ........................................... 14

           2.    Thru Has Not Established Secondary Meaning in "Dropbox" ................ 16

III.   EVEN IF THRU HAD TRADEMARK RIGHTS, DROPBOX WOULD BE THE
      SENIOR USER. ................................................................................................... 18

IV.   THRU'S CLAIMS ARE BARRED BY LACHES. ........................................... 19

      A.    Thru Delayed Six Years to File Suit ..................................................... 20

      B.    Thru's Six-Year Delay is Unreasonable and Inexcusable ................... 21

      C.    The *E-Systems* Factors Confirm That Thru's Delay Was Unreasonable ............ 23

      D.    Dropbox, Inc. Will Suffer Severe Prejudice From Thru's Delay .......................... 24

CONCLUSION .......................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**  **Page(s)**

*Aero Turbine, Inc. v. Aeroturbine, Inc.*, 76 F. App'x 768, 2003 U.S. App. LEXIS 16396 (9th Cir. 2003) ...................................................................................11, 14

*Akhenaten v. Najee, LLC*, 544 F. Supp. 2d 320 (S.D.N.Y. 2008) ....................................11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................10

*Avocet Sports Tech. Inc. v. Polar Electro Inc*., No. C -12-02234 EDL, 2013 U.S. Dist. LEXIS 59577 (N.D. Cal. Apr. 16, 2013) .........................................................22

*Bada Co v. Montgomery Ward & Co.*, 426 F.2d 8 (9th Cir. 1970) ..................................16

*Brady v. Grendene USA, Inc.*, No. 3:12-cv-0604-GPC-KSC, 2015 U.S. Dist. LEXIS 72551 (S.D. Cal. June 3, 2015) .............................................................19

*Celotex Crop. v. Catrett*, 477 U.S. 317 (1986)...............................................................10

*Church & Dwight Co. v. Mayer Labs, Inc.*, 868 F. Supp. 2d 876 (2012) .......................16

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001)..............................19, 24, 25

*E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280 (9th Cir. 1992) .....................19

*E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604 (9th Cir.1983) ......................................23

*Edsal Mfg. Co. v. Vault Brands, Inc.*, 2012 U.S. Dist. LEXIS 163479 (N.D. Ill. Nov. 15, 2012) .......................................................................................11

*Entrepreneur Media v. Smith*, 279 F.3d 1135 (9th Cir. 2002) ..................................13, 16

*Fitbug Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180 (N.D. Cal. 2015)........................... *passim*

*FW OmniMedia Corp. v. Toyota Motor Sales U.S.A., Inc.*, 2004 U.S. Dist. LEXIS 27464 (C.D. Cal. Dec. 8, 2004)...................................................................11, 12

*Gillons v. Shell Co. of Cal.*, 86 F.2d 600 (9th Cir. 1936)................................................22

*Grupo Gigante S.A. de C.V. v Dallo & Co.*, 391 F.3d 1088 (9th Cir. 2004) ......19, 20, 24

*In re Remington Prods. Inc.*, 3 U.S.P.Q.2d 1714 (T.T.A.B. Jan. 29, 1987)....................13

*Japan Telecom, Inc. v. Japan Telecom America, Inc.*, 287 F.3d 866 (9th Cir. 2002)....................14

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002)....................19, 20, 21

*Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190 (9th Cir. 2009).............................................14

*Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352 (9th Cir. 1985)............................14

1  *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961)...........................25

2  *Rock & Roll Hall of Fame v. Gentile Prods.*, 134 F.3d 749 (6th Cir. 1998)...................11

3  *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215 (9th Cir. 1987).........................15

4  *Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*, 680 F. Supp. 2d 1107
       (N.D. Cal. 2010)....................................................................................................14

5  *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096 (N.D. Cal. 2008).........20

6  *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
7       59 F.3d 902 (9th Cir. 1995).................................................................................11

8  *Seltzer v. Green Day, Inc.*, 725 F.3d 1170 (9th Cir. 2013) ...........................................11

9  *Seybert v. Nat'l Ctr. for Missing & Exploited Children*, No. 6:09-CV-169, 2009
10      U.S. Dist. LEXIS 103452 (E.D. Tex. Aug. 10, 2009)..........................................13

11 *Smith v. M & B Sales & Mfg.*, 1990 U.S. Dist. LEXIS 1310
       (N.D. Cal. Jan. 31, 1990)..............................................................................11, 12

12 *Tillamook County Creamery Ass'n v. Tillamook Cheese and Dairy Ass'n*,
13      345 F.2d 158 (9th Cir. 1965)...............................................................................19

14 *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) .................................13, 14

15 *Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank*, 696 F.2d 1371 (Fed. Cir. 1982).....19

16 *Yellow Cab Co./Sacramento v. Yellow Cab/Elk Grove*,
       19 F. 3d 925 (9th Cir. 2005) ..............................................................................11

## STATUTES

18 15 U.S.C. §1057(b) .......................................................................................................11

19 15 U.S.C. §1115(a)........................................................................................................11

20 15 U.S.C. §1127 ............................................................................................................11

21 California Business and Professions Code §17200....................................................10

22 California Code of Civil Procedure §339...................................................................21

23 Lanham Act §43(a)...............................................................................................10, 19, 21

## RULES

25 Fed. R. Civ. P. 56 .....................................................................................................1, 10

26 L.R. 5-4 .........................................................................................................................15

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on October 27, 2016, at 1:30 p.m. in the courtroom of the Hon. Edward M. Chen, Courtroom 5, U.S District Court, Northern District of California, 450 Golden Gate Avenue, San Francisco, California, Plaintiff/Counter-Defendant Dropbox, Inc. ("Dropbox, Inc.") will and hereby does move pursuant to FRCP 56 for summary judgment in its favor on the counterclaims asserted by Defendant/Counterclaimant Thru Inc. ("Thru") in this action.  The motion is based on this Notice and Motion for Summary Judgment, the Memorandum of Points and Authorities, the accompanying declarations and exhibits, the papers on file in this action, and any other submissions or arguments as may be presented to the Court.

**STATEMENT OF ISSUES TO BE DECIDED**

Whether Thru's counterclaims fail as a matter of law because: (a) Thru has no trademark rights in the word "dropbox"; (b) any rights Thru might claim are junior and subordinate to the rights held by Dropbox, Inc.; or (c) assuming Thru has senior trademark rights, its claims in this action are barred by the doctrine of laches.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Dropbox, Inc. filed this declaratory relief action against Thru Inc. to put to rest any notion that Thru has a viable trademark claim against it.  Thru, a company with fewer than 200 customers, has used the word "dropbox" to describe the file transfer functionality in its file management software.  Thru did not use the word as a trademark.  Even had it tried to, it came nowhere close to building the secondary meaning required to establish trademark rights in the descriptive term.  And when Thru learned of Dropbox, Inc.'s prominent and thriving file management service in June 2009, Thru took no action to assert or enforce any supposed trademark rights.

By late 2011, Dropbox, Inc. had built a global brand, had tens of millions of users and was reportedly valued in the billions of dollars.  That is when Thru decided that, because it had used the word "dropbox," it held what its CEO labeled a "lottery ticket."  Thru imagined that if it dangled the threat of a trademark claim over Dropbox, Inc.'s head, Thru would win the lottery.

As Dropbox, Inc. approached a rumored sale of its stock to the public, it supposedly would pay hundreds of millions to Thru to buy it off, even though Thru's claim had no merit.  Thru laid in wait for several more years, plotting to file suit the day Dropbox, Inc., now with over 500 million users, announced plans for an IPO.  More than six years passed between the time Thru learned about Dropbox, Inc. and the time it asserted counterclaims in this case.

Discovery has revealed Thru's trademark charade and its extortionate motives.  Dropbox, Inc. now seeks summary judgment on Thru's counterclaims for three reasons:

- First, Thru lacks any trademark rights in "dropbox" both because it failed to use the word as a trademark, and because it has never established secondary meaning.

- Second, even if Thru could demonstrate a protectable interest in a "dropbox" trademark, Dropbox, Inc. would have seniority over Thru by virtue of its acquisition of rights from an earlier, more robust user of the term "dropbox."

- Third, all of Thru's claims are barred by the doctrine of laches in light of Thru's extended, unreasonable and strategic delay in asserting those claims.

Although the parties are scheduled for a bench trial in January, this action should go no further.  There is no triable issue of fact, and Dropbox, Inc. is entitled to judgment as a matter of law.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Dropbox, Inc. and Its Trademark DROPBOX

Headquartered in San Francisco, Dropbox, Inc. is a global phenomenon.  Founded in 2007, the company created a groundbreaking software application that enables people to store, access, modify, and share their electronic files with ease from anywhere in the world.  Dropbox allows users to have a special folder on their computers, the content of which is synchronized across and accessible on all their devices that have the Dropbox application installed.  Files placed in this folder are also accessible via the Dropbox website at www.dropbox.com.  Today, the company has over 500 million users, supported by over 1,500 employees.  Its Dropbox Business unit counts over 200,000 businesses as customers, offering them simple and secure file management.  Each day, over a billion files are saved to the company's service.  Vashee Decl. ¶5.

