# EXHIBIT 31

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

DROPBOX, INC., a Delaware ) Case No.
corporation,              ) 3:15-CV-01741-EMC (MEJ)
                          )
          Plaintiff,      )
                          )
     v.                   )
                          )
THRU INC., a Delaware     )
corporation,              )
                          )
          Defendant.      )
_____)
                          )
THRU INC., a Delaware     )
corporation,              )
                          )
          Counterclaimant, )
                          )
     v.                   )
                          )
DROPBOX, INC., a Delaware )
corporation,              )
                          )
          Counter-Defendant.)

_____

ORAL AND VIDEOTAPED DEPOSITION OF

THOMAS SKYBAKMOEN

VOLUME 2

JULY 27, 2016

_____

THOMAS SKYBAKMOEN - 7/27/2016

Page 230

1   over my role as I left.  And we had a Katie Richter

2   (phonetic).  She was only there for, like, maybe a month

3   before she was -- was fired by Mr. Harrison.  And the --

4   and just before I left --

5       Q.  Why did he fire Ms. Richter?                        10:41:18

6       A.  Because -- I mean, her competency, skills, and

7   work ethics, I think, wasn't necessarily up to the

8   level.  Yeah.

9       Q.  Okay.  And at the time you came to Thru, was

10  there a -- a formal marketing plan in place?               10:41:37

11      A.  No.  It was more done on an ad hoc level.  I

12  mean, there was a clear overall direction and strategy

13  in Mr. Harrison's head, but there wasn't, you know, a

14  25-page document describing each step and -- and

15  direction and so on.                                       10:42:01

16      Q.  And did you come to write a marketing plan of

17  that kind?

18      A.  Not to that extent, but we were asked to

19  produce some marketing plan, which Rosella started, and

20  I believe I added to that.  But I can't remember to the   10:42:12

21  extent of what that entailed.

22      Q.  Okay.  And -- and did you ever identify, from

23  the time period before you came to Thru, a marketing or

24  business plan specifically directed at the Dropbox name?

25      A.  No.                                                10:42:28

THOMAS SKYBAKMOEN - 7/27/2016

Page 231

```
 1        Q.  Okay.  After you came to Thru, did you ever
 2   become aware of a business or marketing plan
 3   specifically directed at the Dropbox name?
 4        A.  No -- well, as I said, the direction I was
 5   given after the subsequent discussion with the IP      10:42:47
 6   lawyers was to apply the Dropbox name throughout our
 7   documentation and throughout the website and -- and in
 8   e-mail signatures and -- and have them -- yeah, I guess
 9   that became part of the -- the marketing plan, to have a
10   consistent use and ensure that it was applied throughout  10:43:09
11   the company.  Not just in marketing, but also in -- as I
12   said, user guides, which goes, obviously, to existing
13   customers, within the products themselves, and -- yeah,
14   it was more of a company strategy than just -- than just
15   a marketing strategy.                                   10:43:36
16        Q.  So how did Thru spell the name "Dropbox" when
17   it used it for marketing, advertising, and promotion?
18        A.  You mean when I was there or prior?
19        Q.  Both.
20        A.  Okay.  Prior, I found some inconsistencies     10:44:06
21   where "Drop, space, Box" was used, capital "B," stuff
22   like that.  When I took over, the direction was,
23   obviously, to apply it in the same way across the board,
24   using the "TM," and -- and making sure that we had, as I
25   said, the marketing collateral, the products, as well,  10:44:37
```

