# EXHIBIT 34

```
                 UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
                   SAN FRANCISCO DIVISION

     DROPBOX, INC., a Delaware  )
     corporation,               )
        Plaintiff,              )
                                ) Case No.
     v.                         ) 3:15-CV-01741-EMC (MEJ)
                                )
     THRU INC., a Delaware      )
     corporation,               )
        Defendant.             )
                                )
                                )
     THRU INC., a Delaware      )
     corporation,               )
        Counter-Plaintiff,      )
                                )
     v.                         )
                                )
     DROPBOX, INC., a Delaware  )
     corporation,               )
        Counter-Defendant.      )


     ********************************************************

              ORAL AND VIDEOTAPED DEPOSITION OF

                        LEE HARRISON

                        JULY 13, 2016

     ********************************************************
```

1        Q.    Was he a founder of Thru?                    09:48:18

2        A.    No.                                          09:48:20

3        Q.    This operating agreement that you referred to,    09:48:20

4    what does it provide for in terms of confidentiality    09:48:33

5    obligations?                                           09:48:37

6        A.    I would have to review it to know for certain.    09:48:37

7              MR. KRAMER:  Counsel, I don't think we've    09:48:43

8    got that operating agreement.  So if you could see if    09:48:45

9    you can arrange for us to obtain a copy over the course    09:48:47

10   of the day today, that would be helpful so that we don't    09:48:52

11   have to come back and ask questions about it.          09:48:55

12             MR. CONE:  I'm not sure that you've asked    09:48:55

13   for it before.  I will certainly do my best to find it.    09:48:56

14             MR. KRAMER:  Okay.                           09:48:59

15             MR. CONE:  But I'm not sure -- I             09:48:59

16   certainly don't undertake to find it today, so --      09:49:01

17             MR. KRAMER:  Okay.  We'll do the best        09:49:03

18   that we can.                                           09:49:04

19             MR. CONE:  Yes.                              09:49:05

20             MR. KRAMER:  If we don't get it, we may      09:49:05

21   have to come back and ask some more questions.         09:49:08

22       Q.    (BY MR. KRAMER)  Is FTH, sir, an abbreviation    09:49:12

23   that has had some significance at Thru?                09:49:22

24       A.    Yes.                                         09:49:24

25       Q.    And can you describe that significance for me?    09:49:24

LEE HARRISON - 7/13/2016

Page 22

```
 1        A.   It was a product we offered in the early days.    09:49:26

 2        Q.   When you say the early days, what time period     09:49:30

 3   are you referring to?                                       09:49:34

 4        A.   2003 to 2005, I believe.  I would have to         09:49:35

 5   check my records on that.                                   09:49:42

 6        Q.   What do you understand the abbreviation FTH to    09:49:43

 7   refer to?                                                   09:49:48

 8        A.   File Transaction Hub.                             09:49:48

 9        Q.   Back in 2004, FTH was the name for the            09:49:51

10   company's only product.  Right?                             09:49:56

11        A.   It was.  Not the only product, but it was the     09:50:00

12   name of the company's main product.                        09:50:04

13        Q.   What other products did it have back in 2004,     09:50:05

14   the company?                                                09:50:11

15        A.   We introduced dropbox in 2004.                    09:50:11

16        Q.   But dropbox wasn't a product; it was a            09:50:16

17   functionality in the FTH product.  Right?                   09:50:17

18        A.   It's a feature of FTH, yes.                       09:50:18

19        Q.   When was FTH launched?                            09:50:18

20        A.   I'm going to say January 2003.                    09:50:21

21        Q.   And when was it made available for public         09:50:25

22   purchase?                                                   09:50:27

23        A.   In January 2003.                                 09:50:27

24        Q.   Describe for me what functionality the FTH        09:50:30

25   product had when it launched.                               09:50:34
```

 1        A.    The functionality of FTH is not totally          09:50:35

 2    different from where we are today, as far as the core of   09:50:43

 3    the system.  It's an online repository for storing          09:50:46

 4    files.  It's a complete file system.  On introduction it    09:50:52

 5    had a lot of limitations, like the number of folder         09:50:56

 6    levels and things like that.  But essentially it's an       09:51:01

 7    online repository for storing files and transacting         09:51:04

 8    them, a way to share them and a way to organize them        09:51:09

 9    online.  At the time we called that application service     09:51:16

10    provisioning.  There was no such thing as the cloud at      09:51:20

11    the time.                                                   09:51:26

12        Q.    Do you recall how much Thru charged for the       09:51:26

13    product when it launched?                                   09:51:29

14        A.    I'd have to check on that.  I don't recall.       09:51:30

15        Q.    Do you recall how Thru charged for the            09:51:33

16    product?  Was it per seat per company, per installation?    09:51:36

17        A.    I think we charged per seat per user or per       09:51:40

18    site.  And we -- and both depending on opportunistically    09:51:46

19    what we could -- what we could get away with with each      09:51:52

20    customer.                                                   09:51:55

21        Q.    Orders of magnitude, whether you could tell me    09:51:55

22    the exact retail price or not, what dollars were            09:51:59

23    associated with a particular sale of FTH to a company at    09:52:02

24    the time 2004?                                              09:52:07

25        A.    Well, I do remember one customer in particular    09:52:07

LEE HARRISON - 7/13/2016

Page 24

```
 1    was $900 a month.                                        09:52:14

 2         Q.   And that was for the site wide license or for 09:52:17

 3    seat?                                                    09:52:21

 4         A.   That was for a certain amount of storage.  I  09:52:23

 5    don't believe seats were involved at the time.          09:52:26

 6         Q.   And what -- do you recall what company that   09:52:27

 7    was?                                                     09:52:29

 8         A.   HKS Architects.                                09:52:29

 9         Q.   Can you tell me how the name for Thru's        09:52:33

10    product has evolved?  You said it started as FTH and    09:52:37

11    changed over time.  What is the product called today and 09:52:41

12    how did it change over time?                             09:52:44

13         A.   Well, it changed to -- instead of having a lot 09:52:45

14    of different names, we tried to consolidate into just    09:52:56

15    Thru, but then describe the features as Thru features so 09:53:00

16    we could brand everything Thru at some point.            09:53:06

17         Q.   Brand everything with the name Thru?           09:53:11

18         A.   Correct.                                       09:53:14

19         Q.   Were there intermediary names over time        09:53:19

20    between the time that you called the product FTH and the 09:53:23

21    time you were desirous of calling it Thru?               09:53:27

22         A.   Not that I recall.                             09:53:29

23         Q.   So when you offer your software today, your    09:53:34

24    software that effectively serves the File Transaction    09:53:39

25    Hub functionality, what do you call it?                  09:53:43
```

LEE HARRISON - 7/13/2016

Page 25

| | | | |
|---|---|---|---|
| 1 | A. | Thru. | 09:53:46 |
| 2 | Q. | Just Thru? | 09:53:47 |
| 3 | A. | Thru. | 09:53:49 |

4     Q.   Does the acronym MFT have any significance at     09:53:50

5   Thru?     09:54:02

6     A.   Yes.     09:54:03

7     Q.   And what do you understand the acronym MFT to     09:54:03

8   refer to in the Thru world?     09:54:07

9     A.   Managed file transfer.     09:54:09

10     Q.   Is that a name of a Thru product?     09:54:10

11     A.   It is a Thru function, but it is a category     09:54:16

12   designated by the analysts.  Most significantly for us     09:54:24

13   at the time that we used that the most, Gartner covered     09:54:28

14   our space and we used that function or that category to     09:54:34

15   actually describe what we were doing, but also because     09:54:41

16   we had no control over MFT.  We had to use it for     09:54:49

17   searches and things like that for Google.     09:54:54

18     Q.   You say it's a category designated by the     09:54:57

19   analysts, most significantly Gartner.  It's a category     09:55:00

20   of what, sir?     09:55:04

21     A.   A coverage area, technology coverage area.     09:55:04

22     Q.   So a group of products that perform various     09:55:08

23   functions?     09:55:10

24     A.   A group of products that perform -- not a     09:55:12

25   group necessarily, but products that perform, whether it     09:55:16

| | | |
|---|---|---|
| 1 | be a group or a single product, that performs a managed | 09:55:19 |
| 2 | file transfer function. | 09:55:23 |
| 3 | Q.   And how would you describe a managed file | 09:55:24 |
| 4 | transfer function? | 09:55:27 |
| 5 | A.   It is the management of files, simple as that. | 09:55:27 |
| 6 | Q.   So the category that Gartner labels MFT is to | 09:55:34 |
| 7 | describe any product that manages files? | 09:55:45 |
| 8 | A.   Any product that manages, puts governance | 09:55:51 |
| 9 | around, makes files available.  It's a broad category. | 09:55:55 |
| 10 | Q.   Thru has a Twitter account that's under the | 09:56:06 |
| 11 | handle or user name @ThruMFT.  Right? | 09:56:12 |
| 12 | A.   I believe that's correct. | 09:56:18 |
| 13 | Q.   Who's responsible for maintaining that | 09:56:18 |
| 14 | account? | 09:56:21 |
| 15 | A.   Blake Pritchard. | 09:56:21 |
| 16 | Q.   So he's the person who authors the tweets that | 09:56:24 |
| 17 | get posted on that account? | 09:56:26 |
| 18 | A.   That's correct. | 09:56:28 |
| 19 | Q.   Do you review the tweets before they get | 09:56:28 |
| 20 | posted? | 09:56:31 |
| 21 | A.   I do not. | 09:56:31 |
| 22 | Q.   Do you yourself have a Twitter account? | 09:56:31 |
| 23 | A.   I do. | 09:56:34 |
| 24 | Q.   And what is the handle that you have on | 09:56:34 |
| 25 | Twitter? | 09:56:36 |

| | | |
|---|---|---|
| 1 | owners have a distribution folder available from their | 09:59:59 |
| 2 | default home area where subfolders are labeled Inbox and | 10:00:03 |
| 3 | Outbox.  The Inbox distribution folder stores files that | 10:00:08 |
| 4 | have been made available for download by other bonded | 10:00:13 |
| 5 | FTH account holders, closed quote.  Can you explain to | 10:00:17 |
| 6 | me what the term Inbox is referring to in that | 10:00:22 |
| 7 | description of Thru's product? | 10:00:26 |
| 8 | A.   I don't recall this, but I would have to say | 10:01:39 |
| 9 | that the term Inbox used here is also in an e-mail | 10:01:41 |
| 10 | workflow, but I can't be sure.  This is not -- I don't | 10:01:51 |
| 11 | recall this. | 10:01:55 |
| 12 | Q.   It appears as you're sitting here today, | 10:01:55 |
| 13 | though, in reading over this document that Thru called | 10:01:57 |
| 14 | something that served the function of an inbox an inbox. | 10:02:01 |
| 15 | Right? | 10:02:04 |
| 16 | A.   It's in black and white. | 10:02:05 |
| 17 | Q.   Yes? | 10:02:06 |
| 18 | A.   Yes. | 10:02:07 |
| 19 | Q.   Can you give me your definition of the word | 10:02:07 |
| 20 | dropbox with a small D? | 10:02:18 |
| 21 | A.   My definition of dropbox with a small D.  As | 10:02:21 |
| 22 | far as I know or as far as we're concerned, it's the | 10:02:23 |
| 23 | suggested functionality that Thru's been providing | 10:02:25 |
| 24 | through the word, through our trademark Dropbox.  It's | 10:02:28 |
| 25 | the same. | 10:02:34 |

```
 1        Q.   So when you hear the term dropbox with a small      10:02:34

 2   D, you think of Thru's functionality dropbox?                 10:02:37

 3        A.   I do.                                               10:02:41

 4        Q.   Okay.  Can you give me a dictionary definition      10:02:42

 5   of the term dropbox with a small D?                           10:02:44

 6        A.   No.                                                 10:02:48

 7        Q.   Well, I'll give you one.                            10:02:50

 8        A.   Okay.                                               10:02:52

 9        Q.   Macmillan Dictionary defines it as a container     10:02:52

10   where you can leave letters, documents or packages when      10:02:56

11   an office is closed to be dealt with when it opens           10:02:59

12   again.  Do you agree that that is a proper definition of     10:03:04

13   the word dropbox, small D?                                   10:03:06

14        A.   It seems narrow to me, so I -- I can't agree       10:03:13

15   with that necessarily.                                       10:03:17

16        Q.   Why doesn't the word dropbox fit that             10:03:19

17   definition?                                                  10:03:22

18        A.   Well, obviously for me or the way I think         10:03:22

19   dropbox is the way Thru uses the dropbox.  I could see       10:03:27

20   where the way the dictionary has it, it could be -- you      10:03:33

21   could have a dropbox like that.                              10:03:39

22        Q.   So that seems like a proper definition then.      10:03:41

23   Right?                                                       10:03:44

24        A.   Yeah, I guess it could be.                        10:03:44

25        Q.   Google defines dropbox, with a small D, as a       10:03:46
```

1   secured receptacle into which items such as returned          10:03:50

2   books or videotapes, payments, keys or donated clothing       10:03:55

3   can be deposited.  Do you agree that that is a proper         10:04:00

4   definition of the term dropbox?                               10:04:03

5        A.   I agree it could be.                                10:04:05

6        Q.   Within the FTH software that Thru, then Rumble      10:04:07

7   offered, you had a functionality called dropbox starting      10:04:14

8   sometime in 2004.  Right?                                     10:04:18

9        A.   Correct.                                            10:04:20

10       Q.   What did it do?                                     10:04:20

11       A.   It allowed externals to push files back into       10:04:21

12  the, at the time, FTH file system.                            10:04:28

13       Q.   It allowed externals?                               10:04:33

14       A.   People from outside the ecosystem of FTH to        10:04:43

15  anonymously -- not anonymously, but to identify              10:04:48

16  themselves through e-mail to send files back to users of     10:04:52

17  the system and place that into a folder in the system.       10:04:55

18       Q.   Was that folder on the system personal to the      10:05:00

19  user to whom the file was addressed?                          10:05:03

20       A.   Yes.                                                10:05:05

21       Q.   Was the dropbox function within FTH a secured      10:05:12

22  receptacle into which electronic files could be              10:05:16

23  deposited by others for the intended recipient to            10:05:19

24  receive?                                                      10:05:22

25       A.   I believe that's correct.                          10:05:22

LEE HARRISON - 7/13/2016

Page 32

| | | |
|---|---|---|
| 1 | Q.   So Thru labeled something that served the | 10:05:24 |
| 2 | function of a dropbox, small D, with the word dropbox in | 10:05:27 |
| 3 | its FTH software? | 10:05:31 |
| 4 | A.   I think there's an analogy that fits there. | 10:05:34 |
| 5 | Q.   I'm not sure I understand your answer.  It was | 10:05:36 |
| 6 | a pretty straightforward question. | 10:05:39 |
| 7 | A.   Well, could you repeat it? | 10:05:41 |
| 8 | Q.   Yeah. | 10:05:42 |
| 9 |      Thru labeled something that served the | 10:05:43 |
| 10 | function of a dropbox, with a small D, with the word | 10:05:45 |
| 11 | dropbox in its FTH software.  Right? | 10:05:47 |
| 12 | A.   I think that's correct. | 10:05:50 |
| 13 | Q.   How did Thru come to use the word dropbox in | 10:05:52 |
| 14 | its product? | 10:06:03 |
| 15 | A.   The guys running the product team came up with | 10:06:05 |
| 16 | the -- the name.  I believe that was in 2003.  We | 10:06:11 |
| 17 | developed the functionality and started offering it. | 10:06:19 |
| 18 | Q.   Who were the guys running the product team | 10:06:28 |
| 19 | that came up with the name in 2003? | 10:06:30 |
| 20 | A.   Daniel Hurtubise and Sean-Michael Daley. | 10:06:32 |
| 21 | Q.   And you said we developed the functionality | 10:06:40 |
| 22 | and started offering it.  Who is we that developed the | 10:06:42 |
| 23 | functionality? | 10:06:45 |
| 24 | A.   The company. | 10:06:46 |
| 25 | Q.   Anyone in particular? | 10:06:46 |

1        A.    Sergey Arutiunov.  And I don't recall which          10:06:52

2    engineers were working on it specifically, but he would      10:06:55

3    have worked on it and certainly been the manager of that     10:07:03

4    effort.                                                       10:07:06

5        Q.    Have you ever discussed with Mr. Hurtubise or        10:07:06

6    Mr. Sean-Michael --                                           10:07:09

7        A.    Daley.                                               10:07:12

8        Q.    -- Daley the origins for the name dropbox?           10:07:13

9        A.    I have with Mr. Hurtubise.                           10:07:18

10       Q.    And what did he tell you, sir?                       10:07:23

11       A.    He said it seemed to suggest the function that       10:07:27

12   we were trying to create.                                     10:07:30

13       Q.    Did he tell you a story about how they came up       10:07:34

14   with the name?                                                10:07:36

15       A.    That's all he told me.                               10:07:37

16       Q.    Is Mr. Hurtubise still with Thru?                    10:07:40

17       A.    He is.                                               10:07:43

18       Q.    What's his role?                                     10:07:43

19       A.    He is in charge of customer success.                 10:07:44

20       Q.    Is that an officer or director, management           10:07:50

21   position?                                                     10:07:53

22       A.    It's a management position, but not an               10:07:53

23   officer.                                                      10:07:56

24       Q.    Does he have -- is he a vice president?              10:07:56

25       A.    He is -- I don't believe so -- director of          10:07:58

| | | |
|---|---|---|
| 1 | A.   Yeah. | 10:11:44 |
| 2 | Q.   And what information did he give you? | 10:11:44 |
| 3 | A.   He ran the queries to pull IP addresses and | 10:11:46 |
| 4 | touches of the system. | 10:11:53 |
| 5 | Q.   The ones for the map that showed IP addresses | 10:11:53 |
| 6 | that had visited Thru's website over time.  Right? | 10:11:56 |
| 7 | A.   That's correct. | 10:11:59 |
| 8 | Q.   Okay.  Anyone else that you can recall | 10:12:00 |
| 9 | speaking to confirm the validity of the information set | 10:12:03 |
| 10 | forth in these responses? | 10:12:06 |
| 11 | A.   Do you mind if I look at them again -- | 10:12:07 |
| 12 | Q.   Please. | 10:12:09 |
| 13 | A.   -- to see if it jogs my memory? | 10:12:09 |
| 14 | MR. KRAMER:  Let's go off the record. | 10:12:11 |
| 15 | THE VIDEOGRAPHER:  We're off the record. | 10:12:12 |
| 16 | The time is 10:13 a.m. | 10:12:14 |
| 17 | (Break from 10:13 a.m. to 10:13 a.m.) | 10:12:16 |
| 18 | THE VIDEOGRAPHER:  We're back on the | 10:13:19 |
| 19 | record.  The time is 10:13 a.m. | 10:13:20 |
| 20 | Q.   (BY MR. KRAMER)  The question I asked you | 10:13:23 |
| 21 | before the break, Mr. Harrison, is who else you may have | 10:13:24 |
| 22 | spoken to in connection with obtaining the information | 10:13:26 |
| 23 | that's set forth in these interrogatory responses. | 10:13:29 |
| 24 | A.   I talked to Vince Frisky, who was in customer | 10:13:31 |
| 25 | support, no longer with the company.  I talked to | 10:13:36 |

1    Mr. Hurtubise I mentioned before.  I talked to Kevin          10:13:39

2    Westenkirchner.  I talked to Sergey Arutiunov.  I talked      10:13:43

3    to -- and obtained information from these various             10:13:53

4    people.  Su Simha, Subhashini Simha.  I believe that's       10:13:56

5    everyone I spoke to, I believe.                              10:14:19

6        Q.   So turning to these interrogatory responses        10:14:20

7    themselves, sir, Dropbox, Inc. asked Thru about Thru's       10:14:23

8    first use the word dropbox, and in response to               10:14:29

9    interrogatory number 4 Thru answered quote, Thru adopted     10:14:32

10   the trademark "DROPBOX," all caps, in 2003 and started       10:14:42

11   to use it as least as early as May 2004 as evidenced by      10:14:47

12   the copy of its website on that date as stored by the        10:14:51

13   internet archive Wayback Machine which includes              10:14:55

14   reference to the DROPBOX, all caps, functionality as         10:14:59

15   part of the product.  See that?                              10:15:04

16       A.   Yes.                                                10:15:09

17       Q.   Okay.  So your use of the word dropbox on the       10:15:10

18   Thru website on May 24, 2004 was to describe a               10:15:16

19   functionality in your product.  Is that correct?            10:15:21

20       A.   That's correct.                                     10:15:23

21       Q.   What product?                                       10:15:26

22       A.   FTH at the time.                                    10:15:27

23       Q.   And what functionality?                             10:15:32

24       A.   The ability to push data or files back to an       10:15:34

25   individual that was a member of FTH.                         10:15:40

LEE HARRISON - 7/13/2016

Page 39

```
 1      Q.   The ability for those external to the FTH        10:15:45
 2  customer to push files to someone within the             10:15:51
 3  organization.  Is that correct?                          10:15:52
 4      A.   Either external or internal.  It could be       10:15:53
 5  either.  There's no distinction there.                   10:15:57
 6      Q.   Your interrogatory response number 4 uses the   10:16:01
 7  phrase "at least as early as May 24, 2004."  Are you     10:16:05
 8  aware of any evidence of any earlier use by Thru of the  10:16:11
 9  word dropbox in commerce?                                10:16:16
10      A.   The FTH servers were updated -- the code was    10:16:24
11  delivered in March 2004, to my recollection, and the     10:16:30
12  servers were updated.  And this is information from       10:16:37
13  Sergey Arutiunov.  Around the same time as the code was   10:16:41
14  delivered, the servers were updated.  So the             10:16:48
15  functionality and the -- the features and the graphics   10:16:51
16  for dropbox were actually up on the servers around that  10:17:03
17  same time, March 2004.                                   10:17:06
18      Q.   Why then, sir, do you use the date May 2004 in  10:17:09
19  this interrogatory response?                             10:17:13
20      A.   I believe that's the first evidence we have on  10:17:14
21  the Wayback Machine of the advertising on the corporate  10:17:20
22  website.                                                 10:17:29
23      Q.   So May 2004 is the first public facing use of   10:17:29
24  the term dropbox by Thru, as far as you know?            10:17:33
25      A.   No.  All of the portals that Thru produces are  10:17:36
```

```
 1   public facing.  The entry pages are public.          10:17:42

 2        Q.   It's public to who?                        10:17:44

 3        A.   To anyone.                                 10:17:45

 4        Q.   So let me see if I understand what you're  10:17:46

 5   saying.  If I am an FTH customer, I've got a portal page  10:17:48

 6   that is accessible to the world --                   10:17:53

 7        A.   Correct.                                   10:17:56

 8        Q.   -- from which anyone can send someone within  10:17:57

 9   my organization a file?                              10:18:00

10        A.   Via the dropbox.                           10:18:03

11        Q.   Via the dropbox functionality.             10:18:05

12             And is it your testimony, sir, that even   10:18:07

13   before May 24, 2004, there were Thru FTH customers that  10:18:12

14   were making available to the world a page through which  10:18:20

15   others could send files via a dropbox functionality?  10:18:26

16        A.   That's my recollection of it.              10:18:30

17        Q.   But does Thru have any documentation showing  10:18:38

18   that those pages were made accessible to the public  10:18:43

19   prior to May 2004?                                   10:18:51

20        A.   Other than the code itself, I don't believe we  10:18:53

21   do.                                                  10:18:56

22        Q.   Has Thru produced the code itself in this  10:18:57

23   case, to your knowledge?                             10:19:00

24        A.   We have.                                   10:19:01

25        Q.   So the code that you're talking about is what?  10:19:01
```

