# EXHIBIT 39

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


DROPBOX, INC., a Delaware
corporation,


                    Plaintiff,


        -vs-                      No. 3:15-CV-01741-EMC


THRU INC., a Delaware
corporation,


                    Defendant.
                                /
AND RELATED CROSS-ACTION.


            VIDEOTAPED DEPOSITION OF

            LEE HARRISON - 30(b)(6)

                PAGES 1 to 156

            THURSDAY, AUGUST 11, 2016



Reported by:  LOUISE MARIE SOUSOURES, CSR #3575

            Certified LiveNote Reporter



DTI File No. SF-095050

| | |
|---|---|
| 1 | correct? | 10:11:29 |
| 2 | A. Yes, it appears that way. | 10:11:29 |
| 3 | Q. Did you prepare it personally? | 10:11:30 |
| 4 | A. No. | 10:11:32 |
| 5 | Q. Do you know who did? | 10:11:32 |
| 6 | A. Judging by the time frame, it might have been | 10:11:37 |
| 7 | certainly somebody in marketing. | 10:11:42 |
| 8 | Q. Did you use this chart with other potential | 10:11:44 |
| 9 | customers or was this prepared only for Cloudy Bay | 10:11:46 |
| 10 | Vineyards? | 10:11:50 |
| 11 | A. I don't recall. | 10:11:51 |
| 12 | Q. Nevertheless, you sent it to Mr. Morden, | 10:11:53 |
| 13 | correct? | 10:11:56 |
| 14 | A. Yes, I think I did. | 10:11:56 |
| 15 | Q. In August of 2011, you sent a chart to a | 10:11:58 |
| 16 | potential customer that listed as one of the features, | 10:12:01 |
| 17 | both in Thru's product and the product of a | 10:12:05 |
| 18 | competitor, the, quote, feature slash, close quote -- | 10:12:09 |
| 19 | feature/function, close quote of a, quote, site | 10:12:15 |
| 20 | Dropbox, close quote? | 10:12:19 |
| 21 | A. Yes. | 10:12:20 |
| 22 | Q. Thru was clearly aware at this time, August | 10:12:20 |
| 23 | 2011, that a competitor, YouSendIt, offered a Dropbox | 10:12:26 |
| 24 | functionality to its users, correct? | 10:12:29 |
| 25 | A. Appears so. | 10:12:32 |

LEE HARRISON - 30(b)(6) - 8/11/2016

| | | |
|---|---|---|
| 1 | Q.  In this document that you sent to a potential | 10:12:34 |
| 2 | customer in August of 2011, Thru was using the term | 10:12:37 |
| 3 | "Dropbox" not as a reference to a Thru brand, but, | 10:12:42 |
| 4 | rather, to describe a function that other companies | 10:12:46 |
| 5 | offered, too, correct? | 10:12:49 |
| 6 | MR. CONE:  Object to the form of the | 10:12:51 |
| 7 | question. | 10:12:53 |
| 8 | THE WITNESS:  Yes, we're taking our brand and | 10:12:53 |
| 9 | its features and comparing it to what they were doing. | 10:12:58 |
| 10 | BY MR. KRAMER: | 10:13:01 |
| 11 | Q.  So is it your testimony, sir, the reference | 10:13:01 |
| 12 | to site Dropbox in this chart is a reference to a Thru | 10:13:03 |
| 13 | trademark? | 10:13:09 |
| 14 | A.  It's a reference to a Thru functionality | 10:13:10 |
| 15 | shortcutting that. | 10:13:13 |
| 16 | Q.  It's a reference to a functionality that both | 10:13:15 |
| 17 | Thru and YouSendIt offered, correct? | 10:13:18 |
| 18 | A.  It appears that way. | 10:13:20 |
| 19 | Q.  You're telling the potential customer that | 10:13:22 |
| 20 | YouSendIt offers a site Dropbox functionality for an | 10:13:24 |
| 21 | additional $30 a month, right? | 10:13:28 |
| 22 | A.  It appears that way. | 10:13:30 |
| 23 | Q.  Although the site Dropbox functionality is | 10:13:33 |
| 24 | offered inclusively with YouSendIt's corporate | 10:13:37 |
| 25 | product, right?  That's what this chart shows? | 10:13:43 |

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 17

```
 1        A.   It does show that.                        10:13:44

 2        Q.   If Thru genuinely believed it had a trademark   10:13:46

 3   in the term "Dropbox" in August of 2011, why would it   10:13:50

 4   use the term "Dropbox" to describe a function in a   10:13:54

 5   competitor's product to a potential customer?       10:13:56

 6        A.   I don't know.                              10:14:01

 7             MR. KRAMER:  154, please.                 10:14:10

 8             (Whereupon, Exhibit 154 was marked for    10:14:22

 9   identification.)                                     10:14:22

10   BY MR. KRAMER:                                       10:14:22

11        Q.   Exhibit 154, sir, is a document bearing Bates   10:14:26

12   numbers THRU 16210 to 16215, it was produced to us by   10:14:31

13   Thru in this action.                                10:14:39

14             It appears to be a printout from Thru's web   10:14:41

15   site, specifically that portion regarding a case study   10:14:44

16   for a customer called Vocera.                       10:14:46

17             Can you confirm that's what it is for me?   10:14:49

18        A.   It appears to be -- it looks like there's a   10:15:19

19   lot of stuff missing here, so I can't say exactly what   10:15:23

20   it is.                                              10:15:27

21        Q.   The printout appears to leave off the images   10:15:27

22   and videos that appear in that portion of Thru's site,   10:15:30

23   right?                                              10:15:35

24        A.   It appears to be sort of jumbled up.      10:15:35

25        Q.   Was this case study on Thru's web site?   10:15:37
```

```
 1        A.   Of Vocera?   I don't recall.   If you pulled      10:15:40
 2   this from the web site and we provided it, I would say      10:15:45
 3   yes.                                                         10:15:47
 4        Q.   We didn't pull it from the web site, sir, I       10:15:48
 5   think you guys pulled it from the web site.                 10:15:51
 6             Yes?                                               10:15:53
 7        A.   Yes.                                               10:15:54
 8        Q.   So this was publicly available, right?            10:15:55
 9        A.   If it's on our web site, yes.                      10:15:58
10        Q.   Sir, do you know why this document's              10:16:02
11   designated highly confidential, attorneys' eyes only?       10:16:05
12        A.   I do not.                                          10:16:07
13        Q.   It shouldn't be, right?                            10:16:08
14        A.   Well, I haven't studied it that closely.          10:16:10
15             MR. CONE:   That will be my decision rather       10:16:14
16   than his, probably, and I'm happy to waive any claim        10:16:16
17   of highly confidential, attorneys' eyes only.               10:16:19
18             MR. KRAMER:   How about any claim of              10:16:25
19   confidentiality all together?                               10:16:26
20             MR. CONE:   As it was on the web site?   Happy    10:16:27
21   to do that.                                                  10:16:27
22             MR. KRAMER:   At it was on the web site.          10:16:31
23             MR. CONE:   Yeah.                                  10:16:32
24   BY MR. KRAMER:                                               10:16:32
25        Q.   This case study for Vocera, Exhibit 154, was      10:16:33
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 19

