1  IAN K. BOYD, State Bar No. 191434
2  SISKIND BOYD LLP
   Four Embarcadero Center, 39th Floor
3  San Francisco, California 94111
   Telephone: (415) 354-0100
4  Facsimile: (415) 391-7124
   iboyd@siskindboyd.com
5
6  JOHN M. CONE (admitted *pro hac vice*)
   RYAN A. STARNES (admitted *pro hac vice*)
7  FERGUSON, BRASWELL & FRASER, PC
   2500 Dallas Parkway #600
8  Plano, Texas 75093
   Telephone: (972) 378-9111
9  Facsimile: (972) 378-9115
   jcone@dallasbusinesslaw.com
10 rstarnes@dallasbusinesslaw.com

11 Attorneys for Defendant
12 THRU INC.

13            **UNITED STATES DISTRICT COURT**

14            **NORTHERN DISTRICT OF CALIFORNIA**

15                **SAN FRANCISCO DIVISION**

16 DROPBOX, INC., a Delaware corporation,          )   Case No. C 15-01741 EMC
                                                    )
17            Plaintiff/Counterclaim Defendant,     )   **THRU INC.'S OPPOSITION TO**
                                                    )   **DROPBOX, INC.'S MOTION FOR**
18      v.                                          )   **SUMMARY JUDGMENT**
                                                    )
19 THRU INC., a Delaware corporation,              )
                                                    )   Date:     October 27, 2016
20            Defendant/Counterclaimant.            )   Time:     1:30 p.m.
                                                    )   Before:   Honorable Edward M. Chen
21 _____ )   Dept:     Courtroom 5, 17th Floor

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION..................................................................................................1

II.    ARGUMENT AND AUTHORITIES .....................................................................2

    A.     Summary Judgment Standard....................................................................2

    B.     Thru used DROPBOX as a trademark. ......................................................2

    C.     DROPBOX is a suggestive mark. ..............................................................6

        1.     The DROPBOX mark is presumed distinctive. ...........................6

        2.     DROPBOX is suggestive under the imagination test..................8

        3.     DBI should be estopped from arguing that DROPBOX is not suggestive. ..................................................................................12

    D.     DBI is not the senior user of DROPBOX. ..............................................15

    E.     Thru's claims should not be barred by laches. ........................................17

        1.     Thru's delay in filing suit was not unreasonable......................18

        2.     DBI was not prejudiced by any delay in this lawsuit...............22

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## CASES

4

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979)..........................................................9

5

*B. Braun Med. Inc. v. Rogers*, 163 Fed. App'x 500, 2006 WL 92879 (9th Cir. 2006).................17

6

*Brandt Indus., Ltd v. Pitonyak Mach. Corp.*, No. 1:10-CV-857, 2012 WL 3257886
(S.D. Ind. Aug. 8, 2012)..............................................................................................................14

7

8

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999)............11

9

*Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794 (9th Cir. 1970) ..........................21

10

*Chronicle Publ'g Co. v. Chronicle Publ'ns, Inc.*, 733 F. Supp. 1371 (N.D. Cal. 1989)..............10

11

*Competition Spec., Inc. v. Competition Spec., Inc.*, 87 Fed. Appx. 38 (9th Cir. 2004)................21

12

*Contreras Family Trust v. U.S. ex. Rel. Dept. of Agri. Farm Serv. Agency*,
205 Fed. Appx. 580 (9th Cir. 2006) ............................................................................................15

13

14

*Couveau v. Am. Airlines, Inc*., 218 F.3d 1078 (9th Cir. 2000)....................................................18

15

*Danjaq LLC v. Sony Corp*., 263 F.3d 942 (9th Cir. 2001) ..........................................................19

16

*E&J Gallo Winery v. Gallo Cattle Co*., 967 F.2d 1280 (9th Cir. 1992) ......................................16

17

*E–Systems, Inc. v. Monitek, Inc*., 720 F.2d 604 (9th Cir. 1983)..................................................22

18

*Finance Express LLC v. Nowcom Corp*., 564 F. Supp. 2d 1160 (C.D. Cal. 2008).....................12

19

*FLIR Sys. Inc. v. Sierra Media, Inc*., 903 F. Supp. 2d 1120 (D. Or. 2012).................................19

20

*Glow Indus., Inc. v. Lopez*, 973 F. Supp. 2d 1095 (C.D. Cal. 2003)....................................11, 16

21

*Hamilton v. State Farm Fir & Cas. Co.*, 270 F.3d 778 (9th Cir. 2001) .......................................13

22

*Hana Fin., Inc. v. Hana Bank*, 735 F.3d 1158 (9th Cir. 2013) .....................................................5

23

*HGI Mktg. Servs., Inc. v. Pepsico, Inc.*, 50 F.3d 14, 1995 WL 89385 (9th Cir. 1995)..................5

24

*Honor Plastic Indus. Co. Ltd. v. Lollicup USA, Inc.*, 462 F. Supp. 2d 1122
(E.D. Cal. 2006) .............................................................................................................................4

25

26

*Humble Oil & Refining Co. v. Sekisui Chemical Co.*, 165 U.S.P.Q. 597
(T.T.A.B. 1970)...............................................................................................................................4

27

*Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F. 2d 1470 (Fed. Cir. 1987) ....................15

28

1   *In Re Dell, Inc.*, 71 U.S.P.Q.2d 1725, 2004 WL 1942043 (T.T.A.B. 2004) ................................. 3

2   *Internet Spec. West, Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985 (9th Cir. 2009) ........... 17

3   *Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042
4   (9th Cir. 1998) ............................................................................................................................... 8, 9

5   *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596
    (9th Cir. 2005) ............................................................................................................................... 2, 6

6   *Lahoti v. Vericheck, Inc.*, 586 F.3d 1190 (9th Cir. 2009) ......................................................... 6, 10

7   *Lahoti v. Vericheck, Inc.*, 636 F.3d 501 (9th Cir. 2011) ............................................................... 8

8
9   *LaQuinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867 (9th Cir. 2014) ................... 22

10  *Lateral Link v. Springut*, No. LA CV-14-5695, 2015 WL 12426122
    (C.D. Cal. Feb. 26, 2015) ............................................................................................................... 12

11  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................................... 2

12
13  *Novell, Inc. v. Unicom Sales, Inc.*, No. C-03-2785, 2004 WL 1839117
    (N.D. Cal. Aug. 17, 2004) ............................................................................................................... 20

14  *Palantir Techs., Inc. v. Palantir.net Inc.*, No. C 07-3863, 2008 WL 152339
15  (N.D. Cal. Jan. 15, 2008) .................................................................................................................. 4

16  *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F.2d 1150 (9th Cir. 1982) ......... 21

17  *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749 (9th Cir. 2006) ..................................................... 6

18  *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126 (9th Cir. 2006) ................................. 17, 18

19  *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981
    (9th Cir. 2010) ................................................................................................................................. 24
20
    *Seven Elephants Distrib. Corp. v. Earthquake Sound Corp.*, No. CV 06-4761,
21  2007 WL 977391 (C.D. Cal. Jan. 11, 2007) ..................................................................................... 6