Co-founder and CEO Drew Houston conceived of the name "Dropbox" for the company from the start.  He had used a "dropbox" folder years earlier to share video game materials with friends in school, and believed the term aptly described a file transfer functionality, a key aspect

of his new company's service.  Houston Decl. ¶¶3-4.  Houston was told by advisors early on that obtaining a trademark on the term "Dropbox" would be difficult because it was merely descriptive for a file transfer service.  *Id.* ¶11, Ex. A.  He and co-founder Arash Ferdowsi thus debated a host of other names, but concluded in mid-2008, that "Dropbox" was the best fit, and set out to build brand awareness in the name.  *Id.* ¶12.

Dropbox, Inc. officially launched its service in September 2008.  By the end of 2008, it already had 440,000 users.  *Id.* ¶16.  Key to establishing this user base was Dropbox's "freemium" business model of giving users limited free storage, and charging those who wished to add more space or enhanced features.  *Id.* ¶17.  In 2009, Dropbox, Inc. benefitted from glowing national press coverage from publications like the New York Times, CNN, MacWorld, News.com, and dozens of others.  *Id.* ¶20.  It won Techcrunch's award for Internet Application of the Year, a Macworld Editor's Choice Award, and numerous other honors.  *Id.* ¶21.  By November 2009, its customer base had soared to three million users, and it acquired the domain name dropbox.com.  *Id.* ¶¶22-23.

Having built a tremendous user following and gained wide-ranging notoriety, Dropbox, Inc. applied, in late 2009, to the United States Patent and Trademark Office ("PTO") to register the DROPBOX trademark for computer software and services related to storage, synchronization, and back-up of digital files.  *Id.* ¶24.  Others had previously tried to claim a trademark in DROPBOX-related terms for a file storage functionality and were rejected because the PTO deemed the term descriptive for such purposes.  *See* Slafsky Decl. Exs. 76-78 (DROPBOKS); Ex. 75 (PROMOTER DROP BOX).[1]  Dropbox, Inc.'s application was published in March 2011.  Slafsky Decl. ¶3.  By then, Dropbox, Inc. had been featured in hundreds if not thousands of national and international press stories, and had invested millions in marketing its service.  Vashee Decl. ¶10.  According to Thru's VP of Marketing, by the middle of 2011, Dropbox, Inc. was a "household name," and was "particularly well known," including to people in the industry.  Ex. 31 (Skybakmoen II) at 237:1-238:2; 298:15-20; Ex. 32 ("household

---

[1] Unless otherwise noted, "Ex. ___" refers to the corresponding exhibit to the Declaration of John L. Slafsky ("Slafsky Decl.").

name").[2]  The PTO issued Dropbox, Inc. a trademark registration for DROPBOX in February 2014, making it the presumptive owner of the mark and entitled to exclusive, nationwide use on its goods and services.  Slafsky Decl. ¶4.

**B.      Others Claim Rights in the Word "Dropbox"**

In June 2011, a small company called Officeware (*aka* Filesanywhere) sued Dropbox, Inc. in Dallas, Texas, claiming it had common law trademark rights in "dropbox" by virtue of using the word on the file transfer functionality in its software.  Ex. 5.  Officeware claimed to have used "dropbox" continuously since January 2004, and produced marketing materials reflecting that use.  *Id.* ¶ 5.  Dropbox, Inc. contended "dropbox" was merely descriptive in connection with file transfer services and that despite Officeware's use and marketing, it had not established secondary meaning.  Ex. 6.  After more than 18 months of litigation, the parties reached a settlement under which Officeware assigned its rights to Dropbox, Inc.  Ex. 7.

Officeware was not alone in claiming rights in the word "dropbox."  Dropbox, Inc. also heard, in 2011, from a company called YouSendIt that also used "dropbox" for the file transfer functionality in its product.  Slafsky Decl. ¶13.  Shortly thereafter, YouSendIt agreed to stop using it.  *Id.*  Dropbox, Inc. also received a demand from "DropBoks," still another company using the word to describe a file transfer functionality.  Dropbox, Inc. responded that the term was merely descriptive, citing the PTO's refusal of DropBoks' own application, and that DropBoks had no protectable interest in the term.  Houston Decl. ¶15, Ex.B.

**C.      Thru Inc. and its Use of the Word "Dropbox"**

Thru is another small company, with fewer than 200 customers, located only a few miles from Officeware in Irving, Texas.  Dkt. No. 33; Ex. 34 (Harrison) at 215:3-12.  Like Officeware, Thru created a file management software program.  It was originally called "File Transaction Hub" and later "Thru."  Ex. 34 (Harrison) at 22:6-12, 24:9-25:3.  Thru claims that it started using

---

[2]  *See also* Ex. 49 (Thru CEO to Thru board member in March 2013, "I would point out that the Dropbox brand is more akin to Xerox or Coke since it has taken on a secondary meaning."); Ex. 34 (Harrison) at 216:6-13 ("Q. [When you wrote Ex. [49] in March 2013, you meant] in the minds of the relevant consuming public, ["Dropbox"] is recognized as the name of my client's service.  Correct?  A. That's probably correct.").

"dropbox" in May 2004, a few months after Officeware did, applying the "same name" to the "same functionality" as its local competitor.  Ex. 67; Ex. 39 (Thru 30(b)(6)) at 30:7–17, 37:1-8, 35:12-16 (Thru CEO wrote Ex. 67 as note to self and it is correct); Ex. 40 (Rog No. 4).

In Thru's product, as in Officeware's, the "dropbox" function allows a customer to present a web page to the public, from which anyone can send files electronically to the customer's representatives.  Ex. 34 (Harrison) at 40:4-10; Ex. 69; Ex. 67.  Thru designed these public-facing webpages for its customers so that the pages display the customers' own brands and logo (not Thru's) alongside the word "Dropbox."  Ex. 69; Ex. 34 (Harrison) at 116:3-21, 118:20-119:11 ("Q. For how many other companies does Thru host web pages on which the word dropbox appears next to the customer's logo.  A. Every Thru customer."); Ex. 31 (Skybakmoen II) at 302:9-21.

Thru spent virtually nothing on marketing for the entire company in 2004 or 2005.  Ex. 34 (Harrison) at 89:10-91:5, Ex. 68.  It never marketed the dropbox functionality; no one wrote articles featuring the functionality; and it won no awards.  Ex. 34 (Harrison) at 87:25-88:7; Ex. 39 (Thru 30(b)(6)) at 120:5-12.  Thru's former VP of Marketing testified that Thru's marketing and promotion were ineffective prior to his arrival in 2011 and that Thru had not established marketplace recognition in "dropbox" at that time.  Ex. 30 (Skybakmoen I) at 83:12-16.  Thru's former Marketing Director testified that early 2012 was the first she even heard anyone at Thru claim that it had a trademark in "dropbox."  Ex. 36 (Fernandez) at 77:1-6.

Thru actually used "dropbox" in its marketing materials to describe the file transfer functionality *in other parties' competing products*.  *See, e.g.*, Ex. 63 (comparison chart referring to "Site Dropbox" functionality in YouSendIt's product as well as in Thru's); Ex. 39 (Thru 30(b)(6)) at 16:19-17:6 ("Q.  You're telling the potential customer that YouSendIt offers a site Dropbox functionality for an additional $30 a month right? A. It appears that way….Q. If Thru genuinely believed it had a trademark in the term 'Dropbox' in August 2011, why would it use the term 'Dropbox' to describe a function in a competitor's product to a potential customer?  A. I

1    don't know.").[3]  In fact, Thru regularly used "Dropbox" to refer not to the functionality in its

2    own product, but to Dropbox, Inc.  *See, e.g.*, Ex. 33; Ex. 32 (Thru marketing materials for 2012

3    webinar repeatedly referencing Dropbox, Inc.: "Enter Dropbox," "The Benefits of Dropbox,"

4    "Dropbox does not provide end to end security," "Dropbox is a great tool – for the consumer").[4]

5    Over the years, Thru learned that a host of other companies were using the word "dropbox" to

6    describe file transfer functionalities in their software products, including two other companies in

7    Irving, Texas alone.[5]  But Thru took no steps whatsoever – no cease and desist letters, no

8    lawsuits, nothing – to try to prevent such use.  Ex. 34 (Harrison) at 125:20-126:18, 130:1-4; Ex.

9    39 (Thru 30(b)(6)) at 41:14-42:2.  Nor did it seek to register a trademark in "dropbox" from

10   2004-2011.  Ex. 34 (Harrison) at 72:15-73:7.  It has no registration today.  Slafsky Decl. ¶15.