THOMAS SKYBAKMOEN - 7/27/2016

Page 232

```
 1    being aligned with the naming.  Pictures used in

 2    marketing would be also trying to depict what the

 3    functionality of the product was -- was doing.

 4         Q.  Okay.  Did you come across usage of the name

 5    with a capital "D" at the beginning?                      10:44:59

 6         A.  Yeah, I mean, that, I believe, was what we

 7    used.

 8         Q.  Okay.  Did you come across usage of the name

 9    with a lowercase "D" at the beginning?

10         A.  Not that I can recall.                           10:45:12

11         Q.  Okay.  Did you come across use of the name with

12    a space in between "drop" and "box"?

13         A.  Yes, at least before I -- I was hired.

14         Q.  Okay.  And did you come across use of the name

15    with a capital "B" for Box?                               10:45:24

16         A.  Yes.

17         Q.  Okay.  Did you come across use of the phrase

18    "my Dropbox"?

19         A.  Yes.

20         Q.  Okay.  Did you come across use of the phrase     10:45:36

21    "Enterprise Dropbox?

22         A.  When I was there, it was used.  I don't think

23    it was used prior.

24         Q.  Okay.  Did you come across use of the phrase

25    "Thru Dropbox"?                                           10:45:49
```

```
 1       A.  Yes.

 2       Q.  Okay.  Did you come across use of the phrase

 3   "secure Dropbox"?

 4       A.  Yes.

 5       Q.  Did you come across use of the phrase "Thru      10:45:54

 6   secure Dropbox"?

 7       A.  Yes.

 8       Q.  Okay.  And in each of these instances, did you

 9   believe that Thru intended these phrases or references

10   to Dropbox to refer to Thru's own functionality?        10:46:10

11       A.  Yes.

12       Q.  Okay.  Did you come across references to the

13   phrase "consumer Dropbox tools"?

14       A.  I believe we used that as part of our

15   description, yes, but not as a -- as a -- as a service   10:46:24

16   or, obviously, a product that we had, no.

17       Q.  Okay.  So what does "consumer Dropbox tools"

18   refer to?

19       A.  Yeah.  Any -- any product being sold to

20   consumers, which Thru was not.                           10:46:39

21       Q.  And which companies were selling to consumers?

22       A.  Dropbox, Inc., filesanywhere, and others that

23   might have had the word "Dropbox" --

24       Q.  Was YouSendIt a consumer Dropbox tool?

25       A.  Yeah, YouSendIt was a --                         10:46:57
```

THOMAS SKYBAKMOEN - 7/27/2016

Page 236

```
 1       A.  Yeah.

 2       Q.  Was filesanywhere Dropbox-like?

 3       A.  Yeah.

 4       Q.  Okay.  Did you have any concern about the

 5   manner in which the word was being used in so many          10:49:15

 6   different forms?

 7       A.  No.  The goal was to get as many clients to our

 8   website using -- we looked at Google, like, what people

 9   were searching for.  I believe most of the -- and -- and

10   we might have actually used some of those also to refer    10:49:38

11   to our own, when I -- when I think about it now, because

12   we were looking at what people were searching for at

13   Google to make sure that the search term, when people

14   were searching for, let's say, "Dropbox functionality"

15   or searching for something, would direct to the Thru       10:49:54

16   website.

17       Q.  Okay.  So some of these were -- phrases

18   referred to Thru's functionality, as well as to third

19   parties?

20       A.  Yeah, I would say so --                            10:50:05

21       Q.  Okay.

22       A.  -- yeah, based on what I now recall.

23       Q.  Isn't it fair to say the company was not

24   consistent with how it described the Dropbox

25   functionality?                                             10:50:13
```

THOMAS SKYBAKMOEN - 7/27/2016

Page 237

1        A.  Yeah --

2        Q.  Okay.

3        A.  -- in the beginning.

4        Q.  Isn't it fair to say the company was not

5   careful with respect to how it described the Dropbox          10:50:19

6   functionality?

7             MR. CONE:  Objection.  Leading.

8        A.  Yes, when you bring up all the different terms

9   and -- and -- and -- and words being used.  Yes.  It

10   took me just a little while to get back, but yeah, we         10:50:46

11   used those phrases to direct traffic to -- to Thru.

12        Q.  (BY MR. SLAFSKY)  You mentioned that you

13   reviewed Google analytical search data?

14        A.  Yes.

15        Q.  Okay.  And you saw that Dropbox was a popular        10:51:05

16   search term?

17        A.  Yes.

18        Q.  Why did you think it was a popular search term

19   at the time?

20        A.  I guess because of your client, because of          10:51:13

21   it -- as I said, it was a term also being applied to the

22   Dropbox functionality, Dropbox competitors, Dropbox-like

23   functions.  All these terms were being searched on

24   Google.

25        Q.  You understood, though, that my client,             10:51:30

 1    Dropbox, was particularly well-known at the time?

 2         A.  Yes.

 3         Q.  And you understood, therefore, in all

 4    likelihood, many or most of the people who were

 5    searching for Dropbox were actually looking for          10:51:45

 6    Dropbox, Inc.?

 7              MR. CONE:  Objection.  Calls for

 8    speculation and opinion.

 9         A.  Yes.  I guess that's the opinion that I would

10    have made at the time.  So as --                          10:51:57

11         Q.  (BY MR. SLAFSKY)  I'm just asking for your

12    opinion.

13         A.  Yeah.

14         Q.  Okay.  You testified earlier that after you had

15    your discussion with Mr. Harrison about the Dropbox      10:52:09

16    trademark issue, Thru, as a company, came up with a

17    different strategy for use of the term; is that correct?