LEE HARRISON - 7/13/2016

Page 41

| | | |
|---|---|---|
| 1 | A.    It's the FTH code. | 10:19:05 |
| 2 | Q.    So the source code to the FTH product? | 10:19:07 |
| 3 | A.    That's correct. | 10:19:09 |
| 4 | Q.    Okay.  And were you involved in the collection | 10:19:10 |
| 5 | of that code? | 10:19:13 |
| 6 | A.    I was not directly involved in the collection | 10:19:13 |
| 7 | of that code, but I was involved in the -- the actual | 10:19:18 |
| 8 | delivery of it. | 10:19:24 |
| 9 | Q.    Do you know what version of the FTH code was | 10:19:25 |
| 10 | produced by Thru in this case? | 10:19:28 |
| 11 | A.    I believe it's 4.0 or 4.1. | 10:19:29 |
| 12 | Q.    And that code was operative on Thru's servers | 10:19:34 |
| 13 | as of what date? | 10:19:39 |
| 14 | A.    I believe it was around March 24, but I could | 10:19:40 |
| 15 | be wrong a week this way or that way on that.  And that | 10:19:51 |
| 16 | is -- that is from a discussion with Mr. Arutiunov. | 10:19:54 |
| 17 | Q.    Was there a customer employing FTH at that | 10:20:01 |
| 18 | time so as to deploy a portal page at which others could | 10:20:08 |
| 19 | send files via the Thru dropbox functionality.  And that | 10:20:13 |
| 20 | time I'm referring to is upon the launch of the FTH | 10:20:18 |
| 21 | 4.0.1 code? | 10:20:22 |
| 22 | A.    There were. | 10:20:25 |
| 23 | Q.    Who were they? | 10:20:26 |
| 24 | A.    I would have to check on that. | 10:20:27 |
| 25 | Q.    To your knowledge, does any document exist | 10:20:30 |

1        A.   Well, I'm old.  It's recent.                    11:19:37

2              MR. KRAMER:  Let's have this one marked        11:19:43

3    as 31, please.                                           11:19:44

4              (Exhibit 31 marked.)                           11:19:45

5              MR. KRAMER:  One for you.                      11:19:48

6        Q.   (BY MR. KRAMER)  Exhibit 31, sir, is an e-mail  11:20:06

7    back and forth between you and Mr. Arutiunov bearing     11:20:15

8    Bates numbers Thru-1448748 to 1448750.  It starts in     11:20:21

9    October of 2011 and runs until January 2012.  The        11:20:30

10   subject line Dropbox was produced to us by Thru in this  11:20:34

11   action.  Do you recognize this?                          11:20:39

12       A.   Yes.                                            11:20:40

13       Q.   In his first e-mail in the thread,              11:20:41

14   Mr. Arutiunov specifically informed you that Apple had a 11:20:43

15   feature called Drop box in one of its products.  Right?  11:20:45

16       A.   Which line is that?                             11:20:52

17       Q.   The very first e-mail in the thread, the        11:20:55

18   earliest in time at the end of the thread on page Thru   11:20:58

19   1448750.                                                 11:21:00

20       A.   Oh, you're not on the front page.               11:21:02

21       Q.   Right.  The earliest in time in the thread      11:21:04

22   would be the last in the document.                       11:21:08

23       A.   Okay.  Let me go back and look at that.         11:21:10

24              Yes, this would have been the earliest I heard 11:21:20

25   of that.                                                 11:21:22

LEE HARRISON - 7/13/2016

Page 66

1       Q.   So Mr. Arutiunov specifically informed you in    11:21:22

2   October of 2011 that Apple had a feature called Drop      11:21:24

3   box, two words, in one of its products.  Right?          11:21:27

4       A.   Yes.                                             11:21:32

5       Q.   And he gave you a URL where you could get more   11:21:32

6   information on Apple's functionality.  Did you visit      11:21:36

7   that page?                                                11:21:39

8       A.   I don't recall.  I probably did.                11:21:39

9       Q.   You said this was the first you knew of          11:21:40

10  Apple's use of the term Drop box.  You didn't know        11:21:45

11  before Mr. Arutiunov told you this?                       11:21:50

12      A.   I don't believe I did.                          11:21:53

13      Q.   Do you have any idea when Apple started using    11:21:54

14  the term Drop box, two words, as the name for a function  11:21:57

15  in its products?                                          11:22:00

16      A.   I did some research on this recently, and I      11:22:02

17  believe they started around 2000.                         11:22:07

18      Q.   So before Thru started using the term in its     11:22:09

19  product?                                                  11:22:13

20      A.   I think that's correct.                         11:22:13

21      Q.   Did you know back in 2004 when you started       11:22:15

22  using the term My Dropbox in the FTH software that a      11:22:18

23  company called Blackboard was using the term dropbox in   11:22:22

24  its own software at the time?                             11:22:26

25      A.   I was not aware of that.                        11:22:27

LEE HARRISON - 7/13/2016

Page 67

1       Q.   Do you know now that Blackboard has had a          11:22:28
2   function called dropbox in its software offering since      11:22:31
3   at least the late '90s?                                     11:22:35
4       A.   I am aware.                                        11:22:36
5       Q.   Did you consider around the time you started       11:22:37
6   using the term My Dropbox in the FTH product in May 2004    11:22:40
7   whether other file transfer services had used the word     11:22:45
8   dropbox to describe functionalities in their products?     11:22:49
9       A.   I don't recall.                                    11:22:53
10      Q.   Did you do any research to determine that at       11:22:56
11  the time?                                                   11:22:58
12      A.   I didn't personally, I don't think, but it         11:22:58
13  could have been done.                                       11:23:05
14      Q.   Who would have done it if it wasn't you?           11:23:06
15      A.   Mr. Hurtubise or Mr. Daley.                        11:23:08
16      Q.   Why would it have been their responsibility to     11:23:12
17  do that?                                                    11:23:14
18      A.   Because they're product.                           11:23:14
19      Q.   Can you explain what you mean by that?             11:23:17
20  That's --                                                   11:23:19
21      A.   Well, they were developing the product and        11:23:19
22  coming up with the names.                                   11:23:21
23      Q.   So should --                                       11:23:22
24      A.   That's part of their responsibility.              11:23:23
25      Q.   Should they have gone to look to see whether       11:23:25

LEE HARRISON - 7/13/2016

Page 71

```
 1        A.    We did not.                              11:27:10

 2        Q.    Why not?                                 11:27:10

 3        A.    Just didn't seem like we needed to.  Just  11:27:11

 4   didn't do it.                                       11:27:21

 5        Q.    Did Thru do a formal trademark search for  11:27:22

 6   dropbox before Thru started using the term My DropBox?  11:27:25

 7        A.    I don't think so.                        11:27:30

 8        Q.    Why not?                                 11:27:30

 9        A.    Someone might have, but I didn't.  It could  11:27:31

10   have been done.                                     11:27:34

11        Q.    Did it occur to you as CEO of Thru that other  11:27:37

12   people might be using the term dropbox when Thru started  11:27:39

13   using it in May 2004?                               11:27:44

14        A.    It -- it might have occurred to me, but I  11:27:45

15   don't recall.                                       11:27:49

16        Q.    Were you worried that people might bring a  11:27:49

17   claim against you for using the term dropbox on your  11:27:51

18   website in May 2004?                                11:27:54

19        A.    I don't recall whether I was worried or not.  11:27:55

20        Q.    Well, certainly you didn't want to create  11:28:02

21   legal trouble for Thru by using the term dropbox in your  11:28:05

22   product, did you?                                   11:28:08

23        A.    Of course not.                           11:28:08

24        Q.    Were you comfortable that Thru wouldn't be  11:28:09

25   violating anyone elsewise's rights by using the term  11:28:11
```

1   dropbox in its own products in 2004?                           11:28:16

2        A.   Well, I would say I was comfortable in 2004,        11:28:18

3   but I don't recall exactly.  But the fact that it's on        11:28:21

4   the web page says I probably was.                             11:28:23

5        Q.   Well, if you didn't do an internet search and       11:28:25

6   you didn't do a formal trademark search, why would you        11:28:29

7   be comfortable that it was okay for Thru to use the term      11:28:31

8   dropbox in its product in 2004?                               11:28:34

9        A.   Well, I relied on my product team to do that.       11:28:36

10  So if they were comfortable, I was comfortable.               11:28:39

11       Q.   Did you really believe that no one else prior       11:28:42

12  to May 2004 had used the term dropbox in software at          11:28:46

13  all?                                                          11:28:52

14       A.   To the best of my knowledge.                        11:28:52

15       Q.   Did you consider applying to register a             11:28:55

16  trademark for any variant of the word dropbox when you        11:29:00

17  started using it in connection with the function in the       11:29:03

18  FTH product in 2004?                                          11:29:06

19       A.   We didn't.                                          11:29:07

20       Q.   Why didn't you actually go ahead and apply for      11:29:10

21  a registration on some variant of the word dropbox back       11:29:13

22  in 2004?                                                      11:29:16

23       A.   Well, it's expensive and we were small.             11:29:17

24       Q.   Did you seek to register any variant of a           11:29:20

25  Dropbox trademark in 2005?                                    11:29:24

LEE HARRISON - 7/13/2016

Page 73

| | | |
|---|---|---|
| 1 | A.   We did not. | 11:29:26 |
| 2 | Q.   How about in 2006 through 2010? | 11:29:28 |
| 3 | A.   We did not. | 11:29:31 |
| 4 | Q.   You didn't seek to register a trademark on | 11:29:32 |
| 5 | dropbox until after learning about my client Dropbox, | 11:29:36 |
| 6 | Inc.  Right? | 11:29:39 |
| 7 | A.   That's correct. | 11:29:39 |
| 8 | Q.   How long after you learned of Dropbox, Inc. | 11:29:40 |
| 9 | did you seek to register a trademark on dropbox? | 11:29:43 |
| 10 | A.   Probably within six months. | 11:29:49 |
| 11 | Q.   Dropbox's interrogatory number 10, so we're | 11:29:50 |
| 12 | back on Exhibit 25.  Interrogatory number 10 asked Thru | 11:29:56 |
| 13 | to describe in detail its decision to file any trademark | 11:30:08 |
| 14 | applications for registration of the mark dropbox and to | 11:30:12 |
| 15 | include in your description the reason for delaying any | 11:30:16 |
| 16 | such application beyond the alleged first use date in | 11:30:19 |
| 17 | the application. | 11:30:24 |
| 18 | A.   Which page? | 11:30:25 |
| 19 | Q.   It's interrogatory number 10, and your | 11:30:27 |
| 20 | response to it.  It's on page 20. | 11:30:30 |
| 21 | A.   Okay. | 11:30:45 |
| 22 | Q.   Do you have it there? | 11:30:46 |
| 23 | A.   I do. | 11:30:50 |
| 24 | Q.   Okay.  I'm going to read your response, at | 11:30:51 |
| 25 | least the relevant part.  Quote, Prior to 2011, Thru was | 11:30:58 |

LEE HARRISON - 7/13/2016

Page 74

1    not aware of any contest for rights to the term dropbox          11:31:01

2    and, as a relatively new and small company, had not            11:31:05

3    applied to register any trademarks.  Given the relevant        11:31:09

4    purchasing public for Thru's products, registering            11:31:14

5    trademarks did not appear to be a priority need.               11:31:17

6              In, say, 2009 was Thru what you would               11:31:22

7    characterize as a relatively new company?                     11:31:26

8         A.   Well, we still consider ourself a start-up          11:31:28

9    company.                                                       11:31:34

10        Q.   But the words that you used in this                 11:31:34

11   interrogatory response are relatively new.  In 2009,          11:31:38

12   Thru was seven years old.  Right?                             11:31:43

13        A.   That' correct.                                      11:31:45

14        Q.   And in 2011, it was nine years old.  Right?         11:31:46

15        A.   Yes.                                                11:31:49

16        Q.   Is that relatively new in your view?               11:31:50

17        A.   Well, I think semantically we were a start-up       11:31:52

18   company.  We felt like a start-up company.  We felt like      11:31:57

19   we were in a relatively new space, so it seems               11:31:59

20   reasonable to me.                                             11:32:02

21        Q.   You had been in that space for nine years           11:32:03

22   before you applied to register for the trademark on          11:32:05

23   dropbox.  Is that relatively new?                            11:32:09

24        A.   Well, I think the word there is relative.          11:32:11

25        Q.   That's a good question.  What does the word        11:32:18

1    user have gone about finding that on the screen?          11:40:32

2         A.    It was a button on the entrance to the portal   11:40:34

3    page.                                                      11:40:39

4         Q.    For your customers?                             11:40:40

5         A.    For our customers or anyone that knew --        11:40:41

6    navigated to that URL.                                     11:40:46

7         Q.    So it was a public facing page on your          11:40:47

8    customers's websites that was actually hosted by Thru?     11:40:52

9         A.    Correct.                                        11:40:56

10        Q.    Can we go back to Exhibit 20 -- the first one,  11:40:57

11   the concept guide.  24.                                    11:41:09

12        A.    Okay.                                           11:41:11

13        Q.    On page 6, sir, which is --                     11:41:21

14        A.    I'm now sir.                                    11:41:29

15        Q.    You've been sir throughout.                     11:41:30

16              On page 6, Thru-1065246 there is a screenshot   11:41:31

17   of a desktop that would appear to a user of the FTH        11:41:40

18   software.  Do you see that?                                11:41:45

19        A.    I do.                                           11:41:46

20        Q.    The word dropbox doesn't appear on this, does   11:41:53

21   it?                                                        11:41:56

22        A.    I don't see it.                                 11:41:56

23        Q.    Should it be there?                             11:41:58

24        A.    I don't know.  I would have to study this       11:41:59

25   guide to see what it's -- what this page is.  I don't      11:42:15

LEE HARRISON - 7/13/2016

Page 82

```
 1    recall where the dropbox folder would be in this tree,     11:42:24
 2    so I don't know if it should be on here or not.            11:42:28
 3        Q.   You saw the file or you see the file              11:42:30
 4    collections?                                               11:42:35
 5        A.   I do.                                             11:42:36
 6        Q.   Shouldn't it be right there with collections?     11:42:37
 7        A.   I don't recall where it would be on this.  It     11:42:39
 8    seems like it should be there, but I -- I don't recall     11:42:47
 9    if that's -- if this is an older screenshot.               11:42:50
10        Q.   Is it possible, sir, that as of September 2004    11:42:53
11    the dropbox functionality did not exist in the product     11:42:57
12    yet?                                                       11:43:00
13        A.   That is not possible.                             11:43:00
14        Q.   According to Thru's interrogatory response        11:43:01
15    number 4, it started using the phrase DropBox with         11:43:13
16    capital D, capital B, one word, to describe a file         11:43:18
17    repository function on its website in May 2004.  Right?    11:43:23
18        A.   Correct.                                          11:43:34
19        Q.   Was it your view then back in 2004, May 2004,     11:43:34
20    that that use gave Thru a trademark in the word dropbox?   11:43:38
21        A.   I believe we put a TM on it when we first         11:43:46
22    badged it, and I think -- our thinking was that would      11:44:03
23    give us the trademark.                                     11:43:53
24        Q.   So it was the use of the TM label and not the     11:43:54
25    use of the word itself that you believed gave you the      11:43:59
```

1   rights to the Dropbox trademark?                    11:44:01

2        A.   Well, I -- you know, I can't speak to what we   11:44:05

3   were thinking at the time, but I'm sure the combination   11:44:08

4   of the two was, you know, considered.               11:44:11

5        Q.   I want to be clear.  Did you understand --   11:44:14

6   strike that.                                         11:44:21

7             Did you think back in May 2004 that your use   11:44:21

8   of the term dropbox on your website gave you a trademark   11:44:24

9   in the term dropbox?                                 11:44:28

10       A.   I believe we felt like we had the trademark   11:44:30

11   from our usage and from putting it on our portal pages.   11:44:33

12       Q.   On the website Exhibit 26, there's no TM   11:44:38

13   symbol next to My DropBox.  Can you tell me why as of   11:44:44

14   May 2004 you would not have put a TM symbol next to My   11:44:50

15   DropBox?                                            11:44:56

16       A.   The -- back then it was difficult to put   11:44:56

17   superscript on HTML pages.  So it would have been   11:45:02

18   difficult to have it there and have it look correct.  We   11:45:06

19   didn't know how to do it.                           11:45:10

20       Q.   So let me see if I can tease this out a little   11:45:11

21   bit further.  Did you think by virtue of your use of the   11:45:15

22   term My DropBox on the website that Thru had the   11:45:18

23   exclusive right to use the term dropbox back in 2004?   11:45:24

24       A.   I believe we did.                          11:45:29

25       Q.   Was it to the term dropbox or was it to the   11:45:30

LEE HARRISON - 7/13/2016

Page 84

```
 1    term My DropBox that appeared on the website?          11:45:32

 2         A.   My DropBox refers to the individual dropbox  11:45:36

 3    for a particular user.  The term dropbox was the       11:45:41

 4    trademark term.  This is a variation of that for       11:45:45

 5    explanatory -- to explain what the usage was or that   11:45:51

 6    there's a private place for your dropbox files to show 11:45:55

 7    up as a marketing tool.                                11:45:59

 8         Q.   So was that exclusive right that you believed 11:46:00

 9    Thru had back in 2004 the exclusive right to use the   11:46:06

10    term dropbox in any product ever?                      11:46:10

11         A.   You're saying from -- repeat that.           11:46:12

12         Q.   Sure.                                        11:46:20

13              You said that you believed that by virtue of 11:46:21

14    this use, you had an exclusive right to use the term   11:46:23

15    dropbox back in 2004.  And what I'm getting at is what 11:46:27

16    did you believe that exclusive right entitled you to?  11:46:30

17    So the question I asked was, did you believe back in   11:46:34

18    2004 that Thru, by virtue of this use of the term My   11:46:37

19    DropBox on its web page, had the exclusive right to use 11:46:41

20    the term dropbox in any product?                       11:46:45

21         A.   I believe we did.                            11:46:47

22         Q.   Even in, say, a pizza delivery service?      11:46:52

23         A.   Well, I believe it gave us the right to use it 11:46:59

24    with the functionality that we had come up with and not 11:47:06

25    outside that necessarily.                              11:47:16
```

LEE HARRISON - 7/13/2016

Page 86

1    A.   We published it on our public facing portals    11:48:57

2    for our customers.    11:49:00

3    Q.   But not on the web page, the homepage?    11:49:01

4    A.   Not on the homepage.  At least no evidence of    11:49:04

5    the homepage.  We don't -- I don't recall when we put it    11:49:08

6    on the homepage, when we changed that.    11:49:10

7    Q.   What was Thru's total revenue in 2004, sir?    11:49:12

8    A.   I think we produced that.  I don't recall.    11:49:19

9    Q.   Can you tell me in orders of magnitude,    11:49:20

10    thousands, tens of thousands, hundreds of thousands?    11:49:24

11    A.   Thousands.    11:49:27

12    Q.   How many customers did it have for its FTH    11:49:27

13    software in 2004?    11:49:31

14    A.   A few dozen.    11:49:31

15    Q.   Was there a marketing budget for Thru back in    11:49:32

16    2004?    11:49:36

17    A.   I don't recall.  I think we produced that as    11:49:36

18    well.    11:49:43

19    Q.   Maybe.  Let me ask you about that.    11:49:43

20         MR. KRAMER:  What number are we up to?    11:49:54

21         THE REPORTER:  32.    11:49:58

22         MR. KRAMER:  32.    11:49:59

23         (Exhibit 32 marked.)    11:50:00

24    Q.   (BY MR. KRAMER)  Exhibit 32, sir, is a    11:50:14

25    document produced to us by Thru bearing Bates numbers    11:50:18

| | | |
|---|---|---|
| 1 | 1625201 to 1625220.  It's entitled Rumble Group | 11:50:22 |
| 2 | Marketing Plan, and it's dated November 11, 2004 in the | 11:50:34 |
| 3 | footer.  Do you know who prepared this document? | 11:50:38 |
| 4 | A.  I believe it might have been Sean-Michael | 11:50:40 |
| 5 | Daley or myself.  I don't recall. | 11:51:06 |
| 6 | Q.  Okay.  Starting on page 1625216, there is a | 11:51:08 |
| 7 | marketing budget by month for the year 2005.  Do you see | 11:51:27 |
| 8 | that? | 11:51:31 |
| 9 | A.  I do. | 11:51:31 |
| 10 | Q.  Does the Thru marketing budget start in | 11:51:32 |
| 11 | January 2005 because Thru didn't have a marketing budget | 11:51:36 |
| 12 | before then? | 11:51:39 |
| 13 | A.  No.  This would have been, I would assume, a | 11:51:39 |
| 14 | budget presented to the board for approval perhaps. | 11:51:44 |
| 15 | Q.  If there's no similar document for 2004 that's | 11:51:48 |
| 16 | been produced in this case, does that suggest to you | 11:51:53 |
| 17 | that Thru did not have a marketing budget for the year | 11:51:55 |
| 18 | 2004? | 11:51:59 |
| 19 | A.  No, it doesn't suggest that to me. | 11:52:00 |
| 20 | Q.  So sitting here today, do you believe that | 11:52:02 |
| 21 | Thru had a marketing budget for 2004? | 11:52:04 |
| 22 | A.  I believe we did. | 11:52:07 |
| 23 | Q.  Do you have any idea how much it was? | 11:52:09 |
| 24 | A.  I don't recall. | 11:52:11 |
| 25 | Q.  In 2004 Thru didn't fund any marketing | 11:52:12 |

LEE HARRISON - 7/13/2016

Page 88

| | | |
|---|---|---|
| 1 | campaigns focused specifically on the dropbox | 11:52:19 |
| 2 | functionality.  Right? | 11:52:21 |
| 3 | A.   I don't recall, but I don't recall -- I don't | 11:52:22 |
| 4 | think so, but I don't recall. | 11:52:26 |
| 5 | Q.   Do you recall that Thru ever specifically | 11:52:27 |
| 6 | promoted the dropbox functionality itself? | 11:52:32 |
| 7 | A.   I don't recall.  I don't think we did. | 11:52:35 |
| 8 | MR. KRAMER:  Let's have this one marked | 11:52:54 |
| 9 | as 33. | 11:52:56 |
| 10 | (Exhibit 33 marked.) | 11:53:19 |
| 11 | A.   Oh, it says attorneys' eyes only.  Can I look | 11:53:19 |
| 12 | at it? | 11:53:22 |
| 13 | Q.   (BY MR. KRAMER)  It's yours. | 11:53:22 |
| 14 | A.   I'm kidding. | 11:53:23 |
| 15 | Q.   Exhibit 33, sir, is a printout of a | 11:53:29 |
| 16 | spreadsheet entitled Thru, Inc. Profit and Loss | 11:53:33 |
| 17 | January 2002 through December 2002.  It bears Bates | 11:53:38 |
| 18 | numbers Thru-11506 to 11513 and it was produced to us in | 11:53:40 |
| 19 | this action by Thru.  Do you recognize it? | 11:53:50 |
| 20 | A.   Yes. | 11:53:52 |
| 21 | Q.   What is it? | 11:53:52 |
| 22 | A.   It looks like a P&L. | 11:53:52 |
| 23 | Q.   Who prepared it? | 11:53:54 |
| 24 | A.   It depends on when it was produced.  I don't | 11:54:02 |
| 25 | know. | 11:54:04 |