```
 1    created and posted to Thru's web site for marketing        10:16:38

 2    purposes?                                                   10:16:41

 3         A.   Yes.                                              10:16:41

 4         Q.   On page THRU 16213, there's a section at the     10:16:41

 5    top of the page titled "The challenge."                    10:16:49

 6              It describes Vocera as looking for something     10:16:55

 7    that would, quote, solve the following issues.             10:17:00

 8              Do you see that?                                 10:17:03

 9         A.   Yes.                                              10:17:06

10         Q.   Then it lists three bullet points as those       10:17:06

11    issues.                                                    10:17:11

12              Do you see that?                                 10:17:11

13         A.   I do.                                            10:17:13

14         Q.   The second bullet point there on Vocera's        10:17:13

15    list of issues reads "Lack of secure dropbox               10:17:19

16    capabilities for company support teams."                   10:17:25

17              The use of the word dropbox there with a         10:17:28

18    small D, that's not a reference to Thru's supposed         10:17:32

19    trademark in the term "Dropbox," right?                    10:17:37

20         A.   It is not a reference to the Thru Dropbox.       10:17:43

21         Q.   It is not a reference to Thru's trademark in     10:17:54

22    the term "Dropbox," correct?                               10:17:59

23         A.   It is not.  I don't believe so.                 10:18:00

24         Q.   What does Thru mean in saying here in these     10:18:05

25    materials that Vocera lacks, quote, secure dropbox         10:18:09
```

```
 1    capabilities, close quote, with a small D?          10:18:14
 2        A.  Well, I believe, and I didn't write this, and   10:18:24
 3    I don't recall ever having seen it or discussed it    10:18:29
 4    with anyone, but I believe the intention is to point  10:18:31
 5    out a suggested functionality that might be missing   10:18:37
 6    and that it would be a security issue.               10:18:45
 7        Q.  So the functionality that Vocera was missing  10:18:49
 8    was a dropbox functionality, correct?                10:18:53
 9        A.  Appears that way.                             10:18:59
10        Q.  You're using the term "dropbox" there to      10:19:00
11    describe the functionality that Vocera was missing,   10:19:03
12    correct?                                             10:19:07
13        A.  Well, I don't know the time frame which this  10:19:07
14    was written, so this is 2014, so it probably is an    10:19:10
15    indirect reference to your client.                   10:19:21
16        Q.  You told me this was material for potential   10:19:29
17    customers, marketing material for potential customers, 10:19:40
18    right?                                               10:19:43
19        A.  I believe so.                                10:19:43
20        Q.  So in marketing material for potential        10:19:43
21    customers in 2014, Thru used the term "dropbox" not as 10:19:46
22    a reference to its own brand, but, rather, to describe 10:19:52
23    a functionality, right?                              10:19:55
24        A.  That's very possible.                         10:19:56
25        Q.  In fact, you know that to be the case, right, 10:19:58
```

1   as you sit here looking at it?                          10:20:01

2        A.   It appears that way.                          10:20:03

3        Q.   The term "dropbox" as it was used on that     10:20:11

4   bullet point in Thru's marketing material was used as   10:20:14

5   an adjective, correct?                                  10:20:17

6        A.   In the bullet point?                          10:20:19

7        Q.   Yes.                                          10:20:20

8        A.   Well, I think that's a slippery slope.        10:20:23

9             If we -- if our intention, and I'm not sure   10:20:27

10  about that, was to have an indirect reference back to   10:20:30

11  your client.                                            10:20:36

12       Q.   Why would you be referencing my client in     10:20:36

13  your marketing materials, sir?                          10:20:39

14       A.   Having some personal knowledge of Vocera,     10:20:43

15  they -- their challenge was to get your client off      10:20:52

16  their network, but we did not want to say that          10:20:55

17  directly in this marketing piece, it appears to me,     10:21:00

18  and they wouldn't support that either, I wouldn't       10:21:02

19  think.                                                  10:21:05

20       Q.   Again, sir, the term "dropbox" as it appears  10:21:08

21  in this bullet point is used as an adjective to modify  10:21:11

22  the noun capabilities, correct?                         10:21:15

23            MR. CONE:  Objection, asked and answered.     10:21:17

24            THE WITNESS:  I don't believe that's right.   10:21:19

25  BY MR. KRAMER:                                          10:21:19

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 22

| | | |
|---|---|---|
| 1 | Q.  What part of speech, sir, does the term | 10:21:23 |
| 2 | "dropbox" serve in the second bullet point in this | 10:21:27 |
| 3 | Vocera case study marketing material? | 10:21:29 |
| 4 | A.  I believe that's a reference to your client | 10:21:32 |
| 5 | now. | 10:21:34 |
| 6 | Q.  You read that word "dropbox" with a small D | 10:21:34 |
| 7 | in the second bullet point there as a noun; is that | 10:21:38 |
| 8 | your testimony? | 10:21:45 |
| 9 | A.  I believe that's right. | 10:21:46 |
| 10 | Q.  Since 2004, Thru has often used the term | 10:21:49 |
| 11 | "dropbox" as an adjective to describe a kind of | 10:21:54 |
| 12 | functionality, hasn't it? | 10:21:57 |
| 13 | A.  Maybe a suggestive functionality. | 10:22:00 |
| 14 | Q.  I'm sorry.  A suggestive functionality, sir? | 10:22:04 |
| 15 | Who gave you the term "suggestive," sir?  Was that | 10:22:08 |
| 16 | something your counsel dreamed up and informed you say | 10:22:11 |
| 17 | in this deposition? | 10:22:13 |
| 18 | MR. CONE:  Objection to the form of the | 10:22:14 |
| 19 | question, argumentative. | 10:22:15 |
| 20 | THE WITNESS:  No. | 10:22:17 |
| 21 | BY MR. KRAMER: | 10:22:17 |
| 22 | Q.  Thru has routinely used the term "dropbox" as | 10:22:19 |
| 23 | an adjective in marketing materials over time, has it | 10:22:22 |
| 24 | not? | 10:22:26 |
| 25 | A.  You would have to show me that. | 10:22:27 |

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 29

| | | |
|---|---|---|
| 1 | server. | 10:30:50 |
| 2 | So this is a typical use case, but in the | 10:30:53 |
| 3 | cloud, Thru would be the front end to external parties | 10:30:59 |
| 4 | coming in and logging in and using Thru.  Then all | 10:31:04 |
| 5 | that data is replicated down to the customer's network | 10:31:10 |
| 6 | securely and the internals get high-speed access to | 10:31:15 |
| 7 | the files on their local network in a Thru instance | 10:31:18 |
| 8 | there, and Thru does the synchronizing between the | 10:31:21 |
| 9 | two.  That's a hybrid installation, right. | 10:31:25 |
| 10 | Q.  I'm interested in purely a cloud-based | 10:31:27 |
| 11 | deployment of Thru's software. | 10:31:31 |
| 12 | How does Thru get used by a customer to | 10:31:32 |
| 13 | enable secure file transfers if the software is | 10:31:38 |
| 14 | resident exclusively in the cloud? | 10:31:42 |
| 15 | A.  They get a log-in and they log into the web. | 10:31:45 |
| 16 | They can start using it immediately. | 10:31:52 |
| 17 | Q.  I see. | 10:31:55 |
| 18 | A.  Unless they have an integration with the | 10:31:56 |
| 19 | cloud, Salesforce's cloud, through its cloud, | 10:31:58 |
| 20 | integrate the two clouds together, use Salesforce as | 10:32:01 |
| 21 | the front end, everything is documented in Salesforce, | 10:32:05 |
| 22 | does all the heavy lifting with Thru in the back end. | 10:32:08 |
| 23 | That's the case for Vocera. | 10:32:12 |
| 24 | Q.  So in a cloud-based deployment of Thru's | 10:32:13 |
| 25 | software, do the customers' files ever reside on Thru | 10:32:16 |

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 30

| | | |
|---|---|---|
| 1 | servers? | 10:32:22 |
| 2 | A.  Well, they're on our servers in our cloud and | 10:32:24 |
| 3 | our private cloud and rack space. | 10:32:27 |
| 4 | (Whereupon, Exhibit 156 was marked for | 10:32:51 |
| 5 | identification.) | 10:32:51 |
| 6 | BY MR. KRAMER: | 10:32:51 |
| 7 | Q.  What's been marked as Exhibit 156, sir, is a | 10:32:56 |
| 8 | document Thru produced to us bearing Bates numbers | 10:33:00 |
| 9 | 1064782.  It has your name in the upper left-hand | 10:33:06 |
| 10 | corner and, thus, appears to be something you printed. | 10:33:09 |
| 11 | It also lists you as the owner of the | 10:33:15 |
| 12 | document and has the subject "Wiki thoughts" dated | 10:33:19 |
| 13 | November 5, 2014. | 10:33:22 |
| 14 | What is this document, sir? | 10:33:23 |
| 15 | A.  It appears to be a task that I assigned to | 10:33:25 |
| 16 | myself and put down my thoughts on what would be in a | 10:33:30 |
| 17 | wiki on Thru. | 10:33:34 |
| 18 | Q.  What is a wiki? | 10:33:36 |
| 19 | A.  It's an online encyclopedia. | 10:33:40 |
| 20 | Q.  It's an entry for a specific topic, though, | 10:33:44 |
| 21 | right?  You have a wiki about Thru? | 10:33:47 |
| 22 | A.  Well, it's Wikipedia, so it's an | 10:33:53 |
| 23 | encyclopedia, Wikipedia.  It could be other things, | 10:33:58 |
| 24 | but that's my understanding. | 10:34:01 |
| 25 | Q.  This, in your view, is a task you created | 10:34:02 |

1   using Microsoft Outlook?                                    10:34:06

2        A.   Yes.                                              10:34:08

3        Q.   You created this task for yourself, right?        10:34:08

4        A.   Someone probably spoke to me about it or          10:34:11

5   e-mail or something.  I don't know what triggered it.       10:34:15

6             I think maybe -- as I recall, I think it was      10:34:17

7   Ian Snead who asked me my thoughts on this and I            10:34:22

8   tasked myself to write them down.                           10:34:25

9        Q.   Who is Ian Snead?                                 10:34:27

10       A.   He's our V.P. of marketing and sales.             10:34:28

11       Q.   Was Thru creating a wiki about a particular       10:34:32

12   topic in November 2014?                                    10:34:38

13       A.   I don't know the exact timing of that.            10:34:43

14       Q.   Does Thru currently have a wiki?                  10:34:45

15       A.   We did.  I don't know if we still do.  They       10:34:48

16   put them up and take them down.                            10:34:51

17       Q.   By wiki, are you referring to a Wikipedia         10:34:54

18   entry on the web site Wikipedia.com or is there some       10:34:59

19   internal encyclopedia containing information about         10:35:04

20   Thru?                                                      10:35:09

21       A.   I think this is Wikipedia.com.                    10:35:09

22       Q.   You think this is an entry for inclusion in       10:35:10

23   Wikipedia.com's page on Thru?                              10:35:15

24       A.   I believe Ian had tasked me or asked me to        10:35:23

25   write up some of the early stuff on this.  And I just      10:35:26

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 34

| | | |
|---|---|---|
| 1 | A.  No one else has access to that, so it would | 10:38:07 |
| 2 | almost have to be me.  It would have been maybe in a | 10:38:11 |
| 3 | clean-out or maybe I got around to it then.  I don't | 10:38:14 |
| 4 | think so, but I don't recall. | 10:38:17 |
| 5 | Q.  Turning to the text that you created in | 10:38:25 |
| 6 | Exhibit 156, sir, you had a thought of getting the | 10:38:27 |
| 7 | Dallas morning news to do a piece on the, quote, | 10:38:31 |
| 8 | "Dropbox legends of Irving, Texas," correct? | 10:38:34 |
| 9 | A.  So says here, yes. | 10:38:38 |
| 10 | Q.  To whom specifically were you referring when | 10:38:40 |
| 11 | you wrote "Dropbox legends of Irving, Texas"? | 10:38:43 |
| 12 | A.  I'm just thinking out loud. | 10:38:47 |
| 13 | Q.  Okay.  And in thinking out loud, who were you | 10:38:50 |
| 14 | thinking of in using the term "Dropbox legends of | 10:38:54 |
| 15 | Irving, Texas"? | 10:38:58 |
| 16 | A.  I'm thinking of Thru. | 10:39:00 |
| 17 | Q.  Who else? | 10:39:02 |
| 18 | A.  I think it's singular. | 10:39:09 |
| 19 | Q.  Except you used the word "legends."  That's a | 10:39:12 |
| 20 | plural term, isn't it? | 10:39:15 |
| 21 | A.  It is. | 10:39:16 |
| 22 | Q.  You were thinking of Thru, FilesAnywhere and | 10:39:16 |
| 23 | DG System, correct? | 10:39:19 |
| 24 | A.  I see that, yes, they're mentioned here as | 10:39:21 |
| 25 | well, yes. | 10:39:23 |

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 35

```
 1        Q.  There were, in your mind at this time, three        10:39:24
 2   Dropbox legends of Irving, Texas, right?                      10:39:26
 3        A.  Appears to be.                                       10:39:29
 4        Q.  Okay.  After you -- I should ask this:  Did          10:39:31
 5   you ever get the Dallas morning news to do a piece on         10:39:36
 6   the Dropbox legends of Irving, Texas?                         10:39:38
 7        A.  No.                                                  10:39:41
 8        Q.  Did you try?                                         10:39:41
 9        A.  No, not that I know of.  I didn't personally.        10:39:42
10        Q.  You listed four points here with a couple of        10:39:47
11   subpoints.                                                    10:39:53
12             In point 1 you wrote, quote, "Thru creates         10:39:53
13   the Dropbox functionality of May 2004 in Irving              10:39:57
14   start-up garage," close quote.                               10:40:03
15             That was, true, right?                             10:40:05
16        A.  That's true.                                        10:40:08
17        Q.  In point 2 -- let me ask you about the              10:40:10
18   start-up garage.                                             10:40:13
19             Can you elaborate on that?                         10:40:14
20        A.  It was an actual garage in the back of the          10:40:16
21   Dallas communications complex, a truck bay.                  10:40:19
22        Q.  Even in May 2004, Thru was operating in a           10:40:23
23   garage?                                                      10:40:27
24        A.  Yes.                                                10:40:27
25        Q.  Okay.  In point 2 on your --                        10:40:29
```