22  *Shouse v. Pierce County*, 559 F.2d 1142 (9th Cir.1977) ............................................................... 18

23  *Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088 (9th Cir. 1990) ...................................................... 15

24  *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023 (C.D. Cal. 2013) ........................ 9

25  *STX, Inc. v. Bauer USA, Inc.*, No. C 96-1140, 1997 WL 337578
26  (N.D. Cal. Jun. 5, 1997) .................................................................................................................. 19

27  *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063 (N.D. Cal. 2012)................. 9

28  *Telemac Cellular Corp. v. Topp Telecom, Inc.*, No. 98-CV-22, 1999 WL 33471891
    (N.D. Cal. Jul. 1, 1999) ................................................................................................................... 12

*Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F. 3d 1102
(9th Cir. 2006) ....................................................................................................... 22

*Toyota Motor Sales, U.S.A. v. Tabari*, 610 F.3d 1171 (9th Cir. 2010) ......................... 21

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) ........................................ 6

*Univ. Healthsys. Consortium v. UnitedHealth Group, Inc.*, 68 F. Supp. 3d 917
(N.D. Ill. 2014) ...................................................................................................... 22

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925
(9th Cir. 2005) ......................................................................................................... 7

*Zany Toys, LLC v. Pearl Enters., LLC*, No. 13-5262, 2014 WL 2168415
(D. N.J. May 23, 2014) ........................................................................................... 14

*Zedner v. U.S.*, 547 U.S. 489 (2006) ...................................................................... 13

*Zobmondo Entm't LLC v. Falls Media, LLC*, 602 F.3d 1108 (9th Cir. 2010) ............... 2, 8, 9, 12

**STATUTES**

15 U.S.C. §1052 ...................................................................................................... 6

15 U.S.C. §1052(f) .................................................................................................. 14

15 U.S.C. §1057(b) ................................................................................................... 7

Cal. Prof. Bus. & Prof. Code §17208 ....................................................................... 17

**RULES**

Fed. R. Civ. P. 56(c)(2) ........................................................................................... 15

Fed. R. Evid. 802 .................................................................................................... 15

# I.    INTRODUCTION

In May 2002, a group of investors led by Lee Harrison acquired the rights to a digital asset management software product called Studio Central, which allowed tracking and management of digital files and founded Defendant Thru Inc. (f/k/a Rumble Group) ("Thru"). Thru added uploads, downloads and transfers to Studio Central, using what is now referred to as the Cloud, and came to market in November 2002 with a product it called File Transaction Hub (FTH). Harrison Decl. ¶2. In early 2004, Thru added a feature to FTH that allowed its customers to receive digital files from non-customers. Thru referred to the feature as "DropBox." The FTH product, using the DROPBOX trademark, was on the market many years before Plaintiff Dropbox Inc's ("DBI") founder Drew Houston conceived of his file synchronization product that is now the basis of DBI's business. *Id.* at ¶4.

Since 2002, Thru has invested more than $36 million developing its software products, which have been used by major businesses such as Dell/EMC, VMware,Visa, Johnson & Johnson, Bayer, Stantec, HKS, Exxon Mobil and Motley Fool. Harrison Decl. ¶6.

Lee Harrison presented the FTH product to venture capitalists in June 2004 – June 2005, but at that time, the Cloud was not understood and the concept of a business enterprise storing and accessing its files on remote, third-party servers, was considered unrealistic and found no backers. Thru did not succeed in attracting outside capital, leading to particular difficulties in 2008 when funding essentially dried up and key Thru personnel were let go. The years 2009-2012 were tough for Thru and resources were concentrated on survival and expanding its customer base. Harrison Decl. ¶11. Today, Thru has sold to more than 500 customers and has had over 1 million unique users of its product covering all 50 states of the U.S. Harrison Decl. ¶14.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.     ARGUMENT AND AUTHORITIES

### A.  Summary Judgment Standard

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56. The burden to show that there is no genuine issue of material fact is on movant DBI. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable inferences are to be drawn in favor of Thru as the non-movant. *Zobmondo Entm't LLC v. Falls Media, LLC*, 602 F.3d 1108, 1115 (9th Cir. 2010). "[S]ummary judgment is generally disfavored in the trademark arena." *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005).

### B.  Thru used DROPBOX as a trademark.

DBI's contention that Thru has not used DROPBOX as a trademark is totally without merit. DBI would like the Court to believe that Thru is opportunistically seeking to benefit from a mark that DBI created and used for a groundbreaking product. The facts are quite different. Thru started to offer data file synchronization and file transfer software many years before DBI was founded in 2008. Harrison Decl. ¶4.  Similarly, Thru adopted and started to use DROPBOX as a trademark years before DBI was in business.[1]  Thru considered its file transfer functionality and the associated trademark DROPBOX to be significant and promoted it as such long before DBI started to give away its freemium synchronization service in 2009. Harrison Decl. ¶12.

Thru started to use DROPBOX as a trademark in April/May 2004 and has used it continuously ever since. In 2003, Thru's product development team decided to add to its then existing FTH product functionality that allowed large data files to be transferred to a user of that product. This functionality was added to the product in the early months of 2004 and was referred

---

[1] Indeed, as a later user, DBI had to pay off Officeware, which was also an earlier user of DROPBOX, before DBI could obtain a trademark registration of DROPBOX.

to from its introduction as DROPBOX. At that time, Thru began using the ™ symbol (understood to signify a claim of trademark status) adjacent to the word DROPBOX. *Id.* "This use of the designation 'TM' next to [the mark] lends a degree of visual prominence to the term." *In Re Dell, Inc.*, 71 U.S.P.Q.2d 1725, 2004 WL 1942043, at *4 (T.T.A.B. 2004).   Thru promoted its file transfer functionality under the trademark DROPBOX on its website at http://www.rumblegroupusa.com. Harrison Decl. ¶22; Ex 3. Exhibit 3 shows the content of Thru's website on April 30, 2004, as captured by the Internet Archive Wayback machine; the website included "Product Tutorials" explaining how to use the functionalities of the product. One of the tutorials was for DROPBOX 4.0. *Id.* The use of DROPBOX on Thru's website and on a second at www.thruinc.net has continued uninterrupted since 2004 through to the present. *Id.*

Thru also distributes a user guide to its customers. Harrison Decl. ¶17, Ex 2. Exhibit 2 is a copy of the FTH Quick Start User Guide, as distributed in May 2004. *Id.* The second page of Exhibit 2 shows the appearance of the portal page for Global Storm IT, one of Thru's customers at that time. Thru creates and hosts a portal page for each customer substantially similar to the one shown for Global Storm IT in Exhibit 2. This page is seen by every user of Thru's product each time that user accesses the product *Id.* As seen in Exhibit 2, the login page includes an icon with the trademark DROPBOX, which allows access to the file transfer functionality. The symbol ™ is used adjacent the word DROPBOX. The purpose of the DROPBOX™ functionality is on page 2 of the Guide, while an explanation of how to use it is on page 3.   *Id.* Each individual using the FTH product at a Thru customer is provided by Thru with a "My Dropbox" folder as part of the initial set up for that customer. See also Harrison Exhibits 5-10 showing additional example user guides. The graphic design associated with the DROPBOX mark used on the client login site to allow files to be transferred to the user has varied over the years but has always included the word DROPBOX. Harrison Decl. ¶36. While the use of DROPBOX was not always on the home page

of Thru's website, the location of DROPBOX within the website does not dictate its trademark value. Customers visit pages of websites beyond the home page.