11          **D.       Thru's Knowledge of Dropbox, Inc. and Thru's Strategic Delay**

12          Thru learned of Dropbox, Inc. at least as early June 9, 2009.  At that time, in what Thru's

13   CEO characterized as "competitive analysis," Thru's CTO notified the CEO about Dropbox, Inc.

14

---

15         [3] *See also* Ex. 65 (Thru website materials describing a Thru customer as lacking "secure
     dropbox capabilities"); Ex. 39 (Thru 30(b)(6)) at 17:11 – 20:15; *id.* at 20:16-21:2 ("Q. So in
16   marketing material for potential customers in 2014, Thru used the term "Dropbox" not as a
     reference to its own brand, but, rather, to describe a functionality, right?....A. It appears that
17   way."); Ex. 31 (Skybakmoen II) at 252:12-25 (Thru's use of the phrase "dropbox threats" in
     marketing materials did not refer to Thru, but to Dropbox, Inc. and "everyone else."); Ex. 30
18   (Skybakmoen I)  at 115:9-20 ("So Thru . . . was using the term 'Dropbox' to refer to its own
     functionality and also using the term to refer to other companies' functionality as well. . . . A.
19   Yes, I would say so.").

20         [4]  Thru also explained that when it referenced consumer dropbox applications, it was a
     "shadowy" reference to "Dropbox, Inc.".  Ex. 34 (Harrison) at 98:1-4, 101:17-102:8; *see also*
21   Ex. 64 (Thru marketing materials for blogpost in April 2012: "Consumer Dropbox in the
     Enterprise: At first glance consumer Dropbox tools are convenient and easy to use."); Ex. 31
22   (Skybakmoen II) at 248:6-249:21; Ex. 71 (Thru marketing materials on website reading:
     "Consumer dropbox applications have attracted millions of users").

23         [5]  Asked, in an interrogatory, to identify all other companies using the DROPBOX mark of
     which Thru was aware, Thru listed only three schools and a competitor called Syncplicity.  Ex.
24   40 (Rog No. 9).  But its sworn response proved grossly incomplete.  For example, Officeware
     was missing from Thru's response.  Ex. 34 (Harrison) at 120:17-121:8 ("I guess we forgot
25   them").  Among others missing were: (1) DG System, a third company in Irving Texas, whom
     Thru knew, in 2007, was using "dropbox" for a file transfer functionality, Ex. 67; Ex. 39 (Thru
26   30(b)(6)) at 40:7-41:4; (2) Intralinks, a public company offering "dropbox" functionality, even
     though Thru's senior executives discussed Intralinks' use of "dropbox" in 2012, *see* Ex. 66; Ex.
27   34 (Harrison) at 123:3-125:19; (3) Apple Computer, whom Thru acknowledged used the term
     long before Thru, Ex. 46; Ex. 34 (Harrison) at 66:1-20; and (4) Blackboard, a popular file
28   management service at universities starting in the late 1990s that used "dropbox" to describe its
     file repository and transfer function.  Ex. 35 (Blackboard) at 12:11-18, 15:14-17:21, 44:24-46:3.

---

Ex. 42; Ex. 34 (Harrison) at 157:21-159:16.  A few days later, the CTO reported again to the CEO that Dropbox, Inc. was "very prominent in the Mac community" and provided him with a link to a Wikipedia page about the company. Ex. 43.  Despite those alerts and Dropbox, Inc.'s prominence, Thru took no action at all.  Ex. 34 (Harrison) at 159:24-160:2.

Thru likewise remained silent in 2010, even after a potential Thru customer told Thru's Director of Customer Success that he had chosen to use Dropbox, Inc.'s service instead of Thru's product.  Ex. 44 (January 2010 email from potential customer: "I found an application called dropbox (www.dropbox.com) . . . . [I]t serves [my] needs, both professionally and personally.").  Dropbox, Inc., meanwhile, had grown to over three million users, and had invested many millions of dollars in building the company's infrastructure and staff.  Houston Decl. ¶¶18, 20.

There was still not a word from Thru to Dropbox, Inc. in January 2011, when a Thru employee circulated to Thru's CEO, CTO, and a host of others, an invitation to sign up for Dropbox, Inc.'s services.  Ex. 45.  Still, Thru made no claim to trademark rights in "dropbox" and took no action.  Ex. 34 (Harrison) at 154: 4-8 ("Q. Did it occur to you in January 2011, sir, that Thru had rights in the Dropbox name and that Thru needed to take action regarding Dropbox Inc.'s use of the name?  A. If it did, I didn't do anything about it.").  Instead, Thru's CTO simply informed the group of Thru executives, "We are aware of Dropbox."  Ex. 45.

Notwithstanding Thru's longstanding familiarity with Dropbox, Inc. at the highest levels of the company, Thru's CEO verified an interrogatory response claiming that Thru first learned about Dropbox, Inc. in mid-2011.  Ex. 40 (Rog No. 12: "Thru's directors and management first became aware of Dropbox, Inc. and its use of DROPBOX in mid-2011.").  Mr. Harrison then swore that was true in deposition.  Ex. 34 (Harrison) at 136:25-138:20.  Confronted with the reality in cross-examination, however, he was forced to concede that his sworn response (and prior testimony) was false; Thru had actually learned about Dropbox, Inc.'s use of the Dropbox name "as early as June 15, 2009."  *Id.* at 161:17-21, 161:25-162:4 ("Q. Your interrogatory response was false to interrogatory number 12.  Right?  A. It is flawed.  Q. False.  Right?  A. Yes.").

It appears that Thru learned about Officeware's June 2011 lawsuit against Dropbox, Inc. and hatched a plan to extract its own payment for supposed rights in "dropbox." Thus, in December 2011, at least two and a half years after it learned of Dropbox, Inc., Thru contacted Dropbox, Inc. for the first time. Dropbox, Inc. had grown to 50 million users, with a multi-million dollar marketing budget and ▮Redacted▮ in annual revenue. Houston Decl. ¶25; Vashee Decl. ¶¶8, 10. Thru did not charge Dropbox, Inc. with infringement or ask that it stop using the name "Dropbox." It merely offered to sell its supposed rights in the word. Ex. 28.

At roughly the same time, in January 2012, Thru's CEO candidly reported to a lead investor in Thru:

> **New Development** turns out we own the term Dropbox. . . . Our IP attorney is talking to Dropbox's attorney about buying the name from us. . . . They raised 250M in October 2011 at [$]1B value. . . . **An action could be had soon.**

Ex. 47 (emphasis supplied). But no action was forthcoming. Fully aware of the ongoing trademark litigation between Officeware and Dropbox, Inc. in Thru's backyard of Dallas, Thru chose not to participate or assert its "newly developed" rights. Ex. 34 (Harrison) at 171:23-173:13. Although Thru now contends it was harmed by Dropbox, Inc.'s use of the name, it did not file suit in 2009, 2010, 2011, 2012, 2013, or 2014. Ex. 39 (Thru 30(b)(6)) at 135:8-22. Thru also never told Dropbox, Inc. to stop using "Dropbox." *Id.* at 136:10-14. In fact, Thru told this Court in June 2015 that it "has not and does not contest [Dropbox, Inc.'s] use of the DROPBOX mark." Dkt. 19 (Thru's Motion to Dismiss) at 2:18.

Once discovery started, Dropbox, Inc. learned why Thru never sought to enforce any supposed trademark rights. In secret, Thru had hatched a strategic plan of delay, hoping to leverage a long-rumored IPO from Dropbox, Inc. As Thru's CEO later explained: "It just seemed like a leverage point for us." Ex. 34 (Harrison) at 176:20-177:13. Thru deliberately took no action, believing that the best way to maximize a payoff was to "sit tight and wait to the IPO announcement and be prepared to file suit that day and make as much noise as we can about it." Ex. 51; *see also* Ex. 34 (Harrison) at 177:14-178:7, 179:14-19 (Thru CEO set up a Google news alert so that he could monitor the progress of Dropbox, Inc.'s IPO plans in real time). Thru's CEO referred to this strategy of delay as the "slow walk." Ex. 57 ("Slow walking this

1    [dispute] to [Dropbox's] S1 filing is all that is important. The closer we get to that the

2    better.  This action was part of the slow walk.").  He repeatedly described this scheme as Thru's

3    "lottery ticket."  Ex. 54; Ex. 62 (Thru CEO to Thru CFO: "Dropbox will be a lottery ticket").[6]

4          While not asserting rights against Dropbox, Inc., Thru actively sought to profit from

5    Dropbox, Inc.'s enormous success and brand recognition.  Starting in early 2012, by which time

6    Dropbox, Inc. had tens of millions of users, Thru began purchasing advertising on Google keyed

7    to the term "dropbox."  Ex. 38 (internal Thru email dated February 23, 2012:  "[W]e need to

8    focus on Dropbox in adwords. . . .We need to target organically and in adwords every single

9    dropbox use we can find").[7]  Although it had used keyword advertising for years, Thru had never

10   purchased advertising tied to "dropbox" prior to 2012.  Ex. 39 (Thru 30(b)(6)) at 56:3-57:16.