18         A.  Yes, I would say that's correct.

19         Q.  Okay.  And what was the overall objective of

20    that new strategy?                                        10:52:29

21         A.  As I said, the direction I was given was the

22    continuous use of the -- the word "Dropbox" and --

23    and -- and apply it in the product, working then with

24    Sergey to make sure that happened.  Because as -- in the

25    marketing team, I guess I was responsible for branding   10:52:54

THOMAS SKYBAKMOEN - 7/27/2016

Page 239

```
 1   and -- and -- and making sure user documentation, things

 2   internally, business cards, et cetera, would have the

 3   Dropbox.  And a logo was created, I remember, with a

 4   cloud, and we made the Thru Dropbox as part of that and

 5   so forth.                                                    10:53:16

 6       Q.  Okay.  And was the objective of this new

 7   strategy to paint a different picture to the

 8   marketplace?

 9       A.  That, I wouldn't be able to answer.  But the --

10   as I said, it was to at least market this fully, to the     10:53:27

11   extent of what we could, within the website and -- and

12   everywhere else.

13       Q.  Had it been marketed fully previously?

14       A.  No.

15       Q.  Had it been marketed at all previously?            10:53:48

16       A.  As I said, it had some references here and

17   there.  Looking back at the Wayback Machine, which you

18   can take the archive snapshots of the -- the webpage,

19   which was something I reviewed, obviously, to get a full

20   understanding of -- of -- of Thru, looking at prior        10:54:07

21   e-mail campaigns, documents, and so forth, no, it was

22   not.

23       Q.  Okay.  And you testified earlier, did you not,

24   that the past references to the term were,

25   quote/unquote, buried?                                      10:54:23
```

THOMAS SKYBAKMOEN - 7/27/2016

Page 247

1        A.   No.

2        Q.   Okay.  In the second paragraph of the text, it

3    says (as read):  We knew back in 2002 when we started

4    offering a secure enterprise-class Dropbox --

5              And then it says, in parens, formerly        11:12:46

6    Access Point.

7              What is Access Point?

8        A.   I believe, but I'm not sure, that it might have

9    been -- before Thru, I believe Lee had Thru, as a

10   company, called something else, but I -- I -- I don't    11:13:03

11   honestly know.

12       Q.   Okay.  And do you know why that was taken out?

13       A.   No.

14       Q.   Okay.  And the -- the final press release,

15   which was Exhibit 77 -- it says (as read):  It was in    11:13:21

16   2004 that we coined and trademarked the name Dropbox.

17             This says it was in late 2004/2003, if I'm

18   not mistaken.

19       A.   I guess --

20             MR. CONE:  Object to the form of the           11:13:40

21   question.  I don't think anyone's testified that this

22   was the final, that 77 was the final version of the

23   press release.

24       Q.   (BY MR. SLAFSKY)  Do you know why this edit was

25   made?                                                   11:13:57

THOMAS SKYBAKMOEN - 7/27/2016

Page 248

```
 1        A.  If -- if it was me, I can only assume, based on

 2   what I knew, that it was late 2003, early 2004, in which

 3   Harrison had presented me with documents that showed.

 4        Q.  Okay.  It appears, does it not, that the -- the

 5   revised language -- strike that.  Strike that.                11:14:16

 6              MR. SLAFSKY:  Okay.  I'd like to mark, as

 7   Exhibit No. 79, an e-mail dated April 2nd, 2012, with

 8   your name on it.

 9        A.  Thank you.

10              (Exhibit 79 marked.)                               11:15:42

11        Q.  (BY MR. SLAFSKY)  Can you take a moment,

12   please, to review this document.

13        A.  Okay.  (Witness reviews document.)

14        Q.  Let me know when you've had a chance to look at

15   it.                                                           11:16:21

16        A.  Okay.

17        Q.  Do you recognize this document?

18        A.  I believe so, yes.

19        Q.  Okay.  What was the purpose of this document?

20        A.  To highlight Thru functionality and that Thru       11:16:50

21   was a pure enterprise sale with tools and functionality

22   that was -- was ready for that type of use.

23        Q.  Is to highlight to whom?

24        A.  The market, the -- the end users, the -- the

25   purchasers.                                                   11:17:10
```

1       Q.  Okay.  And in the -- the e-mail header at the

2   top has your name in the from field, but the to field is

3   blank.