LEE HARRISON - 7/13/2016

Page 89

```
1        Q.   On the upper left-hand side, it looks like      11:54:04
2    there is a date that says September 25, 2012.            11:54:08
3        A.   It would have been CK Tseng.                    11:54:10
4        Q.   Who is CK Tseng?                                11:54:15
5        A.   He was the controller at the company.          11:54:17
6        Q.   Are Thru's P&L statements audited?              11:54:22
7        A.   No.                                             11:54:25
8        Q.   Are they accurate?                              11:54:26
9        A.   For a small company, as close as possible.     11:54:27
10        Q.   According to Thru's own P&L, what roughly was  11:54:30
11    Thru's marketing expenditure for the entire company in 11:54:35
12    2004?                                                   11:54:42
13        A.   2004?  The external piece would have been, it 11:54:42
14    looks like, $1,000.                                     11:55:04
15        Q.   How are you coming up with that figure, sir?  11:55:06
16        A.   I'm trying to read this.  Wait a minute.      11:55:11
17    January through March.  This is not summed correctly.  11:55:14
18    Oh, it looks like the category that's marked marketing 11:55:23
19    would have been about $3,000.                          11:55:33
20        Q.   A little less than $3,000 for the entire year.11:55:35
21    Right?                                                 11:55:38
22        A.   Yeah.                                          11:55:38
23        Q.   To get to that figure, you went to the row    11:55:39
24    labeled marketing and added up the figures in the      11:55:41
25    columns N to Q on page Thru-11507.  Right?             11:55:45
```

LEE HARRISON - 7/13/2016

Page 90

```
 1        A.   Right.                                      11:55:47
 2        Q.   What kinds of things go into the line item  11:55:48
 3   marketing in this P&L, sir?                           11:55:53
 4        A.   These are any external expenses, printing,  11:55:55
 5   publishing.                                           11:55:59
 6        Q.   Cost of the website?                         11:56:01
 7        A.   Cost of the website maybe.  It might have been 11:56:01
 8   in cost of sales prior or in engineering.             11:56:09
 9        Q.   Sign on the front door in Irving?           11:56:13
10        A.   Sign on the front door in Irving, probably, if 11:56:15
11   there was one.                                        11:56:20
12        Q.   What marketing did Thru do that comprised less 11:56:21
13   than this $3,000 marketing expense in 2004?           11:56:24
14        A.   I don't recall.                             11:56:27
15        Q.   How much of that $3,000, if any, was spent  11:56:28
16   internationally?                                      11:56:32
17        A.   I don't recall.                             11:56:33
18        Q.   Was Thru engaged in international marketing in 11:56:37
19   2004?                                                 11:56:41
20        A.   Internationally we worked with our partner in 11:56:41
21   Australia, but outside of that I don't think we were  11:56:44
22   doing anything internationally.                       11:56:46
23        Q.   For 2005 Thru's P&L statement shows Thru total 11:56:48
24   marketing expenditures roughly $4,000.  Right?        11:56:54
25        A.   In the line that's labeled marketing, one,  11:56:59
```

1    two, three, four -- yeah, roughly 4.          11:57:02

2        Q.   And to do that, you went to the line labeled    11:57:10

3    marketing on page 11508 and added up the columns R to U.    11:57:13

4    Correct?                                        11:57:19

5        A.   Right.                                 11:57:19

6        Q.   How much of that roughly $4,000 in 2005 was    11:57:22

7    spent on international marketing?               11:57:26

8        A.   I'm going to guess none, but I don't know.  I    11:57:27

9    don't remember.                                 11:57:34

10       Q.   What was it spent on?                  11:57:34

11       A.   I don't know.                         11:57:36

12       Q.   While we're looking at this, what does the P&L    11:57:36

13   line item hosted solutions refer to?           11:57:41

14       A.   That is a revenue line for cloud based    11:57:44

15   services.                                       11:57:57

16       Q.   So was that your essentially product sales?    11:57:58

17       A.   Product sales for hosted product sales.    11:58:01

18       Q.   Are there other product sales shown in the    11:58:05

19   P&L?                                            11:58:08

20       A.   Well, not in the -- not in the early days    11:58:09

21   here, it looks like.                            11:58:13

22       Q.   So --                                 11:58:14

23       A.   By the way, the system does -- if you put a    11:58:15

24   column in later, it pulls the column back earlier as    11:58:17

25   well.                                           11:58:21

1       Q.   I don't follow that.  Can you explain that to          11:58:21

2    me?                                                            11:58:24

3       A.   Well, on the -- the accounting system if --          11:58:24

4    say five years from now we put in activation fees, it         11:58:28

5    would have zero for activation fees going backwards.  It      11:58:32

6    doesn't mean there were any - that there was even a           11:58:38

7    price list item for an activation fee in 2002.  For           11:58:39

8    instance, in column F on page 1.  But if there were           11:58:44

9    later, it would put that into this sort of printout.          11:58:47

10       Q.   So it looks like for 2004, there were three          11:58:50

11    sources of income for the company, hosted solutions,         11:58:57

12    activation fees and interest.  Am I reading that             11:59:01

13    correctly?                                                   11:59:04

14       A.   Yes.                                                 11:59:04

15       Q.   And for 2004 Thru's total revenue appears to         11:59:06

16    be for hosted solutions a little less than $40,000.          11:59:12

17    Right?                                                       11:59:18

18       A.   That's correct.                                      11:59:18

19       Q.   And what were activation fees, sir?                  11:59:20

20       A.   When a new customer signs up, we charge them         11:59:24

21    an activation fee for their site.                            11:59:26

22       Q.   In addition to the cost for the software, you        11:59:28

23    charge them just a one-time sign-up fee?                     11:59:31

24       A.   Sign-up and training.                               11:59:33

25       Q.   How much of the roughly $40,000 that Thru            11:59:40

LEE HARRISON - 7/13/2016

Page 97

```
 1        Q.   Oh, you're not familiar with this?          12:16:06

 2        A.   No.                                          12:16:08

 3        Q.   This was a document that we referenced in our   12:16:08

 4   interrogatories once upon a time, so I was assuming that  12:16:10

 5   you were familiar with it.                             12:16:13

 6        A.   I would have to refresh.                     12:16:14

 7        Q.   Sure.  Feel free.  The question that I've    12:16:15

 8   presented is simply what the purpose of this document  12:16:19

 9   was.                                                   12:16:22

10        A.   To generate business for Thru.              12:16:23

11        Q.   So it's marketing material.  Right?         12:16:25

12        A.   Marketing material.                         12:16:27

13        Q.   Okay.  Flipboard's (sic) interrogatory number  12:16:28

14   2, Exhibit 25 -- Flipboard interrogatory number 2 asked  12:16:34

15   Thru to explain the meaning of the word dropbox, lower  12:16:54

16   case, as used on this page of Thru's website in this   12:16:58

17   sentence, quote, Consumer dropbox applications, small D,  12:17:02

18   have attracted millions of users, and the popularity of  12:17:08

19   these solutions is growing by leaps and bounds.        12:17:13

20             In Thru's answer to interrogatory number 2   12:17:15

21   that you verified, Thru said the word dropbox, small D  12:17:20

22   in that sentence, is a reference to my client's,       12:17:23

23   Dropbox, Inc.'s service.  Is that your testimony here  12:17:28

24   today?                                                 12:17:30

25        A.   Yes.                                         12:17:31
```

LEE HARRISON - 7/13/2016

Page 98

1      Q.   So it's your testimony that the word dropbox      12:17:35

2   in the phrase "consumer dropbox applications" is merely   12:17:38

3   a reference to my client Dropbox, Inc.?                    12:17:41

4      A.   I believe it is.                                   12:17:45

5      Q.   Why then does the sentence speak of consumer       12:17:46

6   dropbox applications plural?                               12:17:48

7      A.   We see the way this is written is to try to        12:17:52

8   paint a picture for possible prospects of Thru's           12:18:02

9   services that they should be wary when they consider       12:18:05

10  using consumer applications.  And the date of this -- I    12:18:09

11  don't know the date of this, but as far as the reference   12:18:16

12  to dropbox applications, I think that's marketing's way    12:18:23

13  of trying to paint that picture, that there's a group of   12:18:26

14  products you shouldn't be using, you should be using our   12:18:30

15  product, as marketing would always be trying to do.        12:18:34

16     Q.   What other applications besides my client's        12:18:36

17  application was Thru referencing in this marketing         12:18:38

18  material when it said dropbox consumer -- consumer         12:18:41

19  dropbox applications?                                      12:18:43

20     A.   I would say probably none.                         12:18:44

21     Q.   So why is it plural, sir?                          12:18:45

22     A.   It's -- marketing is trying to, I think, like      12:18:48

23  I say, paint a picture that you should stay away from      12:18:54

24  consumer applications in general.  In particular, since    12:18:57

25  we're sort of under attack by your client, that they       12:19:02

LEE HARRISON - 7/13/2016

Page 99

```
 1   called out your client.                              12:19:09
 2        Q.   I'm sorry, did you say you were under attack   12:19:10
 3   by my client in 2013, sir?                           12:19:12
 4        A.   I did say that.                             12:19:15
 5        Q.   And how were you under attack by my client in   12:19:16
 6   2013?                                                 12:19:18
 7        A.   Well, you're using our trademark.           12:19:19
 8        Q.   And that was what you considered to be under   12:19:22
 9   attack?                                               12:19:25
10        A.   We consider that to be harmful to us.       12:19:25
11        Q.   How is it harmful to you, sir?              12:19:28
12        A.   Well, to us, as we are trying to do business   12:19:30
13   the way we were trying to do business in as secure as   12:19:34
14   possible a fashion, we felt as though Dropbox's       12:19:39
15   reputation is not helpful to us in our marketing      12:19:43
16   efforts.                                              12:19:49
17        Q.   Okay.  So back on this question, your       12:19:51
18   marketing people used the term applications, but they   12:19:56
19   only meant to refer to one company.  That's your      12:19:59
20   testimony?                                            12:20:02
21        A.   I believe that to be correct.              12:20:02
22        Q.   When someone visiting your site read those   12:20:03
23   words "consumer dropbox applications," what did you want   12:20:09
24   them to think of?                                     12:20:12
25        A.   We wanted them to think and come to Thru.   12:20:12
```

LEE HARRISON - 7/13/2016

Page 100

1    Q.   No, my question is specifically with respect          12:20:19

2    to that phrase.  When someone visiting your website read   12:20:22

3    the phrase "consumer dropbox applications," what did you   12:20:25

4    expect people to think of when they read that?             12:20:29

5    A.   Not to use consumer applications.                     12:20:31

6    Q.   What applications?                                     12:20:35

7    A.   Like your client.                                     12:20:36

8    Q.   What else?                                            12:20:38

9    A.   No other.                                             12:20:38

10   Q.   When you decided that Thru had trademark              12:20:41

11   rights to the term dropbox in 2004, did you give           12:20:47

12   instructions to Thru employees that they should only use   12:20:51

13   the word dropbox to identify the dropbox functionality     12:20:53

14   in the Thru software?                                      12:20:56

15   A.   I do not recall giving them instructions on           12:20:57

16   how they should use the trademark.                         12:21:01

17   Q.   Thru employees routinely used the term dropbox        12:21:03

18   small D to refer not to the function in the Thru product   12:21:08

19   but as a common term to describe a dropbox like            12:21:11

20   functionality, don't they?                                 12:21:14

21   A.   I'm not aware of that.                                12:21:15

22   Q.   Back in this article Exhibit 35, there's a            12:21:18

23   reference to file sharing services.  What file sharing     12:21:30

24   services is that a reference to, sir?                      12:21:36

25   A.   You're referring to free file sharing                12:21:37

LEE HARRISON - 7/13/2016

Page 101

```
 1   services?                                          12:21:47

 2        Q.   Yes.                                      12:21:47

 3        A.   I believe it is referring to the premium  12:21:47

 4   providers of file sharing services.                12:22:04

 5        Q.   Which services in particular, sir?        12:22:07

 6        A.   All the free ones.  That would be your client,  12:22:08

 7   perhaps Box, perhaps -- probably those are the main two,  12:22:13

 8   but --                                             12:22:18

 9        Q.   Google Drive?                             12:22:18

10        A.   Google Drive.                             12:22:20

11        Q.   Apple's, Microsoft SkyDrive?              12:22:22

12        A.   Perhaps.                                  12:22:25

13        Q.   In this document on page 2, there's a     12:22:26

14   reference to consumer dropbox solutions, small D.  What  12:22:28

15   do you understand that to be a reference to, sir?  12:22:40

16        A.   The same as in the first page.            12:22:41

17        Q.   So notwithstanding the fact that you're   12:22:44

18   referencing solutions plural, you mean that -- you take  12:22:46

19   that to mean only my client?                       12:22:49

20        A.   I believe that's what it's referring to.  12:22:53

21        Q.   Even though it's plural?                  12:22:55

22        A.   Even though it's plural.                  12:22:57

23        Q.   Sir, if it was a reference to my client, why  12:22:58

24   wouldn't it be capitalized?                        12:23:10

25        A.   I'm hazarding a guess here, but I would say  12:23:11
```

LEE HARRISON - 7/13/2016

Page 102

| | | |
|---|---|---|
| 1 | that marketing was unwilling or nervous about actually | 12:23:17 |
| 2 | directly calling out your client at the time.  It was a | 12:23:21 |
| 3 | judgment call from someone in marketing. | 12:23:27 |
| 4 | Q.   So instead they used the term as an ordinary | 12:23:29 |
| 5 | term to refer to a particular type of functionality. | 12:23:31 |
| 6 | Right? | 12:23:34 |
| 7 | A.   I think it's a shadowy way of saying your | 12:23:34 |
| 8 | client. | 12:23:39 |
| 9 | Q.   Shadowy, that's an interesting word.  Is that | 12:23:39 |
| 10 | a term that you would apply to the marketing efforts by | 12:23:42 |
| 11 | your client generally? | 12:23:45 |
| 12 | A.   My client? | 12:23:46 |
| 13 | Q.   By your company. | 12:23:47 |
| 14 | A.   No. | 12:23:48 |
| 15 | Q.   No, you don't think your client's marketing | 12:23:49 |
| 16 | efforts have been shadowy in general? | 12:23:54 |
| 17 | A.   My client's marketing -- | 12:23:56 |
| 18 | Q.   I keep saying -- do you think that Thru's | 12:23:57 |
| 19 | marketing efforts in general are shadowy? | 12:23:58 |
| 20 | A.   I do not. | 12:24:02 |
| 21 | Q.   Why did you describe this marketing effort as | 12:24:02 |
| 22 | shadowy? | 12:24:06 |
| 23 | A.   Well, I think it's a way of fighting back | 12:24:07 |
| 24 | without being too overt about it, and considering, you | 12:24:10 |
| 25 | know, the limited resources of the company, you know, | 12:24:19 |

```
 1    these marketing people are doing the best they can.        12:24:22
 2         Q.   But they did so in a shadowy way is your          12:24:25
 3    testimony?                                                  12:24:30
 4         A.   Well, I think that's just in this one             12:24:30
 5    reference.                                                  12:24:35
 6         Q.   Is this the only shadowy marketing effort that    12:24:35
 7    you're aware of by your company Thru?                       12:24:40
 8         A.   Well, I'm not going to describe my company's      12:24:41
 9    efforts as shadowy, but this is more of an inference,       12:24:43
10    and maybe that comes across shadowy.  Maybe I misspoke.     12:24:47
11         Q.   Did you ever give instructions to Thru            12:24:51
12    employees that they should use the term dropbox only in     12:25:11
13    a specific manner to refer to the function within the       12:25:13
14    Thru software?                                              12:25:15
15         A.   I don't recall.                                   12:25:16
16         Q.   Who is Su Simha?                                  12:25:21
17         A.   Subhashini Simha is VP of product and             12:25:27
18    marketing.                                                  12:25:32
19         Q.   When did she join Thru?                           12:25:32
20         A.   I believe the fall 2014.                          12:25:40
21         Q.   As I understand it, she's having some             12:25:42
22    immigration issues currently.                               12:25:44
23         A.   Yes.                                              12:25:46
24         Q.   Are you aware of those?                           12:25:46
25         A.   Yes.                                              12:25:47
```

LEE HARRISON - 7/13/2016

Page 106

1   filed, which I believe was yesterday -- we should get          12:28:13

2   confirmation today -- she would not be able to come back       12:28:15

3   for 60 days, and we don't want that.                           12:28:17

4        Q.   (BY MR. KRAMER)  And you learned about this on        12:28:19

5   July 1st?                                                      12:28:21

6        A.   Friday the 1st, I believe.                           12:28:22

7             MR. KRAMER:  Let's have this marked as               12:28:29

8   36.                                                            12:28:31

9             (Exhibit 36 marked.)                                 12:28:31

10       Q.   (BY MR. KRAMER)  This is a document Thru             12:28:43

11   produced to us bearing Bates numbers 0813542 to 43, an        12:28:47

12   August 2015 e-mail from Subhashini Simha to Thru Staff        12:28:56

13   with a cc to you.  The subject line reads IMPORTANT, in       12:29:06

14   all caps, dropbox term usage in customer facing               12:29:08

15   materials and communications, closed quote.  The e-mail      12:29:12

16   sets forth instructions to stop using variations of the      12:29:16

17   word dropbox in Thru materials.                               12:29:23

18            Let me ask you, sir.  An e-mail to the address       12:29:25

19   Thru Staff that appears in Exhibit 36, does that reach        12:29:27

20   everyone in the company?                                      12:29:31

21       A.   It should, yes.                                      12:29:32

22       Q.   Do you know why Ms. Simha sent out this              12:29:33

23   message?                                                      12:29:44

24       A.   Well, it's part of her job to clean up any          12:29:44

25   usage of any of our branding materials.                       12:29:47

LEE HARRISON - 7/13/2016

Page 107

1      Q.   You're aware, are you not, that at the time      12:29:53

2  she gave this instruction people within Thru had long     12:29:59

3  used all sorts of phrases at Thru containing the word      12:30:01

4  dropbox?                                                   12:30:05

5      A.   I'm aware that there are variations of it,       12:30:05

6  yes.                                                       12:30:06

7      Q.   They were using Secure Enterprise Dropbox,       12:30:06

8  Secure Dropbox, Thru Dropbox, My Secure Dropbox?  All      12:30:10

9  yes?                                                       12:30:14

10     A.   All yes.                                          12:30:14

11     Q.   Why did Thru want that to stop in August of      12:30:14

12 2015?                                                      12:30:18

13     A.   Ms. Simha is very, very thorough and likes       12:30:18

14 things to be in a certain order always, and if she --     12:30:31

15 obviously this e-mail is her actually explaining why,      12:30:37

16 but she wants things to be a certain way and that's        12:30:39

17 going to -- that's why she sent this out.                  12:30:42

18     Q.   She didn't send it out for the first year and    12:30:44

19 a half she was at the company, but she sent it out in      12:30:47

20 August of 2015.  Why?                                      12:30:50

21     A.   I think she felt like we were using the --       12:30:52

22 using the mark incorrectly.  She wanted to clean it up.    12:30:58

23     Q.   Why at this time was it "IMPORTANT," in all      12:31:01

24 caps, in August 2015?                                      12:31:06

25     A.   I can only say that she must have done some      12:31:08

1   research and decided this is the way it should be.          12:31:14

2        Q.   Did you direct her to send this message out,      12:31:16

3   sir?                                                         12:31:19

4        A.   I did not.  I might have consulted with her on     12:31:19

5   it, I don't recall, but I talked to her.                     12:31:21

6        Q.   It was because Thru wanted to present a            12:31:25

7   picture of consistent use of a trademark for purposes of    12:31:27

8   this litigation.  Right?                                     12:31:30

9        A.   That's possible.                                   12:31:31

10        Q.   You know that to be so, don't you, sir?            12:31:34

11        A.   Well, I don't know that to be so, but it could    12:31:36

12   be so that we're not diluting our brand as well.            12:31:41

13        Q.   Isn't that why in the first sentence of her       12:31:45

14   e-mail she says, We are in the midst of the legal           12:31:47

15   conflict relating to the dropbox term usage.  She sent      12:31:52

16   this out because she wanted to clean up Thru's use of       12:31:52

17   the term dropbox and present it as though it had been       12:31:56

18   united as of August 2015.  Uniform is the word I meant.     12:31:57

19   Correct?                                                     12:32:02

20        A.   Correct.                                           12:32:04

21        Q.   So just so the record's clear, she wanted Thru    12:32:04

22   to be able to present that its use of the term dropbox      12:32:10

23   was uniform for purposes of this litigation.  Correct?      12:32:14

24        A.   She wanted to present -- to clean up the usage    12:32:17

25   inside the company so that we didn't hurt ourselves in      12:32:23

LEE HARRISON - 7/13/2016

Page 110

| | | |
|---|---|---|
| 1 | verb prior to August 2015? | 12:33:33 |
| 2 | A.   It's possible. | 12:33:34 |
| 3 | Q.   Had they used it as a common noun, sir? | 12:33:35 |
| 4 | A.   Also possible. | 12:33:38 |
| 5 | Q.   Why couldn't people at Thru use dropbox as a | 12:33:39 |
| 6 | common noun going forward after August 2015? | 12:33:42 |
| 7 | A.   Because marketing controls what people do and | 12:33:44 |
| 8 | Ms. Simha wanted to control the signatures in a more | 12:33:51 |
| 9 | uniform way. | 12:33:54 |
| 10 | Q.   Why couldn't people use the term dropbox as a | 12:33:55 |
| 11 | common noun after August 2015? | 12:33:59 |
| 12 | A.   I don't know that the date is significant, but | 12:34:02 |
| 13 | I believe that she's trying to be consistent with the | 12:34:13 |
| 14 | usage of the term. | 12:34:18 |
| 15 | Q.   Because the usage of the term as a common noun | 12:34:19 |
| 16 | is not consistent with a company that claims trademark | 12:34:24 |
| 17 | rights in the term dropbox.  Correct? | 12:34:29 |
| 18 | A.   I believe it's not helpful for us to use it as | 12:34:31 |
| 19 | a common noun. | 12:34:33 |
| 20 | Q.   And you are aware, sir, that over the course | 12:34:34 |
| 21 | of Dropbox's -- strike that. | 12:34:36 |
| 22 | You are aware, sir, are you not, that over the | 12:34:36 |
| 23 | course of Thru's existence, employees regularly use the | 12:34:38 |
| 24 | term dropbox as a common noun at Thru? | 12:34:42 |
| 25 | A.   I am not aware of intended usage as a common | 12:34:45 |

LEE HARRISON - 7/13/2016

Page 111

```
 1    noun.  Perhaps as a lower case -- only for aesthetic        12:34:52
 2    reasons, but I don't believe it was used as a common        12:35:01
 3    noun necessarily, and there certainly could be rogue        12:35:03
 4    employees that are capable of doing almost anything,        12:35:08
 5    but --                                                      12:35:11
 6         Q.   You say rogue employees?                          12:35:14
 7         A.   Yeah.  That's why we're cleaning it up in this    12:35:15
 8    e-mail.                                                     12:35:19
 9         Q.   But you didn't send out instructions to your     12:35:19
10    employees like Ms. Simha's in 2004.  Right?                 12:35:23
11         A.   I didn't personally, no.                         12:35:25
12         Q.   Did anyone?                                       12:35:26
13         A.   I'm not aware of it.                              12:35:27
14         Q.   How about from 2005 to 2010?                      12:35:29
15         A.   I'm not aware of it.                              12:35:31
16         Q.   How about from 2010 to 2014?                      12:35:33
17         A.   I'm not aware.                                    12:35:35
18         Q.   Was Ms. Simha's instructions -- were             12:35:36
19    Ms. Simha's instructions followed?                          12:35:40
20         A.   I believe so.                                     12:35:42
21         Q.   You're not aware of instances in which Thru      12:35:44
22    employees continued to use the term dropbox, lower case     12:35:47
23    D, as an ordinary term to describe an ordinary function?    12:35:50
24         A.   It's possible, but I'm sure at each instance     12:35:53
25    Ms. Simha would try to police that.                         12:35:57
```