```
 1      A.  But -- I'm sorry, I don't mean to interrupt.     10:40:31

 2   Whether it was in the garage or not, it's a            10:40:36

 3   colloquialism for start-up, garage mode.              10:40:40

 4      Q.  It's a bit of embellishment, apocryphal?         10:40:43

 5      A.  You're trying to paint a picture, yes.          10:40:49

 6      Q.  That's what you were trying to do here, paint   10:40:52

 7   a picture?                                             10:40:55

 8      A.  Spewing thoughts.                               10:40:56

 9      Q.  For the Dallas morning news, theoretically?     10:40:58

10      A.  Theoretically.                                  10:41:00

11      Q.  On point 2 in your list on Exhibit 156 you      10:41:01

12   wrote, Mark Cuban's -- quote, "Mark Cuban's            10:41:05

13   FilesAnywhere magically start using the same name with 10:41:10

14   the same functionality as Thru.  In August of 2004,"   10:41:13

15   close quote.                                           10:41:20

16          Do you see that?                                10:41:21

17      A.  I do.                                           10:41:22

18      Q.  So the functionality in FilesAnywhere's         10:41:22

19   product that it called Dropbox was the same            10:41:27

20   functionality as the Dropbox functionality in Thru's   10:41:30

21   product, correct?                                      10:41:33

22      A.  No, it's not correct.                           10:41:35

23      Q.  That's what you wrote here, right, sir?         10:41:36

24      A.  Again, these are just thoughts, but I believe   10:41:39

25   there's differences in the two.                        10:41:43
```

| | | |
|---|---|---|
| 1 | Q.  You wrote in November 2014 that the | 10:41:45 |
| 2 | functionality in the FilesAnywhere product had the | 10:41:48 |
| 3 | same name and was the same functionality as Thru, did | 10:41:51 |
| 4 | you not? | 10:41:54 |
| 5 | A.  I did, I wrote it. | 10:41:57 |
| 6 | Q.  And you were writing this as a note to | 10:41:59 |
| 7 | yourself, right? | 10:42:02 |
| 8 | A.  Yes. | 10:42:05 |
| 9 | Q.  Why would you mischaracterize information in | 10:42:06 |
| 10 | a note to yourself, sir? | 10:42:10 |
| 11 | A.  It's just thoughts.  It's not -- this is not | 10:42:13 |
| 12 | for publication. | 10:42:20 |
| 13 | Q.  So in a message to yourself, it's your | 10:42:23 |
| 14 | testimony that you were misstating facts? | 10:42:25 |
| 15 | A.  Well, yes, I guess I was. | 10:42:31 |
| 16 | Q.  What did you mean when you used the term | 10:42:33 |
| 17 | "magically," sir? | 10:42:36 |
| 18 | A.  Well, I think it means that from out of | 10:42:39 |
| 19 | nowhere or -- I think it's to say wow, how did that | 10:42:43 |
| 20 | happen. | 10:42:49 |
| 21 | Q.  Was your use of the term "magically" intended | 10:42:49 |
| 22 | to convey sarcasm? | 10:42:53 |
| 23 | A.  I don't recall what I was thinking when I | 10:42:56 |
| 24 | wrote it exactly, but it probably is sarcasm, appears | 10:42:57 |
| 25 | to be sarcasm. | 10:43:02 |

```
 1        Q.  Were you suggesting by your use of the term      10:43:03

 2   quote "magically" that FilesAnywhere may have copied      10:43:06

 3   the name Dropbox for its functionality from Thru?         10:43:09

 4        A.  That's possible.                                 10:43:12

 5        Q.  Isn't that a logical reading of the document     10:43:15

 6   as you sit here today?                                    10:43:18

 7        A.  Well, you'd have to know the intention, but I    10:43:20

 8   think it's an indictment of them.                         10:43:25

 9        Q.  How does Thru explain the fact that two          10:43:29

10   companies only a few miles apart both decided at          10:43:32

11   roughly the same time to use the name Dropbox to          10:43:36

12   describe the same functionality in their products?        10:43:39

13        A.  I don't know exactly.                            10:43:44

14        Q.  You don't really think it's the result of        10:43:45

15   magic, right?                                             10:43:48

16        A.  I'm not a believer in magic.                     10:43:48

17        Q.  What do you think is the most logical            10:43:51

18   explanation for why, within a few months of each          10:43:54

19   other, two companies in Irving, Texas independently       10:43:56

20   seized on the identical name for the same function in     10:44:01

21   their products?                                           10:44:04

22        A.  I don't recall, but I mean they could have       10:44:07

23   been looking at each other.                               10:44:11

24        Q.  Isn't a logical explanation that the name the    10:44:16

25   two companies chose for the same function in their        10:44:19
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 39

1   products actually describes the function?                    10:44:22

2       A.  That's not the way I see it.                          10:44:27

3       Q.  You think instead it's more logical one              10:44:31

4   company copied the name Dropbox from the other; is           10:44:34

5   that right?                                                  10:44:37

6       A.  Well, I don't know, but that's completely            10:44:37

7   possible.                                                    10:44:40

8       Q.  Do you think it is also possible that the two        10:44:42

9   companies chose the same name for the same function          10:44:45

10  because the name accurately describes the function?          10:44:48

11      A.  Well, I think it suggests the function.  I           10:44:51

12  think they could be -- I don't know what they're             10:44:55

13  thinking, FilesAnywhere.                                     10:45:00

14      Q.  In point 3 of your list in Exhibit 156, sir,         10:45:29

15  you reference DG Systems and you say it is also of           10:45:34

16  Irving.                                                      10:45:37

17          What is DG Systems, sir?                             10:45:38

18      A.  I believe they do spot delivery for                  10:45:42

19  advertising agencies.                                        10:45:47

20      Q.  You say this company "began a narrow use of          10:45:49

21  the Dropbox trademark in April 2007."                        10:45:53

22          What use of the Dropbox trademark did DG             10:45:56

23  Systems begin in April of 2007?                              10:46:00

24      A.  I only know what I recall.  At a high level,         10:46:06

25  it's delivering television commercials to television         10:46:10

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 40

| | | |
|---|---|---|
| 1 | stations for advertising agencies, I think I said | 10:46:13 |
| 2 | that. | 10:46:16 |
| 3 | Q.  They used it as the name for a file transfer | 10:46:16 |
| 4 | functionality for media assets, right? | 10:46:19 |
| 5 | A.  Sounds reasonable. | 10:46:21 |
| 6 | Q.  Well, I'm asking, not saying. | 10:46:23 |
| 7 | You knew at the time you wrote this that DG | 10:46:26 |
| 8 | Systems used the name Dropbox for a file transfer | 10:46:30 |
| 9 | functionality in their operations in April 2007, | 10:46:33 |
| 10 | right? | 10:46:38 |
| 11 | A.  I did. | 10:46:38 |
| 12 | Q.  What's been previously marked as Exhibit 25, | 10:46:40 |
| 13 | sir, are Thru's responses -- second amended responses | 10:46:52 |
| 14 | to Dropbox's first set of interrogatories, we looked | 10:46:58 |
| 15 | at these a lot in your individual deposition. | 10:47:01 |
| 16 | Could you take a look at that, Exhibit 25. | 10:47:07 |
| 17 | In interrogatory number 9, Dropbox asked for | 10:47:12 |
| 18 | a list of all instances of which Thru was aware of | 10:47:17 |
| 19 | others using the Dropbox mark. | 10:47:23 |
| 20 | Do you have that in front of you, sir? | 10:47:31 |
| 21 | A.  I do. | 10:47:33 |
| 22 | Q.  Do you see that question? | 10:47:33 |
| 23 | A.  I do. | 10:47:35 |
| 24 | Q.  DG Systems in Irving, Texas is not listed in | 10:47:35 |
| 25 | Thru's interrogatory response, is it? | 10:47:40 |

LEE HARRISON - 30(b)(6) - 8/11/2016

```
 1      A.  It is not.                                  10:47:43

 2      Q.  Why not, sir?                               10:47:43

 3      A.  It looks like a mistake -- didn't remember  10:47:44

 4   it.                                                10:47:48

 5      Q.  Another oversight on the part of Thru in    10:47:49

 6   responding to Dropbox's interrogatories, correct?  10:47:53

 7           MR. CONE:  Objection, form of the question. 10:47:57

 8           THE WITNESS:  It is a mistake.             10:48:01

 9   BY MR. KRAMER:                                     10:48:01

10      Q.  How much time, sir, did you spend reviewing 10:48:12

11   the interrogatory responses that you verified on   10:48:15

12   Thru's behalf that appear here in Exhibit 25?      10:48:20

13      A.  I don't know.  It would be several hours.   10:48:29

14      Q.  Back on Exhibit 156 for a minute, so I      10:48:35

15   understand what you are writing here, there are at 10:48:49

16   least two other companies in Irving, Texas besides 10:48:52

17   Thru using the term "Dropbox" for a file transfer  10:48:56

18   functionality as of April 2007, correct?           10:49:00

19      A.  Correct.                                    10:49:04

20      Q.  And Thru, which supposedly had trademark    10:49:04

21   rights in the term Dropbox, did nothing about the  10:49:07

22   other two companies in Irving, Texas using the name 10:49:10

23   Dropbox for file transfer functionalities in their 10:49:14

24   products; is that right?                           10:49:17

25      A.  As of the date of this, no.  Well, no.      10:49:19
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 42

| | | |
|---|---|---|
| 1 | Q.  Never? | 10:49:24 |
| 2 | A.  No. | 10:49:24 |
| 3 | MR. KRAMER:  Let's take a break. | 10:49:27 |
| 4 | THE VIDEOGRAPHER:  We are now off the record | 10:49:29 |
| 5 | at 10:49. | 10:49:31 |
| 6 | (Recess taken.) | 10:49:32 |
| 7 | THE VIDEOGRAPHER:  We are now on the record | 10:58:57 |
| 8 | at 10:59. | 10:58:59 |
| 9 | BY MR. KRAMER: | 10:58:59 |
| 10 | Q.  Mr. Harrison, you attended the deposition in | 10:59:03 |
| 11 | this matter of FilesAnywhere also known as Officeware, | 10:59:06 |
| 12 | correct? | 10:59:10 |
| 13 | A.  Correct. | 10:59:10 |
| 14 | Q.  So you recall, then, that Officeware's | 10:59:11 |
| 15 | corporate designee testified that Officeware started | 10:59:15 |
| 16 | using the term "Dropbox" in January 2004, right? | 10:59:17 |
| 17 | A.  I think I do recall that, yeah. | 10:59:24 |
| 18 | Q.  You also saw Officeware had business records | 10:59:27 |
| 19 | to prove it started using the term "Dropbox" in | 10:59:30 |
| 20 | January 2004, right? | 10:59:33 |
| 21 | MR. CONE:  Objection, form of the question. | 10:59:34 |
| 22 | THE WITNESS:  I believe they did produce some | 10:59:36 |
| 23 | documents.  I don't recall exactly what was on them, | 10:59:39 |
| 24 | but yes, generally. | 10:59:42 |
| 25 | BY MR. KRAMER: | 10:59:42 |

1      Q.  You recalled they showed Officeware had          10:59:44

2  records dating from January 2004 using the term          10:59:46

3  "Dropbox," right?                                          10:59:49

4          MR. CONE:  Object to the form of the             10:59:50

5  question.                                                  10:59:51

6          THE WITNESS:  I don't recall exactly what was    10:59:51

7  on those records.                                          10:59:54

8  BY MR. KRAMER:                                             10:59:54

9      Q.  Do you recall hearing the Officeware             10:59:56

10  corporate designee testify that Officeware used the       10:59:58

11  term "Dropbox" continuously since January 2004?           11:00:01

12      A.  I don't recall exactly, but I'm sure it's in     11:00:04

13  the record.                                               11:00:08

14      Q.  Does Thru have any evidence to suggest that      11:00:09

15  the testimony provided by Officeware's corporate          11:00:12

16  designee was incorrect?                                   11:00:15

17      A.  I do not know.                                    11:00:16

18      Q.  As the corporate designee for Thru, you do       11:00:18

19  not know of any evidence that suggests that the           11:00:23

20  testimony offered by Officeware's designee was            11:00:25

21  incorrect?                                                11:00:29

22      A.  I don't think so, but I --                       11:00:30

23      Q.  If Officeware started using the term             11:00:34

24  "Dropbox" in connection with a file transfer             11:00:38

25  functionality in its product and used it continuously     11:00:41

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 49

| | | |
|---|---|---|
| 1 | MR. CONE:  I do. | 11:07:00 |
| 2 | MR. KRAMER:  Would you do so, please? | 11:07:00 |
| 3 | MR. CONE:  Please don't answer the question. | 11:07:02 |
| 4 | MR. KRAMER:  Needs to be a little more direct | 11:07:03 |
| 5 | than that, sir. | 11:07:05 |
| 6 | MR. CONE:  You don't have to tell -- | 11:07:07 |
| 7 | MR. KRAMER:  Would you just instruct him not | 11:07:08 |
| 8 | to answer? | 11:07:10 |
| 9 | MR. CONE:  I did instruct him not to answer. | 11:07:10 |
| 10 | MR. KRAMER:  You've instructed him not to | 11:07:12 |
| 11 | answer? | 11:07:13 |
| 12 | MR. CONE:  I've instructed him not to answer | 11:07:13 |
| 13 | the question what did your legal team tell you. | 11:07:15 |
| 14 | MR. KRAMER:  Okay. | 11:07:19 |
| 15 | BY MR. KRAMER: | 11:07:19 |
| 16 | Q.  We talked in your individual deposition, | 11:07:44 |
| 17 | Mr. Harrison, about search engine optimization. | 11:07:46 |
| 18 | Do you recall that? | 11:07:49 |
| 19 | A.  Somewhat, yeah. | 11:07:50 |
| 20 | Q.  You recalled that Thru had hired a company to | 11:07:51 |
| 21 | assist it with search engine optimization, but you | 11:07:54 |
| 22 | couldn't remember the name at the time, right? | 11:07:58 |
| 23 | A.  I believe that's right. | 11:07:59 |
| 24 | Q.  Does the name Red Spot Design ring any bells? | 11:08:01 |
| 25 | A.  Actually, it does. | 11:08:04 |

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 50