Thru's use of different fonts for the word DROPBOX is immaterial, as all of those uses were essentially the same mark. Clearly use of a word mark in different fonts is permitted and is recognized as use of one mark. *Palantir Techs., Inc. v. Palantir.net Inc.*, No. C 07-3863, 2008 WL 152339, at *5 (N.D. Cal. Jan. 15, 2008) (evaluating identical marks noting that "They sound the same and have the same meaning. While the fonts used by the companies are different, this distinction is meaningless."). As the TTAB has noted

> It is settled that a person may change the display of a mark at any time because whatever rights he may possess in the mark reside in the term itself rather than in any particular form or arrangement thereof. … [A] change which does not alter its distinctive characteristics represents a continuity of trademark rights. Thus, where the distinctive character of the mark is not changed, the mark is, in effect, the same and the rights obtained by virtue of the earlier use of the prior form inure to the later form.

*Humble Oil & Refining Co. v. Sekisui Chemical Co.*, 165 U.S.P.Q. 597 (T.T.A.B. 1970). The same is true as to use of DROP BOX, as opposed to DROPBOX; a space between "drop" and "box" has no impact on the commercial impression created by the mark as Thru used it. *Honor Plastic Indus. Co. Ltd. v. Lollicup USA, Inc.*, 462 F. Supp. 2d 1122, 1128 (E.D. Cal. 2006) (finding no difference in commercial impression in marks for HONOR where the "O"s in one mark were cup silhouettes and in the other mark the "O"s were just the letter "O" noting that the "overall visual impression of the two marks is the same…. The key element of both is the word 'Honor' in all caps" and the "Minor changes in a mark [] do not change the basic, overall commercial impression created on buyers.").

As early as May 2004, Thru employees were asked, and in the most part did, include the DROPBOX trademark in their email signature blocks. Harrison Decl. ¶12. While some email did not include use of DROPBOX, many thousands of email did and while the exact wording varied

from user to user and time to time, they all used and promoted the file transfer functionality DROPBOX. *Id.*

In addition, Thru's customers were encouraged to, and frequently did, include reference to Thru's DROPBOX functionality in their own email signature blocks to encourage and facilitate their receipt of files from outsiders using the DROPBOX functionality. *Id.* ¶21. While it is impossible to know the number of emails sent by Thru's customers that featured the DROPBOX trademark, it surely is in the millions.

Thru has also used DROPBOX as a trademark in numerous presentations to potential customers starting in 2004 and continuing to the present time. *Id.*

Plaintiff contends that Thru did not spend money on advertising and promotion of its products, including the DROPBOX feature and contrasts that with the millions that Plaintiff has spent to attract users to its freemium product. But, Thru was not trying to give away its product to the general public. It was trying to sell it to a small discrete market: the IT managers of medium size businesses. It did this by person-to-person dialogs and demonstrations and, as early as March 2004, those customers were shown the FTH product with the DROPBOX feature. Harrison Decl. ¶25, Exs. 11-25.

DBI wrongly argues that Thru's use of DROPBOX in association with other words, such as THRU DROPBOX, ENTERPRISE DROPBOX, SECURE DROPBOX and MY DROPBOX somehow destroys a claim that DROPBOX is Thru's trademark. However, there is no rule that use of another word with a trademark destroys the rights in that individual mark.[2]

---

[2] Even if these uses of DROPBOX with other words constitute new trademarks, the dominant portion of each of those marks is still DROPBOX and the marks convey the same continuing impression to the public. As such, each of the marks is legally equivalent and use has been continuous. *Cf. Hana Fin., Inc. v. Hana Bank*, 735 F.3d 1158, 1164-65 (9th Cir. 2013) (noting that tacking is a fact question and affirming jury finding that there was no material difference between HANA BANK and HANA OVERSEAS KOREAN CLUB ); *HGI Mktg. Servs., Inc. v. Pepsico, Inc.*, 50 F.3d 14, 1995 WL 89385, at *2 (9th Cir. 1995) (reversing summary judgment finding fact issue as to whether MAKE A RUN FOR THE BORDER and RUN FOR THE BORDER created the same commercial impression).

This type of use is particularly common when a house mark (THRU) is used in combination with a product mark (DROPBOX). For example, both APPLE and iPhone are recognized as trademarks for consumer electronic devices. If they are used together, as APPLE iPHONE, neither loses its protection as an individual mark. A court in this Circuit observed, "as to multiple branding, [defendant] presents the Court with no case holding that the use of multiple marks on a product renders any one of the marks unprotectable. The Ninth Circuit has approved the combined use of product and house marks, so long as each mark serves to indicate the origin of the product." *Seven Elephants Distrib. Corp. v. Earthquake Sound Corp*., No. CV 06-4761, 2007 WL 977391, at *2 (C.D. Cal. Jan. 11, 2007) *citing Quiksilver, Inc. v. Kymsta Corp*., 466 F.3d 749, 757 (9th Cir. 2006). Thru's various uses of DROPBOX more than adequately show that it has used DROPBOX as a trademark continuously from May 2004 to the present.

### C.  DROPBOX is a suggestive mark.

There are five categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *KP Permanent*, 408 F.3d at 602. "The latter three categories are deemed inherently distinctive and are automatically entitled to protection because they naturally 'serve[ ] to identify a particular source of a product....'" *Id. quoting Two Pesos, Inc. v. Taco Cabana, Inc*., 505 U.S. 763, 768 (1992). "Which category a mark belongs in is a question of fact." *Lahoti v. Vericheck, Inc*., 586 F.3d 1190, 1195 (9th Cir. 2009).

### 1.  The DROPBOX mark is presumed distinctive.

The PTO registers a trademark only if it is distinctive for the goods/services for which it is applied. 15U.S.C.§1052. "There can be no serious dispute with the principle that a federal trademark registration of a particular mark supports the distinctiveness of that mark, because the PTO should not otherwise give it protection. Registration alone may be sufficient in an appropriate case to satisfy a determination of distinctiveness." *Lahoti*, 586 F.3d at 1199. At least five times, the PTO has found the mark DROPBOX to be inherently distinctive by approving trademark

applications for goods/services that are identical or highly similar to the goods/services on which

Thru uses the mark DROPBOX. Cone Decl. ¶¶ 2-6, Exs. 1-5.

| Date Approved | Regis./Appl. No. | Mark | Excerpt of Description in Class 42 |
|---|---|---|---|
| Oct. 2005 | 3,003,912 | DROPBOX | providing temporary use of non-downloadable software for use in database management, primarily in the field of biomedical research |
| Oct. 2007 | 77/136579 | DG DROP BOX | providing non-downloadable online software for uploading video, audio, and print media and metadata via global communication networks |
| Dec. 2008 | 3,553,200 | DROP BOX HD | providing online non-downloadable software for uploading and transferring advertising programs |
| Feb. 2014 | 4,478,345 | DROPBOX | providing temporary use of non-downloadable computer software to store and share data, documents, [and] files |
| Sept. 2014 | 85/012206 | DROPBOX | providing online non-downloadable software for uploading and transferring files for the purpose of file back up and synchronization |

In each of these instances, the PTO did ***not*** require any proof of acquired distinctiveness

before approving the trademark DROPBOX for registration, thereby implicitly finding that

DROPBOX as applied to the goods/services listed on each registration or application is inherently

distinctive. Thru has identified its goods/service as "providing on-line non-downloadable software

for uploading, transferring, downloading, storing and sharing data, documents [and] files…."