11   For the first time in 2012, Thru also launched a search engine optimization effort around

12   "dropbox."  That is, Thru loaded content onto its website hoping to lead search engines to

13   believe the site was relevant to people searching for "dropbox."  Ex. 34 (Harrison) at 228:14-22;

14   226:9-227:5.  The idea behind both the keyword advertising and search engine optimization, as

15   Thru's CEO candidly admitted, was to lure people looking for Dropbox, Inc. to Thru's website

16   instead.  *Id.* at 224:25-225:3 ("Q. So was Thru setting out to lure people looking for Dropbox

17   into coming to Thru even though you knew they were looking for Dropbox?  A. Yes, I believe

18   we were."); 224:15-18.[8]

19   _____

20      [6] In parallel, Thru's board discussed launching a Dropbox lookalike service to "muddle the
     public."  Ex. 51 ("Could we launch a Dropbox look alike buy [sic] not as free as theirs to
21   muddle the public."); Ex. 39 (Thru 30(b)(6)) at 125:21-24 ("Q. Thru's board member, Mr.
     Holiday-Smith, was proposing to his fellow board members that Thru take steps to cause
22   consumer confusion, wasn't he?  A. Yes").  Thru also debated changing the name of its
     company to "Dropbox," but decided that could be "unseemly." Ex. 48.

23      [7] AdWords is a program run by Google, in which a company instructs Google it wants its
24   ads "to show up based on searches that users do, and when Google users conduct those
     searches, if you're one of the highest bidders on that [search] term, your ad, together with a link
25   to your site will show up . . . .  And if a user clicks on your ad, then the user is taken to whatever
     URL you've directed or included, and you pay Google for that referral."  Ex. 34 (Harrison) at
26   219:8-220:3.

27      [8] *See also* Ex. 39 (Thru 30(b)(6)) at 59:16-22 ("Q. So the idea was to find people searching
     for my client [Dropbox, Inc.] using keyword advertising and get them to come to Thru's web
28   site? … A. I believe that was the intention."); Ex. 34 (Harrison) at 240:19-23; Ex. 38 (February
     2012 internal Thru email: "What can we do to entice those folks that are looking for Dropbox
     the company?"); Ex. 36 (Fernandez) at 38:6-10, 66:11-15.  When a consumer contacted Thru
     (continued...)

It was Dropbox, Inc., not Thru, that finally brought this dispute to a head by filing a declaratory relief action in April 2015.  Dkt. No. 1.  Thru moved to dismiss in bad faith, telling the Court there was no actual controversy while admitting internally that there was.  *Compare* Dkt. No. 19 at 6:17 ("There is no justiciable case or controversy for the Court to resolve.") *with* Ex. 56 (███████████████████████████████Redacted█████████████████████████████████ ███████████████████████████████); Ex. 59 ("the judge certainly was correct there is controversy between the parties"), and Ex. 34 (Harrison) at 199:3-18.  After the Court denied Thru's motion, its CEO told his Board that the litigation and its merits were immaterial:

> **The closer to the IPO the better[,] nothing else will matter, court battles mean nothing.**

Ex. 58 (emphasis added); *see also* Ex. 57.  Thru counterclaimed for trademark infringement and related claims in August 2015, but requests only injunctive relief.  Dkt. No. 33.

ARGUMENT

## I.     THE SUMMARY JUDGMENT STANDARD

Summary judgment should be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to decide for the nonmovant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  Where a party has the ultimate burden of proof, its opponent may prevail on summary judgment by pointing to the party's failure "to make a showing sufficient to establish the existence of an element essential to [the party's] case [.]"  *Celotex Crop. v. Catrett*, 477 U.S. 317, 322 (1986).

Thru asserts three counter-claims for infringement of its supposed "dropbox" trademark under the Lanham Act §43(a), California Business and Professions Code § 17200 and California common law, as well as a counter-claim for cancellation of Dropbox, Inc.'s DROPBOX trademark registration on the ground that Thru allegedly has senior rights.  *See* Dkt. No. 33, ¶23.

---

(...continued from previous page)
with a problem regarding their Dropbox, Inc. account, Thru's representative credited Thru's search engine optimization with causing the confusion, took that as a positive, and forwarded the exchange to Thru's CEO.  Ex. 52 ("[T]he positive is that it validates our SEO is working.").

1  Thru bears the burden to prove that it has valid and protectable trademark rights to enforce

2  against Dropbox, Inc. *Yellow Cab Co./Sacramento v. Yellow Cab/Elk Grove,* 419 F. 3d 925 (9th

3  Cir. 2005).  That burden is particularly high given Dropbox, Inc.'s presumptive ownership and

4  right to use its registered trademark.  *See* 15 U.S.C. §§1115(a), 1057(b).  Because Thru cannot

5  prove it has valid or senior rights in "dropbox" to assert against Dropbox, Inc., and because Thru

6  is undeniably guilty of laches, all of its claims should be dismissed.  *Aero Turbine, Inc. v.*

7  *Aeroturbine, Inc*., 76 F. App'x 768, 2003 U.S. App. LEXIS 16396 (9th Cir. 2003); *Seltzer v.*

8  *Green Day, Inc*., 725 F.3d 1170, 1180 n.1 (9th Cir. 2013); *Akhenaten v. Najee, LLC*, 544 F.

9  Supp. 2d 320, 333 (S.D.N.Y. 2008).

10  **II.      THRU HAS NO RIGHTS TO ASSERT AGAINST DROPBOX**

11       **A.       Thru Did Not Use "Dropbox" as a Trademark**

12       Thru's claims fail for the most basic reason: it has no trademark rights in the word

13  "dropbox," because it did not use the term as a trademark.

14       A word functions as a trademark when it is used by a source of a product to
         identify itself to the public as the source of its product and to create in the public
15       consciousness an awareness of the uniqueness of the source and of its products.  A
         party's failure to use a term as a trademark prevents that party from acquiring
16       trademark rights in the word.

17  *Edsal Mfg. Co. v. Vault Brands, Inc*., 2012 U.S. Dist. LEXIS 163479, at *14-19 (N.D. Ill. Nov.

18  15, 2012); *see also Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59

19  F.3d 902, 906-07 (9th Cir. 1995) ("Implicit in the concept of a trade mark 'is a requirement that

20  … it be used in such a manner that it would be readily perceived as identifying such services.'");

21  *Rock & Roll Hall of Fame v. Gentile Prods*., 134 F.3d 749, 753 (6th Cir. 1998) (alleged

22  trademark must be used to "perform[] the trademark function of identifying the source of the

23  merchandise to the customers."); *Smith v. M & B Sales & Mfg*., 1990 U.S. Dist. LEXIS 1310, at

24  *31-33 (N.D. Cal. Jan. 31, 1990) (test asks: "[W]ould the term be perceived as a source of

25  origin?"); 15 U.S.C. §1127 (defining "trademark" as term used "to identify and distinguish"

26  goods or services).  Thru cannot carry its burden of proving the requisite trademark use.  *See FW*

27  *OmniMedia Corp. v. Toyota Motor Sales U.S.A., Inc.*, 2004 U.S. Dist. LEXIS 27464, at *22-24

28  (C.D. Cal. Dec. 8, 2004) (party must show it "made commercial use of the alleged mark that is

1    'sufficiently public' that the marked goods are 'identified or distinguish[ed] . . . in an appropriate

2    segment of the public mind as those of [the adopter of the mark].'").

3           Thru claims to have acquired trademark rights in "dropbox" by putting the word on its

4    website, and using it to name a functionality in its software.  Ex. 34 (Harrison) at 82:14-83:11.

5    But its mere invocation of the word in connection with its product is not nearly enough.  Rather,

6    Thru must prove that it used "dropbox" to identify its product uniquely to the public and to

7    distinguish it from others.  *See FW OmniMedia*, 2004 U.S. Dist. LEXIS 27464, at *22-24; *M &*

8    *B Sales*, 1990 U.S. Dist. LEXIS 1310, at *31-33 ("Plaintiffs have adduced no evidence that tends

9    to support an inference that purchasers recognize the slogan in issue here as a source indicator.").

10   There is nothing remotely like that here.

11          As shown above, Thru's own marketing materials regularly used the word "dropbox" to

12   refer: (i) to the file transfer functionality in the products of its competitors; (ii) to Dropbox, Inc.