4              Is this something you sent to an individual

5   or to a group of people?                              11:17:21

6       A.  I -- I honestly don't know.

7       Q.  Do you know if this e-mail ever went out?

8       A.  Maybe.  I --

9       Q.  Okay.

10      A.  -- I don't know.                              11:17:31

11      Q.  Do you recall sending e-mails like this kind

12  out to people?

13      A.  It was -- it was Rosella Fernandez who would

14  have done that if -- if this went from -- from my

15  e-mail.                                               11:17:44

16      Q.  Okay.  So she had access to your e-mail account

17  and could send things out under your name, then?

18      A.  It appears so.  I can't remember how this was

19  sent, but, I mean, the context and the content here

20  seems to be, at least in -- what I can recall, some of  11:17:58

21  the things that we were saying and -- and doing.

22      Q.  Okay.  When you refer to "consumer Dropbox,"

23  again, you're referring to companies other than Thru?

24      A.  Yes.

25      Q.  Including but not limited to my client,         11:18:11

THOMAS SKYBAKMOEN - 7/27/2016

Page 250

```
 1    Dropbox, Inc.?
 2         A.  Yes.
 3         Q.  Okay.  In the first paragraph, it says
 4    (as read):  At first glance, consumer Dropbox tools.
 5              That's also a reference to a group of          11:18:29
 6    companies --
 7         A.  Yes.
 8         Q.  -- but not Thru?
 9              And in the paragraph under the title
10    "Security and Compliance," where it says (as read):     11:18:40
11    Consumer Dropbox-type tools.
12              Same category of companies you're referring
13    to?
14         A.  Yes.
15         Q.  Okay.  On the second page, under "Antivirus,"  11:18:46
16    it says (as read):  When uploading a file to a consumer
17    Dropbox.
18         A.  Uh-huh.
19         Q.  What does that refer to?
20         A.  To -- yeah.  Again, all the companies out      11:18:58
21    there.
22         Q.  Okay.  But not Thru?
23         A.  Yeah, not Thru.
24         Q.  Okay.  And under "Data Segregation," there's a
25    large paragraph, and in the middle, it says (as read):  11:19:11
```

THOMAS SKYBAKMOEN - 7/27/2016

Page 251

```
 1    Dropbox is now used to share both sensitive corporate

 2    information and private data.

 3                What does "Dropbox" refer to there?

 4        A.  Yeah, I guess that's hard to distinguish

 5    between whether it was your client specifically or the      11:19:36

 6    tools in general, but...

 7        Q.  Does that refer to Thru?

 8        A.  No.  That, I can --

 9        Q.  So it either refers to Dropbox, Inc., or it

10    refers to this general category of companies?              11:19:49

11        A.  Yes.

12        Q.  Okay.  Under the heading "Join Our Webinar," at

13    the bottom, there's a reference to the "onslaught of

14    consumer Dropbox solutions."

15                What does "onslaught" refer to?               11:20:02

16        A.  That employees are -- are bypassing IT

17    governance and regulations by trying to get the work

18    done, and they just download a free tool to synchronize

19    files or send the files outside of the company.

20        Q.  But what is the meaning of the term               11:20:22

21    "onslaught"?

22        A.  Significant increase, that there's a lot of

23    this being done and -- and tools in the marketplace.

24        Q.  Including those offered by my client,

25    Dropbox, Inc.?                                             11:20:41
```

THOMAS SKYBAKMOEN - 7/27/2016

Page 252

```
 1        A.  Yeah.

 2        Q.  Okay.  And on the next page, the last

 3   paragraph, it says (as read):  Michael Osterman,

 4   President of Osterman Research, will discuss the

 5   concerns behind consumer file transfer solutions.     11:20:53

 6        A.  Uh-huh.

 7        Q.  What does that refer to?

 8        A.  Again, the other companies than Thru -- anyone

 9   who offers these tools for free, where an individual can

10   download these tools and start using them within --      11:21:07

11   without IT's sanction.

12        Q.  So consumer file transfer solutions is the same

13   thing as --

14        A.  Dropbox-type solutions.

15        Q.  Or Dropbox-type tools?                           11:21:17

16        A.  Yeah.

17        Q.  Or consumer Dropbox?

18        A.  Yeah.

19        Q.  And then in the last sentence, it says

20   (as read):  Also, if you are interested in protecting     11:21:23

21   your organization from -- lowercase -- dropbox threats.

22             Is that a reference to Thru?

23        A.  No.

24        Q.  Is it a reference to my client?

25        A.  Yeah, your client and everyone else.             11:21:35
```