LEE HARRISON - 7/13/2016

Page 112

```
 1        Q.   In her e-mail in August 2015 Ms. Simha says      12:36:00
 2   that an e-mail signature that read My Thru Secure          12:36:04
 3   Dropbox, capital D, with the trademark symbol was          12:36:08
 4   incorrect.  Why was that incorrect?                        12:36:12
 5        A.   I don't remember why, but I think she probably   12:36:18
 6   wanted to shorten that.                                    12:36:20
 7        Q.   People had used My Thru Secure Dropbox for a     12:36:22
 8   long time in their e-mail signatures, had they not?       12:36:28
 9        A.   I believe they had.                              12:36:30
10        Q.   Had anyone said to the company prior to this     12:36:30
11   lawsuit and this e-mail the use of My Thru Secure          12:36:32
12   Dropbox with a trademark symbol was an improper use of    12:36:37
13   the term dropbox?                                          12:36:40
14        A.   Had anyone?                                      12:36:41
15        Q.   Yeah.                                            12:36:44
16        A.   Outside of counsel, probably not.               12:36:44
17        Q.   Ms. Simha instructs as of her message in        12:36:54
18   August 2015 that the correct usage is My Dropbox          12:37:00
19   trademark symbol.  Correct?                               12:37:05
20        A.   Correct.                                         12:37:06
21        Q.   Did that only become the correct usage after    12:37:07
22   this lawsuit was filed?                                    12:37:09
23        A.   No.  We had used it before, actually in 2004    12:37:10
24   as well.                                                   12:37:13
25        Q.   Why wasn't there an instruction to the company  12:37:14
```

1    prior to this time that that was the correct usage?          12:37:17

2         A.    Management failures.                              12:37:19

3         Q.    For 12 years?                                     12:37:24

4         A.    Possibly.                                         12:37:25

5         Q.    Well, is there any other explanation?            12:37:27

6         A.    I can't think of any.                             12:37:30

7         Q.    In Thru's interrogatory response to              12:37:31

8    interrogatory number 3, this is Exhibit 25, it wrote        12:37:39

9    that in 2004 Thru decided to include use of its             12:37:48

10   trademark Dropbox in the signature block of all Thru        12:37:52

11   employees's e-mails and, quote, since approximately         12:37:57

12   May 2004, this has been the practice so that all e-mails    12:38:02

13   sent by Thru employees have included a reference to         12:38:06

14   DROPBOX, all caps.   You verified that answer, did you      12:38:10

15   not, sir?                                                   12:38:14

16        A.    I did.                                            12:38:15

17        Q.    What did you do to determine that since          12:38:15

18   approximately May 2004 all e-mails sent by Thru            12:38:18

19   employees have included a reference to dropbox?            12:38:22

20        A.    Well, we regularly update what the signature     12:38:29

21   should look like.   The exception to that would probably   12:38:38

22   be replies might not have that.   I could correct that,    12:38:40

23   that replies might not have it, but all originating        12:38:43

24   e-mails should have the full block signature on them.      12:38:46

25        Q.    All full e-mails sent by Thru employees, it's    12:38:49

LEE HARRISON - 7/13/2016

Page 114

1    your testimony, contain a reference to DROPBOX, all          12:38:54
2    caps?                                                        12:38:58
3         A.    The best of my knowledge.                         12:38:58
4         Q.    You don't think that is a gross overstatement,    12:39:00
5    sir?                                                         12:39:02
6         A.    No, I don't.                                      12:39:02
7         Q.    That's not something that you made up in the      12:39:08
8    hopes of helping Thru's case here?                           12:39:11
9         A.    No.                                               12:39:14
10        Q.    So you stand by that statement now?               12:39:14
11        A.    I do, to the best of my knowledge.  I can't       12:39:15
12   police every e-mail.                                         12:39:20
13        Q.    And you didn't try until Ms. Simha's message      12:39:22
14   in August 2015, right?                                       12:39:25
15        A.    Well, there's an ad hoc policing of e-mails.      12:39:27
16   As you receive them, you might say you need to this.         12:39:32
17        Q.    Do you recall doing that?                         12:39:34
18        A.    I have on occasion.                               12:39:35
19        Q.    When?                                             12:39:36
20        A.    I don't recall the dates.                         12:39:36
21        Q.    Would it surprise you to learn that there are     12:39:40
22   thousands of e-mails sent by Thru employees that contain     12:39:43
23   no reference to dropbox whatsoever?                          12:39:47
24        A.    It wouldn't surprise me.                          12:39:50
25        Q.    And how, sir, could you swear under oath that     12:39:51

| | | |
|---|---|---|
| 1 | all e-mails sent since 2004 sent by Thru employees have | 12:39:54 |
| 2 | included a reference to dropbox if it wouldn't surprise | 12:39:58 |
| 3 | you that there are thousands that don't? | 12:40:00 |
| 4 | A.   Well, we asked our employees to do it, and | 12:40:02 |
| 5 | employees that send me things almost always have a full | 12:40:09 |
| 6 | signature block on them.  There are plenty of e-mails | 12:40:13 |
| 7 | that come that are from iPhones that might not have it | 12:40:16 |
| 8 | or text based e-mails that come from something else. | 12:40:19 |
| 9 | Q.   But none of that is in your interrogatory | 12:40:23 |
| 10 | response, sir.  You said all e-mails sent by Thru | 12:40:25 |
| 11 | employees contain a reference to dropbox.  Is that still | 12:40:27 |
| 12 | your testimony? | 12:40:29 |
| 13 | A.   I would say that we endeavored to have all | 12:40:30 |
| 14 | e-mails. | 12:40:38 |
| 15 | Q.   You didn't say that in the interrogatory | 12:40:39 |
| 16 | response? | 12:40:41 |
| 17 | A.   Yes.  That's probably incorrect. | 12:40:41 |
| 18 | Q.   So your interrogatory response is a gross | 12:40:43 |
| 19 | overstatement, wouldn't you agree? | 12:40:46 |
| 20 | A.   Well, you have to define gross.  If you have | 12:40:47 |
| 21 | those numbers. | 12:40:49 |
| 22 | Q.   Thousands and thousands of e-mails sent by | 12:40:50 |
| 23 | Thru employees contain no reference to dropbox | 12:40:53 |
| 24 | whatsoever, isn't that so, sir? | 12:40:56 |
| 25 | A.   I don't know the numbers. | 12:40:57 |

LEE HARRISON - 7/13/2016

Page 116

 1                      MR. KRAMER:  Let's keep going.  No. 37.        12:41:09

 2                      (Exhibit 37 marked.)                           12:41:11

 3          Q.   (BY MR. KRAMER)  Sir, taking a look at               12:41:24

 4     Exhibit 37 is a document produced by Thru bearing Bates        12:41:35

 5     numbers Thru-0854617.  Can you tell me what this is?           12:41:38

 6          A.   It looks like a DropBox page from a customer         12:41:44

 7     Navis.                                                         12:41:48

 8          Q.   Who is Navis?                                        12:41:53

 9          A.   A customer of Thru.                                  12:41:53

10          Q.   Can you be a little more specific or provide a       12:41:55

11     little more information?  Where are they located?             12:41:57

12          A.   I don't know where they're located.                 12:41:58

13          Q.   Do you know how big they are?                        12:41:59

14          A.   I don't know how big they are.                       12:42:01

15          Q.   We were talking earlier about the portal page       12:42:11

16     that a Thru customer might present to the outside world        12:42:15

17     from which others could send the customer files via the       12:42:22

18     DropBox functionality.  Is this an example of that?           12:42:27

19          A.   This is.                                             12:42:29

20          Q.   And is this hosted by Thru today?                    12:42:30

21          A.   It is.                                               12:42:34

22          Q.   Who designed this page?                              12:42:34

23          A.   It would be a collaborative effort over a            12:42:37

24     period of years with several people.                          12:42:43

25          Q.   So someone who comes to this page on the Navis       12:42:48

LEE HARRISON - 7/13/2016

Page 117

```
 1   website would see this?                          12:42:52
 2        A.   The Navis Thru site would see this.    12:42:53
 3        Q.   Okay.                                  12:42:57
 4        A.   They would not see this.  They would see the  12:42:59
 5   DropBox badge, and they would click on the DropBox badge  12:43:02
 6   and this would open up.                          12:43:07
 7        Q.   I see.  Okay.  Why is there a Cappcha,  12:43:09
 8   C-A-P-P-C-H-A, at the bottom of this page?       12:43:19
 9        A.   So that bots can't -- it's an open web page,  12:43:20
10   so that bots can't actually come in and upload things on  12:43:24
11   this page.                                       12:43:28
12        Q.   Would other Thru customers have a similar set  12:43:29
13   up for the DropBox functionality in Thru's product?  12:43:33
14        A.   Yes.                                   12:43:36
15        Q.   So they would navigate -- sorry.  So visitors  12:43:37
16   to Thru's customers's websites would see a page with a  12:43:43
17   DropBox functionality on it, click on it and be taken to  12:43:48
18   a page like this one for Thru's other customers?  12:43:55
19        A.   Customers -- people who navigate to the  12:43:57
20   customer's portal page through portal page would see a  12:44:04
21   DropBox button and click on that, and they would be able  12:44:10
22   to upload only to that customer's such as Navis's Thru  12:44:13
23   site, which is a separate website.               12:44:19
24        Q.   This web page, what's depicted in Exhibit 37,  12:44:25
25   is hosted by Thru.  Right?                       12:44:37
```

| | | |
|---|---|---|
| 1 | A.   Yes. | 12:44:38 |
| 2 | Q.   And it was designed by Thru in collaboration | 12:44:39 |
| 3 | with its customer Navis? | 12:44:42 |
| 4 | A.   No.   This is designed by Thru.   The only | 12:44:43 |
| 5 | custom component on here is their logo. | 12:44:47 |
| 6 | Q.   I see.  And Thru put the Navis logo there on | 12:44:50 |
| 7 | this page? | 12:44:56 |
| 8 | A.   I don't know.  The administrator of that | 12:44:56 |
| 9 | particular site, the Navis site, could have put it up | 12:45:00 |
| 10 | there, or they could have asked us to do it.  It's | 12:45:04 |
| 11 | self-serving. | 12:45:08 |
| 12 | Q.   Was this a standard layout for Thru's | 12:45:12 |
| 13 | customers, what's shown in Exhibit 37? | 12:45:15 |
| 14 | A.   At the time this was done, this was taken, | 12:45:17 |
| 15 | yes. | 12:45:21 |
| 16 | Q.   When was this, roughly? | 12:45:21 |
| 17 | A.   I don't know.  I don't know the date on this. | 12:45:24 |
| 18 | Q.   Is it still the design today? | 12:45:41 |
| 19 | A.   It's similar today. | 12:45:43 |
| 20 | Q.   So in designing this page, Thru left a space | 12:45:46 |
| 21 | for its customer to put its logo at the top left. | 12:45:51 |
| 22 | Correct? | 12:45:54 |
| 23 | A.   Correct. | 12:45:55 |
| 24 | Q.   And other Thru customers put their logo on | 12:45:56 |
| 25 | their similar pages.  Correct? | 12:46:04 |

LEE HARRISON - 7/13/2016

Page 119

| | | | | |
|---|---|---|---|---|
| 1 | A. | Correct. | | 12:46:05 |
| 2 | Q. | For how many other companies does Thru host | | 12:46:06 |
| 3 | web pages on which the word DropBox appears next to the | | | 12:46:09 |
| 4 | customer's logo? | | | 12:46:14 |
| 5 | A. | Every Thru customer. | | 12:46:19 |
| 6 | Q. | Which is how many? | | 12:46:20 |
| 7 | A. | There would be active today less than 200. | | 12:46:21 |
| 8 | Q. | And has that always been the case, sir? | | 12:46:32 |
| 9 | A. | Since introduction. | | 12:46:34 |
| 10 | Q. | Which was roughly when? | | 12:46:35 |
| 11 | A. | March 2004. | | 12:46:37 |

```
12         Q.   Let me move back to interrogatory number 9,      12:46:41
13   sir, in Exhibit 25.  Interrogatory 9, Dropbox asked Thru    12:47:04
14   to describe in detail all third party uses of the          12:47:19
15   DROPBOX mark of which it was aware, the date it became      12:47:23
16   aware and all efforts to enforce Thru's supposed rights     12:47:26
17   against those third parties.  In response, you listed       12:47:29
18   four other parties that Thru knew to be using the           12:47:33
19   DROPBOX mark.  Right?                                       12:47:36
20         A.   Yes.                                             12:47:38
21         Q.   Three schools and a competitor called            12:47:39
22   Syncplicity.  Syncplicity.  Right?                          12:47:42
23         A.   Syncplicity.                                     12:47:43
24         Q.   You say Thru has taken no action to enforce      12:47:45
25   its trademark rights against any of those.  Correct?       12:47:48
```

1        A.    No.                                          12:47:52

2        Q.    That's not correct, or you have not taken any    12:47:53

3    action?                                                12:47:55

4        A.    We have not.                                 12:47:55

5        Q.    Just so the record is clear, you have not   12:47:56

6    taken any action against any of the four entities you   12:48:00

7    identified in response to interrogatory number 9.     12:48:02

8    Correct?                                               12:48:04

9        A.    We have not taken any action to any of the  12:48:05

10   companies called out in interrogatory number 9.       12:48:08

11       Q.    The question, though, asked for a           12:48:10

12   comprehensive list of third party users of the term   12:48:13

13   Dropbox.  Is it your testimony that the four parties   12:48:16

14   that are listed there are the only other parties using    12:48:20

15   the term dropbox of whom Thru was ever aware?         12:48:23

16       A.    As far as I can recall, this is correct.    12:48:51

17       Q.    What about Officeware?                       12:48:53

18       A.    As I said earlier, we may have been aware of    12:48:56

19   that, but I don't recall it.                          12:49:00

20       Q.    Well, you were aware of it when you verified    12:49:02

21   the interrogatory response in 2015, were you not?     12:49:04

22       A.    I guess this takes into effect that another    12:49:07

23   interrogatory, I believe, speaks to the PTO filing and    12:49:15

24   Officeware in that, but I don't recall.              12:49:19

25       Q.    You were aware, were you not, when you      12:49:21

| | | |
|---|---|---|
| 1 | verified this interrogatory response that Officeware had | 12:49:23 |
| 2 | used the term dropbox in its software.  Right? | 12:49:25 |
| 3 | A.   We were aware of Officeware. | 12:49:28 |
| 4 | Q.   So when the question asked you to describe all | 12:49:30 |
| 5 | third party uses of the DROPBOX mark of which you are | 12:49:33 |
| 6 | aware, why didn't you list Officeware? | 12:49:37 |
| 7 | A.   I can't say.  I guess we forgot to -- forgot | 12:49:39 |
| 8 | them. | 12:49:48 |
| 9 | Q.   Are there any other companies you forgot to | 12:49:48 |
| 10 | list in response to your interrogatory number 9? | 12:49:50 |
| 11 | A.   Your client. | 12:49:52 |
| 12 | Q.   Anyone else? | 12:49:54 |
| 13 | A.   I don't think so. | 12:49:54 |
| 14 | Q.   How about YouSendIt? | 12:49:56 |
| 15 | A.   No. | 12:50:01 |
| 16 | Q.   You're not aware of YouSendIt? | 12:50:01 |
| 17 | A.   I am aware of YouSendIt, but -- | 12:50:03 |
| 18 | Q.   You're aware they use the term dropbox, are | 12:50:06 |
| 19 | you not, sir? | 12:50:09 |
| 20 | A.   I'm aware that they -- in the PTO they claimed | 12:50:09 |
| 21 | that -- or they were opposing the registration for your | 12:50:12 |
| 22 | client, but I didn't know they were using it and I don't | 12:50:18 |
| 23 | think they claim to use it. | 12:50:20 |
| 24 | Q.   Okay.  So sitting here today, you're not aware | 12:50:22 |
| 25 | of any other third party uses beyond the four that | 12:50:25 |

1   you've listed in Officeware?                          12:50:28

2       A.   Well, you've reminded me that I knew about   12:50:30

3   Apple.                                                12:50:38

4       Q.   Yes, sir.                                    12:50:38

5       A.   And they should be in here.                  12:50:39

6       Q.   And Box -- not Box, I'm sorry.  Apple and    12:50:40

7   Blackboard?                                           12:50:46

8       A.   I don't think I knew about Blackboard at the 12:50:47

9   time of this.  Maybe we did because it's in the link in 12:50:49

10  the -- I don't recall when we found out about         12:50:53

11  Blackboard.                                           12:50:56

12      Q.   Sir, let me just ask you the question again. 12:50:56

13      A.   Okay.                                         12:51:00

14      Q.   A comprehensive list, if you would, please, of 12:51:00

15  all third parties that you are aware of that use the  12:51:03

16  term dropbox?                                         12:51:06

17      A.   Well, there's Carnegie Mellon, Barry         12:51:10

18  University, Oakton College, Officeware, Apple and your 12:51:14

19  client.                                               12:51:22

20      Q.   Blackboard?                                   12:51:25

21      A.   Now Blackboard.                               12:51:26

22      Q.   YouSendIt?                                    12:51:27

23      A.   I don't think YouSendIt used it.             12:51:32

24      Q.   How about IntraLinks?                         12:51:34

25      A.   I don't think IntraLinks used it.  I don't   12:51:36

LEE HARRISON - 7/13/2016

Page 123

```
 1   know if they did or didn't, but --                      12:51:42
 2                (Exhibit 38 marked.)                        12:51:44
 3        Q.   (BY MR. KRAMER)  Exhibit 38, sir, e-mail from  12:51:57
 4   John Herr at Thru to Mr. Skybakmoen with a copy to you   12:52:05
 5   dated February 10, 2012 with a subject line IntraLinks   12:52:11
 6   Drop Box.  Do you see that?                              12:52:15
 7        A.   I do.                                          12:52:19
 8        Q.   Do you recall receiving this e-mail?           12:52:20
 9        A.   I don't.                                       12:52:21
10        Q.   Do you recognize it as an e-mail that's sent   12:52:22
11   through the Thru system?                                 12:52:24
12        A.   I do.                                          12:52:26
13        Q.   In this message Mr. Herr reports that he got   12:52:26
14   an e-mail from a Greg Sobieskei, S-O-B-I-E-S-K-E-I, at a 12:52:34
15   company called Intralinks containing a signature line    12:52:36
16   suggesting use of IntraLinks Drop Box for file transfer  12:52:38
17   purposes, and he forwarded that message to you.  You     12:52:42
18   were told in February 2012 that IntraLinks was using the 12:52:46
19   term Drop Box to promote a file transfer service.        12:52:51
20   Correct?                                                 12:52:55
21        A.   It appears so, yes.                            12:52:55
22        Q.   You were told that they were referencing the   12:52:56
23   functionality in their e-mail signatures at IntraLinks   12:52:59
24   just like at Thru.  Correct?                             12:53:03
25        A.   Yes.                                           12:53:05
```

1    Q.   Mr. Herr also sent you and Mr. Skybakmoen a    12:53:11
2    screenshot of the IntraLinks interface in this document.    12:53:18
3    Correct?    12:53:22
4    A.   Yes.    12:53:22
5    Q.   Did Thru do any further investigation into    12:53:23
6    IntraLinks's use with the Drop Box name in connection    12:53:27
7    with the IntraLinks file transfer service?    12:53:31
8    A.   I don't believe so.    12:53:33
9    Q.   Why isn't IntraLinks listed in response to    12:53:34
10   interrogatory number 9 as a company about whom Thru was    12:53:39
11   aware that was using the Drop Box term?    12:53:40
12   A.   I believe it's an oversight.    12:53:42
13   Q.   IntraLinks is a publicly traded company, is it    12:53:44
14   not?    12:53:47
15   A.   I believe they are.    12:53:47
16   Q.   It's a competitor to Thru, isn't it?    12:53:48
17   A.   No.  We've never run into them in a deal.    12:53:52
18   Q.   Did Thru ever contact this publicly traded    12:53:55
19   company IntraLinks to demand it stop use of the term    12:53:58
20   Drop Box in its file transfer service?    12:54:03
21   A.   No.    12:54:04
22   Q.   Thru had no problem with this use by    12:54:04
23   IntraLinks.  Right?    12:54:08
24   A.   Not true, but we didn't do anything about it.    12:54:09
25   Q.   Why not?    12:54:12

LEE HARRISON - 7/13/2016

Page 125

1      A.   It didn't seem -- I would say I don't recall          12:54:12

2  exactly, but they -- we never ran into them in a              12:54:17

3  competitive deal, so it probably wouldn't have risen to       12:54:23

4  a high level of priority at the time.                         12:54:29

5      Q.   Did anyone at Thru even suggest to you that          12:54:31

6  you should take action to stop this use by IntraLinks?        12:54:34

7      A.   No one suggested that to me.                          12:54:37

8      Q.   Why would Mr. Herr be bringing it to your            12:54:42

9  attention, sir, if you didn't think that Thru should be       12:54:45

10  taking action to do something about it?                       12:54:48

11      A.   I think this is competitive intelligence.           12:54:49

12      Q.   You said that IntraLinks wasn't even a              12:54:52

13  competitor, sir?                                              12:54:54

14      A.   Mr. Herr used to work at IntraLinks.                12:54:55

15      Q.   So he provided you with competitive                12:54:58

16  intelligence that showed IntraLinks was using the term       12:55:01

17  Drop Box in a file transfer service and marketing it in      12:55:04

18  its e-mail signatures, and you did nothing about it?         12:55:07

19      A.   We did nothing, correct.                            12:55:10

20      Q.   Prior to its counterclaim in this litigation,       12:55:27

21  sir, how many lawsuits did Thru file claiming that use       12:55:30

22  by others of the dropbox name infringed Thru's supposed      12:55:35

23  trademark in dropbox?                                         12:55:39

24      A.   None.                                                12:55:40

25      Q.   Thru didn't sue Apple over its use of the          12:55:44

LEE HARRISON - 7/13/2016

Page 126

```
 1  dropbox name.  Right?                                   12:55:47
 2       A.   No.                                           12:55:48
 3       Q.   Didn't sue IntraLinks or Officeware.  Right?  12:55:48
 4       A.   No.                                           12:55:52
 5       Q.   Didn't sue Blackboard?  Didn't sue YouSendIt? 12:55:53
 6       A.   No.                                           12:55:56
 7       Q.   Isn't the reason Thru never sued any of these 12:55:56
 8  parties is that Thru never really believed it had any   12:55:58
 9  trademark rights in the term dropbox?                   12:56:00
10       A.   Not true.                                     12:56:02
11       Q.   How many cease and desist letters did Thru    12:56:03
12  send to the other parties telling them that their use of 12:56:07
13  the term dropbox constituted trademark infringement?    12:56:10
14       A.   None.                                         12:56:12
15       Q.   Thru didn't send any cease and desist letters 12:56:12
16  to anybody regarding their use of the term dropbox.     12:56:17
17  Correct?                                                12:56:20
18       A.   No.                                           12:56:21
19       Q.   Why didn't Thru send any of them letters      12:56:21
20  directing them to stop using Thru's claimed trademark?  12:56:28
21       A.   Some were erratic in their use, and it didn't 12:56:31
22  seem that it was a good use of our time.                12:56:39
23       Q.   But Thru did --                               12:56:39
24       A.   Commercially it didn't seem like a good use of 12:56:42
25  time.                                                   12:56:45
```