```
 1        Q.   That was the company that Thru hired to help      11:08:05

 2   it with search engine optimization, right?                  11:08:08

 3        A.   It sounds familiar.                               11:08:11

 4             (Whereupon, Exhibit 157 was marked for            11:08:29

 5   identification.)                                            11:08:30

 6   BY MR. KRAMER:                                              11:08:34

 7        Q.   Exhibit 157, sir, is a document bearing Bates     11:08:35

 8   number THRU 957294 to 957316.                               11:08:41

 9             It's an e-mail exchange between                   11:08:47

10   Mr. Skybakmoen and a representative of Red Spot Design      11:08:50

11   in June and July of 2012 and it was forwarded to you       11:08:54

12   on July 20, 2012 by Mr. Skybakmoen.                        11:08:58

13             Does this help refresh your recollection that    11:09:03

14   Red Spot Design was the company Thru engaged to assist     11:09:05

15   with search engine optimization efforts in 2012?           11:09:10

16        A.   Yes, it looks familiar.                          11:09:15

17        Q.   Red Spot Design, after it was engaged,           11:09:16

18   examined Thru's site in 2012 to identify those terms       11:09:20

19   that were most closely associated with Thru as far as      11:09:23

20   the Google search engine was concerned in June 2012,       11:09:27

21   right?                                                     11:09:34

22        A.   I don't know that.                               11:09:34

23        Q.   On page 957300 -- from 299 to 300, Red Spot      11:09:42

24   Design provided Thru with an analysis of the terms it      11:09:50

25   concluded would be most likely associated with Thru on     11:09:54
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 51

```
 1    Google's search engine, right?                      11:09:59

 2         A.   I don't recall this.   Look at it for a    11:10:03

 3    minute.                                              11:10:09

 4              It appears to be a report on page rankings. 11:10:27

 5         Q.   It's a report that they entitled "Keyword  11:10:31

 6    competency," right?                                  11:10:34

 7         A.   That looks to be that way, yeah.           11:10:37

 8         Q.   And this is an analysis by the search engine 11:10:39

 9    optimization company of the terms that they believed 11:10:43

10    would most likely be associated with Thru on the    11:10:46

11    Google search engine, correct?                      11:10:51

12              MR. CONE:   Object to the form of the      11:10:54

13    question.                                            11:10:55

14              THE WITNESS:   I don't know exactly what   11:10:56

15    they're saying here, keyword competency, keyword.   11:11:00

16              It's not clear to me if this is a proposal or 11:11:10

17    a report on current status.                          11:11:13

18    BY MR. KRAMER:                                       11:11:13

19         Q.   It's both, sir, isn't it?                  11:11:16

20         A.   Yes, it looks like that.                   11:11:25

21         Q.   And this report does not show any keyword  11:11:26

22    competency for Thru and the term "Dropbox" in June  11:11:31

23    2012, correct?                                        11:11:35

24         A.   It appears not.                            11:11:52

25         Q.   So even in June 2012, sir, Thru's own search 11:11:53
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 52

```
 1    engine optimization company did not see an association      11:12:00
 2    between Thru's web site and any Dropbox-related term,        11:12:00
 3    right?                                                       11:12:04
 4          MR. CONE:  Object to the form of the                   11:12:04
 5    question.                                                    11:12:05
 6          THE WITNESS:  It appears they didn't.                  11:12:06
 7    BY MR. KRAMER:                                               11:12:06
 8      Q.  Mr. Harrison, are you aware that Dropbox               11:12:10
 9    asked Thru for all of the documents Thru has relating       11:12:11
10    to its use of search engine advertising?                    11:12:14
11      A.  I am.                                                  11:12:18
12      Q.  Okay.  Who at Thru was responsible for                11:12:19
13    gathering up the documents responsive to that request      11:12:22
14    which, by the way, is request number 81 in Dropbox's        11:12:24
15    second set of document requests?                            11:12:29
16      A.  That would have been a combination of -- I            11:12:32
17    guess I would have overseen it.                             11:12:36
18      Q.  Can you describe for me how Thru went about           11:12:40
19    collecting documents relating to Thru's keyword             11:12:44
20    advertising on search engines?                              11:12:47
21      A.  I can't.                                               11:12:54
22      Q.  Who could?                                             11:12:56
23      A.  Ian Snead.                                             11:13:00
24      Q.  The V.P. of marketing at Thru?                        11:13:03
25      A.  Yes.                                                   11:13:04
```

1      Q.  At first, the only document that we received          11:13:05
2   in response to this request was a very difficult to          11:13:12
3   read pdf spreadsheet showing purchases by Thru of            11:13:16
4   Dropbox-related keywords in Google's AdWords program.        11:13:20
5          I'm going to show you that and have it marked         11:13:25
6   as Exhibit 158.                                              11:13:28
7      A.  Put this one back together?                           11:13:32
8      Q.  Please do.                                            11:13:34
9          (Whereupon, Exhibit 158 was marked for               11:13:46
10  identification.)                                             11:13:46
11  BY MR. KRAMER:                                               11:13:46
12     Q.  So Exhibit 158 is a printout of a pdf we              11:13:50
13  received from Thru without Bates numbers.                    11:13:54
14         We printed it out and it is, as I said, very          11:14:00
15  difficult to read.                                           11:14:07
16         Do you know how this information was                  11:14:08
17  gathered, sir?  Did someone log into Google AdWords          11:14:10
18  and download some information accessible in the              11:14:18
19  account?                                                     11:14:21
20     A.  That would have to be the case.                       11:14:21
21     Q.  Mr. Snead?                                            11:14:23
22     A.  Or Ms. Simha or Blake or --                           11:14:24
23     Q.  Who is Blake?                                         11:14:28
24     A.  He runs social, he could do this.                     11:14:29
25         I could have done it.  I don't remember --            11:14:32

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 55

| | | |
|---|---|---|
| 1 | A.  Since the pendency of this suit, yes. | 11:15:41 |
| 2 | Q.  How about before pendency of this suit, ever? | 11:15:43 |
| 3 | A.  Bing, prior, but not much. | 11:15:47 |
| 4 | Q.  You said Bing prior? | 11:15:50 |
| 5 | A.  Bing. | 11:15:52 |
| 6 | Q.  In addition to using Google AdWords, Thru | 11:15:53 |
| 7 | used Bing's keyword advertising services minimally? | 11:15:58 |
| 8 | A.  Minimally. | 11:16:05 |
| 9 | Q.  Did someone at Thru take up the task of | 11:16:06 |
| 10 | accessing the records regarding Thru's use of Bing for | 11:16:11 |
| 11 | keyword advertising in order to provide those | 11:16:18 |
| 12 | documents to Dropbox? | 11:16:21 |
| 13 | A.  I'm going to assume yes. | 11:16:22 |
| 14 | MR. KRAMER:  Counsel, we don't have any | 11:16:25 |
| 15 | documents in that regard. | 11:16:27 |
| 16 | MR. CONE:  I don't believe I've seen any | 11:16:28 |
| 17 | either.  I think, for the record, you also have the | 11:16:30 |
| 18 | Excel version of that download. | 11:16:34 |
| 19 | MR. KRAMER:  No, we don't, but I'll get to | 11:16:36 |
| 20 | that. | 11:16:38 |
| 21 | MR. CONE:  It was produced on Monday. | 11:16:38 |
| 22 | MR. KRAMER:  We have something different. | 11:16:40 |
| 23 | BY MR. KRAMER: | 11:16:40 |
| 24 | Q.  Is Bing the only other search engine that | 11:16:45 |
| 25 | Thru used for keyword advertising at all other than | 11:16:50 |

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 56