Cone Decl. ¶7, Ex 6. This subject matter overlaps directly with the services of the other

DROPBOX applications/registrations.

A certificate of registration is "prima facie evidence of the validity of the registered mark."

15 U.S.C. § 1057(b). "For this reason, a plaintiff alleging infringement of a federally-registered

mark is entitled to a presumption that the mark is [distinctive]. In essence, the registration

discharges the plaintiff's original common law burden of proving validity in an infringement

action." *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005) (internal citations omitted) (reversing summary judgment). Because the mark DROPBOX is registered for goods/services identical to those provided by Thru, Thru is entitled to rely on the presumption of validity. Even though the DROPBOX registration is owned by DBI and not Thru, there is no legal reason why the presumption of distinctiveness — which is based on an objective determination by the PTO of the word applied to the goods/services — should not apply.[3]  In fact, the Ninth Circuit has affirmed such an application as appropriate observing even that "the district court perhaps <u>could have relied exclusively</u> on the registration of the [third party's substantially identical] Mark to determine suggestiveness." *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 507 (9th Cir. 2011) (affirming finding that plaintiff's design mark VERICHECK for check verification services was suggestive relying in part on federal registration of third party's design mark VERICHECK) (emphasis added).

"The presumption of validity is a strong one, and the burden on the defendant necessary to overcome that presumption at summary judgment is heavy." *Zobmondo*, 602 F.3d at 1115 (reversing grant of summary judgment). At a minimum, the existence of federal trademark registrations for DROPBOX for the same goods/services on which the identical mark DROPBOX has been used by Thru creates a fact issue as to the proper categorization of the mark on the spectrum of distinctiveness.

### 2.  DROPBOX is suggestive under the imagination test.

A suggestive mark is one for which if "a consumer must use imagination or any type of multistage reasoning to understand the mark's significance ... the mark does not describe the product's features, but suggests them." *Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150

---

[3] Thru applied to register DROPBOX for these services and, while the application was rejected because of DBI's earlier registration, the PTO did not object that the mark was descriptive of the services. Cone Decl. ¶7 Ex 6.

F.3d 1042, 1047 n. 8 (9th Cir. 1998). In contrast, "[d]escriptive marks define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood." *Id*. The primary test used by the Ninth Circuit, the "imagination test", demonstrates that DROPBOX was suggestive as of 2004 for the service of providing non-downloadable software for uploading, transferring, downloading, storing and sharing data, documents and files.

The imagination test asks whether "imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced." *Zobmondo*, 602 F.3d at 1115 (finding mark WOULD YOU RATHER suggestive as to board games involving humorous or bizarre choices). "The primary criterion is … how immediate and direct is the thought process from the mark to the particular product." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979) (finding SLICKCRAFT for boats to be suggestive). If "a consumer must use imagination or any type of multistage reasoning to understand the mark's significance ... the mark does not describe the product's features, but suggests them." *Kendall–Jackson*, 150 F.3d at 1047 n. 8.

In 2004, an imaginative leap was required to reach the nature of the product offered by Thru under the mark DROPBOX. DBI argues that the term DROPBOX is not suggestive, because there is a dictionary definition for it. (Mot. at 15). DBI cites a definition of "dropbox" as a secured physical receptacle in which a payment or donated clothing is dropped but submitted no evidence of that definition existing as of 2004. (*Id.*; DBI Ex. 79 (dated 2016)). Moreover, even that definition does not support a finding of mere descriptiveness, because the service of providing software for uploading, storing and sharing data does not involve a physical receptacle and has different characteristics from a physical receptacle as defined. Thus, Thru's DROPBOX mark "conveys an impression of a good but requires the exercise of some imagination and perception to reach a conclusion as to the product's nature." *Stonefire Grill, Inc. v. FGF Brands, Inc*., 987 F. Supp. 2d 1023, 1048 (C.D. Cal. 2013) (finding STONEFIRE GRILL suggestive for a restaurant

serving mainly grilled and barbecued items); *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1077 (N.D. Cal. 2012) (finding SUNEARTH suggestive for solar energy collectors); *Chronicle Publ'g Co. v. Chronicle Publ'ns, Inc.*, 733 F. Supp. 1371, 1376 (N.D. Cal. 1989) (finding CHRONICLE suggestive for illustrated "coffee table" books noting that there was some nexus between the mark and the plaintiff's books but it required a "small dose of imagination" for a consumer to determine the type of books published by plaintiff).

The distinctiveness of a mark must be assessed not in the abstract, but in relation to the applicable goods or services, the context in which the mark is used and encountered in the marketplace, and the significance the mark in that context is likely to have to the average consumer. *Lahoti*, 586 F.3d at 1201. Many of the pre-2004 uses of "dropbox" cited by DBI are not uses likely to have been seen or understood by the average consumer, instead reflecting uses by computer programmers' discussion groups and in publications directed to computer programmers. (*See, e.g.*, DBI Ex. 81 collecting various technical books).

If anything, the use of DROPBOX by Thru in a virtual context was an extension or variation on the idea of dropboxes used in the physical world, not merely a straightforward description of the qualities of the service. In 2004, a "dropbox" did not describe anything in the virtual world to a general consumer without requiring a mental leap for that consumer to determine what the product was. The uses of the word "dropbox" submitted by DBI ostensibly to show that "dropbox was in common parlance" as of 2004 actually show that "dropbox" was not merely descriptive. (Mot. at 15; DBI Exs. 80-84). If a term was merely descriptive, it would not require a description or definition of what it was describing in order to be understood. That is the very definition of a descriptive mark — it requires no reasoning for the consumer to understand what product it is describing. Yet, in many of DBI's examples, the word "dropbox" or "drop box" not only appears in quotations to indicate that it is a coined term (*i.e.*, not a term that everyone recognizes as describing something particular), it is also followed by an explanation of what is

meant by the word. (*See, e.g.*, DBI Ex. 80 at PDF p. 2 of 10 explaining that you "can designate the folder as a secure 'drop box.'  This option allows people to place any file into the secure folder, but only those with the password can open the secure folder to see the contents."; DBI Ex. 81 at PDF p. 3 with a paragraph explanation of what a "dropbox folder" is).