13   specifically; and (iii) to file transfer functionalities generally.  *Supra* at 5:20-6:4, n.3, n.4.  In one

14   particularly damning marketing presentation, Thru likened the word "dropbox" to other terms

15   such as "secure file transfer," "managed file transfer," and "online collaboration," stating:

16   "[w]hat these terms all have in common is the fact they often are all used to describe online file

17   transfer/exchange of files and messages."  Ex. 32.  Further, from the outset, Thru presented its

18   customers' brand names and logos alongside the word "dropbox" on the public-facing webpages

19   where the dropbox functionality was offered.  Ex. 69.  Thus, rather than foster public association

20   of "dropbox" with Thru, it fostered association of the word with its customers' brands.  All of

21   this is flatly inconsistent with the requirement that Thru have used the term to uniquely identify

22   the source of its product or product feature.[9]

23   _____

24          [9] Owing to what Thru's CEO called "management failures," Thru failed for more than a
     decade to instruct its employees on how to use "dropbox" consistently to promote an association
25   between the word and Thru.  Ex. 34 (Harrison) at 111:9-17, 112:10-113:6.  When Thru did use
     "dropbox" to refer to the function in its product, its use was wildly inconsistent.  Sometimes it
26   was "Secure Dropbox" or "Thru Secure Dropbox" or "Dropbox Enterprise File Transfer" or
     "Dropbox Services" or a host of other variations.  Ex. 30 (Skybakmoen I) at 103:16-23, 115:5-
27   9; Ex. 34 (Harrison) at 107:1-10; *see also* Ex. 40 (Rog No. 14).  Sometimes Thru presented it as
     two words ("Drop Box"); other times it was one word with two capital letters ("DropBox"), or
28   only an initial capital letter ("Dropbox"), or no capital letter at all ("dropbox").  *See, e.g.*, Exs.
     72, 73, 74; *see also* Ex. 31 (Skybakmoen II) at 231:20-232:16.

1    Thru was also plainly content to allow anyone and everyone to use the term

2    "dropbox."  Although it was aware for years of a dozen companies, including several direct

3    competitors, using "dropbox" to describe a file transfer functionality in their own products, Thru

4    took no action against any of them.  *See supra* 6:5-10.  And of course, Thru did not seek to

5    register a trademark for "dropbox" until it hatched its scheme to obtain payment from Dropbox,

6    Inc. in late 2011, (just before Thru's CEO proclaimed: "New development turns out we own the

7    term Dropbox").  Ex. 47.  That is not how trademarks work.  They are not "newly developed"

8    when a company has used an ordinary word in connection with a product and, long after-the-

9    fact, decides to try to extract payment from a far more successful company.[10]

10    No reasonable fact finder could conclude that Thru used the term "dropbox" as a source

11    identifier for Thru or its product.  For this reason alone, Thru's claims fail as a matter of law.

12    **B.    "Dropbox" is Descriptive and Thru Has Not Established Secondary**
     **Meaning**

13

14    Even if Thru had used "dropbox" as a trademark, it would still have no rights to assert

15    against Dropbox.  That is because the word "dropbox," as applied to the file transfer function in

16    Thru's product, is merely descriptive, and Thru never developed secondary meaning in it.

17    To be valid and protectable, a trademark must be "distinctive" in relation to the goods

18    and services it identifies.  *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002).

19    Whether a trademark is distinctive and protectable depends on its categorization on the

20    "spectrum" of distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or

21    (5) fanciful.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).  Marks in the

22    latter three categories are inherently distinctive and entitled to protection automatically upon

23

24    [10] Thru will presumably point to the fact that over the years it sometimes, but not
     consistently, attached the notation "TM" to some of the varied formulations it tried.  But that

25    window dressing is irrelevant, even if Thru's intent was to claim some formulation as a
     trademark.  *Seybert v. Nat'l Ctr. for Missing & Exploited Children*, No. 6:09-CV-169, 2009

26    U.S. Dist. LEXIS 103452, at *5-6 (E.D. Tex. Aug. 10, 2009) (The "mere addition of the
     trademark symbol is not sufficient to transform the non-trademark use into trademark use."); *In*

27    *re Remington Prods. Inc.*, 3 U.S.P.Q.2d 1714, 1715 (T.T.A.B. Jan. 29, 1987) ("Mere intent that
     a term function as a trademark is not enough in and of itself, any more than attachment of the

28    trademark symbol would be, to make a term a trademark. . . . Use of the letters 'TM' on a
     product does not make unregistrable matter into a trademark.").

1  adoption as a trademark because "their intrinsic nature serves to identify a particular source of a

2  product[.]"  *Id*.  At the other end of the spectrum, generic terms are never entitled to protection

3  because they reflect the common name of a product or service, not its source.  *See id.* at 768.

4          Descriptive marks fall in the middle.  They are not inherently distinctive and are

5  therefore not protectable upon adoption because they describe the product itself rather than

6  identifying the *source* of the product.  *Lahoti v. VeriCheck, Inc*., 586 F.3d 1190, 1198 (9th Cir.

7  2009).  Thus, SAND HILL ADVISORS is descriptive for an advisory service on Sand Hill

8  Road; AERO TURBINE is descriptive for an aircraft turbine business; and JAPAN TELECOM

9  is descriptive for a business that offers telecommunications services to the Japanese community.

10  *See Aero Turbine, Inc.*, 76 F. App'x 768, 2003 U.S. App. LEXIS 16396, at *2; *Japan Telecom,*

11  *Inc. v. Japan Telecom America, Inc.*, 287 F.3d 866, 873 (9th Cir. 2002); *Sand Hill Advisors, LLC*

12  *v. Sand Hill Advisors, LLC*, 680 F. Supp. 2d 1107 (N.D. Cal. 2010).

13          A descriptive mark can only become distinctive and protectable if it is used sufficiently

14  and prominently in commerce such that consumers come to associate it with a particular source

15  or sponsor.  *Two Pesos, Inc.*, 505 U.S. at 769.  This association is "secondary meaning."  *Id*.  A

16  party claiming senior trademark rights must establish secondary meaning *before an alleged*

17  *infringer began using the mark.  See Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1358

18  (9th Cir. 1985); 2 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 16:34 (4th

19  ed. 2002) ("[T]he senior user must prove the existence of secondary meaning in its mark at the

20  time and place that the junior user first began use of the mark.").  Thru cannot make that

21  showing.  It never developed secondary meaning in "dropbox," much less before Dropbox, Inc.

22  began using "dropbox" more than eight years ago.

23          **1.      "Dropbox" Is Merely Descriptive**

24          That "dropbox" is descriptive as used by Thru is beyond dispute given the record in this

25  case.  Thru itself admitted that it used "dropbox" in its public-facing materials to describe a file

26  functionality both in its own product and in those of its competitors.  Ex. 34 (Harrison) at 38:17-

27  25, 82:14-18 ("Q. So your use of the word dropbox on the Thru website on May 24, 2004 was to

28  describe a functionality in your product.  Is that correct?  A. That's correct."); Ex. 39 (Thru

30(b)(6)) at 20:16-21:2 ("Q. So in marketing material for potential customers in 2014, Thru used the term 'Dropbox' not as a reference to its own brand, but, rather, to describe a functionality, right?  A. It appears that way."); *see also supra* 5:20-6:4, n.3, n.4.  Thru even prepared a public marketing presentation expressly calling out the term "dropbox" as "often [] used to describe online file transfer/exchange of files and messages."  Ex. 32 at 4.  As Thru's former Marketing VP explained, "dropbox" is a word "used by people to describe the functionality in which a file is being moved."  Ex. 31 (Skybakmoen II) at 300:3-10.

Thru is entirely correct.  By the time it claims to have started using "dropbox" in 2004, "dropbox" was in common parlance.  *See* Exs. 80-84 (books, news articles, trademark applications, educational/university websites, research papers, and manuals).  The host of services that use "dropbox" to describe the file transfer functionalities in their own products leaves no doubt that the term is descriptive for such purposes.  *Supra* n. 5, 4:4-19 (at least Apple, Blackboard, Officeware, Syncplicity, Intralinks, YouSendIt and DG Systems).  Indeed, the PTO said exactly that when it rejected as "merely descriptive" an application for the mark DROPBOKS for "electronic storage of files and documents."  Ex. 76  ("This term is widely used by others to name similar storage services, that allow users to store or place files in a digital drop box for retrieval later, or for sharing."); *see also* Ex. 75 (PROMOTER DROP BOX "merely describes a characteristic, feature or function of applicant's goods and/or services.").