THOMAS SKYBAKMOEN - 7/27/2016

Page 253

```
 1        Q.  Okay.  And everyone else, again, would be
 2    companies?
 3        A.  YouSendIt, box.net, any -- any consumer, yeah.
 4        Q.  filesanywhere.com?
 5        A.  Yeah.                                          11:21:49
 6        Q.  Okay.
 7        A.  Can I ask a question?
 8        Q.  Do you want to take a break or do you want to
 9    ask a question about the document?
10        A.  About the document.                            11:22:09
11        Q.  Go ahead.
12        A.  Was this part of what I submitted or...
13        Q.  It has a Thru number at the bottom.
14        A.  Okay.
15        Q.  So it looks as if it was actually produced by  11:22:17
16    Thru.
17        A.  Okay.
18        Q.  You testified, did you not, sir, that you
19    received a direction from Mr. Harrison that Thru needed
20    to make more consistent and more prominent use of the  11:22:34
21    term "Dropbox"?
22        A.  Correct.
23        Q.  Okay.  What steps did Thru decide to take to
24    increase the prominence of the name "Dropbox"?
25        A.  As I said in the website, setup and -- and --  11:22:47
```

THOMAS SKYBAKMOEN - 7/27/2016

Page 292

```
1    one owe" --
2              I think you meant --
3    A.  Owned.
4    Q.  -- "owned."
5              (As read):  -- the trademark.  Our legal        12:40:17
6    team has told us that as long as we don't use the
7    Dropbox, Inc. name, we can slam the Dropbox name.
8              What does that mean?
9    A.  It means what it means.
10   Q.  What does "slam the Dropbox name" mean?            12:40:26
11   A.  That we can't, obviously, say Dropbox, Inc. --
12   sorry.  That we can use any terminology to describe
13   Dropbox in general, unsanctioned file service, Dropbox,
14   across the board, I guess.
15   Q.  So what does "slam" mean?                         12:40:46
16   A.  I guess, put down or -- or talk negatively
17   about.
18   Q.  Okay.  So one of the intents of the -- of the
19   webinar was to make critical comments about the Dropbox
20   product offering?                                      12:41:06
21   A.  Yeah.  The -- the way it was written up was,
22   obviously, to make general comments about Dropbox in
23   general.  Because --
24   Q.  "General comments," is that what you said?
25   A.  Yeah.  I mean, as it says, specifically, we       12:41:18
```

THOMAS SKYBAKMOEN - 7/27/2016

Page 293

1  cannot talk about Dropbox, Inc.  So the way that it was

2  all done was, obviously, to focus on Dropbox and apply

3  it in the general term.

4       Q.  The general term referring to the category of

5  companies that you earlier said included YouSendIt,        12:41:38

6  filesanywhere, box.net, and the like?

7       A.  Yes.  And including, obviously, Dropbox, Inc.

8       Q.  What was the objective, generally, of this

9  webinar?

10      A.  To highlight Thru and to make sure that Thru's   12:42:15

11  Dropbox was on the map as being the secure and -- and

12  only solution for the enterprise, high level.

13             MR. SLAFSKY:  Take a break for a couple

14  minutes, please.

15             THE VIDEOGRAPHER:  Off the record at          12:43:11

16  12:43 p.m.

17             (A recess was taken from 12:43 p.m.

18              to 12:48 p.m.)

19             THE VIDEOGRAPHER:  We're on the record,

20  12:48 p.m.                                                12:48:12

21             MR. SLAFSKY:  I'm going to mark, as

22  Exhibit No. 90, an e-mail, an attachment that's dated

23  April 17, 2012.  It's from Mr. Skybakmoen to a series of

24  people.

25             (Exhibit 90 marked.)                          12:48:24

THOMAS SKYBAKMOEN - 7/27/2016

Page 294

```
 1        A.   Thank you.
 2        Q.   (BY MR. SLAFSKY)   Take a look at the e-mail on
 3   the cover page, sir.
 4        A.   Uh-huh.
 5        Q.   And I'd like you to look at the attachment as     12:48:46
 6   well.
 7        A.   (Witness reviews document.)
 8             Okay.
 9        Q.   Am I correct in understanding that this is an
10   e-mail anticipating the webinar that we were just          12:51:02
11   discussing?
12        A.   Yes.
13        Q.   Okay.   And attached to this e-mail is, if I'm
14   not mistaken, a draft of the PowerPoint presentation
15   that would have accompanied the webinar?                   12:51:17
16        A.   Yes.
17        Q.   Okay.   In your e-mail to your colleagues at
18   Thru, you say (as read):   We don't make an excuse
19   anywhere for Dropbox, but it's clear who we go after.
20             What did you mean by that?                       12:51:29
21        A.   The webinar clearly goes after Dropbox, Inc.
22        Q.   In particular?
23        A.   Yeah.
24        Q.   And not the category of companies that you
25   referred to a few minutes ago?                             12:51:39
```

1    A.  No.  I -- the -- the webinar was -- was more

2  targeted as such.