LEE HARRISON - 7/13/2016

Page 127

```
 1       Q.   Thru did contact a host of companies about      12:56:45
 2   selling its supposed rights to the dropbox name, didn't  12:56:48
 3   it?                                                       12:56:48
 4       A.   Yes.                                             12:56:48
 5       Q.   It tried to sell its supposed rights in the     12:56:57
 6   dropbox name to Apple.  Right?                            12:56:58
 7       A.   We never contacted -- we reached out, never     12:56:59
 8   heard back.                                               12:57:01
 9       Q.   But you tried to contact Apple to sell them     12:57:01
10   Thru's supposed rights in dropbox.  Correct?             12:57:03
11       A.   Yes.                                             12:57:06
12       Q.   And Microsoft.  Correct?                         12:57:06
13       A.   Yes.                                             12:57:07
14       Q.   And IBM?                                         12:57:08
15       A.   Yes.                                             12:57:09
16       Q.   And YouSendIt?                                   12:57:10
17       A.   Yes.                                             12:57:11
18       Q.   How many others, sir?                            12:57:12
19       A.   Box.                                             12:57:13
20       Q.   Who else?                                        12:57:15
21       A.   I don't recall.  There are others, I think,     12:57:16
22   but I don't recall.                                       12:57:25
23       Q.   So Thru had time to reach out to propose        12:57:25
24   selling its supposed rights but never decided it was     12:57:31
25   worth its while to try to protect those supposed rights. 12:57:34
```

1    Where did your numbers come from?  What's the answer to          12:59:14
2    Mr. McCoy's question, Mr. Harrison?  Where do your               12:59:16
3    numbers come from?                                               12:59:22
4         A.   It's just a guess.                                     12:59:22
5         Q.   Box never made an offer of any kind to acquire         12:59:23
6    Thru's supposed rights in the dropbox name, did it?             12:59:30
7         A.   We never got that far.                                 12:59:32
8         Q.   So why were you so wrong in your guess that it         12:59:34
9    was going to offer several million dollars for Thru's           12:59:34
10   supposed rights in the word dropbox?                            12:59:39
11        A.   We stopped communicating.                              12:59:39
12        Q.   When you say we stopped communicating, who are        12:59:41
13   you referring to?                                                12:59:46
14        A.   Box and Thru.                                          12:59:47
15        Q.   Yes, but you projected that Thru was going            12:59:48
16   to -- sorry -- going to get an offer of several million         12:59:52
17   dollars from Box for its supposed rights and Box never          12:59:55
18   made an offer.  So my question to you is why were you so        12:59:59
19   off in your estimate to the board?                              13:00:02
20        A.   Well, it's just a guess of what it might be           13:00:06
21   worth to them.  You can't --                                    13:00:13
22        Q.   Where did you come up with your numbers?              13:00:14
23        A.   Just a guess.                                          13:00:17
24        Q.   And what was that guess based on?                     13:00:18
25        A.   Just pulled it out of the air.                        13:00:22

LEE HARRISON - 7/13/2016

Page 130

1      Q.   Isn't it true, sir, that Thru has never even      13:00:26

2    threatened to enforce its claimed rights to the word      13:00:32

3    dropbox against any third party other than my client?    13:00:36

4      A.   That's correct.                                   13:00:39

5      Q.   Was Thru profitable in 2013?                      13:00:40

6      A.   No.                                               13:00:55

7      Q.   How about 2014?                                   13:00:55

8      A.   No.                                               13:00:59

9      Q.   How about 2015?                                   13:01:00

10     A.   No.                                               13:01:01

11     Q.   How about this year?  How does it look?           13:01:01

12     A.   It looks pretty good.                             13:01:03

13     Q.   Profitable?                                       13:01:04

14     A.   Last quarter.                                     13:01:05

15     Q.   How is Thru continuing to operate at a loss       13:01:06

16   over 2013, 2014, 2015?  What's it using for capital?     13:01:12

17     A.   We have a shareholder base, and we raise money    13:01:17

18   amongst ourselves.                                       13:01:21

19     Q.   So it's important for Thru to hold out the        13:01:22

20   promise of a return to its investors in order to         13:01:24

21   continue operating.  Right?                              13:01:27

22     A.   Certainly any company operates that way.          13:01:28

23     Q.   Well, some companies operate at a profit so       13:01:32

24   they don't need to go back to investors regularly in     13:01:34

25   order to continue to operate, but Thru does?             13:01:37

1        A.    Well, Thru can be profitable at any time.  The          13:01:40

2   board actually encourages us to continue to grow by           13:01:44

3   adding money back to our capital base.  So if we needed       13:01:47

4   to be profitable, we could be profitable.                     13:01:52

5        Q.    What is Thru's current capitalization?             13:01:54

6        A.    We've raised about 18 million.                     13:02:05

7        Q.    Total?                                             13:02:10

8        A.    Total.                                             13:02:10

9        Q.    And how much of that is in the bank today?         13:02:11

10       A.    Cash, a little over a million.                     13:02:16

11       Q.    Sir, if Thru really believed it had trademark      13:02:20

12   rights in the term dropbox, why didn't it file an            13:02:35

13   opposition when Dropbox, Inc. applied to the Patent and      13:02:39

14   Trademark Office to register the trademark Dropbox?          13:02:44

15       A.    We weren't aware of it.                            13:02:48

16       Q.    I'm sorry.  You weren't aware of what?             13:02:49

17       A.    Of their filing.                                   13:02:50

18       Q.    Well, did Thru have a system of monitoring         13:02:52

19   trademark filings at the Patent and Trademark Office --      13:02:55

20       A.    No.                                                13:02:57

21       Q.    -- to identify other parties claiming rights       13:02:58

22   in any trademark Thru claimed to have?                       13:03:00

23       A.    No.                                                13:03:03

24       Q.    Why not?                                           13:03:08

25       A.    Just something we didn't do.                       13:03:08

```
 1                    MR. CONE:  David, you know you've taken      14:03:36

 2     his deposition, you've gone over this.                     14:03:37

 3                    MR. KRAMER:  True.                           14:03:39

 4                    MR. CONE:  Do you want to do it again?       14:03:40

 5                    MR. KRAMER:  I would like to hear            14:03:41

 6     Mr. Harrison's understanding.                              14:03:43

 7                    MR. CONE:  Okay.                             14:03:44

 8        A.   He left over the weekend, and just from            14:03:44

 9     sitting in on his deposition he said because the job       14:03:54

10     wasn't what he thought it was.  I have not spoken with     14:03:57

11     him since he left.                                         14:04:00

12        Q.   (BY MR. KRAMER)  You haven't spoken with him       14:04:00

13     since he left, but you said in my question about this      14:04:02

14     interrogatory response that you spoke to him in order to   14:04:07

15     get the information prior to verifying?                    14:04:10

16        A.   Well, I had spoken with him in 2011.  That's       14:04:11

17     how I responded to the first response here.                14:04:14

18        Q.   Okay.  But my question was in investigating        14:04:17

19     the veracity of this response, with whom did you speak.    14:04:24

20     And you said Mr. Skybakmoen.  Is that not true?            14:04:28

21        A.   I said I spoke to Thomas Skybakmoen to -- in       14:04:34

22     this response because he's made me aware, but I spoke to   14:04:41

23     other employees once we got the interrogatory, to answer  14:04:46

24     the interrogatory.                                         14:04:53

25        Q.   Okay.  So you haven't with Mr. Skybakmoen          14:04:54
```

```
 1   since he left Thru?                                 14:04:57

 2        A.   Other than at the deposition, no.         14:04:59

 3        Q.   Thru did not threaten Mr. Skybakmoen with any  14:05:00

 4   legal action of any kind?                           14:05:04

 5        A.   None.                                      14:05:05

 6        Q.   And Thru has not offered him anything in   14:05:06

 7   exchange for supporting Thru in connection with this  14:05:08

 8   lawsuit?                                             14:05:11

 9        A.   Absolutely not.                            14:05:11

10        Q.   Have you asked someone else to reach out to  14:05:14

11   him on Thru's behalf?                               14:05:17

12        A.   No.                                        14:05:18

13        Q.   So I was asking you about this investigation  14:05:22

14   you did prior to verifying this interrogatory response.  14:05:24

15   Did you speak with Mr. Arutiunov about the issue of when  14:05:27

16   Thru first learned of Dropbox, Inc.?                 14:05:31

17        A.   I did.                                     14:05:34

18        Q.   And again, who was he?                     14:05:34

19        A.   He is the CTO of the company.             14:05:35

20        Q.   And he's been at Thru since the beginning?  14:05:39

21        A.   About a year in.                           14:05:42

22        Q.   So 2003ish or '04ish?                      14:05:43

23        A.   Really 2002, the fall of 2002.  So four or  14:05:48

24   five months into the company.                       14:05:53

25        Q.   So your investigation confirmed that Thru  14:05:54
```

LEE HARRISON - 7/13/2016

Page 137

1    first learned of Dropbox, Inc. in the summer of 2011.          14:05:58

2    Is that right?                                                 14:06:01

3         A.   That's right.                                        14:06:02

4         Q.   Did you know that Dropbox, Inc. had 3 million        14:06:02

5    users by the end of 2009, sir?                                 14:06:05

6         A.   No, I didn't.                                        14:06:08

7         Q.   Did you see the article on Dropbox, Inc. in          14:06:09

8    2009 in The New York Times?                                    14:06:13

9         A.   No.                                                  14:06:14

10        Q.   How about the story on Dropbox, Inc. on CNN in       14:06:14

11   2009?                                                          14:06:20

12        A.   No.                                                  14:06:20

13        Q.   How about the article in Mac World in 2009?          14:06:20

14        A.   No.                                                  14:06:24

15        Q.   Did you read the Dropbox story on News.com in        14:06:24

16   2009?                                                          14:06:28

17        A.   No.                                                  14:06:28

18        Q.   How about any of the stories about Dropbox on        14:06:29

19   Tech Crunch in 2009 that highlighted Dropbox, Inc. as a        14:06:32

20   file sync and file transfer service?  Did you read those      14:06:36

21   when they were published in 2009?                              14:06:40

22        A.   I did not.                                           14:06:41

23        Q.   Is it your testimony, sir, that you didn't          14:06:42

24   read any of the countless stories about Dropbox, Inc. in       14:06:46

25   the popular press in 2009?                                     14:06:51

LEE HARRISON - 7/13/2016

Page 138

```
 1        A.    I did not.                              14:06:52

 2        Q.    How about any of the countless press stories  14:06:52

 3   about Dropbox, Inc. in 2010 in the popular press?   14:06:55

 4        A.    No.                                      14:06:57

 5        Q.    So you didn't see the article on Dropbox, Inc.  14:06:58

 6   in Forbes in 2010?                                  14:07:03

 7        A.    No.                                      14:07:04

 8        Q.    How about the article in Wired that same year?  14:07:04

 9        A.    No.                                      14:07:07

10        Q.    You didn't see the articles in PC World or Mac  14:07:07

11   World about Dropbox, Inc. in 2010?                  14:07:10

12        A.    No, I did not.                           14:07:14

13        Q.    And you didn't read any of the numerous  14:07:15

14   articles about Dropbox, Inc. on Tech Crunch in 2010?  14:07:17

15        A.    No.                                      14:07:20

16        Q.    So you're telling me that the CEO of a company  14:07:20

17   in the file transfer and storage business hadn't heard  14:07:22

18   of Dropbox, Inc. before the summer of 2011 by which time  14:07:27

19   it had roughly 40 million users?                    14:07:28

20        A.    That's correct.                          14:07:30

21        Q.    Okay.  Tell me more about the conversation, if  14:07:30

22   you would, between you and Mr. Skybakmoen in which you  14:07:34

23   say you first heard of Dropbox, Inc.?               14:07:37

24        A.    Well, Mr. Skybakmoen is a former analyst at  14:07:41

25   Gartner, and he informed me as an analyst at Gartner  14:07:43
```

LEE HARRISON - 7/13/2016

Page 139

```
1    about this new company and what they were doing, and      14:07:48
2    that was a conversation while he was still at Gartner.     14:07:53
3         Q.   Was it in person or by phone?                    14:07:57
4         A.   By phone.                                        14:07:59
5         Q.   What was the occasion for the conversation?      14:08:00
6         A.   I don't recall exactly, but it was probably      14:08:02
7    one of our regular analyst briefings we do with Gartner.   14:08:06
8         Q.   Now in your response you say, Mr. Skybakmoen     14:08:11
9    first brought Dropbox's trademark infringement to your     14:08:14
10   attention in the summer of 2011.  Can you be more          14:08:18
11   precise than summer 2011?                                  14:08:21
12        A.   Not really, no.                                  14:08:23
13        Q.   Early summer?  Late summer?                      14:08:27
14        A.   Early summer.                                    14:08:30
15        Q.   Was it a function of a quarterly meeting that    14:08:31
16   Thru had with Gartner?                                     14:08:34
17        A.   I don't recall.                                  14:08:37
18        Q.   Would the conversation be on your calendar?      14:08:38
19        A.   Probably not because I probably didn't           14:08:41
20   organize it.                                               14:08:45
21        Q.   Okay.  What was Mr. Skybakmoen's title when he   14:08:48
22   came to the company Thru?                                  14:08:54
23        A.   VP of marketing.                                 14:08:57
24        Q.   When did he join?                                14:08:58
25        A.   I believe late 2011.  August 2011, I believe.    14:09:02
```

LEE HARRISON - 7/13/2016

Page 153

```
 1   Dropbox, Inc., right?                                  14:26:43
 2        A.   It is.                                        14:26:44
 3        Q.   The point of Mr. Richardson's message in      14:26:44
 4   January 2011 was expressly to make you aware of Dropbox, 14:26:47
 5   Inc., wasn't it?                                        14:26:50
 6        A.   It appears so.                                14:26:51
 7        Q.   So you were aware of my client Dropbox in     14:26:52
 8   January 2011, weren't you?                              14:26:55
 9        A.   According to this e-mail, I was.              14:26:56
10        Q.   And so were a lot of other people at Thru.    14:26:59
11   Right?                                                  14:27:02
12        A.   There looks to be a lot of people on the     14:27:02
13   chain, yes.                                             14:27:04
14        Q.   Everyone on this chain was told about Dropbox 14:27:05
15   in 2011.  Right?                                        14:27:07
16        A.   It appears so.                                14:27:08
17        Q.   And what was your response to this message    14:27:11
18   from Mr. Richardson, sir?                               14:27:13
19        A.   I don't recall.                               14:27:15
20        Q.   You had no reaction at all?                   14:27:16
21        A.   I don't recall.                               14:27:17
22        Q.   You don't recall taking any action whatsoever 14:27:19
23   in response to learning about Dropbox, Inc. from        14:27:21
24   Mr. Richardson in January 2011.  Is that correct?       14:27:24
25        A.   I do not recall.                              14:27:27
```

| | | |
|---|---|---|
| 1 | Q.   You do not recall what? | 14:27:27 |
| 2 | A.   If any -- I don't recall this e-mail, one, and | 14:27:29 |
| 3 | then I don't recall taking any action. | 14:27:34 |
| 4 | Q.   Did it occur to you in January 2011, sir, that | 14:27:35 |
| 5 | Thru had rights in the Dropbox name and that Thru needed | 14:27:39 |
| 6 | to take action regarding Dropbox, Inc.'s use of the | 14:27:43 |
| 7 | name? | 14:27:46 |
| 8 | A.   If it did, I didn't do anything about it. | 14:27:46 |
| 9 | Q.   Did you say to anyone in response to this | 14:27:53 |
| 10 | e-mail that Thru had rights in the Dropbox name? | 14:27:54 |
| 11 | A.   I don't recall. | 14:27:57 |
| 12 | Q.   Did anyone say at that time, anyone say at | 14:27:57 |
| 13 | that time, January 2011, that Thru needed to take action | 14:28:00 |
| 14 | to stop Dropbox, Inc.'s use of the name? | 14:28:02 |
| 15 | A.   Not that I recall. | 14:28:07 |
| 16 | Q.   You see that Mr. Arutiunov responds to the | 14:28:08 |
| 17 | message at the top of the e-mail in January 2011, | 14:28:10 |
| 18 | quote, We are aware of Dropbox.  It is a tool to sync | 14:28:15 |
| 19 | the file between different devices.  Do you know who | 14:28:19 |
| 20 | Mr. Arutiunov is referring to when he says we are aware | 14:28:26 |
| 21 | of Dropbox? | 14:28:28 |
| 22 | A.   I do not. | 14:28:29 |
| 23 | Q.   Does he mean you, sir? | 14:28:30 |
| 24 | A.   Unclear to me. | 14:28:32 |
| 25 | Q.   Were you aware of Dropbox even prior to | 14:28:34 |

1    receiving this e-mail in January 2011?                    14:28:37

2        A.   I don't believe so.                              14:28:39

3        Q.   Well, you agree with me that at least            14:28:41

4    according to this e-mail, Mr. Arutiunov and others knew   14:28:43

5    about Dropbox even before receiving this e-mail.  Right?  14:28:46

6        A.   I do.                                            14:28:49

7        Q.   But you didn't learn that when you supposedly    14:28:50

8    investigated Thru's answer to interrogatory number 12     14:28:55

9    and swore Thru didn't know about Dropbox, Inc. until the  14:28:57

10   summer of 2011.  Right?                                   14:29:01

11       A.   Yeah, it appears I overlooked this.              14:29:02

12       Q.   According to Thru's website, Daniel Hurtubise    14:29:05

13   is the vice president of customer experience at Thru.     14:29:10

14   Correct?                                                  14:29:14

15       A.   Correct.                                         14:29:14

16       Q.   How long has he been at Thru?                    14:29:14

17       A.   Daniel's been in and out a couple of times, so   14:29:16

18   he just started back again about a year ago.              14:29:21

19       Q.   When you swore that Thru wasn't aware of         14:29:23

20   Dropbox, Inc. and its use of the Dropbox name until the   14:29:26

21   summer of 2011, were you including Mr. Hurtubise as part  14:29:30

22   of Thru?                                                  14:29:33

23       A.   I would have to say yes.                         14:29:38

24       Q.   How is it possible, sir, that you didn't know    14:29:40

25   that Mr. Hurtubise, in fact, was aware of Dropbox, Inc.   14:29:44

LEE HARRISON - 7/13/2016

Page 156

```
 1    and its use of the Dropbox name even before          14:29:46
 2    January 2011?                                         14:29:49
 3          A.   Can you repeat that?                       14:29:52
 4          Q.   How is it possible that you did not know that   14:29:53
 5    Mr. Hurtubise, in fact, was aware of Dropbox, Inc. and    14:29:56
 6    its use of the Dropbox name even before January 2011?    14:29:59
 7          A.   It's possible that it was overlooked that he    14:30:04
 8    knew, if he knew.                                     14:30:12
 9          Q.   Did you ask him in verifying this          14:30:13
10    interrogatory?                                        14:30:15
11          A.   I didn't personally ask.  We had an intern     14:30:15
12    ask.                                                  14:30:17
13          Q.   Did the intern verify the responses, sir, or   14:30:17
14    did you?                                              14:30:20
15          A.   I verified the responses.                  14:30:21
16               (Exhibit 41 marked.)                       14:30:30
17          Q.   (BY MR. KRAMER)  Exhibit 41, a document     14:30:47
18    produced to us in discovery by Thru bearing Bates    14:30:51
19    numbers 1011452 to 54.  It's an e-mail exchange between   14:30:53
20    a prospective Thru customer and Mr. Hurtubise.       14:31:01
21    Responding to Mr. Hurtubise's invitation to set up a    14:31:01
22    call to discuss Thru's services, the prospect replies,   14:31:06
23    quote, Sometime between my correspondence and your    14:31:10
24    reply, I found an application called Dropbox,        14:31:14
25    www.dropbox.com.  It's not as sophisticated as Thru's   14:31:20
```

LEE HARRISON - 7/13/2016

Page 157

```
 1   product, but it serves my needs, both professionally and      14:31:23
 2   personally.  Do you see that?                                 14:31:27
 3       A.   I see it.                                            14:31:28
 4       Q.   This was a potential Thru customer that             14:31:29
 5   decided to use Dropbox, Inc.'s product instead of Thru's      14:31:31
 6   product.  Right?                                             14:31:35
 7       A.   It appears so.                                      14:31:35
 8       Q.   And that was January 2010?                          14:31:36
 9       A.   Yes.                                                14:31:38
10       Q.   Are you telling me that Mr. Hurtubise did not       14:31:38
11   bring Dropbox, Inc. to your attention in January 2010?       14:31:40
12       A.   Not that I recall.                                  14:31:45
13       Q.   Well, would you recall it, sir, given that          14:31:46
14   Thru was losing potential business to Dropbox at the         14:31:49
15   time?                                                        14:31:52
16       A.   Perhaps, but I don't recall this at all.            14:31:52
17       Q.   Sir, the truth is you knew about Dropbox, Inc.      14:31:57
18   at least as early as June 2009, isn't it?                    14:32:00
19       A.   Not that I recall, no.                              14:32:05
20            (Exhibit 42 marked.)                                14:32:13
21       Q.   (BY MR. KRAMER)  Exhibit 42, another e-mail         14:32:25
22   produced to us by Thru in this case, bearing Bates           14:32:34
23   number 1634420, an e-mail from Sergey Arutiunov to you,      14:32:37
24   Lee Harrison, among others, with the subject line,           14:32:43
25   Another site - Dropbox.                                      14:32:46
```

LEE HARRISON - 7/13/2016

Page 158

| | | |
|---|---|---|
| 1 | Mr. Arutiunov's message includes a hyperlink | 14:32:50 |
| 2 | to the Dropbox, Inc. website, then at | 14:32:53 |
| 3 | www.getdropbox.com.  Then he adds a brief description, | 14:33:01 |
| 4 | quote, To sync the files across computers, Win and Mac | 14:33:04 |
| 5 | versions exist, closed quote.  Mr. Arutiunov wrote | 14:33:07 |
| 6 | specifically to tell you about my client Dropbox back in | 14:33:09 |
| 7 | June 2009.  Right? | 14:33:12 |
| 8 | A.   Yes. | 14:33:13 |
| 9 | Q.   Any idea why he was writing to you to tell you | 14:33:13 |
| 10 | about another, underlined, site called Dropbox that | 14:33:17 |
| 11 | allowed file syncing across computers? | 14:33:23 |
| 12 | A.   I do not know. | 14:33:29 |
| 13 | Q.   Do you have a reasonable understanding about | 14:33:30 |
| 14 | why he might have been writing to you about another site | 14:33:32 |
| 15 | at the time? | 14:33:34 |
| 16 | A.   Well, I can only assume there was another | 14:33:34 |
| 17 | site. | 14:33:36 |
| 18 | Q.   Other sites that allowed for file syncing | 14:33:37 |
| 19 | across computers.  Correct? | 14:33:41 |
| 20 | A.   Perhaps.  That sounds reasonable. | 14:33:42 |
| 21 | Q.   Were you and Mr. Arutiunov discussing in 2009 | 14:33:44 |
| 22 | the various sites that allowed for file syncing across | 14:33:47 |
| 23 | computers? | 14:33:51 |
| 24 | A.   It's possible. | 14:33:51 |
| 25 | Q.   Why would it be of interest to you that there | 14:33:55 |