```
 1    Google?                                              11:16:54

 2        A.   I believe that's correct.                   11:16:55

 3        Q.   When was the first time that Thru used      11:16:56

 4    keyword advertising to promote its business in any   11:17:02

 5    way?                                                  11:17:05

 6        A.   As I recall, probably 2005, but this account 11:17:05

 7    goes back to 2007, I believe, and it was two different 11:17:16

 8    accounts and I don't think there's a -- I don't think 11:17:21

 9    there's a way to get in the 2005 account, lost or     11:17:26

10    changed for some reason.                              11:17:30

11        Q.   So for ease of reference, this Google AdWords 11:17:31

12    account that dates back to 2007, is there a name on    11:17:36

13    the account?                                           11:17:40

14        A.   Thru and Google's account number, that's the 11:17:40

15    way they do everything, as far as I know.              11:17:48

16        Q.   Did someone make a decision not to collect up 11:17:50

17    and produce information regarding search engine        11:17:57

18    advertising on search engines other than Google?       11:18:00

19        A.   Absolutely not.  I don't think so.            11:18:03

20        Q.   Has Thru engaged in keyword advertising       11:18:06

21    around the term "Dropbox" on any search engines other  11:18:09

22    than Google?                                           11:18:13

23        A.   I don't believe so.                           11:18:13

24        Q.   This printout, Exhibit 158, to the extent it  11:18:18

25    is legible, does it purport to show all of the keyword 11:18:24
```

1   advertising that Thru did in Google's AdWords program          11:18:28

2   around Dropbox-related terms?                                  11:18:34

3       A.  It appears so.  There's a lot here.  I                 11:18:38

4   couldn't certify it, but -- I can certify it.  We did          11:18:48

5   our best to get it out of there.                              11:18:51

6       Q.  To get the information out of Google's                11:18:53

7   AdWords database that showed Thru's keyword                    11:18:57

8   advertising around Dropbox-related terms, correct?            11:19:01

9       A.  Correct.                                              11:19:04

10      Q.  That's what Exhibit 158 shows, right?                 11:19:04

11      A.  It does.                                              11:19:06

12      Q.  As I read this, Exhibit 158, and, again, it          11:19:08

13  wasn't easy, it indicates that Thru first purchased          11:19:12

14  keyword advertising around Dropbox-related terms in          11:19:15

15  2012; is that correct?                                        11:19:20

16      A.  Yes, that's correct.                                 11:19:21

17      Q.  If Thru genuinely believed it had trademark          11:19:22

18  rights in the term "Dropbox" starting in 2004, why           11:19:40

19  wasn't it until 2012 that Thru first purchased keyword       11:19:43

20  advertising around the term "Dropbox"?                        11:19:47

21      A.  Well, it was a business decision.                     11:19:51

22      Q.  What motivated that business decision, sir?          11:19:55

23      A.  Thru didn't purchase a lot of AdWords for            11:19:58

24  anything, Dropbox or non-Dropbox.                             11:20:04

25      Q.  You told me this AdWords account that Thru           11:20:10

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 58

```
 1   had with Google dated back to 2007.                    11:20:13

 2        So Thru used --                                    11:20:16

 3   A.   Yes.                                               11:20:18

 4   Q.   -- the AdWords account for five years without      11:20:18

 5   purchasing keyword advertising around the term          11:20:22

 6   "Dropbox", right?                                       11:20:24

 7   A.   That's right.                                      11:20:25

 8   Q.   If Thru genuinely believed it had trademark        11:20:25

 9   rights in the term "Dropbox" over that period, why      11:20:29

10   wasn't it purchasing keyword advertising around the     11:20:31

11   term "Dropbox"?                                          11:20:34

12   A.   It was a business decision.                        11:20:35

13   Q.   I understand.                                      11:20:39

14   A.   We --                                              11:20:40

15        MR. CONE:  He's answering.                         11:20:41

16        MR. KRAMER:  I thought you were finished.          11:20:43

17        THE WITNESS:  Sorry.  Well, with a limited         11:20:45

18   budget, you're trying to keyword yourself around, the   11:20:50

19   marketing people felt like we would spend our budget    11:20:56

20   better elsewhere.                                       11:21:00

21   BY MR. KRAMER:                                          11:21:00

22   Q.   Was Thru's decision to begin keyword               11:21:04

23   advertising around Dropbox-related terms in 2012 in     11:21:07

24   part an attempt to make it look like Thru had serious   11:21:11

25   interest in protecting the Dropbox trademark?           11:21:15
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 59

| | | |
|---|---|---|
| 1 | A.  No, I don't believe so. | 11:21:21 |
| 2 | Q.  Was Thru trying to create the potential for | 11:21:26 |
| 3 | consumer confusion by virtue of its use of keyword | 11:21:29 |
| 4 | advertising around the term "Dropbox" starting in | 11:21:34 |
| 5 | 2012? | 11:21:37 |
| 6 | A.  No, I don't believe so. | 11:21:37 |
| 7 | Q.  Why did Thru begin keyword advertising around | 11:21:46 |
| 8 | Dropbox-related terms starting in 2012? | 11:21:50 |
| 9 | A.  Well, as a business decision, it looked as | 11:21:52 |
| 10 | though your client was doing very well with lots of | 11:21:55 |
| 11 | users and we could direct traffic to our site by | 11:21:59 |
| 12 | keywording. | 11:22:05 |
| 13 | Q.  My client's name? | 11:22:07 |
| 14 | A.  Our trademark. | 11:22:08 |
| 15 | Q.  As you contend. | 11:22:10 |
| 16 | So the idea was to find people searching for | 11:22:14 |
| 17 | my client using keyword advertising and get them to | 11:22:19 |
| 18 | come to Thru's web site? | 11:22:23 |
| 19 | MR. CONE:  Object to the form of the | 11:22:26 |
| 20 | question. | 11:22:27 |
| 21 | THE WITNESS:  I believe that was the | 11:22:28 |
| 22 | intention. | 11:22:35 |
| 23 | BY MR. KRAMER: | 11:22:35 |
| 24 | Q.  So we did, as your counsel suggested, raise | 11:22:35 |
| 25 | some concerns about this document, Exhibit 158, and we | 11:22:39 |

1   subsequently got a spreadsheet from Thru afterwards          11:22:43

2   and let me show you that one.                               11:22:47

3          MR. KRAMER:  Let's have that marked as               11:23:09

4   Exhibit 159.                                                11:23:10

5          (Whereupon, Exhibit 159 was marked for               11:23:12

6   identification.)                                            11:23:12

7   BY MR. KRAMER:                                              11:23:12

8      Q.  Exhibit 159 is that spreadsheet we received          11:23:23

9   from Thru bearing Bates numbers 2042668 to 711.             11:23:28

10          My question, sir, is:  How was Thru able to         11:23:42

11  generate the information shown in the spreadsheet that      11:23:47

12  is Exhibit 159?                                             11:23:49

13     A.  It would be a download from Google.                  11:23:52

14     Q.  Someone logged into Thru's AdWords account           11:23:55

15  and retrieved and downloaded this information, right?       11:24:01

16     A.  Right.                                               11:24:06

17     Q.  The Exhibit 159 spreadsheet shows AdWords            11:24:07

18  purchases by Thru on Google dating back to 2012, but        11:24:13

19  you've told me that Thru had AdWords purchases dating        11:24:18

20  back to 2007.                                               11:24:23

21          Why, sir, doesn't the spreadsheet date back        11:24:24

22  to 2007?                                                    11:24:27

23     A.  There was no Dropbox keyword -- AdWords              11:24:29

24  purchases prior to this date, this date here.               11:24:37

25     Q.  If I wanted to see all of Thru's AdWords             11:24:43

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 117

```
 1      Q.  Is Thru aware of any evidence that any        13:51:52
 2  would-be purchaser of Thru's product chose to        13:51:57
 3  patronize my client Dropbox because it was confused by 13:52:01
 4  my client's use of the name Dropbox?                  13:52:06
 5      A.  Purchaser from Thru?                          13:52:11
 6      Q.  Is Thru aware of any evidence that any        13:52:14
 7  would-be purchaser of Thru's product chose to        13:52:18
 8  patronize my client Dropbox because it was confused by 13:52:22
 9  my client's use of the name Dropbox?                  13:52:27
10      A.  I don't have that -- I don't recall that.     13:52:34
11      Q.  You have no evidence of that?                 13:52:36
12      A.  I don't have any evidence of it.              13:52:39
13      Q.  And you're here testifying on behalf of the   13:52:40
14  company as its designee, right?                       13:52:43
15      A.  Right.                                        13:52:45
16      Q.  So Thru is not aware of a single sale that it 13:52:45
17  lost to Dropbox over supposed confusion in a potential 13:52:55
18  customer caused by my client's use of the name        13:53:01
19  Dropbox, correct?                                     13:53:04
20      A.  Well, no, we've lost sales to Dropbox.  I     13:53:05
21  didn't understand the other question.                 13:53:08
22      Q.  That's a different question, sir.             13:53:10
23          What you've just answered, undoubtedly        13:53:12
24  clients have chosen to patronize my client rather than 13:53:16
25  Thru.                                                 13:53:19
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 118

| | | |
|---|---|---|
| 1 | My question is:  Is Thru aware of a single | 13:53:21 |
| 2 | sale that it lost to Dropbox over supposed confusion | 13:53:25 |
| 3 | in a potential customer caused by my client's use of | 13:53:31 |
| 4 | the name Dropbox? | 13:53:35 |
| 5 | A.  No. | 13:53:36 |
| 6 | Q.  Thru is not asserting a claim for damages in | 13:53:39 |
| 7 | this case, right? | 13:53:42 |
| 8 | A.  That's correct. | 13:53:43 |
| 9 | Q.  Does Thru believe it has suffered financial | 13:53:45 |
| 10 | injury by virtue of my client's use of the name | 13:53:50 |
| 11 | Dropbox? | 13:53:53 |
| 12 | A.  Yes, Thru thinks that. | 13:53:54 |
| 13 | Q.  Why isn't Thru asserting a claim for that | 13:53:56 |
| 14 | injury in a claim about such use? | 13:53:59 |
| 15 | A.  Rather just have our trademark back. | 13:54:04 |
| 16 | Q.  You felt that the financial injury that you | 13:54:08 |
| 17 | believe Thru suffered as a result of my client's use | 13:54:12 |
| 18 | of the term "Dropbox" was not significant enough to | 13:54:16 |
| 19 | seek in this case? | 13:54:19 |
| 20 | A.  Well, we made a decision that we'd just | 13:54:21 |
| 21 | rather have our trademark back. | 13:54:27 |
| 22 | Q.  But, sir, it wasn't necessarily a choice | 13:54:29 |
| 23 | between either/or. | 13:54:33 |
| 24 | Why is Thru not seeking damages in this case | 13:54:34 |
| 25 | if it believes it supposedly suffered injury by virtue | 13:54:37 |

1    of my client's use of the term "Dropbox"?                    13:54:41

2           MR. CONE:  Objection, asked and answered.             13:54:44

3           THE WITNESS:  Because we just want our                13:54:45

4    trademark back.                                              13:54:51

5    BY MR. KRAMER:                                               13:54:51

6       Q.  You said that you believed that Thru suffered         13:54:56

7    financial injury caused by my client's use of the name       13:54:59

8    Dropbox.                                                     13:55:02

9           Explain that to me if you would, please.             13:55:03

10      A.  Well, because Dropbox initially has a lot of          13:55:07

11   free users, we felt as though, and this is hard to           13:55:13

12   prove, but that there's probably an advantage from a         13:55:19

13   pricing standpoint since we don't do any free and that       13:55:23

14   they're using the trademark that we feel we own              13:55:28

15   against us, and giving away software that might come         13:55:31

16   to us.                                                       13:55:35

17          This is not -- it's a theory, we can't prove          13:55:35

18   that, but that's our thinking.                               13:55:38

19      Q.  But that would exist whether my client's              13:55:40

20   company were called Dropbox or Esoterica, right, if it       13:55:43

21   were giving away its product for free it might cost          13:55:47

22   Thru some customers whom Thru wanted to charge for           13:55:51

23   similar services?                                            13:55:54

24      A.  That's true and we wouldn't be here.                  13:55:55

25      Q.  Has the Dropbox functionality in Thru                 13:55:57

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 120