Similarly, when the word "dropbox" was used in educational products or contexts prior to 2004, an associated explanation of the service was included, implying that those customers would not recognize the word "dropbox" as merely describing a particular offering. (*See, e.g.*, DBI Ex. 80 at p. 8 of 10 explaining that school assignments can be turned in in "'digital drop boxes' that teachers create. We can go onto any computer and access the information that we've saved, said [a student]. This is extremely helpful, because if you work on one computer and it is being used later, you can go to any other computer and work on the same information"; DBI Ex. 82 at PDF p. 3 of 9 with a paragraph explanation of what a "drop box" is; DBI Ex. 83 at PDF p. 2 of 6 explaining what a "Digital Dropbox" is; DBI Ex. 83 at PDF p. 5 of 6 (same)). *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999) (affirming finding that MOVIEBUFF was suggestive for software/searchable database of movie-related information "because it does not describe either the software product or the purpose").

Thru's customers to whom its DROPBOX was marketed were also provided with an explanation of the service provided under that mark, because it was not directly apparent. Thru's testimony that it used the term "dropbox" to describe product functionality does not "control categorization of the mark as a legal matter." *Glow Indus., Inc. v. Lopez*, 973 F. Supp. 2d 1095, 1118 (C.D. Cal. 2003) (finding GLOW suggestive for skin care products despite defendant's testimony that use of products leads to "glowing" skin). In a similar case, the Court found federally registered trademark TRAC as applied to an accounting system for use with cellular telephones suggestive, observing that "the mark alone does not provide any clear indication of the device's overall function, or even the particular field of technology to which it belongs. Thus, a

consumer confronted with the TRAC mark will not necessarily recognize that the mark signifies a system for tracking calls placed on a cellular phone." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, No. 98-CV-22, 1999 WL 33471891, at *16 (N.D. Cal. Jul. 1, 1999).

In another case in this Circuit when discussing the mark DEALTRACE as applied to software that allows automobile dealer to manage transactions, the court noted that "[a]lthough the term "DealTrace" is suggestive of its purpose — to trace deals — it is not immediately apparent what product is at issue or to whom the product is directed." *Finance Express LLC v. Nowcom Corp.*, 564 F. Supp. 2d 1160, 1169 (C.D. Cal. 2008) (finding DEALTRACE suggestive). The court held that "[b]ecause there is a mental leap between the concept of tracing deals and the fact that this is a software service intended to aid automobile dealers contracting with lenders, 'DealTrace' is a suggestive mark."  This case is factually analogous. The term "Dropbox" may suggest the concept of a secure place to transfer documents, but there is a mental leap to the fact that DROPBOX is a software service intended to provide secure file uploading, downloading, storage and transfer by multiple parties. DROPBOX is therefore properly categorized as a suggestive mark or, at a minimum, there is a fact question as to distinctiveness. See *Lateral Link v. Springut*, No. LA CV-14-5695, 2015 WL 12426122, at *6-7 (C.D. Cal. Feb. 26, 2015)(finding fact question on whether LATERAL LINK as applied to legal recruiting services is suggestive or descriptive in view of evidence of federal registration and use of its composite words in the industry).[4]

### 3.   DBI should be estopped from arguing that DROPBOX is not suggestive.

---

[4] DROPBOX is also suggestive under the alternative "competitors' needs" test used by the Ninth Circuit which asks whether other companies need to use the mark to identify their goods/services. *Zobmondo*, 602 F.3d at 1117. Thru's DROPBOX product/service is a secure file-transfer and storage product/service. A number of companies exist that provide similar products under a variety of names. Harrison Decl ¶27.

DBI should be estopped from arguing that DROPBOX is not suggestive as to the goods/services identified by DBI both in its own trademark application for DROPBOX and in the application now assigned to it for DROPBOX originally filed by Officeware. Judicial estoppel is an equitable doctrine that "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Zedner v. U.S.*, 547 U.S. 489, 504 (2006). "The application of judicial estoppel is not limited to bar the assertion of inconsistent positions in the same litigation, but is also appropriate to bar litigants from making incompatible statements in two different cases." *Hamilton v. State Farm Fir & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001). In evaluating whether judicial estoppel should apply, the Court considers three factors: (1) a party's later position must be clearly inconsistent with its earlier position, (2) the party must have succeeded in persuading a court to accept the earlier position, and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id*. Each of these factors favor estoppel in this case.

First, DBI's position in its Motion is that the mark DROPBOX is not suggestive as applied to Thru's goods/services of "providing on-line non-downloadable software for uploading, transferring, downloading, storing and sharing data, documents [and] files…." Cone Decl ¶7 Ex 6. However, DBI took the opposite position in both its own trademark application and the Officeware application assigned to it. Inherently in both applications, DBI has taken the position that DROPBOX is sufficiently distinctive to warrant registration with the requirement of showing secondary meaning (*i.e.*, DROPBOX is at least a suggestive mark). The class 42 services for which DBI has both sought and obtained a registration are substantially identical to Thru's goods and services. Compare DBI's Reg. No. 4,478,345 describing "providing temporary use of non-downloadable computer software to store and share data, documents, [and] files…via global computer networks" and DBI's application No. 85/012206 describing "providing online non-

downloadable software for uploading and transferring files for the purpose of file back up and synchronization" to Thru's goods/services of "providing on-line non-downloadable software for uploading, transferring, downloading, storing and sharing data, documents [and] files." Cone Decl. ¶7 Ex 6.

Second, DBI has actually obtained a trademark registration and the application of Officeware now assigned to DBI has been approved for registration for DROPBOX without the PTO requiring proof of secondary meaning.[5] Cone Decl ¶3 Ex 2. Thus, DBI has succeeded in convincing the PTO that DROPBOX is a distinctive mark. Third, it is clearly unfair to Thru to allow DBI to obtain a trademark for DROPBOX in 2014 by taking the position with the PTO that the mark is distinctive as applied to (its) certain services and then to argue that the identical mark applied to identical services is not distinctive to avoid liability in this litigation. Other courts have found estoppel under indistinguishable circumstances. For example, in *Zany Toys,* the court found that where a party had applied for a trademark for the mark at issue, its application "inherently acknowledges that [party] also believe[s] that the First Mark is valid and protectable." *Zany Toys, LLC v. Pearl Enters., LLC*, No. 13-5262, 2014 WL 2168415, at *6 (D. N.J. May 23, 2014). The court then applied judicial estoppel in holding that "[b]ecause it already took the position to the USPTO that its mark was distinctive, [the trademark applicant] cannot now argue that [the identical] Mark is not distinctive." *Id*. See also *Brandt Indus., Ltd v. Pitonyak Mach. Corp*., No. 1:10-CV-857, 2012 WL 3257886, at *10 (S.D. Ind. Aug. 8, 2012) (applying judicial estoppel to preclude party from arguing likelihood of confusion in litigation where it had successfully argued no likelihood of confusion in a TTAB opposition resulting in issuance of its trademark). DBI should likewise be estopped from arguing that Thru's DROPBOX mark is not distinctive.

---

[5] If the PTO had required proof of secondary meaning, the trademark certificate would show that the registration was issued under 2(f) or such an indication would appear in the file history for the pending application. 15 U.S.C. §1052(f). It is beyond dispute that neither the registration or application are under 2(f).