The Ninth Circuit's prevailing test for descriptiveness further confirms the conclusion.  Under its "imagination test," courts are to ask whether imagination or a mental leap is required to understand the nature of the product or service being offered; if not, the mark is descriptive.  *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1218 (9th Cir. 1987).  No imagination is required to understand the use to which Thru puts "dropbox."  The term is defined to refer to a box or receptacle into which documents, books, clothes, etc. are deposited, such as at a library, courthouse, or bank.  Ex. 79; *see, e.g.*, N.D. Cal. L.R. 5-4 ("Drop Box Filings").  Thru's CEO adopted the Google dictionary definition: "a secured receptacle into which items such as returned books or videotapes, payments, keys or donated clothing can be deposited."  Ex. 34 (Harrison) at 30:25-32:12; *see* Ex. 79 (Google dictionary definition).  He then agreed that the

1  functionality in Thru's product called "dropbox" serves exactly that role.  Ex. 34 (Harrison) at

2  32:9-12.  ("Q. Thru labeled something that served the function of a dropbox . . . with the word

3  dropbox in its FTH software.  Right?  A.  I think that's correct.").  No mental leap was

4  necessary, nor would one be by others.  *See Bada Co v. Montgomery Ward & Co*., 426 F.2d 8,

5  11 (9th Cir. 1970) (relying on appearance of term in dictionaries to show descriptiveness).  For

6  this reason as well, Thru's claimed mark in "dropbox" is merely descriptive.[11]

7  **2.  Thru Has Not Established Secondary Meaning in "Dropbox"**

8  Because "dropbox" is descriptive, Thru has no rights in the term to enforce against

9  Dropbox, Inc. unless it proves that it acquired secondary meaning in the mark *before Dropbox,*

10  *Inc. began to use it in 2008*.  That is a showing Thru cannot possibly make.

11  To determine whether a descriptive mark has acquired secondary meaning, courts

12  consider:  "(1) whether actual purchasers of the product bearing the claimed trademark associate

13  the trademark with the producer, (2) the degree and manner of advertising under the claimed

14  trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the

15  claimed trademark has been exclusive."  *Church & Dwight Co. v. Mayer Labs, Inc*., 868 F.

16  Supp. 2d 876, 926 (2012) (Chen, J.).  All show a lack of secondary meaning here.

17  *Thru has not consistently used "dropbox" as a trademark or exclusively*.  As discussed

18  *supra* at 11:12-13:11, Thru has not consistently used "dropbox" as a trademark, but instead as a

19  general descriptive term to refer to its own product functionality, third-party functionalities, and

20  Dropbox, Inc.  Indeed, even after Thru decided to claim trademark rights in "dropbox" in late

21  2011 to try to extract payment from Dropbox, Inc., Thru still failed to use "dropbox"

22  consistently as a trademark, to use it with consistent terminology (e.g., "Secure Dropbox" versus

23  "Thru Secure Dropbox" versus "Dropbox Enterprise File Transfer" versus "Dropbox Services"),

24  or even to spell or capitalize it consistently.  *Supra* n.9.  It certainly did not use the term

25

26  _____

27  [11] Under the Ninth Circuit's alternative, "competitors need" test, the same result obtains.
    *See Entrepreneur Media*, 279 F.3d at 1143 (Need of others in the marketplace to use the word to
    describe their goods confirms a mark is descriptive; "[w]idespread use of a word by others may
28  serve as confirmation of the need[.]").  The host of services using "dropbox" and the ubiquity of
    the term in industry literature is dispositive.  *Id.*

1    exclusively, and never took enforcement actions against others using "dropbox."  In short, it

2    failed to establish a unique association between itself and a claimed "dropbox" trademark.

3        *Purchasers do not associate "dropbox" with Thru*.  Thru's former VP of Marketing

4    admitted that even as of 2011 – seven years after Thru claims to have adopted "dropbox" –

5    purchasers did not associate it with Thru.  Ex. 30 (Skybakmoen I) at 83:12-16 ("Q. [W]as the

6    Dropbox name as Thru was offering it, something that was well-known in the marketplace?  A.

7    No.").  Given Thru's various descriptive and inconsistent uses of the term that is hardly

8    surprising.  As noted, Thru went so far as to foster association of the term with its *customers*'

9    brands (as opposed to its own), the opposite of what one would do to establish a unique

10   association of a mark with oneself.  Ex. 69; Ex. 34 (Harrison) at 116:3-21, 118:20-119:11;

11   Ex. 31 (Skybakmoen II) at 302:9-21.  As the dictionary definitions, competitor use and

12   widespread descriptive use make clear, the public perceives "dropbox" as describing general file

13   transfer functionality or referring to Dropbox, Inc.  They do not associate it with Thru.[12]

14       *Thru did not advertise "dropbox."*  Thru never marketed its "dropbox" functionality.  Ex.

15   34 (Harrison) at 88:5-7 ("Q. Do you recall that Thru ever specifically promoted the dropbox

16   functionality itself?  A. I don't recall.  I don't think we did.").  Nor did its use of the term benefit

17   from media attention or awards.  Ex. 39 at 120:6-12.  This failure to promote "dropbox" as a

18   trademark is consistent with Thru's failure to use or even consider "dropbox" to be a trademark

19   except insofar as it could be used to leverage a payout from Dropbox, Inc.

20       There is no genuine dispute that Thru failed to acquire secondary meaning in the

21   descriptive term "dropbox."  Because Thru cannot meet its burden to establish valid rights in

22   "dropbox," its claims against Dropbox, Inc. should be dismissed.

23

24   _____

25       [12]  In August 2011, Thru had contemplated search engine advertising, and its executives
     brainstormed lists of terms that Thru "cared about" and "wanted to capitalize on" at that time.
26   Ex. 36 (Fernandez) at 31:16-34:13; Ex. 37. The word "dropbox" was not on any of six different
     lists of such words in August 2011.  *Id.*  Even later, in June 2012, a company that Thru engaged
27   to assist in its search engine optimization efforts analyzed Thru's website to identify the terms
     on the site that search engines would associate with Thru.  It called this Thru's "Keyword
28   Competency."  As of June 2012, the report showed no "keyword competency" for Thru and the
     term "dropbox." Ex. 70; Ex. 39 (Thru 30(b)(6)) at 50:23-52:6.

1    **III.    EVEN IF THRU HAD TRADEMARK RIGHTS, DROPBOX WOULD BE THE**
     **SENIOR USER**

2

3         If Thru could somehow overcome its lack of trademark rights, whether because it can

4    prove "dropbox" is suggestive, or because it can show it established secondary meaning, its

5    claims against Dropbox, Inc. would still fail as a matter of law.  By virtue of the agreement

6    Dropbox, Inc. entered with Officeware to resolve their 2011 litigation, Dropbox, Inc. would have

7    rights senior to any that Thru could gin up.

8         Officeware and Thru used the word "dropbox" in file management software product to

9    describe the "same" file transfer functionality.  Ex. 67.  Officeware first used "dropbox" in

10   commerce months before Thru.  Officeware began providing services, including a prominent

11   "dropbox" functionality, to the City of Flower Mound, Texas in January 2004.  Ex. 8

12   (Officeware 30(b)(6)) at 27:11-18, 23:9-25:8, 26:18-24, Ex. 9, Ex. 10.  That is earlier than the

13   May 2004 date claimed by Thru.  *See* Ex. 67; Ex. 39 (Thru 30(b)(6)) at 35:10-16; Ex. 34

14   (Harrison) at 82:14-18.  Thus, if "dropbox" is suggestive and its mere invocation is sufficient to

15   establish trademark rights, Officeware, not Thru, would be the senior user.

16        Officeware's use of "dropbox" was also considerably more prominent and substantial

17   than Thru's.  Officeware highlighted the Dropbox feature on its homepage continuously starting

18   in August 2004, issued press releases promoting the Dropbox feature (including one republished

19   by Forbes.com in 2005), and dedicated a blog post to the feature in 2008.[13]  Officeware also

20   applied to register a trademark in "Dropbox" in April 2010.  Ex. 4.  Thru did none of that, and

21   truly nothing at all until late 2011.  Here too, if Thru's meager use of the descriptive term

22   "dropbox" was sufficient to establish secondary meaning, Officeware again was first.

23        Officeware transferred to Dropbox, Inc. whatever trademark rights it had in "dropbox,"

24   together with any goodwill, in the settlement agreement that ended the parties' 18-month

25

26   _____

27       [13]  *See* Ex. 8 (Officeware 30(b)(6)) at 34:5-51:17, 53:19-54:1, Exs. 11-22 (continual
     presence of "Dropbox" on the front page of the Officeware website from August 2004 to March
28   2013); Ex. 8 (Officeware 30(b)(6)) at 58:11-63:8, Exs. 23-25 (press releases); *see also* Ex. 8
     (Officeware 30(b)(6)) at 63:16-64:23, Ex. 26 (blog post).

1  trademark litigation.  Ex. 7.[14]  Dropbox, Inc. thus stands in Officeware's shoes, and would have

2  seniority over Thru if Thru had rights in "dropbox."  *Tillamook County Creamery Ass'n v.*

3  *Tillamook Cheese and Dairy Ass'n*, 345 F.2d 158, 161-62 (9th Cir. 1965) (party enjoys the

4  priority of its predecessors); 3 McCarthy § 18:15 (4th ed. 2002) ("All courts follow the rule that

5  after a valid assignment, the assignee acquires all of the legal advantages of the mark that the

6  assignor enjoyed, including priority of use.").  For this additional reason, Thru's claims fail as a

7  matter of law.