3    Q.  Targeted as such at Dropbox, Inc.?

4    A.  Yes, I would say so.

5    Q.  Okay.  And in the last paragraph, you say, in      12:51:50

6  the middle of the sentence (as read):  We would really

7  only be calling out Dropbox and not YSI/Box.

8        What did you mean by that?

9    A.  Yeah.  So it goes back to the PowerPoint here

10  that, in this case, it's really about Dropbox and not    12:52:09

11  YouSendIt and Box.

12    Q.  Okay.

13    A.  Because it uses, I guess, the more specific

14  term, "Dropbox."

15    Q.  Okay.                                              12:52:18

16        MR. SLAFSKY:  I'd like to mark, as

17  Exhibit No. 91, a PowerPoint presentation.

18        (Exhibit 91 marked.)

19    Q.  (BY MR. SLAFSKY)  Take a quick look at this

20  document, and I'll come back to it in a minute or so.    12:52:46

21    A.  (Witness reviews document.)

22        Okay.

23    Q.  Who, again, is Mr. Osterman?

24    A.  An external research and consultancy company.

25  I think it's a one- to two-man company.                 12:55:17

THOMAS SKYBAKMOEN - 7/27/2016

Page 296

```
 1        Q.   How did Thru come to choose him as a speaker
 2   for this webinar?
 3        A.   I think it was originally Rosella's suggestion
 4   to bring in someone externally to -- rather than even
 5   me, coming from Gartner, to talk about Thru and its          12:55:32
 6   capabilities.
 7        Q.   And was he paid to speak?
 8        A.   Yes.
 9        Q.   Did you speak as well?
10        A.   Yes, I believe so.  Honestly, I can't remember      12:55:44
11   at this point.  I know there were talks about doing
12   this.  I believe Rosella did some introduction and then
13   I talked about Thru.
14        Q.   At the bottom of Exhibit No. 91, the
15   PowerPoint, if you turn to page 3, for example, it says      12:55:59
16   "Talking points."
17             Does that suggest that you had a speaking
18   role in the webinar?  Or do you -- or do you think these
19   talking points were for someone else?
20        A.   It would have either been me and Rosella, and      12:56:16
21   honestly, I cannot recall.
22        Q.   Okay.
23        A.   It should be available online still.
24        Q.   Okay.  Did Mr. Harrison speak in the webinar?
25        A.   I don't believe so.                                12:56:30
```

THOMAS SKYBAKMOEN - 7/27/2016

Page 297

```
 1              MR. SLAFSKY:  Counsel, I -- I would just
 2    ask, to the extent the actual webinar video and audio
 3    hasn't been produced, that it be made available to us.
 4         Q.  (BY MR. SLAFSKY)  How did you prepare for the
 5    webinar?                                              12:56:45
 6         A.  Oh, you -- oh, e-mail campaigns.  We,
 7    obviously, set it up on the website with links.  So
 8    there was a big marketing campaign and outreach to that
 9    effect.
10         Q.  And did you do research or any work with     12:56:55
11    Mr. Osterman to prepare the content that would be
12    delivered during the webinar?
13         A.  Most of the content came from him.  That was,
14    obviously, part of our -- we gave some feedback and
15    guidance, but that was it.  I mean, most of these things 12:57:09
16    originated from him.
17         Q.  Did either customers or potential customers of
18    Thru sign up for the webinar?
19         A.  Yes.
20         Q.  Do you know approximately how many people     12:57:21
21    participated in the webinar?
22         A.  No, I don't.  I don't.
23         Q.  Okay.  Looking at Exhibit No. 91, and in
24    particular, page 3, there is a talking point at the
25    bottom.  Just to be clear, your recollection today is   12:57:39
```

 1    that this would have been a talking point for either you

 2    or Ms. Fernandez?

 3         A.  Yes.

 4         Q.  Okay.  When you say (as read):  Dropbox has

 5    done an excellent job of fulfilling growing consumer        12:57:50

 6    needs for storing and sharing digital media, such as

 7    movies, photos, et cetera, what do you mean by the fact

 8    that Dropbox has done an excellent job?