1   was another site allowing for file syncing across          14:33:58

2   computers in June of 2009, sir?                            14:34:02

3        A.   There could have been another site that was      14:34:04

4   competitive to us that was syncing files across            14:34:07

5   computers.                                                 14:34:09

6        Q.   Like Dropbox?                                     14:34:10

7        A.   Or like somebody else.  I don't know.             14:34:11

8        Q.   But like Dropbox in particular?                   14:34:12

9        A.   I can't say.                                      14:34:14

10       Q.   Well, what other reason would Mr. Arutiunov       14:34:15

11  have for bringing this to your attention, sir?             14:34:18

12       A.   To make me aware that there are other sites       14:34:20

13  that are doing this.                                       14:34:25

14       Q.   But why would he think you cared about such a     14:34:26

15  thing?                                                     14:34:28

16       A.   Competitive analysis.                            14:34:29

17       Q.   What was your reaction, sir, when                14:34:33

18  Mr. Arutiunov wrote to you specifically in June 2009 to    14:34:39

19  tell you about my client Dropbox?                         14:34:42

20       A.   I do not recall.                                 14:34:44

21       Q.   Did you say to anyone then that Thru had         14:34:45

22  trademark rights in the Dropbox name?                     14:34:48

23       A.   I don't recall.                                  14:34:51

24       Q.   Did you take any action whatsoever regarding     14:34:52

25  Dropbox's use of the Dropbox name when you were told      14:34:55

 1    about it specifically in June 2009?                    14:34:57

 2         A.   I did not.                                    14:35:00

 3         Q.   If you really believed that Thru had the     14:35:01

 4    exclusive right to use the trademark Dropbox for a file 14:35:04

 5    transfer technology, why didn't you do anything to     14:35:07

 6    address Dropbox's use of the name in June of 2009?     14:35:10

 7         A.   It didn't rise to the level of priority      14:35:14

 8    commercially to us at the time.                        14:35:18

 9         Q.   Meaning it was not a priority commercially to 14:35:24

10    enforce this supposed brand that you had established in 14:35:29

11    the Dropbox name?                                      14:35:31

12         A.   Well, it didn't -- I can't recall exactly why, 14:35:31

13    but I would say that's the way we make decisions is    14:35:34

14    priority.                                              14:35:37

15         Q.   You understood in June 2009 that my client   14:35:38

16    Dropbox already had a prominent public footprint, didn't 14:35:40

17    you?                                                   14:35:44

18         A.   No.                                          14:35:44

19                   (Exhibit 43 marked.)                    14:35:51

20                   MR. KRAMER:   43.                       14:35:53

21         Q.   (BY MR. KRAMER)  Exhibit 43, another e-mail  14:36:03

22    produced to us by Thru dated June 15, 2009 bearing Bates 14:36:06

23    number 1636233 to 35.  It's an e-mail, the last in time 14:36:11

24    from Sergey Arutiunov to you and Mr. Hurtubise.        14:36:20

25    Mr. Arutiunov writes, quote, Are we okay with web-only 14:36:25

LEE HARRISON - 7/13/2016

Page 161

1   write only dropbox or we will need something like          14:36:28

2   getdropbox.com, referring to my client.  He then goes on   14:36:33

3   to say, They are very prominent in Mac community, and it   14:36:37

4   includes a link to a wiki for my client's product.        14:36:41

5   Mr. Arutiunov told you in June 2009 that my client         14:36:46

6   Dropbox was very prominent in the Mac community, right?    14:36:50

7       A.   It so states, yes.                                14:36:54

8       Q.   I'll ask you again, sir, why did Thru not take    14:36:56

9   any action regarding Dropbox, Inc.'s use of the term       14:36:59

10  Dropbox in June 2009?                                      14:37:02

11      A.   It didn't seem like it was commercially the       14:37:04

12  right thing to do at the time.                             14:37:07

13      Q.   It didn't even occur to you because you didn't    14:37:09

14  believe Thru had any rights to the term dropbox in         14:37:11

15  June 2009.  Right, sir?                                    14:37:15

16      A.   No, that's incorrect.                             14:37:16

17      Q.   Let me ask you this, sir.  Notwithstanding        14:37:17

18  Thru's sworn interrogatory response that you verified,     14:37:19

19  when did Thru actually learn about Dropbox, Inc. and its   14:37:22

20  use of the Dropbox name?                                   14:37:26

21      A.   Well, as early as June 15, 2009.                  14:37:27

22      Q.   In fact, it was earlier than that, wasn't it,     14:37:30

23  sir?                                                       14:37:33

24      A.   Not that I recall.                                14:37:33

25      Q.   Your interrogatory response was false to         14:37:35

LEE HARRISON - 7/13/2016

Page 162

| | | |
|---|---|---|
| 1 | interrogatory number 12.  Right? | 14:37:40 |
| 2 | A.   It is flawed. | 14:37:41 |
| 3 | Q.   False.  Right? | 14:37:43 |
| 4 | A.   Yes. | 14:37:45 |
| 5 | MR. KRAMER:  Let's take a break. | 14:37:51 |
| 6 | THE VIDEOGRAPHER:  We're off the record. | 14:37:52 |
| 7 | The time is 2:39 p.m. | 14:37:53 |
| 8 | (Break from 2:39 p.m. to 2:54 p.m.) | 14:37:55 |
| 9 | THE VIDEOGRAPHER:  We're back on the | 14:53:26 |
| 10 | records.  The time is 2:54 p.m. | 14:53:29 |
| 11 | Q.   (BY MR. KRAMER)  Mr. Harrison, when did you | 14:53:31 |
| 12 | first discuss with anyone a strategy for obtaining value | 14:53:32 |
| 13 | for Thru's supposed rights in the word Dropbox? | 14:53:37 |
| 14 | A.   I actually don't recall. | 14:53:40 |
| 15 | Q.   Do you recall discussing with a member of the | 14:53:45 |
| 16 | Thru board of directors a strategy for obtaining value | 14:53:47 |
| 17 | from someone else for Thru's supposed rights in the term | 14:53:50 |
| 18 | dropbox? | 14:53:53 |
| 19 | A.   I don't remember the date, but I'm sure it | 14:53:53 |
| 20 | would have been with the board. | 14:53:55 |
| 21 | Q.   Early in 2011, 2012? | 14:53:56 |
| 22 | A.   Could have been, yes. | 14:53:58 |
| 23 | Q.   Well, could have been anything, but I'm asking | 14:53:59 |
| 24 | you when you best -- your best recollection of when you | 14:54:03 |
| 25 | first discussed with a member of Thru's board of | 14:54:07 |

| | |
|---|---|
| 1 | directors the idea of obtaining value from someone for | 14:54:11 |
| 2 | Thru's supposed rights in the term dropbox? | 14:54:18 |
| 3 | A.    It could have been late 2011. | 14:54:19 |
| 4 | Q.    The first letter that Thru sent to Dropbox was | 14:54:20 |
| 5 | in late December 2011.  Right? | 14:54:24 |
| 6 | A.    I believe that's correct. | 14:54:26 |
| 7 | Q.    I think I've got it here.  In that letter | 14:54:27 |
| 8 | though, Mr. Harrison, Thru didn't demand that Dropbox, | 14:54:30 |
| 9 | Inc. cease to use the name Dropbox, did it? | 14:54:34 |
| 10 | A.    I would have to see the letter. | 14:54:36 |
| 11 | Q.    Thankfully I've got it right here. | 14:54:37 |
| 12 | MR. KRAMER:  Let's have this one marked | 14:54:42 |
| 13 | as 44. | 14:54:43 |
| 14 | (Exhibit 44 marked.) | 14:54:44 |
| 15 | Q.    (BY MR. KRAMER)  What's been marked as | 14:54:59 |
| 16 | Exhibit 44 is a letter from John M. Cone to my partner | 14:55:01 |
| 17 | John Slafsky dated December 8, 2011, with the subject | 14:55:06 |
| 18 | line trademark DROPBOX, all caps, and Dropbox, Inc., | 14:55:12 |
| 19 | init caps, and I will ask you to take a look at this | 14:55:19 |
| 20 | letter, sir, and confirm for me that in it Thru does not | 14:55:19 |
| 21 | demand that Dropbox, Inc. cease to use the Dropbox name. | 14:55:23 |
| 22 | Right? | 14:55:25 |
| 23 | A.    It does not. | 14:55:26 |
| 24 | Q.    Why not? | 14:55:27 |
| 25 | A.    Well, we thought probably we could work | 14:55:29 |

LEE HARRISON - 7/13/2016

Page 168

```
1      A.   Yes.                                              15:01:48

2      Q.   There's value there?                              15:01:50

3      A.   There's value there.                              15:01:51

4      Q.   If Thru really had been using the term dropbox    15:01:52

5    as a trademark to that point, why would you say, quote,  15:01:55

6    It turns out, closed quote, we own the term Dropbox?     15:01:59

7      A.   Well, I think it's just the way you talk to       15:02:02

8    people sometimes.  I don't think it's a statement of     15:02:05

9    whether on this particular day we woke up and said we    15:02:09

10   owned the Dropbox trademark.                             15:02:12

11     Q.   This was the particular day or shortly before     15:02:14

12   this that you woke up and said you owned the Thru -- the 15:02:17

13   Dropbox term, was it not?                                15:02:20

14     A.   I didn't wake up and say that.  And I think       15:02:22

15   the way this reads, New development turns out we own the 15:02:25

16   term Dropbox, is a way of communicating with Mr. Lucas   15:02:29

17   that there's value in that.                              15:02:33

18     Q.   Because there wasn't any value in it before,      15:02:34

19   sir?                                                     15:02:36

20     A.   Well, no.  That there's additional value.         15:02:36

21     Q.   You wrote to Mr. Lucas our legal team says we     15:02:39

22   have it.  What legal team was that, sir?                 15:03:03

23     A.   That would be John Cone.                          15:03:05

24     Q.   And that was a surprise to you that your legal    15:03:15

25   team said we have the term dropbox.  Right?              15:03:18
```

```
 1        A.   Well, it's not a surprise necessarily.        15:03:27

 2        Q.   Why did you need your legal team to tell you   15:03:27

 3   that if you believed it since 2004, sir?                 15:03:31

 4        A.   Well, you always want counsel to actually      15:03:31

 5   confirm what you believe.                                15:03:34

 6        Q.   But you wrote it was a new development that we  15:03:35

 7   own the term Dropbox?                                    15:03:39

 8        A.   I did write that.                              15:03:40

 9        Q.   And you meant by that, sir, that you had       15:03:42

10   seized upon a strategy to extract value for something    15:03:45

11   that you had not previously considered valuable.         15:03:47

12   Correct?                                                 15:03:50

13        A.   No, those are not my words.                    15:03:50

14        Q.   I'm asking you whether that's what you meant?  15:03:53

15        A.   I said, and I'll say it again, it looks like   15:03:54

16   there's more value here than we thought previously.      15:03:58

17   That's why I said it that way.                           15:04:00

18        Q.   Well, why didn't the word value show up in     15:04:02

19   your e-mail, sir?                                        15:04:05

20        A.   I can't answer that.  It's just the way I      15:04:06

21   wrote it.                                                15:04:13

22        Q.   Who is Mr. Lucas?                              15:04:19

23        A.   He's a significant shareholder of the company. 15:04:20

24        Q.   How significant?                               15:04:22

25        A.   Well, I guess he's probably the fourth         15:04:23
```

LEE HARRISON - 7/13/2016

 1    largest, fifth largest shareholder.                    15:04:28

 2        Q.    What percentage of the company does he own?   15:04:31

 3        A.    Probably 12 percent.  11 percent.            15:04:32

 4        Q.    Wouldn't he know if he owned 12 percent of the  15:04:36

 5    company that the company had rights to the term dropbox  15:04:40

 6    prior to this e-mail?                                  15:04:42

 7        A.    Well, he might or might not.                 15:04:43

 8        Q.    When did he become a shareholder, sir?       15:04:47

 9        A.    He became -- oh, I don't remember.  Maybe    15:04:49

10    2008.  I can't remember.                              15:04:56

11        Q.    But it was a new development to him in 2012   15:04:56

12    that Thru owned the term dropbox?                      15:05:01

13        A.    Yes, it looks like.                          15:05:05

14        Q.    You told Mr. Lucas three other companies are  15:05:08

15    suing Dropbox for the mark, YouSendIt, Box.net,        15:05:12

16    FilesAnywhere.  The latter two are Mark Cuban, 4       15:05:18

17    billionaire companies.  An action could be had soon.   15:05:23

18    The last phrase, an action could be had soon, closed   15:05:27

19    quote, what did that mean?                             15:05:31

20        A.    I would have to reread that.  I don't recall  15:05:32

21    my frame of mind when I wrote an action could be had   15:05:39

22    soon, but I could only think that what I'm trying to   15:05:43

23    communicate to Mr. Lucas is something impending could  15:05:46

24    happen around this.                                    15:05:50

25        Q.    That Thru could be filing a lawsuit against   15:05:50

```
 1   Dropbox, Inc. soon.  Right?                          15:05:53

 2        A.   Or we could make a deal.                   15:05:54

 3        Q.   That's what you meant by an action, a deal? 15:05:58

 4        A.   A deal could happen.                       15:06:02

 5        Q.   That's what that sentence means to you, an 15:06:04

 6   action could be had soon meant a deal could happen?  15:06:07

 7        A.   Well, when I refer to an action, I'm not an 15:06:10

 8   attorney, so I don't say an action.  I don't refer to an 15:06:13

 9   action as bringing a court action necessarily.       15:06:16

10        Q.   Is it your testimony, sir, that when you wrote 15:06:18

11   an action could be had soon, you were not referring to 15:06:21

12   filing a lawsuit against Dropbox, Inc.?              15:06:25

13        A.   I don't think we were contemplating that, but 15:06:26

14   I don't recall what I was thinking at that time.  We 15:06:33

15   could have been thinking about a lawsuit.           15:06:36

16        Q.   You reference in --                        15:06:37

17        A.   I'm sure we went back and forth about whether 15:06:38

18   we should or shouldn't.                              15:06:41

19        Q.   Back in this time frame?                   15:06:42

20        A.   Yes.                                       15:06:43

21        Q.   February 2012?                             15:06:43

22        A.   Yes.                                       15:06:44

23        Q.   When did you become aware that the company 15:06:45

24   called Officeware, AKA FilesAnywhere, had filed suit 15:06:48

25   against Dropbox regarding the Dropbox name?  You     15:06:53
```

LEE HARRISON - 7/13/2016

Page 172

```
 1   reference it in this e-mail, so I'm asking when did you      15:06:59
 2   first become aware of it?                                    15:07:03
 3        A.   I believe in the fall of 2011.                     15:07:04
 4        Q.   Do you know now that the case was filed in         15:07:06
 5   June of 2011?                                                15:07:09
 6        A.   I don't recall the dates.                          15:07:10
 7        Q.   The case was in Dallas.  Right?                     15:07:13
 8        A.   It was.                                            15:07:15
 9        Q.   And where is Thru's headquarters?                  15:07:15
10        A.   Irving.                                            15:07:18
11        Q.   Do pretty close to Dallas?                         15:07:18
12        A.   Pretty close.                                      15:07:20
13        Q.   How far?                                           15:07:20
14        A.   To what part of Dallas?                            15:07:21
15        Q.   Any part of Dallas.                                15:07:24
16        A.   Two miles to the city limits.                      15:07:25
17        Q.   Thru did not seek to intervene in a case in        15:07:28
18   its own hometown to assert what it claimed were senior       15:07:31
19   rights to Officeware, did it?                                15:07:34
20        A.   It didn't.                                         15:07:36
21        Q.   Thru was monitoring the litigation, though,        15:07:36
22   wasn't it?                                                   15:07:39
23        A.   We were.                                           15:07:40
24        Q.   You were personally monitoring the litigation.     15:07:40
25   Right?                                                       15:07:44
```

LEE HARRISON - 7/13/2016

Page 173

1          A.   Yes.                                          15:07:44

2          Q.   Thru chose not to participate in the         15:07:44

3    Officeware versus Dropbox litigation because it wanted  15:07:46

4    to see which party prevailed in the case and then assert 15:07:49

5    its supposed rights against the prevailing party.       15:07:53

6    Right?                                                   15:07:56

7          A.   That seemed to be a strategy at the time.     15:07:56

8          Q.   And that was fall 2011?                       15:07:58

9          A.   In that time period, yes.                     15:07:59

10         Q.   When did you decide that sitting on the side  15:08:02

11   lines was the best strategy for Thru to maximize its     15:08:04

12   value?                                                   15:08:07

13         A.   I don't recall the exact date.                15:08:07

14         Q.   Was it roughly the same time, fall of 2011?   15:08:09

15         A.   We're constantly mulling over what to do.  I  15:08:13

16   wouldn't say that there was ever a firm date as to       15:08:17

17   making an absolute decision that we're not going to do   15:08:20

18   something, but we -- it was always in discussion, should 15:08:22

19   we react in a certain way on a certain date, but we      15:08:26

20   didn't have a particular strategy as to not              15:08:29

21   reconsidering filing.                                    15:08:34

22         Q.   You recall that Thru filed an application to  15:08:35

23   cancel Dropbox's trademark registration for the term     15:08:55

24   Dropbox.  Right?                                         15:08:58

25         A.   I do.                                         15:08:59

1        Q.   That was in February of 2014 or so.  Correct?                    15:08:59

2        A.   I believe that's correct.                                        15:09:04

3        Q.   After you filed an application to cancel                         15:09:05

4    Dropbox's trademark, was the plan to file a lawsuit                       15:09:09

5    against Dropbox shortly thereafter?                                       15:09:12

6        A.   It was under consideration, but there was no                     15:09:13

7    firm plan in place.                                                       15:09:19

8                  MR. KRAMER:  45.                                            15:09:34

9                  THE REPORTER:  46.                                          15:09:35

10                 MR. KRAMER:  46.                                            15:09:36

11                 (Exhibit 46 marked.)                                        15:09:37

12       Q.   (BY MR. KRAMER)  Exhibit 46, sir, another                        15:09:38

13   e-mail produced to us in this litigation by Thru                          15:09:48

14   exchanged between you and Mr. Yonge on February 5 and 6                    15:09:53

15   of 2014.  In it -- in the fist in time message you told                   15:09:58

16   Mr. Yonge that, quote, We have filed a cancellation on                    15:10:03

17   Dropbox's registration efforts at the USPTO.  We will                     15:10:08

18   wait a few weeks to see what they do before we file a                     15:10:12

19   lawsuit.                                                                  15:10:15

20             Was Thru planning to file a lawsuit against                     15:10:16

21   Dropbox a few weeks after it filed to cancel Dropbox's                    15:10:18

22   trademark registration?                                                   15:10:22

23       A.   It was under consideration.                                      15:10:23

24       Q.   Why if you had just filed to cancel Dropbox's                    15:10:26

25   trademark registration were you considering filing a                     15:10:29

1    lawsuit against Dropbox a few weeks later?                    15:10:32

2        A.   I don't recall the exact strategy of waiting         15:10:36

3    or going forward with that actually.                          15:10:38

4        Q.   Let me ask it a little differently so I can be       15:10:40

5    clear.                                                        15:10:45

6             Why would it be necessary to file a lawsuit          15:10:45

7    against Dropbox if you had already asserted rights in         15:10:47

8    the Patent and Trademark Office via your cancellation         15:10:51

9    petition?                                                     15:10:56

10       A.   I can't say.  And maybe this is a bit of             15:10:56

11   bravado back on my part with our board member.  It might      15:10:59

12   not have been that we were going to file a lawsuit.           15:11:03

13       Q.   Let me see if I can get to the nub of the            15:11:05

14   issue, sir.                                                   15:11:06

15       A.   Yeah.                                                15:11:07

16       Q.   You understood that to get Dropbox, Inc. to         15:11:07

17   stop using the name Dropbox, you would have to file a         15:11:10

18   lawsuit in court.  Right?                                     15:11:13

19       A.   Well, we thought we could win at the PTO.           15:11:14

20       Q.   Right.  But your PTO proceedings would not          15:11:19

21   have stopped Dropbox from using the name; they simply        15:11:23

22   would have canceled Dropbox's registration.  Correct?        15:11:27

23       A.   That's correct.                                     15:11:31

24       Q.   And you understood that to get Dropbox to stop      15:11:31

25   using the name, you would have to file a lawsuit against     15:11:33

```
 1   Dropbox in court.  Correct?                    15:11:37
 2        A.   Correct.                             15:11:38
 3        Q.   When did you first understand that, sir?  All  15:11:39
 4   along, right, since 2011?                      15:11:44
 5        A.   I would say probably so, yeah.       15:11:46
 6        Q.   At what point did you learn that Dropbox was a  15:11:47
 7   candidate for an initial public offering?      15:11:49
 8        A.   I don't remember the date of that.   15:11:51
 9        Q.   Well, you assumed that an IPO would be a big  15:11:55
10   deal for Dropbox.  Right?                       15:11:58
11        A.   Yes, and still do.                   15:11:59
12        Q.   For stockholding employees of a company that  15:12:01
13   goes public, the IPO can be a reward for their years of  15:12:04
14   hard work in building the company.  Right?     15:12:08
15        A.   This is correct.                     15:12:09
16        Q.   And for investors in a company, an IPO can  15:12:09
17   function as the payoff for years of putting their  15:12:13
18   capital at risk and supporting the company.  Right?  15:12:15
19        A.   I agree with you.                    15:12:17
20        Q.   Did you ever come to believe that Thru could  15:12:18
21   hinder Dropbox's ability to conduct an initial public  15:12:21
22   offering of its stock?                          15:12:24
23        A.   I believed that they would want to settle with  15:12:25
24   us before they did that and that could be a hindrance  15:12:30
25   for them.                                       15:12:34
```

1      Q.   Why did you think that Thru could be a       15:12:34

2   hindrance to Dropbox's plans for an IPO?            15:12:40

3      A.   Well, it would seem to me that they would want 15:12:43

4   to own the name of the company outright.            15:12:47

5      Q.   So did you come to believe that by making a   15:12:50

6   claim for ownership of the term dropbox, Thru could  15:12:55

7   hinder my client Dropbox, Inc.'s ability to file for an 15:13:04

8   initial public offering?                            15:13:08

9      A.   It's just a commercial leverage, in our      15:13:09

10   opinion, as to whether or not they could file for an 15:13:15

11   IPO, your client could file for an IPO.             15:13:18

12      Q.   I'm sorry.  Did you say it's --             15:13:20

13      A.   It just seemed like a leverage point for us. 15:13:22

14      Q.   Are you familiar with Google News Alerts, sir? 15:13:26

15      A.   I am.                                       15:13:30

16      Q.   How do they work?                           15:13:30

17      A.   You put in an alert, and then it sends you a 15:13:31

18   daily list of the alerts.                           15:13:35

19      Q.   If you have an account with Google, you can  15:13:36

20   program its news system to send you an e-mail anytime 15:13:40

21   Google sees a news article that contains particular  15:13:44

22   phrases of interest to you.  Right?                 15:13:48

23      A.   That's right.                               15:13:49

24      Q.   And then the e-mail that Google sends you will 15:13:49

25   contain a link to the news article that references that 15:13:52

LEE HARRISON - 7/13/2016

Page 178

```
 1   term.  Right?                                    15:13:55

 2        A.   That's correct.                         15:13:55

 3        Q.   Do you personally have any Google News Alerts   15:13:56

 4   set up?                                           15:13:59

 5        A.   I do.                                    15:13:59

 6        Q.   For what terms?                          15:14:00

 7        A.   Dropbox Box IPO.                         15:14:01

 8        Q.   Any others?                              15:14:02

 9        A.   Dropbox.                                 15:14:03

10        Q.   Any others?                              15:14:03

11        A.   Lee Harrison.                            15:14:04

12        Q.   Okay.  Any others?                       15:14:06

13        A.   Thru, Inc.                               15:14:07

14        Q.   When did you set up a Google News Alert for   15:14:09

15   the phrase "Dropbox IPO"?                          15:14:13

16        A.   I don't remember.  Refresh me.           15:14:22

17        Q.   I'm not sure this is going to refresh you, but   15:14:23

18   I will do my best.                                 15:14:26

19               (Exhibit 47 marked.)                   15:14:27

20               THE WITNESS:  47.                      15:14:41

21               MR. KRAMER:  47.                       15:14:42

22        Q.   (BY MR. KRAMER)  Exhibit 47 is an October 28,   15:14:42

23   2014 e-mail exchange that starts with an e-mail from   15:14:46

24   Google Alerts to you, Lee Harrison, with the subject   15:14:50

25   Google Alert Dropbox IPO.  Does that refresh your   15:14:55
```