```
 1   software ever won any awards?                        13:56:00
 2       A.  Individually or -- Thru has, but we sell the 13:56:03
 3   same software to -- everybody gets everything, so -- 13:56:08
 4       Q.  Thru may have won some awards.                13:56:11
 5           I'm asking specifically, though, has the     13:56:13
 6   Dropbox functionality in Thru's software ever won any 13:56:16
 7   awards?                                               13:56:19
 8       A.  No.                                           13:56:20
 9       Q.  Have there ever been any news articles in the 13:56:20
10   popular press written specifically about the Dropbox 13:56:23
11   functionality in Thru's software?                    13:56:26
12       A.  No.                                           13:56:27
13       Q.  How about in the trade press, any articles    13:56:27
14   written specifically about the Dropbox functionality  13:56:31
15   in Thru's software?                                   13:56:33
16       A.  There may be some.                            13:56:35
17       Q.  Identify them for me, please.                 13:56:37
18       A.  I don't have them in front of me, but --      13:56:40
19       Q.  In what article -- what publication do you    13:56:43
20   believe there was an article written about the Dropbox 13:56:46
21   function specifically in Thru's product?              13:56:49
22       A.  I don't recall.                               13:56:51
23       Q.  Is Thru aware of any evidence to suggest that 13:56:53
24   my client chose the name Dropbox in an effort to trade 13:56:56
25   on brand recognition that Thru had developed in the   13:57:01
```

1    term "Dropbox"?                                    13:57:04

2        A.  We have no information on that.            13:57:06

3        Q.  Is Thru aware of any evidence to suggest that   13:57:09

4    the people who adopted the Dropbox name for my client   13:57:14

5    had even heard of Thru at the time they chose to use   13:57:17

6    the name Dropbox?                                  13:57:20

7        A.  We have no information on that.            13:57:21

8        Q.  My client Dropbox, Inc. launched to the   13:57:23

9    public in 2008, sir.                               13:57:35

10       Does Thru have any evidence that in 2008,      13:57:37

11   anyone mistook Thru's product for those of my client   13:57:42

12   because of my client's use of the name Dropbox?    13:57:46

13       A.  In 2008?                                   13:57:48

14       Q.  Yes.                                       13:57:50

15       A.  I don't recall.                            13:57:51

16       MR. KRAMER:  Let's go off the record for a     13:58:08

17   second.                                            13:58:10

18       THE VIDEOGRAPHER:  We are off the record at    13:58:10

19   1:58.                                              13:58:12

20       (Recess taken.)                                13:58:13

21       THE VIDEOGRAPHER:  We are now on the record    13:59:07

22   at 1:59.                                           13:59:13

23   BY MR. KRAMER:                                     13:59:13

24       Q.  Turn if you would, sir, in Exhibit 25 through   13:59:18

25   second amended and supplemental responses to plaintiff   13:59:22

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 122

| | |
|---|---|
| 1    Dropbox's first set of interrogatories to page 11 and | 13:59:27 |
| 2    interrogatory number 8. | 13:59:31 |
| 3         I'd like you to confirm for me in response to | 13:59:38 |
| 4    interrogatory number 8 which asks for a description of | 13:59:41 |
| 5    each incident of actual confusion of which Thru is | 13:59:44 |
| 6    aware there is nothing listed earlier than 2012. | 13:59:49 |
| 7         Do you have the question in mind?  The | 14:00:33 |
| 8    question was:  Can you confirm for me in response to | 14:00:35 |
| 9    interrogatory number 8 which asks for a description of | 14:00:39 |
| 10   each incident of actual confusion of which Thru is | 14:00:42 |
| 11   aware there is nothing listed earlier than 2012? | 14:00:45 |
| 12   A.  That's correct. | 14:00:52 |
| 13   Q.  So does Thru have any evidence that in 2008 | 14:00:52 |
| 14   anyone mistook Thru's product for those of my client | 14:00:58 |
| 15   Dropbox because of my client's use of the term | 14:01:02 |
| 16   "Dropbox"? | 14:01:06 |
| 17   A.  I don't believe so. | 14:01:06 |
| 18   Q.  If it did, it would have listed it there in | 14:01:06 |
| 19   response to interrogatory number 8, right? | 14:01:11 |
| 20   A.  It would have tried to. | 14:01:13 |
| 21   Q.  How about through 2009?  Does Thru have any | 14:01:14 |
| 22   evidence of anyone that was interacting with Thru in | 14:01:17 |
| 23   2009 because they were confused by my client's use of | 14:01:22 |
| 24   the term "Dropbox"? | 14:01:26 |
| 25   A.  I don't know of any. | 14:01:28 |

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 124

| | | |
|---|---|---|
| 1 | Board of Directors? | 14:03:11 |
| 2 |     A.  I don't recall the exact dates, but he was | 14:03:12 |
| 3 | the initial chairman of the company and at some point | 14:03:14 |
| 4 | he took a hiatus probably until -- I could be off a | 14:03:19 |
| 5 | year or two, could be 2008 before he came back. | 14:03:29 |
| 6 |     Q.  You also told me you recalled | 14:03:32 |
| 7 | Mr. Holiday-Smith while he was a member of the board | 14:03:35 |
| 8 | suggesting in the 2013 time frame that Thru launch a | 14:03:38 |
| 9 | Dropbox look-alike service in order to muddle the | 14:03:42 |
| 10 | public, right? | 14:03:47 |
| 11 |     A.  I think he suggested that. | 14:03:48 |
| 12 |     Q.  Let me put that same question to you now as | 14:03:49 |
| 13 | Thru's corporate designee. | 14:03:53 |
| 14 |     Didn't Mr. Holiday-Smith, a member of Thru's | 14:03:54 |
| 15 | Board of Directors, suggest to you one tactic for Thru | 14:03:58 |
| 16 | to employ in an effort to obtain payout from Dropbox | 14:04:01 |
| 17 | was for Thru to launch a Dropbox look-alike in an | 14:04:05 |
| 18 | effort to muddle the public? | 14:04:09 |
| 19 |     MR. CONE:  Object to the form of the | 14:04:11 |
| 20 | question. | 14:04:13 |
| 21 |     THE WITNESS:  I don't recall exactly his | 14:04:13 |
| 22 | motive and I do recall the final substance of it, but | 14:04:14 |
| 23 | he did suggest something along those lines. | 14:04:18 |
| 24 | BY MR. KRAMER: | 14:04:22 |
| 25 |     Q.  In fact, he suggested that not just to you | 14:04:22 |

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 125

```
 1   but to Thru's entire Board of Directors, right?              14:04:25

 2        A.   That I don't recall.                               14:04:27

 3             MR. KRAMER:   169, please.                         14:04:32

 4             (Whereupon, Exhibit 169 was marked for             14:04:44

 5   identification.)                                             14:04:44

 6   BY MR. KRAMER:                                               14:04:44

 7        Q.   Exhibit 169 is an e-mail produced to us in         14:04:46

 8   this action by Thru bearing Bates numbers 729809 to          14:04:49

 9   810.                                                         14:04:54

10             It's an e-mail exchange among the Thru Board       14:04:56

11   of Directors including yourself on October 2, 2013           14:05:00

12   with the subject line Dropbox.                               14:05:02

13             And at the top of the page in the last in          14:05:04

14   time message, Mr. Smith writes to his fellow board           14:05:07

15   members asking, quote, "Lee are there any other              14:05:13

16   tactics to employ?"  He writes, quote, "Could we             14:05:16

17   launch a Dropbox look-alike but not as free as theirs        14:05:20

18   to muddle the public?"                                       14:05:24

19             Do you see that?                                   14:05:26

20        A.   Yes, I do.                                         14:05:27

21        Q.   Thru's board member, Mr. Holiday-Smith, was        14:05:28

22   proposing to his fellow board members Thru take steps        14:05:32

23   to cause consumer confusion, wasn't he?                      14:05:35

24        A.   Yes.                                               14:05:38

25        Q.   What was your reaction to the suggestion made      14:05:39
```

1   by a member of Thru's Board of Directors that Thru act        14:05:42

2   to muddle the public?        14:05:45

3        A.  I don't recall my reaction.        14:05:47

4        Q.  Did you write back to Mr. Holiday-Smith and        14:05:50

5   tell him this was a terrible idea and Thru would never        14:05:53

6   stoop to such behavior?        14:05:56

7        A.  I don't recall.        14:05:57

8        Q.  Did you say that Thru could do what he        14:05:58

9   suggested?        14:06:02

10       A.  You know, it's -- I probably said we could,        14:06:07

11  but we didn't.        14:06:12

12       Q.  What was the reaction of Thru's other        14:06:12

13  directors to this tactical suggestion from        14:06:15

14  Mr. Holiday-Smith?        14:06:19

15       A.  I don't recall.        14:06:20

16       Q.  In the same message Mr. Holiday-Smith        14:06:21

17  suggests "We need to start an agitation campaign that        14:06:26

18  caused them some public pressure and Twitter chatter."        14:06:32

19           Do you see that?        14:06:36

20       A.  Where is that?  I'm really bad about doing        14:06:37

21  that.  Okay.  I see it.  I'm always looking way above        14:06:45

22  you here.        14:06:52

23           I got it, David.        14:06:53

24       Q.  Mr. Holiday-Smith means to cause my client        14:06:57

25  Dropbox some public pressure, right?        14:07:02

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 132