**D.  DBI is not the senior user of DROPBOX.**

DBI's sole argument that it is the senior user of DROPBOX is based on the assignment of any rights that Officeware had in the DROPBOX trademark. [Mot. at 18-19]. Thru initially used DROPBOX in commerce as of April/May 2004. Harrison Decl ¶22. Thus, in order for DBI to be the senior user of DROPBOX, it would have to show (1) use of DROPBOX by Officeware prior to that date and (2) that such use properly inures to effectively make DBI the senior user by assignment. There are a myriad of disputed facts on these points. First, there is no proof that Officeware established rights in DROPBOX based on use of that mark prior to Thru's first use in May 2004. In its trademark application No. 85/012206, Officeware stated that its date of first use was August 8, 2004. Cone Decl ¶3 Ex 2.

Second, if DBI now seeks an earlier date of first use, it must prove that by clear and convincing evidence. *Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F. 2d 1470, 1473 (Fed. Cir. 1987). DBI relies solely on hearsay and ambiguous documents in arguing that, contrary to the declaration of Officeware's CEO Tim Rice, Officeware in fact began using the DROPBOX mark in commerce in January 2004 for the city of Flower Mound, Texas. (Mot. at 18). This evidence is not clear and convincing as (1) hearsay is inadmissible in a summary judgment context and the witness has no personal knowledge of anything that happened in 2004 as he was not employed by Officeware until 2012 (Cone Ex 12; McCrory Dep. 70:21-72:4; 72:17-73:15),[6] (2) even Mr. McCrory testifies that the evidence he found in Officeware's records showed that the "Dropbox"

---

[6] "Like affidavits, deposition testimony that is not based on personal knowledge and is hearsay is inadmissible and cannot raise a genuine issue of material fact …[on] summary judgment." *Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir. 1990). Moreover, Mr. McCrory's testimony is not of the type that could be presented in an admissible form at trial, because he simply has no personal knowledge. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 802; *Contreras Family Trust v. U.S. ex. Rel. Dept. of Agri. Farm Serv. Agency*, 205 Fed. Appx. 580 582 (9th Cir. 2006) (refusing to consider trustee's testimony repeating "things he had been told" in summary judgment context). Further, if anyone were to testify admissibly at trial to the facts about Officeware's use of DROPBOX in 2004, it would be CEO Tim Rice, who has already testified via his PTO Declaration.

feature was not publicly released on the Flower Mound website until August 2004 (Cone Decl. Ex 12; McCrory Dep. 27:21-28:1; 27:3-10), (3) the email from Mr. Rice to a Flower Mound employee dated January 20, 2004 does not show trademark use of DROPBOX (Cone Decl. Ex 13), and (4) the invoice showing that Flower Mound was a customer of Officeware beginning on January 21, 2004 does not show trademark use of DROPBOX (Cone Decl. Ex 14). In sum, DBI presents no evidence — much less clear and convincing evidence — to contradict the original testimony of Officeware that its first use of DROPBOX was in August 2004.

Third, in order for DBI, as the assignee of Officeware's rights, if any, in DROPBOX, to claim priority based on Officeware's use of DROPBOX, the assignment must have included transfer of the goodwill associated with that mark. A naked assignment does not transfer goodwill and therefore does not transfer priority. *E&J Gallo Winery v. Gallo Cattle Co*., 967 F.2d 1280, 1289 (9th Cir. 1992) ("it is the goodwill of the business that must accompany the mark.").

Here, the evidence shows that the assignment transferred nothing to DBI, other than title to Officeware's application, and that after the assignment, Officeware continued operating exactly as it had prior to the assignment of trademark rights and DBI made no change to its service as a result of the assignment. Cone Decl. Ex 11. Officeware did not discontinue or otherwise change its offering after the trademark assignment; "the only thing [Officeware] did was remove the term "Dropbox" throughout the product and Web site." (Cone Decl. Ex 12; McCrory Dep. 87:2-88:2). The service provided to customers was the same before and after the transfer. *Id*. No technology or customers were transferred. *Id*. Likewise, DBI's product did not change after the assignment. Cone Decl. Ex 11. If the requirement for the transfer of goodwill means anything at all, it certainly was not present in the Officeware to DBI assignment. *Glow Indus*., 273 F. Supp. 2d at 1114 n. 98 (collecting cases on trademark assignments as sham transactions and finding that the many fact issues as to the inferences of intent are "not properly resolved on summary judgment.").

Fourth, DBI's claim to have acquired rights from Officeware is incompatible with its contention that DROPBOX is a descriptive mark for the type of services provided by Thru and Officeware. If DROPBOX is merely descriptive for Thru's services, then it was merely descriptive also for Officeware's services. In order for DBI to show that it received trademark rights in the assignment, it would also have to prove that such trademark rights existed, *i.e.*, that DROPBOX as used by Officeware was a distinctive mark. DBI provides no evidence to support a claim that Officeware had acquired secondary meaning in the word "Dropbox" such that it had rights in a DROPBOX mark to transfer to DBI. As such, no rights transferred to DBI and its claim of senior use of DROPBOX (*i.e.*, use before May 2004) must be rejected.

**E.  Thru's claims should not be barred by laches.**

"Laches bars trademark infringement claims 'only where the trademark holder knowingly allowed the infringing mark to be used without objection for a lengthy period of time.'" *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1138 (9th Cir. 2006) (affirming refusal to apply laches in trademark case) (internal citation omitted). As the Court knows, Thru had filed both a Cancellation Petition and an Opposition asking the TTAB to decide trademark priority when DBI filed this action. The TTAB promptly suspended these proceedings thereby forcing Thru to bring a compulsory counterclaim for infringement in this action.

Thru's counterclaim of trademark infringement was timely and is therefore not barred by laches. In evaluating laches, the Ninth Circuit looks at the statute of limitations for the analogous state action to see whether a claim was presumptively brought in time; a four-year statute of limitations under Cal. Prof. Bus. & Prof. Code §17208 applies for trademark claims. *Internet Spec. West, Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 990 (9th Cir. 2009).  This case was initially brought as a declaratory judgment action by DBI in April 2015. As a matter of law, as of that date, the statute of limitations for any counterclaim by Thru was tolled when the complaint was filed. When "a counterclaim [] arises out of the same facts as the plaintiff's claim,

the statute of limitations 'is a bar to the defendant's affirmative claim only if the period has already run when the complaint is filed. The filing of the complaint suspends the statute during the pendency of the action, and the defendant may set up his [counter]claim by appropriate pleading at any time.'" *B. Braun Med. Inc. v. Rogers*, 163 Fed. App'x 500, 2006 WL 92879, at * 2 (9th Cir. 2006). As discussed below, there is no evidence (or there is at least a factual dispute as to the evidence), that Thru knew or should have known of its claim against DBI prior to July 2011. Thus, when Thru filed its counterclaim in August 2015, it was timely because the statute of limitations would have not have barred such a claim until July 2015 and that period was tolled during the pendency of the lawsuit. As such, the Ninth Circuit strongly presumes that laches does not apply in this case. *Reno Air*, 452 F.2d at 1149. See also *Shouse v. Pierce County*, 559 F.2d 1142, 1147 (9th Cir.1977) ("It is extremely rare for laches to be effectively invoked when a [party] has filed his action before limitations in an analogous action at law has run."). DBI has not overcome this strong presumption that Thru's claim should be allowed to proceed.