8  **IV.    THRU'S CLAIMS ARE BARRED BY LACHES**

9       If Thru could overcome both its lack of trademark rights, and Dropbox, Inc.'s seniority,

10  Thru's claims would still fail because Thru unreasonably sat on its rights for six years while

11  Dropbox, Inc. developed the "Dropbox" brand.  "Laches is an equitable time limitation on a

12  party's right to bring suit, resting on the maxim that one who seeks the help of a court of equity

13  must not sleep on his rights."  *Jarrow Formulas, Inc. v. Nutrition Now, Inc*., 304 F.3d 829, 835

14  (9th Cir. 2002).  Laches bars injunctive relief and operates as defense to all of the claims Thru

15  asserts in this action.  *Id.* at 840; *Fitbug Ltd. v. Fitbit, Inc.,* 78 F. Supp. 3d 1180, 1186 (N.D. Cal.

16  2015) (Conti, J.).  The issue is often resolved on summary judgment.[15]

17       To establish laches, a party charged with infringement must show that: (1) the claimant

18  unreasonably delayed in bringing suit; and (2) that delay caused prejudice to the alleged

19  infringer.  *See Jarrow*, 304 F.3d at 835.  That test is easily met here.  Thru's claims are

20  presumptively barred because it failed to bring them for more than six years, well beyond the

---

21

22       [14] The settlement agreement resolved a bona fide dispute between the parties regarding the
term "dropbox," and thus establishes the transfer of goodwill required for a valid assignment.

23  *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1289 (9th Cir. 1992) (settlement
of a bona fide trademark litigation effectuates the requisite transfer of goodwill associated with

24  a mark).  The assignment of goodwill also is independently established by the similarity of the
services offered by Officeware and Dropbox, Inc., which both offer file sharing, collaboration

25  and storage tools to individuals and businesses.  *See* Ex. 8 (Officeware 30(b)(6)) at 13:20-14:18;
*see also Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank*, 696 F.2d 1371, 1376 (Fed. Cir.

26  1982) (assignment of mark and goodwill valid where both companies offered check cards,
despite assignee's "significantly expanded" business); *Brady v. Grendene USA, Inc.*, No. 3:12-

27  cv-0604-GPC-KSC, 2015 U.S. Dist. LEXIS 72551, at *23 (S.D. Cal. June 3, 2015).

       [15] *See, e.g., Grupo Gigante S.A. de C.V. v Dallo & Co.,* 391 F.3d 1088, 1105 (9th Cir. 2004)

28  (affirming summary judgment of laches in Lanham Act case); *Danjaq LLC v. Sony Corp*., 263
F.3d 942, 960 (9th Cir. 2001)(same); *Jarrow Formulas, Inc*., 304 F.3d at 842 (same).

1   limitations period on which laches depends.  During Thru's long delay in filing suit, Dropbox,

2   Inc. expended years of effort and hundreds of millions of dollars to develop the "Dropbox"

3   brand.  And unlike the usual case where delay results from inadvertence, in this case, delay

4   results from Thru's deliberate scheme to enrich itself.  Thru adopted a strategy of delay – its

5   "slow walk" to an anticipated Dropbox IPO – to maximize the prejudice to Dropbox and the

6   payoff for itself.  Ex. 57; Ex. 51.  Accordingly, laches bars Thru's claims against Dropbox, Inc.

7       **A.      Thru Delayed Six Years to File Suit**

8           In assessing delay, the Court must consider (1) the length of the delay, and (2) whether it

9   was unreasonable.  *Jarrow*, 304 F.3d at 835.  To measure the length of the delay, courts apply an

10  objective "knew or should have known" standard in which laches may arise from either actual or

11  constructive knowledge. *Id*. at 838.  "The constructive knowledge standard imposes on a

12  trademark owner the duty to police its rights against potential infringers." *Saul Zaentz Co. v.*

13  *Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1110-11 (N.D. Cal. 2008); *Grupo Gigante Sa De*

14  *CV*, 391 F.3d at 1102 ("Companies expecting judicial enforcement of their marks must conduct

15  an effective policing effort.").  The inquiry focuses on when a claimant should have been aware

16  of its claim, and charges it with the knowledge it may have received if it diligently sought to

17  enforce its rights.  *Jarrow*, 304 F.3d at 838; *Saul Zentz Co.*, 627 F. Supp. at 1109-10.

18          Thru dissembled when asked when it first became aware of Dropbox.  It swore falsely in

19  an interrogatory response that it only learned of Dropbox, Inc. in mid-2011.  Ex. 40 (Rog No.

20  12); Ex. 34 (Harrison) at 161:25-162:4.  Its CEO then reiterated that falsehood in deposition: "Q.

21  So you're telling me that the CEO of a company in the file transfer and storage business hadn't

22  heard of Dropbox, Inc. before the summer of 2011 by which time it had roughly 40 million

23  users?  A. That's correct." Ex. 34 (Harrison) at 136:25-138:20.  In truth, as its CEO was later

24  forced to admit, Thru learned of Dropbox, Inc. in "competitive analysis" at least as early as June

25  9, 2009.  *Id.* at 157:21-159:16, 161:17-21.  Thru's executives discussed Dropbox, Inc. twice that

26  same week, the second time touting it as "very prominent."  Ex. 43.

27          The threat to Thru was obvious: Dropbox, Inc. was using the identical name in

28  connection with a similar product to serve the same or similar customers, and by that point in

1    time already had more than a million customers, a virally expanding customer base, and

2    significant media attention.  *See supra* at 3:6-14.  Thru's corporate designee testified that even

3    then, Dropbox, Inc. was "overwhelmingly an obvious violation of our [sic] what we believe is

4    our trademark."  Ex. 50; Ex. 39 (Thru 30(b)(6)) at 139:18-140:25 ("It was an opinion at that

5    time").  Yet Thru sat on its supposed rights, and did nothing.  A few months later, Thru learned

6    that it had lost a customer to Dropbox, Inc., but still did nothing.  Ex. 44 (January 2010).

7            These undisputed facts establish that Thru actually knew (and certainly should have

8    known) of a potential claim against Dropbox, Inc. at least as of June 9, 2009.  *See Fitbug Ltd.,* 78

9    F. Supp. 3d at 1187-88 (trademark plaintiff should have known of potential claim because

10   defendant was selling similar devices in the same area under a similar name.)  Yet Thru waited

11   more than six years – until August 15, 2015 – *after* Dropbox, Inc. instituted the current

12   declaratory judgment action – to file counterclaims against Dropbox, Inc.

13           **B.     Thru's Six-Year Delay is Unreasonable and Inexcusable**

14           Because the Lanham Act does not have its own statute of limitations, courts consider the

15   reasonableness of delay in light of the statute of limitations that applies to the most closely

16   analogous state-law claim.  *Jarrow Formulas*, 304 F.3d at 838.  If any part of the allegedly

17   infringing conduct occurs outside the limitations period, the delay is presumed to be

18   unreasonable.  *Id.* at 836-37.  The most analogous state law claim here is common law trademark

19   infringement, which is subject to California's two-year statute of limitations for tort claims under

20   California Code of Civil Procedure §339.  *See Fitbug*, 78 F. Supp. 3d at 1189-90 (finding

21   "meritorious" defendant's argument that two-year period applied without deciding the issue).[16]

22   Thru's six year delay in bringing suit is therefore presumptively unreasonable.[17]

23   _____

24       [16] In considering the length of the laches period, the *Fitbug* court acknowledged that prior
     Ninth Circuit cases relied on California's four-year catch-all statute of limitations, but without

25   "actually analyz[ing] the question in depth," and in nearly all such cases, "the parties agreed that
     using the four-year period was appropriate."  *Id.* at 1189.  The *Fitbug* court ultimately did not

26   need to decide the issue since the plaintiff's delay was presumed unreasonable even under the
     longer imitations period.  The same is true here:  Thru's six year delay is presumptively

27   unreasonable whether the 2- or 4-year limitations period applies.

         [17] Thru did request cancellation of Dropbox, Inc.'s federal trademark registration in February

28   2014.  Ex. 29.  But even that administrative action came at least four and a half years after-the-
     fact, putting it well outside the applicable limitations period.  Moreover, as Thru has stated

                                                                                        (continued...)

1    The only excuse Thru has concocted for its delay is some vague notion that it did not

2    make business sense for Thru to take action against Dropbox, Inc. (or any of the others using the

3    term "dropbox").  Ex. 39 (Thru 30(b)(6)) at 144:7-145:11.  That is no excuse at all.  *See Gillons*

4    *v. Shell Co. of Cal.*, 86 F.2d 600, 606 (9th Cir. 1936) ("[P]overty is no excuse for delay in filing

5    suit."); *Avocet Sports Tech. Inc. v. Polar Electro Inc.*, No. C -12-02234 EDL, 2013 U.S. Dist.

6    LEXIS 59577, at *19 (N.D. Cal. Apr. 16, 2013) ("Plaintiff's lack of funds does not excuse its

7    delay.").  Thru knowingly elected not to enforce its supposed trademark rights for years, and

8    watched as Dropbox, Inc. invested to build a globally-recognized brand serving hundreds of

9    millions of users.  There is no legitimate excuse for such prolonged inaction.