 9         A.  That growthwise, productwise, that they were

10    doing what they set out to do.                              12:58:09

11         Q.  Okay.  So -- so both the -- the functionality

12    of the product reflected an excellent job and the

13    success in the marketplace reflected an excellent job?

14         A.  Yeah, I'd say that.

15         Q.  Okay.  And you say (as read):  Which has          12:58:21

16    resulted in a rapid growth and made them a household

17    name.

18              What did you mean by "household name"?

19         A.  That a lot of people would recognize the name

20    "Dropbox."                                                  12:58:34

21         Q.  Okay.  Turning to page 4, at the bottom of the

22    PowerPoint page, it says (as read):  Why we are hosting

23    this webcast.

24              Would that be a talking point as well?

25         A.  Yes, I believe that that would be, obviously,      12:58:45

THOMAS SKYBAKMOEN - 7/27/2016

Page 299

 1      the words to address the agenda slide which you see on

 2      the top.

 3            Q.  Okay.  And do you recall whether it was you or

 4      Ms. Fernandez who would have spoken these talking

 5      points?                                                    12:58:57

 6            A.  No.  And the reason is, simply, I did probably

 7      about seven or eight of these.  But I recall, with this

 8      and some of the others, it was eventually to phase me

 9      more out of the external marketing piece, but I can't

10      recall if I did this or not.                               12:59:13

11            Q.  Okay.  And either you or Rosella would have

12      written the talking points?

13            A.  We would have collaborated with Osterman,

14      obviously, and Mr. Harrison, Brotzel.

15            Q.  Okay.  And Mr. Harrison would have participated  12:59:26

16      as well?

17            A.  Yeah.

18            Q.  And he would have approved the content?

19            A.  Yeah.

20            Q.  Including the talking points?                    12:59:32

21            A.  Yeah.  He paid, obviously, for the webinar.

22            Q.  There are a series of bullet points in the

23      talking points on page 4.

24                Do you see those?

25            A.  Yes.                                             12:59:41

THOMAS SKYBAKMOEN - 7/27/2016

Page 300

```
 1        Q.   Do you recognize those terms?

 2        A.   Yes.

 3        Q.   And then it says, in the sentence below,

 4   (as read):  What these terms all have in common is the     12:59:48

 5   fact that they are often all used to describe online

 6   file transfer/exchange of files and messages.

 7             Can you explain that sentence?

 8        A.   That these words are used by people to describe

 9   the functionality in which a file is being moved or --

10   or done.                                                    13:00:03

11        Q.   Okay.

12        A.   You securely file transfer something or you

13   have an online collaboration, exchange of files.  So you

14   drop it off in the Dropbox, that type of thing.

15        Q.   Okay.  Can you shift to page 10 of the           13:00:15

16   PowerPoint presentation?

17        A.   Yes.

18        Q.   It says "Enter Dropbox."  What does -- what is

19   the term "Dropbox" a reference to there?

20        A.   I believe that would have been the -- the       13:00:26

21   company, Dropbox, Inc.

22        Q.   Okay.  So that would be my client?

23        A.   Uh-huh.

24        Q.   And this chart purports to show the number of

25   users of the Dropbox, Inc. software at the time?          13:00:37
```

THOMAS SKYBAKMOEN - 7/27/2016

Page 301

1     A.  I believe so, yes.

2     Q.  Okay.  And it says -- in the very bottom right

3  corner, there's a copyright notice, and it says

4  "Osterman Research."

5          Is this a chart that Mr. Osterman would          13:00:49

6  have prepared or someone at Thru?

7     A.  Osterman.

8     Q.  Okay.

9     A.  Yeah, I believe the slides where the

10  Osterman Research is applied, then that's his content.   13:00:58

11     Q.  Okay.  But these talking points would have been

12  written by you or Ms. Fernandez?

13     A.  No.  That -- that would have typically come

14  from Osterman, but we would have input to the -- the

15  talking points.                                          13:01:12

16     Q.  And in the talking points below, where it says

17  (as read):  Dropbox fulfills a significant file-sharing

18  and file-syncing need, as previously mentioned.

19          Is that a reference to Dropbox, my client?

20     A.  Yes.                                              13:01:26

21     Q.  "Fulfills a significant file-sharing and

22  file-syncing need."