LEE HARRISON - 7/13/2016

Page 179

```
 1   recollection?                                       15:14:58
 2        A.   Yes, I admitted I have this trigger set up. 15:14:58
 3              MR. KRAMER:  Do you want to get that,    15:15:03
 4   John?                                               15:15:04
 5              MR. CONE:  No.                            15:15:05
 6        Q.   (BY MR. KRAMER)  Okay.  Does Exhibit 47   15:15:07
 7   refresh your recollection that you had a Google News 15:15:08
 8   Alert set up for the phrase "Dropbox IPO" as of     15:15:10
 9   October 28, 2014?                                   15:15:15
10        A.   It does.                                  15:15:16
11        Q.   Was it set up before this?               15:15:16
12        A.   It could have been.  I don't recall.  I would 15:15:18
13   have to look.  We would have produced it.          15:15:21
14        Q.   So whenever you started it -- and we can 15:15:23
15   consult Google for that -- anytime there was a news 15:15:25
16   article that mentioned a possible IPO for Dropbox, Inc., 15:15:27
17   you got an e-mail from Google with a link to the   15:15:30
18   article.  Right?                                   15:15:33
19        A.   Yes.                                     15:15:35
20        Q.   So Thru felt it could use its claim to hold 15:15:36
21   rights in the term dropbox as leverage in negotiations 15:15:43
22   with Dropbox simply by waiting for Dropbox -- strike 15:15:46
23   that.                                              15:15:46
24              Isn't it true that Thru felt it could increase 15:15:51
25   its leverage in negotiations with Dropbox over the 15:15:54
```

LEE HARRISON - 7/13/2016

Page 180

| | |
|---|---|
| 1   Dropbox name simply by waiting for Dropbox to seek to | 15:15:57 |
| 2   conduct an IPO of its stock? | 15:16:00 |
| 3       A.   We didn't feel like it was the waiting game, | 15:16:02 |
| 4   but it was a leverage to get them to come to the table | 15:16:07 |
| 5   as soon as possible, which we very much wanted. | 15:16:10 |
| 6       Q.   Didn't you think Thru should just do nothing | 15:16:13 |
| 7   until Dropbox's IPO announcement? | 15:16:16 |
| 8       A.   Absolutely not.  We put our hand out for a | 15:16:19 |
| 9   meeting with any C level person that would meet with me | 15:16:22 |
| 10  starting in January 2012. | 15:16:26 |
| 11      Q.   Was Thru preparing to file a lawsuit against | 15:16:29 |
| 12  Dropbox the day Dropbox announced it was going to seek | 15:16:32 |
| 13  to conduct an IPO? | 15:16:35 |
| 14      A.   Has Dropbox filed for an IPO? | 15:16:36 |
| 15      Q.   No.  My question, sir, is was Thru preparing | 15:16:45 |
| 16  to file a lawsuit against Dropbox the day Dropbox | 15:16:48 |
| 17  announced it was going to seek to conduct an IPO? | 15:16:51 |
| 18      A.   No, that wasn't the plan. | 15:16:54 |
| 19      Q.   What did you -- did Thru adopt a strategy of | 15:16:55 |
| 20  not taking action regarding Dropbox, Inc.'s use of the | 15:17:00 |
| 21  Dropbox name in the hopes that Thru would have more | 15:17:03 |
| 22  leverage to extract the settlement payoff as Dropbox got | 15:17:06 |
| 23  closer to filing for an IPO? | 15:17:11 |
| 24      A.   No. | 15:17:13 |
| 25              MR. KRAMER:  48. | 15:17:20 |

LEE HARRISON - 7/13/2016

Page 183

1        A.   We made a decision not to sue them at this          15:20:33

2     time, yes, that's true.                                     15:20:36

3        Q.   Even though you believe that Dropbox's use of       15:20:37

4     the Dropbox name was causing your client -- your company    15:20:39

5     consumer -- was causing -- even though you believed         15:20:42

6     Dropbox's use of the Dropbox name was causing consumer      15:20:43

7     confusion.  Right?                                          15:20:47

8        A.   That is correct.                                    15:20:47

9        Q.   And the reason you made a decision not to take      15:20:48

10    action at this time was because you were hoping to          15:20:53

11    maximize the payout from Dropbox's IPO.  Right?             15:20:55

12       A.   No, that's not correct.  It could have been a       15:20:58

13    strategy.  We change strategy all the time.  But mostly     15:21:03

14    we were waiting for Dropbox to come to us.                  15:21:10

15       Q.   Dropbox wasn't coming to you.  Right?               15:21:13

16       A.   Well, they hadn't.                                  15:21:15

17       Q.   Dropbox made clear they had no interest in          15:21:16

18    Thru's supposed rights to the Dropbox name.  Right?         15:21:19

19       A.   That is correct.                                    15:21:22

20       Q.   So you nevertheless did nothing to take action      15:21:22

21    against Dropbox and its use of Dropbox because you          15:21:27

22    believed that the longer you waited, the greater your       15:21:32

23    leverage and the greater the impact on the IPO.             15:21:36

24    Correct?                                                    15:21:39

25       A.   Well, we were taking action at the PTO, and we      15:21:39

LEE HARRISON - 7/13/2016

Page 184

```
 1    felt like that was the best place for us, most          15:21:42
 2    economical for us.                                       15:21:47
 3        Q.   But you told me, sir, that you understood that  15:21:47
 4    action at the PTO would not stop Dropbox, Inc. from      15:21:51
 5    using the Dropbox name.  Right?                          15:21:52
 6        A.   That's true, but we felt even in court we       15:21:52
 7    would have a better place -- we would be in a better     15:21:55
 8    place if we could win at the TTAB.                       15:21:56
 9        Q.   So you were allowing Dropbox, Inc. to continue  15:21:58
10    using the Dropbox name even though you believed it was   15:22:05
11    causing consumer confusion because you wanted to         15:22:09
12    increase your leverage and hold Dropbox's IPO hostage.   15:22:12
13    Right?                                                   15:22:18
14        A.   You know, we might have thought that at times,  15:22:18
15    but for the most part we were just waiting on Dropbox to 15:22:25
16    come to us.                                              15:22:28
17                 MR. KRAMER:  49, please.                    15:22:40
18                 (Exhibit 49 marked.)                        15:22:41
19        Q.   (BY MR. KRAMER)  Exhibit 49 is an e-mail        15:22:41
20    exchange between you and Louie Harrison dated January    15:22:49
21    25, 2015 that Thru produced in discovery.  Let me ask    15:22:53
22    you first, sir, who is Louie Harrison.                   15:22:56
23        A.   He's my brother.                                15:22:59
24        Q.   Is he an investor in the company?               15:23:00
25        A.   He is.                                          15:23:03
```

1       Q.   In Thru, that is, right?                    15:23:04

2       A.   Yes.                                        15:23:05

3       Q.   In your last in time message at the top of the    15:23:06

4  page you wrote referring to my client Dropbox, Inc.,    15:23:08

5  quote, They will not want to file an S1 without clear    15:23:11

6  title to the trademark, closed quote.  Do you see that?   15:23:14

7       A.   I do.                                       15:23:16

8       Q.   What's an S1?                               15:23:16

9       A.   It's a document you file prior to an IPO.   15:23:18

10      Q.   And you were content to wait for that because   15:23:21

11  as an IPO in an S1 got closer, you thought you could    15:23:25

12  demand a higher price from Dropbox.  Right?           15:23:30

13      A.   Well, we were, again, waiting on Dropbox to   15:23:32

14  come to us.  With this looming over them, we thought   15:23:36

15  they would come to us to try to clear things up.       15:23:40

16      Q.   Why did you add a smiley face at the end of   15:23:44

17  the sentence in your message to your brother,          15:23:47

18  Mr. Harrison?                                          15:23:48

19      A.   Because he's my brother.                    15:23:48

20      Q.   You added a smiley face because you thought   15:23:50

21  that waiting until Dropbox got closer to an IPO and an   15:23:52

22  S1 filing, you would get more money.  Right?          15:23:52

23      A.   No.                                         15:23:55

24      Q.   That's not what that smiley face means?     15:23:57

25      A.   No.  It's an indication of this is a nice   15:23:59

LEE HARRISON - 7/13/2016

Page 186

```
 1   paragraph for you as a shareholder.                    15:24:03

 2        Q.   Why would it be a nice paragraph for him as a 15:24:04

 3   shareholder?                                            15:24:08

 4        A.   Because he's invested money and he wants to   15:24:08

 5   get a return.                                           15:24:11

 6        Q.   I don't understand, sir.  The smiley face     15:24:11

 7   indicates what to your brother?                         15:24:18

 8        A.   That you may have a return coming to you from 15:24:19

 9   all of the above in the paragraph.                      15:24:26

10        Q.   Well, your brother certainly knew about       15:24:29

11   Dropbox because he initiated the chain on January 24,   15:24:33

12   2015.  My question is the smiley -- strike it.          15:24:36

13             The smiley face follows at the end of this    15:24:43

14   paragraph because you thought it was a good thing that  15:24:47

15   Dropbox would not want to file an S1 without clear title 15:24:49

16   to the trademark.  Right?                               15:24:52

17        A.   That's correct.                               15:24:53

18        Q.   And you were telling him that this is going to 15:24:53

19   increase the value you're likely to receive.  Right?    15:24:55

20        A.   I'm telling him that that is a leverage point 15:24:58

21   for us.                                                 15:25:01

22        Q.   Okay.  Was it your view that as long as you   15:25:02

23   could keep the threat of a claim over the name hanging  15:25:11

24   over Dropbox's head, it couldn't file to go public and  15:25:14

25   that would lead to Thru getting paid off?               15:25:17
```

LEE HARRISON - 7/13/2016

Page 187

1        A.    It seemed to us that it would be tough for          15:25:20

2    them to file without clear title.                             15:25:22

3        Q.    So as long as you could keep the threat of a        15:25:25

4    claim regarding the name hanging over Dropbox's head,         15:25:27

5    you thought it would be tough for them to file to go          15:25:30

6    public and that would mean that Thru would get paid off.      15:25:33

7    Right?                                                        15:25:36

8        A.    We felt as it was a leverage point that they       15:25:36

9    would come to us eventually and settle with us.              15:25:41

10       Q.    Didn't you tell Thru's board that with respect      15:25:43

11   to Thru's claimed rights in the Dropbox name, that this       15:25:46

12   litigation didn't matter, that the only thing that            15:25:48

13   mattered was the Dropbox IPO?                                 15:25:51

14       A.    Well, that's again a leverage point, that the       15:25:53

15   IPO seemed to us to be the most important date to             15:25:56

16   Dropbox at the time and that they would eventually want       15:26:00

17   to talk.  That didn't happen.                                 15:26:03

18       Q.    Sir, why would the litigation not matter?           15:26:05

19       A.    Well, it's a phrase.  It's a priority date.         15:26:07

20   Either the trial is the priority date or the IPO is the       15:26:14

21   priority date.                                                15:26:17

22       Q.    Let me give you the document and maybe we can       15:26:19

23   clear this up.                                                15:26:21

24            (Exhibit 50 marked.)                                 15:26:22

25            MR. KRAMER:  50, please.                             15:26:33

LEE HARRISON - 7/13/2016

Page 188

```
 1        Q.    (BY MR. KRAMER)   Exhibit 50 is an e-mail          15:26:34
 2   exchange between you and the Thru board of directors          15:26:39
 3   dated August 2, 2015.  Mr. Smith wrote to you saying at       15:26:42
 4   6:55 p.m., quote, I think we must drive the issue and         15:26:50
 5   the sooner we find out the truth of the Dropbox matter        15:26:54
 6   the better.  You responded in line after your initials        15:26:57
 7   in bold and italics.  Right?                                  15:27:01
 8        A.    Yes.                                                15:27:03
 9        Q.    You said, quote, The closer to the IPO, the        15:27:03
10   better.  Nothing else will matter.  Court battles mean        15:27:07
11   nothing.  Do you see that?                                    15:27:11
12        A.    I do.                                              15:27:12
13        Q.    When you said court battles mean nothing, you      15:27:13
14   were telling Thru's board of directors that it didn't         15:27:17
15   matter whether or not Thru's claims against Dropbox           15:27:19
16   actually had merit, weren't you?                              15:27:22
17        A.    No.                                                15:27:24
18        Q.    You meant that all Thru had to do was keep a       15:27:25
19   trademark claim hanging over Dropbox's head at the time       15:27:29
20   of the Dropbox IPO and Thru would get paid off.  Right?       15:27:32
21        A.    Again, it's a leverage point, the IPO.  Is it      15:27:35
22   the date of the IPO or the date of the trial that             15:27:39
23   mattered to get them to come to the table?                    15:27:43
24        Q.    You wrote, sir, court battles mean nothing.        15:27:45
25   What did you mean when you said court battles mean            15:27:48
```

1       A.   I gather -- is that the first piece of the

2  thread where he says that?

3       Q.   It's on the first page from the bottom half of

4  the page, Mr. Nicholl, August 26, 2015, at 2:02 a.m.

5  Dear Lee, I trust this finds you well.  And later on in

6  that sentence in that paragraph, I gather we lost our

7  initial court hearing and now we go to arbitration.  See

8  that now?

9       A.   I see that.

10       Q.   Okay.  And your comments are in line, in bold

11  and italics after your initials in brackets.  Right?

12       A.   That's correct.

13       Q.   You wrote, We motioned for dismissal and it

14  was denied.  Of course, we would do that, but the judge

15  certainly was correct that there is controversy between

16  the parties, closed quote.  You wrote that.  Right?

17       A.   Yes.

18       Q.   Do you think Thru was being candid with the

19  Court when it took the position that the case should be

20  dismissed because there was no controversy between

21  Dropbox and Thru when you knew there was a controversy

22  between the parties?

23       A.   Again, I believe that our premise was that

24  there wasn't significant controversy and that that

25  controversy didn't rise to the bar and, again, I would

15:58:48
15:58:57
15:58:58
15:59:03
15:59:08
15:59:13
15:59:17
15:59:21
15:59:21
15:59:22
15:59:24
15:59:27
15:59:28
15:59:31
15:59:35
15:59:38
15:59:43
15:59:43
15:59:46
15:59:48
15:59:50
15:59:54
15:59:55
16:00:00
16:00:05

LEE HARRISON - 7/13/2016

Page 199

```
 1   have to review the court documents, too.  I don't          16:00:12
 2   recall.                                                     16:00:14
 3       Q.   Well, what did you mean, sir, when you wrote       16:00:14
 4   the judge certainly was correct, there is controversy       16:00:17
 5   between the parties?                                        16:00:19
 6       A.   Well, there is controversy between the            16:00:20
 7   parties.  That's -- I'm stating it plainly.                16:00:22
 8       Q.   And there always was.  Right?                     16:00:25
 9       A.   I believe so.                                     16:00:27
10       Q.   And there was at the time you filed your          16:00:28
11   motion to dismiss.  Right?                                 16:00:29
12       A.   There was some level of controversy.             16:00:32
13       Q.   In fact, sir, if you had prevailed on your        16:00:35
14   motion to dismiss, you planned to file your own lawsuit    16:00:38
15   against Dropbox promptly thereafter in Texas.  Isn't       16:00:40
16   that so?                                                   16:00:44
17       A.   Our strategies changed from time to time.         16:00:44
18   That could have been one of the strategies, yes.           16:00:47
19       Q.   After the judge denied Thru's motion to           16:00:49
20   dismiss, you told a member of Thru's board of directors    16:01:01
21   that the judge had done so because the judge was           16:01:04
22   salivating to hear the case himself, didn't you?           16:01:07
23       A.   Is that here?                                     16:01:09
24       Q.   No.  I'm just asking you.                         16:01:13
25       A.   I don't recall exactly.  Do you have a copy of    16:01:14
```

LEE HARRISON - 7/13/2016

Page 200

| | | |
|---|---|---|
| 1 | it? | 16:01:18 |
| 2 | Q.   I do, but I'm asking if you have an | 16:01:19 |
| 3 | independent recollection first of telling a member of | 16:01:21 |
| 4 | the board of directors that one of the reasons why the | 16:01:24 |
| 5 | judge denied the case was because the judge denied the | 16:01:25 |
| 6 | motion to dismiss was because the judge was salivating | 16:01:29 |
| 7 | to hear the case himself? | 16:01:32 |
| 8 | A.   I believe it -- my opinion was that the judge | 16:01:33 |
| 9 | did want to hear the case, yes. | 16:01:35 |
| 10 | Q.   What gave you the impression that the judge | 16:01:38 |
| 11 | was salivating to hear the case himself? | 16:01:40 |
| 12 | A.   I think it was his demeanor.  It seemed like | 16:01:42 |
| 13 | he was very interested in the legal aspects of this | 16:01:45 |
| 14 | case.  I think judges do that. | 16:01:48 |
| 15 | Q.   Did you attend the hearing on the motion to | 16:01:50 |
| 16 | dismiss? | 16:01:55 |
| 17 | A.   I did. | 16:01:55 |
| 18 | Q.   And did you review the transcript on the | 16:01:55 |
| 19 | motion to dismiss? | 16:01:59 |
| 20 | A.   I did. | 16:02:00 |
| 21 | Q.   What indicated to you, sir, that the judge was | 16:02:01 |
| 22 | salivating to hear this case himself? | 16:02:04 |
| 23 | A.   Well, it's just an opinion.  His -- | 16:02:09 |
| 24 | Q.   I'm asking the basis for your opinion. | 16:02:11 |
| 25 | A.   I did answer that.  I said his demeanor at the | 16:02:13 |

```
 1         A.    Both of us did.                              16:22:56

 2         Q.    And does it refer to Dropbox as a lottery    16:22:58

 3    ticket?                                                 16:23:03

 4         A.    We prepped just a business deck.  We didn't  16:23:03

 5    put Dropbox in there at all for him to pitch the        16:23:08

 6    business as we turned him around to not pitch the       16:23:12

 7    Dropbox lottery ticket.                                 16:23:15

 8         Q.    Mr. Harrison, would you agree with me that the 16:23:16

 9    Dropbox name is specifically associated with my client  16:23:22

10    Dropbox, Inc. in the minds of the public?               16:23:26

11         A.    Well, I can't get into the minds of the      16:23:30

12    public.  I know my customers would say that Dropbox is  16:23:32

13    part of Thru functionality.                             16:23:34

14         Q.    Would you agree with me that my client's name, 16:23:36

15    Dropbox, is specifically associated in the minds of a   16:23:41

16    large percentage of the public with my client?          16:23:45

17         A.    I think your client has a significant        16:23:48

18    footprint, yes.                                         16:23:51

19         Q.    Would you agree that my client Dropbox, Inc.  16:23:52

20    has established secondary meaning in the term Dropbox?   16:23:56

21         A.    Perhaps with their customers, but not        16:24:00

22    necessarily with mine.                                  16:24:02

23         Q.    With the public generally.  Right?           16:24:03

24         A.    I can't speak for the public.                16:24:05

25         Q.    Well, you know that Dropbox has hundreds of   16:24:06
```

LEE HARRISON - 7/13/2016

Page 215

```
 1   millions of users.  Right?                          16:24:09

 2       A.   I am aware.                                 16:24:10

 3       Q.   The public identifies the brand name Dropbox 16:24:11

 4   with my client.  Right?                             16:24:13

 5       A.   Well, the public is who?                    16:24:14

 6       Q.   Hundreds of millions of people.            16:24:17

 7       A.   Well, their customers are hundreds of       16:24:18

 8   millions, but there are billions of people on the   16:24:21

 9   planet.                                              16:24:24

10       Q.   Yes, sir, but in this country there are     16:24:24

11   hundreds of millions.  And you have how many customers? 16:24:26

12       A.   We have just under 200.                     16:24:29

13       Q.   So other than the 200 customers or so that you 16:24:30

14   have, the general populace associates the term Dropbox 16:24:33

15   with my client Dropbox, Inc.  Right?                16:24:35

16       A.   I'm not sure about the general public.  I   16:24:37

17   can't testify to that.                              16:24:42

18       Q.   Did you think that my client Dropbox had    16:24:43

19   established secondary meaning in the term Dropbox as of 16:24:49

20   March 2013?                                          16:24:53

21       A.   I have no idea whether they did or didn't.  16:24:54

22            (Exhibit 57 marked.)                        16:25:02

23       Q.   (BY MR. KRAMER)  In Exhibit 57, Thru-1747531 16:25:17

24   to 32, you had an exchange with Mr. Yonge, another of 16:25:26

25   Thru's directors back in March of 2013.  The subject 16:25:33
```

```
 1   line is Dropbox.  You wrote to Mr. Yonge the last in        16:25:41
 2   time message.  Quote, I would point out that the Dropbox    16:25:46
 3   brand is more akin to Xerox or Coke since it has taken      16:25:51
 4   on a secondary meaning.  Do you see that?                   16:25:55
 5        A.   I do.                                             16:25:57
 6        Q.   What did you mean when you said that the          16:25:57
 7   Dropbox brand has taken on a secondary meaning, sir?        16:26:00
 8        A.   Well, it's the same as in this -- what I've       16:26:05
 9   written here, is that it sounds like Xerox or Coke.         16:26:12
10        Q.   Meaning that in the minds of the relevant         16:26:15
11   consuming public, it is recognized as the name of my        16:26:17
12   client's service.  Correct?                                 16:26:21
13        A.   That's probably correct.                          16:26:23
14        Q.   You wrote later on in this message, Does          16:26:27
15   anyone think that Dropbox has not taken on a secondary      16:26:30
16   meaning?  How do you direct 120 million users to           16:26:34
17   download a newly rebranded app and go to an alternative     16:26:39
18   or sorry -- alternate URL?  How do you value the loss in    16:26:43
19   credibility?  You were referring to my client Dropbox,      16:26:47
20   Inc. there.  Right?                                         16:26:50
21        A.   Yes.                                              16:26:51
22        Q.   You were talking about the harm that Dropbox      16:26:51
23   would suffer if it had to give up the Dropbox name and      16:26:56
24   try to move 120 million users.  Right?                      16:26:59
25        A.   That's correct.                                   16:27:02
```