```
1    the sidelines, they can ignore us and march merrily on      14:13:49
2    toward an IPO.  If we ambush them at the end of that         14:13:54
3    process they may get more sympathy from the courts,          14:13:58
4    the market and the public."                                  14:14:03
5          Do you see that?                                       14:14:03
6    A.   Yeah.                                                    14:14:04
7    Q.   He's referring to my client Dropbox, Inc.,              14:14:05
8    right?                                                        14:14:05
9    A.   I believe so.                                            14:14:08
10   Q.   Your chairman's instinct was Thru should have           14:14:09
11   filed lawsuit against Dropbox over supposed trademark        14:14:14
12   infringement in October 2013, right?                         14:14:18
13   A.   He is suggesting that.                                   14:14:19
14   Q.   Mr. Holiday-Smith agreed with your chairman,            14:14:21
15   Mr. McCoy, if you look at the top of his message in          14:14:25
16   the thread, he writes, quote, "In general I agree with       14:14:29
17   Mike," right?                                                 14:14:32
18   A.   Yes.                                                     14:14:32
19   Q.   But you didn't agree with the chairman of               14:14:33
20   Thru's Board of Directors or Mr. Holiday-Smith about         14:14:37
21   the timing of Thru's lawsuit against Dropbox, did you?       14:14:39
22   A.   I'd have to review the e-mail.                           14:14:44
23   Q.   Well, in your message that starts the thread,           14:14:46
24   you wrote "The best leverage we have is to sit tight         14:14:48
25   and wait to the IPO announcement and be prepared to          14:14:53
```

| | | |
|---|---|---|
| 1 | file suit that day and make as much noise as we can | 14:14:59 |
| 2 | about it." | 14:15:04 |
| 3 | You wrote that, right? | 14:15:04 |
| 4 | A.  Where is that? | 14:15:05 |
| 5 | Q.  The first message in the thread, sir, on page | 14:15:07 |
| 6 | 729810, second paragraph -- | 14:15:11 |
| 7 | A.  Let me just read it. | 14:15:18 |
| 8 | Q.  And you wrote that, right? | 14:15:18 |
| 9 | A.  I did. | 14:15:32 |
| 10 | Q.  And that was your view of when Thru should | 14:15:32 |
| 11 | file a lawsuit against my client Dropbox, right? | 14:15:35 |
| 12 | A.  At that time, it looks like that. | 14:15:35 |
| 13 | Q.  Thru was waiting for Dropbox to announce an | 14:15:37 |
| 14 | IPO so Thru could file a lawsuit that day because | 14:15:40 |
| 15 | that's what Thru would afford it the biggest payoff, | 14:15:44 |
| 16 | right? | 14:15:47 |
| 17 | A.  It's a tactic considered. | 14:15:47 |
| 18 | Q.  It's a tactic you were advocating? | 14:15:49 |
| 19 | A.  Yes. | 14:15:51 |
| 20 | Q.  In fact, it was a tactic that was deployed, | 14:15:51 |
| 21 | wasn't it, sir? | 14:15:55 |
| 22 | A.  Well, I would say that we've sort of given up | 14:15:56 |
| 23 | hope on your client coming to talk to us about it. | 14:16:01 |
| 24 | So we seemed to have no choice but to wait. | 14:16:03 |
| 25 | Q.  Thru was waiting for Dropbox to announce a | 14:16:07 |

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 134

| | | |
|---|---|---|
| 1 | IPO so it could file a lawsuit that day because that's | 14:16:10 |
| 2 | what Thru thought would bring it the biggest payoff, | 14:16:14 |
| 3 | right? | 14:16:18 |
| 4 | A.  It was -- it was a thought at the time, yes. | 14:16:18 |
| 5 | Q.  And it's a thought that Thru actually went | 14:16:21 |
| 6 | with, correct? | 14:16:24 |
| 7 | A.  Well, it's not what we're sitting around | 14:16:27 |
| 8 | waiting on, no, I don't think so. | 14:16:30 |
| 9 | Q.  You didn't file a lawsuit in October 2013 as | 14:16:32 |
| 10 | your chairman and another board member suggested, | 14:16:35 |
| 11 | right? | 14:16:38 |
| 12 | A.  Actually, what we wanted to do was stay at | 14:16:38 |
| 13 | the PTO and fight it out there. | 14:16:41 |
| 14 | Q.  Sir, you wrote here that "The best leverage | 14:16:44 |
| 15 | we have is to sit tight and wait until the IPO | 14:16:49 |
| 16 | announcement and be prepared to file suit that day and | 14:16:52 |
| 17 | make as much noise as we can about it," right? | 14:16:57 |
| 18 | A.  I did write that. | 14:17:01 |
| 19 | Q.  And that was the strategy Thru actually | 14:17:03 |
| 20 | employed in connection with its claim against my | 14:17:06 |
| 21 | client Dropbox, right? | 14:17:09 |
| 22 | A.  No, the strategy was to fight it out at the | 14:17:11 |
| 23 | USPTO. | 14:17:14 |
| 24 | This was just an idea. | 14:17:15 |
| 25 | Q.  Did Thru file a lawsuit against my client for | 14:17:17 |

```
1    trademark infringement in October of 2013?        14:17:20

2        A.  No.                                        14:17:23

3        Q.  This strategy of laying in wait for the    14:17:24

4    Dropbox IPO, that's the strategy Dropbox went with, 14:17:31

5    right?                                             14:17:36

6        A.  Dropbox went?                              14:17:36

7        Q.  Sorry, strike that.                        14:17:38

8            Thru did not file a trademark lawsuit against 14:17:39

9    my client Dropbox at around the time it learned of my 14:17:42

10   client in June 2009, right?                        14:17:46

11       A.  No, it didn't.                             14:17:49

12       Q.  Didn't file a lawsuit against my client    14:17:50

13   Dropbox for trademark infringement in 2010, did it? 14:17:52

14       A.  No.                                        14:17:56

15       Q.  Didn't file a trademark lawsuit against my 14:17:56

16   client in 2011, right?                             14:17:59

17       A.  Correct.                                   14:18:00

18       Q.  Did not file a trademark infringement lawsuit 14:18:01

19   against my client Dropbox in 2012 or 2013, correct? 14:18:03

20       A.  Correct.                                   14:18:07

21       Q.  Thru did not even file this lawsuit, did it? 14:18:07

22       A.  No.                                        14:18:11

23       Q.  Thru was executing on the strategy you     14:18:13

24   articulated in this e-mail message, Exhibit 169, to 14:18:16

25   hold off until Dropbox announced an IPO because you 14:18:20
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 136

```
 1    thought that's how Thru would maximize a payout,          14:18:25

 2    right?                                                    14:18:29

 3         A.   Incorrect.                                      14:18:29

 4         Q.   How is that incorrect, sir?                     14:18:30

 5         A.   Our strategy was to fight it out at the U.S.    14:18:32

 6    Patent and Trademark Office.  We could not afford to      14:18:36

 7    file a lawsuit.                                            14:18:39

 8              It didn't make sense economically for us to     14:18:40

 9    do that.                                                  14:18:43

10         Q.   Even though Thru was well aware of my client    14:18:44

11    for years, Thru never once, even as of July 2015, told    14:18:47

12    my client Dropbox to stop using the name Dropbox, did     14:18:52

13    it?                                                       14:18:57

14         A.   No.                                             14:18:57

15         Q.   In fact, sir, in July 2015 in a brief it        14:18:58

16    filed in this case, Thru took the position it had         14:19:02

17    never objected to Dropbox's use of the Dropbox mark,      14:19:06

18    right?                                                    14:19:11

19         A.   I don't recall.                                 14:19:11

20         Q.   This plan of sitting on the sidelines and       14:19:12

21    waiting for Dropbox to announce an IPO, that's what       14:19:14

22    Mr. McCoy, Thru's chairman of the board, characterized    14:19:19

23    as an ambush, right?                                      14:19:23

24         A.   His instinct was not to wait but file now.      14:19:30

25         Q.   He thought if Thru waited to file a lawsuit     14:19:35
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 137

```
 1    until Dropbox announced an IPO, that would be          14:19:39
 2    considered an ambush, right?                           14:19:43
 3        A.  His concern, I think he's writing here, was    14:19:55
 4    that there would be sympathetic courts.                14:19:58
 5        Q.  Given the fact that Thru had failed to take    14:20:06
 6    action for many years?                                 14:20:09
 7        A.  No.  I can't say what he was thinking exactly  14:20:13
 8    there and why he wrote that, but he was worried that   14:20:17
 9    the courts wouldn't be fair to us, I believe.          14:20:20
10           MR. KRAMER:  Let's take a break.                14:20:24
11           THE VIDEOGRAPHER:  We are now off the record    14:20:25
12    at 2:20.                                               14:20:27
13           (Recess taken.)                                 14:20:29
14           THE VIDEOGRAPHER:  We are now on the record     14:34:55
15    at 2:35.                                               14:34:57
16           MR. KRAMER:  Mark this as 170.                  14:35:01
17           (Whereupon, Exhibit 170 was marked for          14:35:15
18    identification.)                                       14:35:15
19    BY MR. KRAMER:                                         14:35:15
20        Q.  For the record, Mr. Harrison, Exhibit 170 is   14:35:19
21    a document bearing Bates numbers THRU 729731 to 33,    14:35:22
22    originally among Thru's Board of Directors and later   14:35:31
23    an exchange between you, Mr. Harrison, and a Thru      14:35:35
24    board member, Mr. Yonge.                               14:35:39
25           The e-mail thread runs from August 13th         14:35:41
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 138

```
 1   through Tuesday August 19th, 2013.                  14:35:46
 2        The first e-mail in the thread, first in       14:35:48
 3   time, is redacted based on a claim of privilege by  14:35:49
 4   Thru with which Dropbox disagrees, but that is an   14:35:52
 5   issue we have agreed to table for now, okay.        14:35:55
 6        Mr. Yonge here in August 2013 --               14:35:59
 7        MR. KRAMER:  Sorry, did you have something --  14:36:06
 8        MR. CONE:  Pronounced Yonge.                   14:36:08
 9        MR. KRAMER:  I apologize.                      14:36:11
10   BY MR. KRAMER:                                      14:36:11
11      Q.  Mr. Yonge in the first message that appears  14:36:13
12   in the thread on August 17, 2013, is questioning    14:36:16
13   Thru's strategy of inaction towards Dropbox, isn't he?  14:36:21
14      A.  It looks like he's asking for a discussion on  14:36:39
15   it.                                                 14:36:46
16      Q.  He says "I need to debate with you the pros  14:36:46
17   and cons of starting an action sooner rather than   14:36:49
18   later, assuming the issue is not forced by an early  14:36:52
19   IPO development," right?                            14:36:55
20      A.  That's what he wrote here, yeah.             14:36:56
21      Q.  And he was writing this because Thru had     14:36:58
22   adopted the strategy of inaction at the time, right?  14:37:04
23      A.  Our policy or -- it wasn't a policy, our     14:37:11
24   strategy wasn't changed, was to stick with the USPTO  14:37:14
25   if we could.                                        14:37:20
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 139

```
 1        Q.  In August of 2013 there was no ongoing          14:37:21

 2   proceeding at the USPTO between the parties, right?      14:37:25

 3        A.  We were waiting for the outcome of serial       14:37:28

 4   things, several parties squabbling over the trademark    14:37:33

 5   and we didn't want to get the wrong one at the end of    14:37:38

 6   that process.                                            14:37:42

 7        Q.  So in response to Mr. Yonge at 11:31 p.m.,      14:37:43

 8   you wrote "There is certainly a reason to debate         14:37:50

 9   this."                                                   14:37:55

10        And you later wrote in that same e-mail "They       14:37:57

11   will argue that Dropbox is so successful we should       14:38:01

12   have file an action right away."                         14:38:05

13        Do you see that?                                    14:38:07

14        A.  I do.                                           14:38:08

15        Q.  There's a typo there, right, file should be     14:38:08

16   filed?                                                   14:38:12

17        A.  It's a typo.                                    14:38:15

18        Q.  You closed your message by saying "Frankly,     14:38:18

19   we didn't hear of Dropbox till it was overwhelmingly     14:38:23

20   an obvious violation of what we believe is our           14:38:30

21   trademark."                                              14:38:34

22        Right?                                              14:38:35

23        A.  Right.                                          14:38:36

24        Q.  There's another typo there I cut out, right,    14:38:36

25   the word "our" appears in a couple of places?            14:38:40
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 140

```
 1      A.  Yes, full of typos, yes.                  14:38:43
 2      Q.  I want to focus on that last sentence there,  14:38:45
 3   sir.                                              14:38:49
 4          What did you mean when you said that my    14:38:49
 5   client Dropbox was overwhelmingly an obvious violation  14:38:54
 6   of what Thru believes is its trademark?          14:38:57
 7      A.  I don't remember what I was thinking when I  14:39:03
 8   wrote it, but I'd say it stands on what is written.  14:39:10
 9      Q.  How was my client's use of the Dropbox name  14:39:14
10   an obvious violation, overwhelmingly an obvious   14:39:17
11   violation?                                        14:39:22
12      A.  I don't recall what I was thinking, but just  14:39:23
13   from the text I would say -- and it's just an opinion,  14:39:26
14   because I don't know what a true violation is, but  14:39:35
15   probably the success of Dropbox at that point in time.  14:39:41
16      Q.  Thru heard of my client Dropbox at least as  14:39:47
17   early as June 2009, right?                        14:39:51
18      A.  I believe that's correct.                  14:39:53
19      Q.  So at the time my client had two or three  14:39:54
20   million users, right?                             14:39:58
21      A.  I don't know.                              14:40:01
22      Q.  And at that time, my client's use of the name  14:40:01
23   Dropbox was an overwhelmingly obvious violation of  14:40:05
24   what Thru contends is its trademark?              14:40:08
25      A.  It was an opinion at that time.            14:40:19
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 141