When a claim is filed outside of the statute of limitations for the analogous state law claim) and the Ninth Circuit applies a presumption of laches, the presumption is still just a presumption. Even assuming a presumption applied (which it does not), the burden is on DBI to prove (1) that Thru's delay in filing suit was unreasonable and (2) that DBI would be prejudiced by the delay if the suit were allowed to continue now. *Id*. DBI proves neither point. As the Ninth Circuit has observed, "[b]ecause a claim of laches depends on a close evaluation of all the particular facts in a case, it is seldom susceptible of resolution by summary judgment." *Couveau v. Am. Airlines, Inc*., 218 F.3d 1078, 1083 (9th Cir. 2000).

### 1.   Thru's delay in filing suit was not unreasonable.

This case is not a situation in which DBI only learned in 2015 that Thru was asserting trademark rights in DROPBOX. It is undisputed that DBI has known about Thru's claim of trademark rights in DROPBOX for years. On December 8, 2011, Thru's counsel notified DBI of

Thru's claim to rights in the trademark DROPBOX in a letter to DBI's attorney. Cone Decl ¶10, Ex 9. That letter was followed by an email of February 7, 2012, setting out details of Thru's use of DROPBOX as a trademark. Cone Decl11 ¶, Ex 10. Thru also repeatedly offered to meet with DBI on a business to business basis to resolve the ownership question hoping for a business solution given the parties' similar products, but mismatch in resources. Harrison Decl ¶41. Although Thru did not file suit until forced to do so by DBI's declaratory judgment action, it has always maintained its claim of superior rights. *STX, Inc. v. Bauer USA, Inc*., No. C 96-1140, 1997 WL 337578, at *8 (N.D. Cal. Jun. 5, 1997) (denying summary judgment finding that even if parties' communications "may not rise to the level of good faith settlement negotiations, they do evince efforts by plaintiff to settle the dispute without resort to the legal system; sound policy reasons caution against including such time in calculating the length of delay in filing suit"); see also *FLIR Sys. Inc. v. Sierra Media, Inc*., 903 F. Supp. 2d 1120, 1148 (D. Or. 2012) (denying summary judgment on laches noting multiple fact issues as to reasonable delay where parties had been corresponding for years about the dispute).

DBI would have the Court consider Thru's actions in not filing suit in a vacuum, however, DBI has been fighting multiple parties about who owns the trademark DROPBOX for years. By the time that Thru determined that DBI's use of DROPBOX had become substantial enough to be a commercial problem in early 2011, it discovered that DBI had filed a trademark application, which had been published for opposition on March 1, 2011. That trademark application was already being opposed by three parties: Yousendit, Inc., Box.net, Inc. and Officeware Corp, d/b/a Filesanywhere.com when Thru learned of it.[7]

---

[7] Thru also learned that Officeware had contemporaneously filed a trademark infringement action against DBI (3:11-cv-1448) in the Northern District of Texas. Harrison Decl. ¶41. The PTO suspended the pending oppositions in favor of the district court litigation. Cone Decl. ¶9 Ex 8.

"Delay has been held permissible, among other reasons, when it is necessitated by the exhaustion of remedies through the administrative process…and when its purpose is to determine whether the scope of proposed infringement will justify the cost of litigation."  *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 954 (9th Cir. 2001). Thru could not tell which of these parties had superior rights in the DROPBOX mark and decided to let them fight it out and then pursue the party that the PTO affirmed. Harrison Decl. ¶39. It appeared to Thru that Officeware was the most senior user of those parties based on the date of first use claimed in Officeware's trademark application 85/012206 (August 2004), several years before DBI even existed (2007).[8]  Because Thru's rights in DROPBOX predate any use by Officeware, Thru believed that it would ultimately prevail once the smoke cleared and could then pursue its own action in the PTO. Harrison Decl. ¶39.[9]

Under analogous circumstances, this Court has denied a summary judgment motion on laches. *Novell, Inc. v. Unicom Sales, Inc.*, No. C-03-2785, 2004 WL 1839117 (N.D. Cal. Aug. 17, 2004). In *Novell*, the court found that the plaintiff was reasonable in waiting five years to bring suit for trademark infringement against a party using plaintiff's marks by secondarily marketing and distributing plaintiff's software. *Id.* at *6-7. In *Novell*, Novell's right to prohibit secondary marketing was being challenged by three defendants in three lawsuits when plaintiff learned about Unicom's infringement. *Id.* at *5-6. The Court found it reasonable for Novell to have waited to file the Unicom suit until the legal issue of whether it had the right to prevent marketing by parties situated similarly to Unicom had been resolved through its other lawsuits. *Id.* at *6. Likewise, in this case, it was reasonable for Thru to wait to file a lawsuit until the main

---

[8] Yousendit did not specify the date of its first use of DROPBOX in its Opposition, but stated that it was founded in 2004 and used DROPBOX before any priority date that DBI could claim. Cone Decl. Ex 7.

[9] While the district court litigation was proceeding and the oppositions were pending at the PTO, Thru filed its own federal trademark application for DROPBOX. That application was suspended pending resolution of the oppositions. Cone Decl. ¶9 Ex 8.

1  legal issue of who had priority rights in the DROPBOX mark was established by the PTO

2  proceedings and Officeware litigation.

3        The infringement action by Officeware and the associated trademark opposition were the

4  last disputes to settle among the parties claiming rights in DROPBOX, resolving on April 22,

5  2013. The terms of the settlement included an assignment to DBI of Officeware's application

6  Serial No. 85/012062 and a withdrawal of Officeware's opposition to DBI's application

7  77/817716 for DROPBOX. Cone Decl. Ex 26. After the opposition was withdrawn, DBI's

8  application issued as Registration No. 4478345 on February 4, 2014; Thru filed Petition for

9  Cancellation No. 92058621 on the same day. The application by Officeware (now owned by

10  DBI) was published for opposition on October 24, 2014; Thru filed Opposition number

11  91219070 four days later on October 28, 2014. Thru was focused on establishing its rights in

12  DROPBOX through the PTO, because it is much more cost effective than district court litigation.

13  Harrison Decl ¶43. "It was not unreasonable for Toyota to attempt to avoid the expense and

14  inconvenience of a lawsuit." *Toyota Motor Sales, U.S.A. v. Tabari*, 610 F.3d 1171, 1183 (9th Cir.

15  2010) (rejecting laches defense in trademark case finding delay in bringing suit while parties

16  tried to resolve the matter out of court to be reasonable). The time that Thru waited is reasonable

17  in view of the ongoing third-party disputes about the ownership of DROPBOX and Thru's desire

18  to establish its own rights via a PTO proceeding prior to instituting litigation.