10    Further, no excuse would be credible.  Thru's own documents reveal that the reason it sat

11    on its supposed rights was greed.  It thought it could obtain maximum value by laying in wait

12    and trying to hold hostage a Dropbox, Inc. IPO.  Thru's CEO put it bluntly:

13        The best leverage we have is to sit tight and wait to the IPO announcement and be
          prepared to file suit that day and make as much noise as we can about it.  That will
14        cost them market cap.

15    Ex. 51; Ex. 53 ("The longer they delay a discussion, the higher the impact on the IPO and the

16    leverage we have."); Ex. 58 ("[t]he closer to the IPO the better"); Ex. 57 ("slow walk[]" to the

17    IPO "is all that is important").  In other words, Thru wanted the jackpot for its "lottery ticket" to

18    grow.  *See* Ex. 39 (Thru 30(b)(6)) at 133:13-24  ("Thru was waiting for Dropbox to announce an

19    IPO so Thru could file a lawsuit that day because that's what Thru [thought] would afford it the

20    biggest payoff…"); Ex. 34 (Harrison) at 184:9-16, 186:13-187:9; Ex. 55 (Thru CEO email to

21    brother in January 2015: "last pre-money round for Dropbox was $10B, so this is fantastic news

22    for our trademark value…They will not want to file an S1 without clear title to the

23    trademark. ☺").  Thru's machinations present a better-than-textbook case of laches.

24

25    _____
                    (…continued from previous page)
26    repeatedly, that proceeding was not challenging Dropbox, Inc.'s right to the use the mark.  *See*
      Dkt. 19 (Thru Mtn. to Dismiss) at 2 ("Thru has not and does not contest [Dropbox, Inc.'s] use of
27    the DROPBOX mark."), 5, 7.  In other words, Thru never suggested to Dropbox, Inc. that its use
      of its name was at risk.  Thru had known at least since 2011, that even if a cancellation
28    proceeding were successful, that would not prevent Dropbox, Inc. from using the name; a lawsuit
      would be required for that.  Ex. 34 (Harrison) at 175:20-176:5.

### C.   The *E-Systems* Factors Confirm That Thru's Delay Was Unreasonable

The Ninth Circuit has identified a number of additional factors than can bear on the laches question.  *See E-Systems, Inc. v. Monitek, Inc*., 720 F.2d 604, 607 (9th Cir. 1983).  Here, where the evidence demonstrates beyond dispute that Thru's extended delay was motivated by avarice, consideration of these factors should be superfluous.  Regardless, the factors confirm the unreasonableness of Thru's failure to act, and the propriety of a laches determination.

*Strength and Value of the Parties' Respective Trademark Rights.*  There is no question that the value to Dropbox, Inc. of its "Dropbox" trademark far outweighs whatever value, if any, Thru has in the word.  *See Fitbug*, 78 F. Supp. 3d at 1193 (finding "Fitbit's mark is substantially more valuable by virtue of its 'rapid and continuing growth' relative to Fitbug.") (citing *E-Systems*, 720 F.2d at 607).  Dropbox has spent hundreds of millions of dollars to promote the Dropbox brand and service, which is recognized worldwide and is the subject of a federal trademark registration.  Thru itself has valued Dropbox, Inc.'s continuing right to use its trademark in the billions of dollars. Ex. 61 (███████████████Redacted███████████████

███████.  By contrast, if Thru has acquired any trademark rights from its descriptive, inconsistent and haphazard use of "dropbox," they are of negligible value.

*Plaintiff's Diligence in Enforcing Mark*.  Thru was as negligent as a supposed trademark owner could be with respect to policing its claimed rights in "dropbox."  Despite its awareness of use of the word by Dropbox, Inc. and many other competitors, Thru took no action whatsoever. It never even threatened to enforce its rights, let alone sent demand letters or initiated litigation. *See supra* 6:5-10 n.5; Ex. 39 (Thru 30(b)(6))  at 143:10-19.

*Harm to Senior User If Relief Is Denied*.  Assuming Thru were the senior user of "dropbox," the only harm it would suffer if its prayer for injunctive relief fails is the loss of the windfall it has long imagined.  Thru admits it has no evidence of any lost sales to Dropbox, Inc. due to supposed confusion. Ex. 39 (Thru 30(b)(6)) at 118:1-5 ("Is Thru aware of a single sale that it lost to Dropbox over supposed confusion in a potential customer caused by my client's use of the name Dropbox? A. No.").  Indeed, Thru elected not to pursue a claim for damages in this action, and cannot prove any injury that it is supposedly suffering from Dropbox, Inc.'s use

of the term. *Id.* at 118:6-119:24.  Further, to the extent anyone associates Thru's product with

Dropbox, Inc., discovery has shown that Thru actively cultivated that association and sought to

profit from it. *See supra* at 9:4-18, n.8.  Thru is at no risk of harm.

    *Good-Faith Ignorance by Junior User*.  Again, indulging the counter-factual assumption

that Thru has rights in "dropbox" senior to those of Dropbox, Inc., this factor too favors a laches

determination because it is undisputed that Dropbox, Inc. began using the "Dropbox" name with

no knowledge of Thru.  *See* Houston Decl. ¶5; Ex. 39 (Thru 30(b)(6)) at 120:23-121:7; *see also*

*Grupo Gigante*, 391 F.3d at 1104 (factor favors application of laches where party neither "acted

in bad faith [n]or had knowledge of" the other's use when it selected its mark).

### D.      Dropbox, Inc. Will Suffer Severe Prejudice From Thru's Delay

    "The very purpose of laches as an equitable doctrine . . . is that the claim is barred

because the plaintiff's delay occasioned the defendant's prejudice."  *Danjaq*, 263 F.3d at 955.

Prejudice typically arises where an alleged infringer took actions or suffered consequences it

would not have if plaintiff had timely brought suit.  *Id.* at 956.  Thus, a party "can make the

required showing of prejudice by proving that it has continued to build a valuable business

around its trademark during the time that the plaintiff delayed the exercise of its legal rights."

*Grupo Gigante*, 391 F.3d at 1105.  That is overwhelmingly the case here.

    Dropbox, Inc. has made massive investments in time, money, and effort to build a

worldwide success around the "Dropbox" brand.  During the six years Thru delayed filing a

lawsuit, Dropbox, Inc. spent tens of millions of dollars on marketing, acquired the dropbox.com

domain name, obtained a federal trademark registration, enforced its rights in the mark, and

resolved disputes with others over the mark.  It also grew a user base of hundreds of millions,

who associate the name "Dropbox" with Dropbox, Inc.  Dropbox, Inc.'s substantial investment

of time and money has resulted in enormous goodwill in its "Dropbox" brand.

    If Thru actually had valid and senior trademark rights, and had timely and successfully

enforced them, Dropbox, Inc. would have pursued a very different path.  It would have

conserved the millions it spent to build and protect its brand and user base, and spent it building

1   goodwill in a different name instead.  It would not be in this litigation today, facing the threat,

2   however remote, of some sort of injunction regarding its use of its name.[18]

3        This is precisely the prejudice that Thru was seeking to cause so that it could maximize

4   the ransom it sought.  And it is precisely the prejudice against which the doctrine of laches is

5   intended to protect. *See Polaroid Corp. v. Polarad Elecs. Corp*., 287 F.2d 492, 498 (2d Cir.

6   1961) ("[I]t cannot be equitable for a well-informed merchant with knowledge of a claimed

7   invasion of right, to wait to see how successful his competitor will be and then destroy with the

8   aid of a court decree, much that the competitor has striven for and accomplished."); *Danjaq*, 263

9   F.3d at 951; *Fitbit*, 78 F. Supp. 3d at 1194-95.

10        In sum, there will rarely be a more clear-cut case for the application of laches than this

11   one.  Summary judgment in favor of Dropbox, Inc. is warranted on this ground as well.

12   **CONCLUSION**

13        For the foregoing reasons, Dropbox, Inc. respectfully requests that the Court grant

14   summary judgment in its favor on the counterclaims asserted by Thru in this action.

15   Dated:  September 15, 2016           Respectfully submitted,

16                            WILSON SONSINI GOODRICH & ROSATI
                         Professional Corporation

17

18                            By:  /s/ *David H. Kramer*
                              DAVID H. KRAMER

19                            Attorneys for Plaintiff and Counter-Defendant
                         DROPBOX, INC.

20

21

22

23

24

25

26

27       [18] According to Thru, the injunction it seeks would "likely destroy" Dropbox, Inc. or at least force it "to completely start over."  Ex. 60 ("DBI's 400 million customers would be required to re-install new software (since the word "Dropbox" is embedded in the code installed on its

28   customers' customers and devices")).  However misguided Thru's views, it certainly cannot now be heard to claim Dropbox, Inc. does not face prejudice from Thru's extended delay.