23          What does that mean?

24     A.  That it has certain capabilities, I guess,

25  relating to that fact.                                   13:01:37

THOMAS SKYBAKMOEN - 7/27/2016

Page 302

```
 1        Q.  And the next bullet point, it says (as read):

 2   Its success is due primarily to limitations in corporate

 3   tools and policies.

 4                What does that mean exactly?

 5        A.  That the individual user download these tools    13:01:48

 6   to use as a way to bypass limitations of e-mail

 7   attachment sizing and to be able to share files, be it

 8   with a home computer or external customers.

 9        Q.  Did Thru ever allow its own customers to use

10   the term "Dropbox"?                                        13:02:19

11        A.  Yes.  There would have been landing pages

12   where, for instance, Sage, as I mentioned, or any of the

13   customers would have -- they would have, like, a

14   sage.thruinc.net or similar pages, which was set up on

15   the -- on the -- on the Thru service.                      13:02:43

16                And they would be -- use the Sage Dropbox

17   to upload files or send the secure attachments.  Or

18   there would be customers, I believe, that would have --

19   send me -- or use my Dropbox to send me a secure file,

20   which they would have as part of their signature in       13:03:05

21   their e-mail.

22        Q.  And were these customer references to the term

23   "Dropbox" ones that were conceived by Thru or by the

24   customer?  Was it part of the Thru functionality or,

25   alternatively, did Thru go to the customer and say, we    13:03:26
```

THOMAS SKYBAKMOEN - 7/27/2016

Page 303

1   want you to use it in this manner?

2        A.  No, I don't think anyone was told to use them,

3   but, obviously, the phrasing on the website, the product

4   name and so on, I presume, would have -- I can't recall

5   specifically us targeting the customer base to do that.          13:03:44

6        Q.  Other than this webinar targeting

7   Dropbox, Inc., were there other public announcements or

8   press releases in which Thru compared itself to

9   Dropbox, Inc. or made comments about Dropbox, Inc.?

10       A.  I believe the advice was that we wouldn't do         13:04:27

11  the direct comparison.  But, I mean, we -- we did

12  compare ourselves to all the solutions, and some were

13  very directed, obviously, towards Dropbox specifically.

14  But I don't recall anything -- I mean, we did have -- as

15  I mentioned, there were all the webinars that should          13:04:48

16  potentially be on YouTube, as well as the website, but I

17  don't recall the content of -- of each of them.

18       Q.  Yeah.  To be clear, though, were any of the

19  other webinars that you just referred to about Dropbox,

20  my client?                                                     13:05:02

21       A.  That, I don't recall, but I believe we at least

22  discussed us versus the competitors.  But what the

23  context was for those, I don't --

24       Q.  Okay.  So it's possible that one or more of the

25  other webinars would have identified my client,              13:05:14

THOMAS SKYBAKMOEN - 7/27/2016

Page 324

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN FRANCISCO DIVISION

 4    DROPBOX, INC., a Delaware ) Case No.
      corporation,              ) 3:15-CV-01741-EMC (MEJ)
 5                              )
              Plaintiff,        )
 6                              )
         v.                     )
 7                              )
      THRU INC., a Delaware     )
 8    corporation,             )
                                )
 9            Defendant.        )
      _____ )
10                              )
      THRU INC., a Delaware     )
11    corporation,             )
                                )
12            Counterclaimant,  )
                                )
13       v.                     )
                                )
14    DROPBOX, INC., a Delaware )
      corporation,              )
15                              )
              Counter-Defendant.)

16

17             REPORTER'S CERTIFICATION

18          ORAL AND VIDEOTAPED DEPOSITION OF

19                THOMAS SKYBAKMOEN

20                     VOLUME 2

21                  JULY 27, 2016

22

23       I, CANDICE ANDINO, Certified Shorthand Reporter in

24    and for the State of Texas, hereby certify to the

25    following:
```

1        That the witness, THOMAS SKYBAKMOEN, was duly sworn

2   by the officer and that the transcript of the oral

3   deposition is a true record of the testimony given by

4   the witness;

5        I further certify that pursuant to FRCP Rule

6   30(f)(1) that the signature of the deponent:

7        __X__ was requested by the deponent or a party

8   before the completion of the deposition and returned

9   within 30 days from date of receipt of the transcript.

10   If returned, the attached Changes and Signature Page

11   contains changes and the reasons therefor;

12        _____ was not requested by the deponent or a party

13   before the completion of the deposition.

14        I further certify that I am neither attorney nor

15   counsel for, related to, nor employed by any of the

16   parties to the action in which this testimony was taken.

17        Further, I am not a relative or employee of any

18   attorney of record in this cause, nor do I have a

19   financial interest in the action.

20        Subscribed and sworn to on this 30th day of July,

21   2016.

22

23   _____

     CANDICE ANDINO, Texas CSR 9332, RMR
24   Expiration Date:  12/31/16

25