LEE HARRISON - 7/13/2016

Page 217

1      Q.   You thought the harm would be substantial,          16:27:02

2   didn't you?                                                 16:27:04

3      A.   Yes.                                                 16:27:05

4      Q.   You thought the bigger Dropbox grew, the more       16:27:05

5   substantial the harm would be and the more Thru could       16:27:09

6   obtain as a payoff from Dropbox, Inc. to avoid that         16:27:11

7   harm.  Right?                                               16:27:15

8      A.   Well, I think when this was written, it seemed      16:27:16

9   like that was enough harm just on that particular day.      16:27:20

10     Q.   But you thought the bigger it grew, the more        16:27:23

11  substantial the harm would be.  Right?                      16:27:26

12     A.   No, I didn't say that here.                         16:27:27

13     Q.   Well, if it was difficult enough for Dropbox        16:27:29

14  to redirect 120 million users, how would it be for          16:27:33

15  Dropbox to direct 400 million users to a new URL and a      16:27:38

16  new app?                                                    16:27:43

17     A.   I assume it would be more trouble for them.         16:27:44

18  That's certainly on them.                                   16:27:49

19     Q.   Did Thru ever prepare a package of materials        16:27:53

20  about this case that Mr. Smith could use to solicit         16:27:58

21  potential investors for Thru?                               16:28:01

22     A.   We might have sent materials to them.               16:28:04

23     Q.   Do you think you could find that for me?  I         16:28:06

24  don't believe that we've gotten that in discovery.          16:28:08

25     A.   I would have to look to see if we actually          16:28:11

LEE HARRISON - 7/13/2016

Page 218

1    did.                                                      16:28:13

2        Q.   Okay.  Did Thru ever prepare a package of        16:28:13

3    materials about this dispute that Mr. Smith could use to  16:28:21

4    share with people associated with Dropbox, Inc.?          16:28:19

5        A.   I don't recall whether we did.  I know           16:28:22

6    Mr. Smith was working on those things as -- you know, on  16:28:24

7    his own as well, but he could have prepared a lot of it   16:28:27

8    for himself.                                              16:28:30

9        Q.   You don't recall working with Mr. Kight on a     16:28:31

10   package of materials for Mr. Smith that he could use to   16:28:34

11   provide to people associated with Dropbox, Inc.?          16:28:37

12       A.   Yes, I do remember that, yes.                    16:28:39

13       Q.   Do you know if those materials have been         16:28:41

14   gathered and produced in discovery in this case?          16:28:43

15       A.   They should have been.  I would assume so.       16:28:46

16            MR. KRAMER:  John, I don't think they            16:28:48

17   have been, so --                                          16:28:50

18            MR. CONE:  We will look for them.  Can           16:28:51

19   you identify them any more clearly?                       16:28:53

20            MR. KRAMER:  I can't.                            16:28:55

21            MR. CONE:  Oh, because you don't have            16:28:55

22   them?                                                     16:28:57

23            MR. KRAMER:  I don't have them.  I'm             16:28:58

24   looking for them.                                         16:28:59

25            MR. CONE:  I'll talk to Mr. Harrison             16:29:00

LEE HARRISON - 7/13/2016

Page 219

```
 1    about it, yeah.                                      16:29:01

 2               THE WITNESS:  I think it was mostly the   16:29:02

 3    trial data or the court case data.                  16:29:03

 4               MR. KRAMER:  Certainly some publicly      16:29:05

 5    available court records in them.                     16:29:07

 6               THE WITNESS:  Yes.                         16:29:08

 7               MR. CONE:  Okay.                           16:29:09

 8          Q.   (BY MR. KRAMER)  What's AdWords?           16:29:11

 9          A.   AdWords, Google AdWords.                   16:29:13

10          Q.   It's an advertising program run by Google. 16:29:16

11    Correct?                                             16:29:18

12          A.   Yes.                                       16:29:19

13          Q.   Ads are shown in association with search  16:29:19

14    queries --                                           16:29:22

15          A.   That's right.                             16:29:22

16          Q.   -- that users perform.  Right?            16:29:23

17          A.   That's correct.                           16:29:25

18          Q.   So you instruct Google as a business that you 16:29:25

19    want your advertisements to show up based on searches 16:29:28

20    that users do, and when Google users conduct those  16:29:31

21    searches, if you're one of the highest bidders on that 16:29:35

22    term, your ad, together with a link to your site, will 16:29:39

23    show up.  Right?                                      16:29:43

24          A.   That's correct.                           16:29:44

25          Q.   Okay.  And if a user clicks on your ad, then 16:29:44
```

1    the user is taken to whatever URL you've directed or    16:29:47

2    included and you pay Google for that referral.  Right?    16:29:52

3         A.   That's correct.    16:29:54

4         Q.   All right.  When did Thru start using Google's    16:29:55

5    AdWords program to advertise its services?    16:30:02

6         A.   Probably as early as 2005.    16:30:03

7         Q.   Well, we looked at that chart, which is a ways    16:30:05

8    back now, but I think I can find it, which showed no    16:30:07

9    marketing at all in 2004 and 2005.  Right?    16:30:10

10        A.   You would have to -- we would have to go back    16:30:12

11   and look.  It could have been 2006.    16:30:14

12        Q.   It's Exhibit 34.    16:30:20

13        A.   36?    16:30:46

14        Q.   34.    16:30:48

15        A.   Oh.  Okay.    16:30:53

16        Q.   So my question was when did Thru start using    16:30:54

17   Google's AdWords program to advertise Thru's products    16:30:57

18   and services?    16:31:00

19        A.   According to this, 2006.    16:31:00

20        Q.   And when did Thru start targeting Dropbox    16:31:03

21   related terms in its AdWords purchases?    16:31:09

22        A.   Probably in 2011.    16:31:12

23        Q.   Why does that date stand out in your mind?    16:31:16

24        A.   Because I believe Mr. Skybakmoen wanted to do    16:31:19

25   that.    16:31:23

LEE HARRISON - 7/13/2016

Page 221

```
 1       Q.   Did he explain why he wanted to do that?        16:31:23
 2       A.   He wanted more traffic to -- to our site to     16:31:25
 3  draw attention to our trademark.                          16:31:31
 4       Q.   Who is Rosella Fernandez?                        16:31:33
 5       A.   Rosella was a digital marketing person at       16:31:37
 6  Thru.  I think I explained earlier, I think she was       16:31:42
 7  there maybe 2010, '11, or maybe 2009, '11.                16:31:45
 8       Q.   I may have asked this, and if I did --          16:31:51
 9       A.   You did.                                        16:31:52
10       Q.   -- I apologize.                                 16:31:53
11       A.   Okay.                                           16:31:53
12       Q.   It's been a long day.                           16:31:53
13       A.   That's okay.                                    16:31:55
14       Q.   But was her departure from Thru voluntary?      16:31:56
15       A.   Yes.                                            16:31:56
16       Q.   Was the parting amicable?                       16:32:00
17       A.   Absolutely.                                     16:32:00
18       Q.   Any reason to believe she's untruthful?         16:32:00
19       A.   No.                                             16:32:03
20       Q.   When was the last time you spoke with her?      16:32:03
21       A.   It's been years and years.  I don't recall.     16:32:05
22       Q.   How about Nicholas Blanton, is he still with    16:32:07
23  Thru?                                                     16:32:15
24       A.   No.                                             16:32:16
25       Q.   When did he leave?                              16:32:16
```

LEE HARRISON - 7/13/2016

Page 223

1   fashion that he deleted all his e-mails.  So there could    16:33:54
2   be e-mails that he has that we don't have.  That's          16:33:57
3   possible.                                                    16:34:01
4        Q.   And again, when did he leave?                      16:34:02
5        A.   He left in the fall.  I believe August 2012.      16:34:03
6        Q.   So he had been with the company for less than     16:34:10
7   a year?                                                      16:34:12
8        A.   About a year.  It was very close to a year, I     16:34:13
9   think.                                                       16:34:16
10       Q.   Okay.  This exchange between Mr. Skybakmoen,       16:34:16
11  you, Ms. Fernandez and Mr. Blanton occurred in              16:34:24
12  February 2012.  Do you recognize this as an e-mail          16:34:29
13  exchange at Thru?                                            16:34:32
14       A.   It appears to be.                                  16:34:33
15       Q.   The subject line is Google AdWords payment        16:34:35
16  declined.  It goes on from there.  And in this exchange     16:34:40
17  on February 23, 2012 at 9:52, which is the bottom of --     16:34:44
18  9:52?                                                        16:35:02
19       A.   9:52.                                              16:35:02
20       Q.   9:52, which is in the middle of the second        16:35:03
21  page.                                                        16:35:06
22       A.   Yeah.                                              16:35:06
23       Q.   Mr. Skybakmoen writes to you and Ms. Fernandez    16:35:06
24  saying, Lee, correct me if I'm wrong, but we need to        16:35:10
25  focus on Dropbox in AdWords.  Do you see that?              16:35:13

LEE HARRISON - 7/13/2016

Page 224

```
 1        A.   I see it.                                    16:35:16

 2        Q.   Did you correct him?                         16:35:17

 3        A.   I don't recall.                              16:35:18

 4        Q.   Mr. Skybakmoen proposes targeting organically  16:35:18

 5   and in AdWords every single dropbox use we can find.   16:35:23

 6   And he lists a few; secure dropbox, alternative Dropbox,  16:35:28

 7   Enterprise Dropbox and more.                           16:35:31

 8             He's proposing that Thru purchase AdWords    16:35:33

 9   advertising for users searching on Google for Dropbox  16:35:37

10   related terms in 2012.  Right?                         16:35:40

11        A.   It appears that way, yes.                    16:35:41

12        Q.   Why was he proposing to you to target every  16:35:42

13   single version of the term Dropbox that Thru could find?  16:35:46

14        A.   To increase traffic to the Thru website.    16:35:49

15        Q.   The point was to have Thru's ads show up when  16:35:51

16   people were searching for Dropbox, Inc., my client, a  16:35:54

17   company with millions of users.  Right?               16:35:58

18        A.   That's correct.                              16:35:59

19        Q.   Ms. Fernandez responded at 11:55 a.m. and    16:36:01

20   asked at the bottom of her e-mail, which is at the top  16:36:05

21   of page 2, quote, What can we do to entice those folks  16:36:09

22   that are looking for Dropbox, the company?  Do you see  16:36:14

23   that?                                                  16:36:17

24        A.   I see it.                                    16:36:17

25        Q.   So was Thru setting out to lure people looking  16:36:19
```

LEE HARRISON - 7/13/2016

Page 225

1    for Dropbox into coming to Thru even though you knew        16:36:21

2    they were looking for Dropbox?                              16:36:25

3         A.    Yes, I believe we were.                          16:36:26

4         Q.    Thru did not run AdWords campaigns on Google     16:36:27

5    with ads connected to the search term dropbox prior to      16:36:35

6    this, correct, prior to February 2012?                      16:36:38

7         A.    I would have to look, but I don't think so.      16:36:42

8    We might have.                                              16:36:44

9         Q.    What would you look at?                          16:36:48

10        A.    AdWords.                                          16:36:51

11        Q.    So you can get a printout of Thru's historical    16:36:52

12   ad buys through the AdWords program by consulting            16:36:58

13   AdWords online today?                                        16:37:01

14        A.    I'm not sure that we can go back to -- to the     16:37:03

15   ad buys themselves, but I think we can see what ads were     16:37:09

16   running.  I'm not sure about that.  I would have to          16:37:12

17   check.  I'm happy to.                                        16:37:16

18        Q.    We've asked actually for that information in      16:37:17

19   our most recent set of document requests.  If you could.    16:37:20

20   You certainly can log on to the site and gain access to     16:37:23

21   lots of information about your AdWords use.  Right?          16:37:27

22        A.    Sure.  Sure.                                      16:37:29

23        Q.    What else did Thru do to, in Ms. Fernandez's     16:37:30

24   words, try to entice folks looking for Dropbox, the         16:37:37

25   company, to Thru instead?                                   16:37:44

LEE HARRISON - 7/13/2016

Page 226

```
 1        A.    I don't recall.                            16:37:45

 2        Q.    How about search engine optimization?      16:37:45

 3        A.    Sounds reasonable.                          16:37:48

 4        Q.    Did Thru engage in search engine optimization   16:37:49

 5   for Dropbox related terms back in early 2012?         16:37:54

 6        A.    I believe Mr. Skybakmoen employed a search   16:37:57

 7   engine optimization company and had them working on   16:38:03

 8   that.                                                  16:38:04

 9        Q.    Can you explain what search engine          16:38:05

10   optimization is?                                       16:38:08

11        A.    SEO.  It's tuning your website and obtaining   16:38:09

12   back links to other sites so that you get a higher    16:38:14

13   ranking.                                               16:38:17

14        Q.    So that search engines think your pages are   16:38:17

15   relevant to those searching for --                     16:38:21

16        A.    Right.                                      16:38:21

17        Q.    -- specific terms.  Right?                  16:38:22

18        A.    That's right.                               16:38:24

19        Q.    So, for example, you might put the word Thru   16:38:25

20   all over your website so that when someone searches on   16:38:27

21   Google for the word Thru, you hope Google will rank your   16:38:31

22   site highly in its ordinary search results.  Right?   16:38:36

23        A.    Correct.                                    16:38:39

24        Q.    And why do you want your site to rank highly   16:38:40

25   in Google's natural or organic search results?         16:38:46
```

LEE HARRISON - 7/13/2016

Page 227

```
 1       A.   To get more traffic to the site.              16:38:48
 2       Q.   The higher you rank, the more likely people    16:38:51
 3  are to see a link to your site, the more likely they are 16:38:53
 4  to visit your site.  Right?                              16:38:53
 5       A.   Precisely.                                      16:38:54
 6       Q.   SEO, search engine optimization, is different  16:38:55
 7  from paying to show ads when people conduct a search on  16:38:59
 8  a given term.  Right?                                    16:39:03
 9       A.   That's correct.                                16:39:06
10       Q.   Can you help me understand how it works, how   16:39:08
11  do you go about optimizing or tweaking your web pages to 16:39:10
12  be relevant to a given search query?                     16:39:16
13       A.   Well, my understanding -- I'm no expert -- is  16:39:21
14  you put relevant terms on the site and -- that you       16:39:23
15  want, your keywords.  You put them on the pages that you 16:39:28
16  want to be found, and you try to obtain as many back     16:39:30
17  links and place as many news stories and things like     16:39:36
18  that as you can from other sites to raise your site      16:39:41
19  value and your validity as opposed to AdWords, which are 16:39:47
20  really paid -- you're bidding for a spot on the page,    16:39:51
21  which is much more expensive.                            16:39:55
22       Q.   So in this e-mail when Mr. Skybakmoen says we  16:40:03
23  need to target organically and in AdWords every single   16:40:08
24  Dropbox use we can find, he's referring both to SEO and  16:40:13
25  advertising.  Correct.                                   16:40:19
```

LEE HARRISON - 7/13/2016

Page 228

```
 1      A.   When he says organically, I'm going to assume    16:40:20
 2  it's SEO.                                                  16:40:28
 3      Q.   Do you know what he means when he says, quote,    16:40:35
 4  from a web page point of view we can create duplicate      16:40:39
 5  pages with these phrases (landing pages for people to      16:40:44
 6  come to) just spinning the phrases?                        16:40:49
 7      A.   I think he's talking about creating landing       16:40:53
 8  pages with multiple phrases on them that might create      16:41:00
 9  more traction, but it's not -- it's not a standard         16:41:04
10  practice, I don't think, to do that.                       16:41:09
11      Q.   Do you know what he means by, quote, sorted by    16:41:11
12  telling Google its canonical URL's?                        16:41:15
13      A.   No, I don't know what that means.                 16:41:19
14      Q.   So Thru embarked on an SEO program targeting      16:41:21
15  Dropbox related terms at about this time February 2012.    16:41:29
16  Right?                                                     16:41:32
17      A.   I think we did, yes.                              16:41:32
18      Q.   And Thru had a goal in early 2012 to increase     16:41:38
19  the visibility of Thru's website in organic search         16:41:40
20  results when people search for a Dropbox related term.     16:41:44
21  Right?                                                     16:41:47
22      A.   Yes.                                              16:41:47
23      Q.   Are you familiar with the online service         16:41:47
24  Twitter?                                                   16:41:50
25      A.   I am.                                             16:41:52
```

DTI Court Reporting Solutions - San Francisco
(800) 869-9132                              www.deposition.com

LEE HARRISON - 7/13/2016

Page 229

```
1        Q.   We talked about it earlier.              16:41:52

2        A.   Yes.                                      16:41:54

3        Q.   You are @ceo -- sorry.  What is your handle   16:41:54

4   again on Twitter?                                   16:42:00

5        A.   Thru CEO.                                 16:42:00

6        Q.   MFT?                                      16:42:04

7        A.   MFT.                                      16:42:06

8        Q.   Some version of that?                     16:42:07

9        A.   Some version of that.                     16:42:08

10       Q.   I think we got it right earlier.          16:42:09

11       A.   I could look and tell you.  I don't tweet   16:42:10

12   myself.                                            16:42:14

13       Q.   The company's handle is @ThruMFT.  Right?   16:42:14

14       A.   That's right.                             16:42:21

15       Q.   Do you know when Thru established the Twitter   16:42:22

16   account @ThruMFT?                                  16:42:24

17       A.   I don't know the exact date.  It could have   16:42:26

18   been in 2012, '11, '10.                            16:42:27

19       Q.   And we talked about who was responsible for   16:42:31

20   that.  Can you remind me of the name?             16:42:32

21       A.   Blake Pritchard currently.                16:42:34

22       Q.   Do you know when Thru began posting tweets to   16:42:37

23   the Twitter service using the @ThruMFT account to   16:42:41

24   include the word Dropbox?                          16:42:44

25       A.   I don't know the date.  We can search that.   16:42:45
```

LEE HARRISON - 7/13/2016

Page 239

```
 1        A.    Right.                                        16:57:57
 2        Q.    Okay.  So Mr. Yu is communicating with CK     16:57:58
 3   Tseng and the address help center at Thru.net about      16:58:07
 4   contact from someone names James Neil that wanted to     16:58:12
 5   cancel his Dropbox account.  And Kevin                   16:58:15
 6   Westenkirchner@thru says to Mr. Yu, quote, Looks like he 16:58:18
 7   thinks we are Dropbox.  Do you see that?                 16:58:23
 8        A.    I do.                                         16:58:24
 9        Q.    Mr. Yu responds at 11:25 a.m., Yeah, the      16:58:25
10   positive is that it validates our SEO is working.  See  16:58:29
11   that?                                                    16:58:33
12        A.    I do.                                         16:58:33
13        Q.    Mr. Yu then forwarded this exchange to you in 16:58:34
14   November 2013.  Right?                                   16:58:37
15        A.    Yes.                                          16:58:39
16        Q.    Mr. Yu was crediting Thru's search engine     16:58:40
17   optimization for the fact that Mr. Neal, James Neal was  16:58:44
18   trying to reach Dropbox, Inc. but got Thru instead.      16:58:47
19   Right?                                                   16:58:51
20        A.    It looks like that's his opinion.             16:58:51
21        Q.    He thought the customer was confused by Thru's 16:58:53
22   search engine optimization?                             16:58:57
23        A.    That's what his opinion is here.              16:58:59
24        Q.    He took that as a positive, didn't he?        16:59:00
25        A.    It appears that way, yeah.                    16:59:03
```

LEE HARRISON - 7/13/2016

Page 240

```
 1       Q.   Did you take that as a positive?                16:59:04

 2       A.   I didn't see this until 2013, so it was a moot  16:59:06

 3  point at that point.                                      16:59:12

 4       Q.   Well, when you saw it in 2013, did you agree    16:59:13

 5  with Mr. Yu that it was positive that consumers were      16:59:16

 6  being confused by Thru's search engine optimization?      16:59:19

 7       A.   Well, I didn't look at it as a positive one     16:59:23

 8  way or the other about SEO.  I just noted that it's a     16:59:26

 9  confusing -- that there's some confusion in the market    16:59:30

10  and that's why this was sent to me.                       16:59:32

11       Q.   I'm sorry.  Can you explain that a little bit   16:59:33

12  more?  Do you have any insight as to why Mr. Yu           16:59:35

13  forwarded you this e-mail exchange in November 2013?      16:59:38

14  Did you ask for it?                                       16:59:41

15       A.   I don't recall whether I asked for it or not,   16:59:42

16  but he did forward it to me because -- I may have asked   16:59:44

17  is there any evidence of market confusion that anyone     16:59:51

18  knows of and we're trying to collect data.                16:59:53

19       Q.   Are you aware of any other suggestions at Thru  16:59:57

20  about how Thru could, in Ms. Fernandez's words, entice    16:59:59

21  people looking for Dropbox the company?                   17:00:05

22       A.   All our efforts were online either through      17:00:06

23  AdWords or SEO, as far as I can recall.                   17:00:10

24       Q.   Did anyone at Thru ever suggest that Thru       17:00:16

25  launch a Dropbox look alike service to create consumer    17:00:19
```

LEE HARRISON - 7/13/2016

Page 241

1    confusion?                                                          17:00:24

2         A.    Someone could have suggested that, but I don't          17:00:25

3    recall that.                                                       17:00:27

4         Q.    Someone, say, on the board of directors?               17:00:27

5         A.    That could have happened.                              17:00:30

6         Q.    Sounds like something that someone on the              17:00:31

7    board would say?                                                  17:00:34

8         A.    Perhaps.                                               17:00:34

9         Q.    Who does it sound like?                                17:00:34

10        A.    It sounds like perhaps Mr. Smith.                      17:00:36

11        Q.    Did Thru adopt Mr. Smith's suggestion?                 17:00:41

12        A.    No.                                                    17:00:43

13        Q.    Why not?                                               17:00:43

14        A.    It doesn't seem like a reasonable thing to do.        17:00:44

15        Q.    Why not?                                               17:00:48

16        A.    Why not?  We are -- just commercially it              17:00:48

17   doesn't seem to make a lot of sense.                             17:00:58

18        Q.    Did anyone suggest to you that the company            17:01:00

19   should change its name from Thru to Dropbox?                     17:01:05

20        A.    I think that gets suggested multiple times.           17:01:07

21        Q.    Who suggested that?                                   17:01:11

22        A.    It would be various people, but perhaps a            17:01:12

23   board member or a shareholder.                                   17:01:14

24        Q.    Did you give serious consideration to the            17:01:15

25   possibility of changing the company's name from Thru to         17:01:32

LEE HARRISON - 7/13/2016

Page 250

```
 1                      DECLARATION

 2

 3

 4          I hereby declare I am the deponent in the

 5  within matter; that I have read the foregoing deposition

 6  and know the contents thereof, and I declare that the

 7  same is true of my knowledge except as to the matters

 8  which are therein stated upon my information or belief,

 9  and as to those matters, I believe it to be true.

10          I declare under the penalties of perjury of

11  the State of Texas that the foregoing is true and

12  correct.

13          Executed on the_____day of_____

14  2016, at _____, Texas.

15

16

17          _____

18                      LEE HARRISON

19

20

21

22

23

24

25
```

LEE HARRISON - 7/13/2016

Page 251

```
 1              CERTIFICATE OF SHORTHAND REPORTER
 2          I, Julie C. Brandt, Registered Professional
 3    Reporter and Texas Certified Shorthand Reporter, the
 4    court reporter before whom the foregoing deposition was
 5    taken, do hereby certify:
 6          That prior to being examined, the witness was duly
 7    sworn to testify the truth, the whole truth, and nothing
 8    but the truth;
 9          That the foregoing transcript is a true and correct
10    record of the testimony given;
11          That said testimony was taken by me
12    stenographically and thereafter reduced to typewriting
13    under my supervision;
14          That before the completion of the deposition,
15    review of the transcript [x] was [ ] was not requested
16    and that any changes made by the deponent (and provided
17    to the reporter) during the period allowed are appended
18    hereto;
19          That I am neither counsel for, related to, nor
20    employed by any of the parties to this case and have no
21    interest, financial or otherwise, in its outcome.
22          Witness my hand this 19th day of   July  , 2016.
23
24          _____
            Julie C. Brandt, CSR, RMR, CRR
25          Texas CSR No. 4018, Expires 12/31/16
```