```
 1              I can't say what an obvious violation of a        14:40:21
 2      trademark actually is, but it's just a discussion        14:40:25
 3      between myself and Mr. Yonge.                            14:40:29
 4          Q.  Just for clarification on the record - strike    14:40:44
 5      that.                                                    14:40:44
 6              If my client was engaged in what you             14:40:54
 7      characterized as an overwhelmingly obvious violation     14:40:56
 8      of Thru's trademark, why didn't Thru write to my         14:41:00
 9      client Dropbox to tell them to stop using the name?      14:41:05
10          A.  We had sent your client a letter and said        14:41:09
11      we're open for a meeting any time, to talk about it.     14:41:13
12          Q.  At no time, you told me just a few moments        14:41:16
13      ago, did Thru send a letter to my client Dropbox         14:41:19
14      telling it to stop using the Dropbox name, right?        14:41:23
15          A.  We did not.                                      14:41:26
16          Q.  Okay.  If my client was engaged in what you      14:41:27
17      characterized to Mr. Yonge as an overwhelmingly          14:41:31
18      obvious violation of Thru's trademark, why didn't Thru   14:41:35
19      write to my client Dropbox telling them to stop using    14:41:39
20      the name?                                                14:41:41
21          A.  I believe the way we worded that letter, you     14:41:41
22      have it here, is we felt that was the best approach to   14:41:44
23      settle this matter between the parties in a reasonable   14:41:47
24      fashion, just obviously getting further and further      14:41:50
25      out of hand, but that's been our approach.               14:41:54
```

1     Q.  That was in December of 2011?                    14:41:56

2     A.  Yes.                                             14:41:58

3     Q.  And you were perfectly content thereafter for   14:41:58

4  my client to continue using the Dropbox name because   14:42:01

5  you never sent Dropbox a letter telling it to stop?     14:42:04

6     A.  We were not content with it.                     14:42:08

7         We were waiting for the USPTO to decide          14:42:09

8  the -- I believe there are three parties in there       14:42:17

9  fighting it out, we wanted to go after whoever ended     14:42:20

10 up with it.                                             14:42:25

11        We did feel like Dropbox would probably win       14:42:25

12 that and they didn't.                                   14:42:31

13    Q.  You also wrote in this message to Mr. Yonge       14:42:55

14 on August 13, 11:31 p.m., quote, "since we put a TM on   14:43:00

15 the mark when we did use it and since first use is key   14:43:08

16 in the U.S., we look like we were seriously interested   14:43:12

17 in protecting the name," right?                         14:43:15

18    A.  It says that, yes.                               14:43:19

19    Q.  But Thru was not seriously interested in         14:43:21

20 protecting the Dropbox name prior to, say, late 2011,    14:43:25

21 was it?                                                 14:43:33

22    A.  I guess it's a matter of opinion of what         14:43:36

23 seriously interested means.                             14:43:38

24    Q.  Well, in terms of your understanding of the      14:43:40

25 terms, seriously interested, as you use them in this    14:43:44

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 143

```
 1   document, Thru was not seriously interested in          14:43:49
 2   protecting the Dropbox name prior to, say, late 2011,    14:43:51
 3   right?                                                    14:43:57
 4      A.  I don't recall what we were thinking on this      14:43:57
 5   day, but we've always been interested in protecting      14:43:59
 6   all our trademarks.                                       14:44:02
 7      Q.  Thru didn't apply to register a trademark on      14:44:04
 8   the term "Dropbox" in the years 2004 to 2010, right?     14:44:10
 9      A.  No.                                                14:44:13
10      Q.  Thru didn't have any monitoring in place to       14:44:13
11   determine whether anyone else had applied to register    14:44:16
12   the trademark on the term "Dropbox", correct?            14:44:19
13      A.  Correct.                                           14:44:21
14      Q.  Thru was well aware a host of others were         14:44:21
15   using the name and it never even threatened an           14:44:23
16   enforcement action against any of them, right?           14:44:26
17         MR. CONE:  Object to the form of the               14:44:29
18   question.                                                 14:44:30
19         THE WITNESS:  That's correct.                      14:44:30
20   BY MR. KRAMER:                                            14:44:30
21      Q.  In fact, Thru was aware two other companies       14:44:31
22   in Irving, Texas were using the name Dropbox and took    14:44:34
23   no action at all regarding their use, right?             14:44:37
24      A.  Correct.                                           14:44:40
25      Q.  Prior to 2012, Thru did not purchase keyword      14:44:40
```

LEE HARRISON - 30(b)(6) - 8/11/2016

Page 144

```
 1    advertising around the term "Dropbox", did it?          14:44:43
 2         A.  Not to my knowledge.                            14:44:45
 3         Q.  Thru did not engage in search engine            14:44:46
 4    optimization around the term "Dropbox" until 2012,       14:44:49
 5    right?                                                   14:44:52
 6         A.  That's correct.                                 14:44:52
 7         Q.  Prior to seizing on the idea Thru could         14:44:52
 8    obtain money from my client for its supposed rights in   14:44:56
 9    the term, Thru wasn't seriously interested in            14:44:59
10    protecting its supposed rights in the term "Dropbox",    14:45:02
11    was it?                                                  14:45:06
12         A.  No, we made a business decision in each case    14:45:06
13    and didn't make sense to go after each one of the        14:45:10
14    other parties, they weren't successful with what they    14:45:12
15    were doing.                                              14:45:16
16         Q.  IntraLinks, a publicly traded competitor of     14:45:18
17    Thru's, was using the term "Dropbox" for a file          14:45:24
18    transfer functionality that was almost identical to      14:45:29
19    Thru's, right?                                           14:45:31
20         A.  I don't know how identical it was.              14:45:32
21         Q.  Did you not think that IntraLinks as a          14:45:33
22    publicly traded company was successful?                  14:45:38
23         A.  Yes, IntraLinks, I believe, is pretty           14:45:40
24    successful.                                              14:45:43
25         Q.  You were aware they were using the Dropbox      14:45:43
```

1    name, right?                                               14:45:45
2        A.  We were vaguely made aware.                        14:45:46
3        Q.  You made a business decision not to take           14:45:47
4    action against them notwithstanding your supposed          14:45:50
5    rights in the term "Dropbox," right?                       14:45:53
6        A.  We made a business decision not to do that.        14:45:55
7        Q.  You were perfectly content to allow a              14:45:58
8    publicly traded company to use what you consider now       14:46:01
9    to be a trademark of yours?                                14:46:04
10       A.  We did make a decision to let them -- not          14:46:06
11   interfere with them at that time.                          14:46:10
12       Q.  Isn't it fair to say, sir, that Thru wasn't        14:46:14
13   seriously interested in protecting rights to the term      14:46:18
14   "Dropbox," but it was seriously interested in looking      14:46:23
15   like it was?                                               14:46:25
16       A.  No, I can't say that.                              14:46:29
17       Q.  If Thru was actually interested in protecting      14:46:30
18   its supposed rights, sir, why did you say in the           14:46:34
19   e-mail message to your board member that Thru, quote,      14:46:37
20   "looked like it was seriously interested in protecting     14:46:41
21   those rights"?                                             14:46:44
22       A.  Form follows function.  We were doing it,          14:46:45
23   that was our way of trying to protect it in the most       14:46:49
24   cost efficient manner, put a TM on it.                     14:46:52
25       Q.  Yes, but I'm not asking why you put the TM on      14:46:56

1    it, sir.                                                    14:47:00

2            I'm asking why in your message to your board        14:47:00

3    member in August 2013 you wrote that "we look like we       14:47:03

4    were seriously interested in protecting the name."          14:47:06

5    You didn't write we were seriously interested in            14:47:10

6    protecting the name and my question is:  Why?               14:47:14

7        A.  Well, I think -- I don't recall what I was          14:47:16

8    thinking when I wrote this, but in a presentation in,       14:47:19

9    say, in the USPTO, they would consider the TM on the        14:47:22

10   mark as important.                                          14:47:28

11       Q.  You're not writing to the USPTO here, sir,          14:47:29

12   you're writing to Mr. Yonge, a member of your Board of      14:47:33

13   Directors, right?                                           14:47:35

14       A.  Yes, that's correct.                                14:47:37

15       Q.  And you told him that since you took some           14:47:38

16   actions, we look like we were seriously interested in       14:47:40

17   protecting the name.                                        14:47:44

18           Why did you use the phrase "we look like we         14:47:45

19   are seriously interested" rather than simply saying we      14:47:49

20   were interested?                                            14:47:52

21       A.  We look like it to outside parties like the         14:47:54

22   USPTO is what I -- I think I'm inferring here.              14:48:00

23       Q.  Even though you weren't actually seriously          14:48:05

24   interested in protecting it, at least you looked like       14:48:08

25   it?                                                         14:48:11

1    I, LOUISE MARIE SOUSOURES, a Certified Shorthand

2    Reporter, hereby certify that the witness in the

3    foregoing deposition was by me duly sworn to tell the

4    truth, the whole truth, and nothing but the truth in

5    the within-entitled cause;

6    That said deposition was taken down in shorthand by

7    me, a disinterested person, at the time and place

8    therein stated, and was hereafter transcribed, by

9    computer, into typewriting, under my direction and

10   supervision;

11   That before completion of the deposition review of

12   the transcript ( x ) was requested ( ) was not

13   requested.  If requested, any changes made by the

14   deponent (and provided to the reporter) are appended

15   hereto.

16   I further certify that I am not of counsel, nor

17   attorney for any of the parties in the foregoing

18   deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption, and that I am not related to any of the

21   parties hereto.

22

23   DATE: AUGUST 17, 2016

24   _____

25   LOUISE MARIE SOUSOURES, CSR. NO 3575