19        Further, this Circuit has approved consideration of the rate of growth of the encroachment

20  in evaluating laches, noting that "there is no laches where the defendant's encroachment is

21  steady but slow." *Competition Spec., Inc. v. Competition Spec., Inc*., 87 Fed. Appx. 38, 40-41

22  (9th Cir. 2004) citing Carter–*Wallace, Inc. v. Procter & Gamble Co*., 434 F.2d 794, 803 n. 4 (9th

23  Cir. 1970). See also *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal*., 694 F.2d 1150,

24  1154 (9th Cir. 1982) (noting the progressive encroachment "principle that if the junior user of a

1   mark moves into direct competition with the senior user, selling the same "product" through the

2   same channels and causing actual market confusion, laches is no defense.").

3          Although there is some evidence that Thru knew about DBI's use of DROPBOX on its

4   products in mid-2009, there is an equal amount of evidence that Thru believed that use to be non-

5   competitive or minimal in light of the customers Thru was targeting. Mot. at 20; Harrison Decl.

6   ¶26. Mr. Harrison's testimony that he did not become aware of the proliferation of DBI's use of

7   DROPBOX until 2011 is credible and consistent with former Thru V.P. of Marketing Mr.

8   Skybakmoen's testimony that DBI was "not something that the typical enterprise customer

9   would deploy within their enterprise network. It was still, at the time, being seen as a more

10  disruptive consumer technology…Thru…had a different approach or marketing message at the

11  time." Cone Decl. Ex 24 (Skybakmoen Dep. 17:25-18:11; 22:18-24:7; 33:24-34:11; 37:24-

12  38:4).[10] Thru's market has consistently been business. Harrison Decl ¶26. In contrast, DBI

13  began as a free consumer photosharing service and added its Enterprise product in 2015.

14  Harrison Decl ¶34. Thus, DBI was not directly competing with Thru. Thru's legitimate belief in

15  this fact was bolstered by the fact that it only knew of one instance in 2010 where it lost a

16  potential client to DBI. [Cite]. Drawing all inferences in favor of Thru, it is reasonable to

17  conclude that when DBI progressively encroached on Thru's market, Thru acted to address that

18  encroachment within months, such that laches should not apply. *Univ. Healthsys. Consortium v.*

19  *UnitedHealth Group, Inc.*, 68 F. Supp. 3d 917, 928-29 (N.D. Ill. 2014) (denying summary

20  judgment on laches finding that progressive encroachment was a possible conclusion).

21              **2.  DBI was not prejudiced by any delay in this lawsuit.**

---

[10] Once Mr. Skybakmoen joined Thru in July 2011, his discussions with Mr. Harrison about Thru's use of the DROPBOX mark and DBI's use of DROPBOX led Thru to pursue its trademark rights against DBI. Harrison Decl. ¶33; see also Cone Decl. Ex 24; Skybakmoen Dep. 122:1-123:16; 124:16-125:12.

Courts often consider the six E-System factors in determining whether laches should apply. *E–Systems, Inc. v. Monitek, Inc*., 720 F.2d 604, 607 (9th Cir. 1983). DBI must prove that the six factors weigh in its favor. *LaQuinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 878-79 (9th Cir. 2014) (affirming denial of summary judgment on laches despite arguably fifteen-year delay in filing suit). The overarching issue, however, is whether DBI has "suffered prejudice as a result of [Thru]'s unreasonable delay in filing suit." *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F. 3d 1102, 1108 (9th Cir. 2006). Not only has DBI not proven an unreasonable delay, but it has not suffered any prejudice as a result of any delay.

DBI has presented no evidence that it would have done anything differently if this lawsuit had been brought sooner. In fact, the evidence demonstrates the exact opposite; DBI has been engaged in disputes about its rights to use DROPBOX since its inception, yet throughout that time, it continued to invest millions of dollars in attempting to build brand recognition around the mark DROPBOX. Thru bringing a lawsuit earlier would not have changed the landscape.

For instance, when DBI was evaluating whether to use the name Dropbox, it learned that the domain dropbox.com was already taken. (Houston Dep. 12:19-13:14). Instead of choosing another name — an option which it evaluated seriously at the time using multiple branding agencies — DBI chose to move forward with the Dropbox name. (*Id*. at 43:14-19, 44:13-17; Exs. 8-12, 46:1-54:3). After failed negotiations with the Dropbox.com domain name owner, DBI eventually filed a Complaint asking to be given the domain name and ultimately settled the dispute in 2009. (Houston Exs. 3 & 5). In its Complaint, DBI argued that even as of September 2009, it had spent over $1 million in advertising under the DROPBOX mark and had millions of customers. (Houston Ex. 3, Compl. at ¶¶ 20-22). Considering that the earliest date on which Thru became aware of DBI's use of DROPBOX was in June 2009, the evidence shows that DBI was already committed to that name, spending money and litigating about it.

1    Further, the evidence also shows that DBI continued to pour money into promoting the

2  DROPBOX mark for its products even though it was aware that other companies in the industry

3  were also using the word "Dropbox" in association with their products. For instance, DBI knew

4  about Yousendit's use of "Dropbox" at least as of February 2010. (Houston Dep. 58:21-59:6; Ex.

5  14). Despite this knowledge, DBI did nothing and just continued to build its business. There is

6  no logical reason why DBI's behavior would have changed if Thru had sued it at that time

7  considering that Thru was similarly situated to Yousendit.com. Objectively and as compared to

8  DBI in 2010, Yousendit.com and Thru were small companies with relatively few customers and

9  with the same type and scale of use of DROPBOX on their products/services. Clearly, DBI did

10  not see these small companies' use of DROPBOX as an actual threat to it while it spent millions

11  of dollars in advertising. Further, DBI has known specifically about Thru's claim of rights in

12  DROPBOX since December 2011 and continued to act unaffected by that claim.

13

14    DBI's view is also evidenced in its reaction to the oppositions filed in 2011 by Yousendit,

15  Box, and Officeware about its DROPBOX trademark application. Although those oppositions

16  and related district court litigation filed by Officeware on the same issue were pending at least

17  until April 2013, DBI increased its spending on the DROPBOX mark year after year. There is no

18  evidence that DBI ever treated any allegation of DROPBOX ownership by a third party as a

19  reason to reconsider its use of that mark. DBI has to prove that Thru's delay in filing a lawsuit

20  has caused it prejudice. DBI presents literally no evidence that it would have done anything

21  differently if Thru had been one of the myriad of companies involved in disputing the

22  DROPBOX mark earlier. "[U]ndue prejudice requires at least some reliance on the absence of a

23  lawsuit." *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981,

24  989 (9th Cir. 2010). Application of laches in this case would be inequitable.

25

26

27

28

1        For the reasons stated above, DBI's Motion for Summary Judgment should be denied.

2  Dated: September 29, 2016             SISKIND BOYD LLP

3                           IAN K. BOYD

4                           FERGUSON, BRASWELL & FRASER, PC

5                           JOHN M. CONE

                             RYAN A. STARNES

6                           By:    /John M. Cone/

7                                John M. Cone

8                           Attorneys for Defendant/Counterclaimant

9                           THRU INC.