# EXHIBIT 15
# TO DECLARATION OF JOHN M. CONE
# IN SUPPORT OF THRU INC.'S OPPOSITION
# TO DROPBOX, INC.'S MOTION FOR
# SUMMARY JUDGMENT

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--o0o--

| | |
|---|---|
| DROPBOX, INC., A DELAWARE CORPORATION, | ) ) ) |
| Plaintiff/Counterclaim Defendant, | ) ) |
| vs. | ) NO. C 15-01741 EMC ) |
| THRU INC., A DELAWARE CORPORATION, | ) ) ) |
| Defendant/Counterclaimant. | ) ) |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF

DREW HOUSTON

Thursday, August 18, 2016

PAGES:  1 - 114

REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR 12470

JOB DA-096089

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

Page 12

```
1          Q.   Who did you have a meeting with?

2          A.   With the three folks here.

3          Q.   Okay.  And how long did that meeting last?

4          A.   A few hours.

5          Q.   Did you review any documents in

6     preparation for this deposition?

7          A.   We reviewed documents in the meeting.

8          Q.   Were they documents you selected or were

9     they selected by your attorney?

10         A.   They were selected by my attorney.

11         Q.   Okay.  Does the name Giri Nirkondar mean

12    anything to you?

13         A.   Yes.

14         Q.   Tell me about Giri Nirkondar.

15              MS. BAL:  Objection.  Vague and ambiguous.

16    Calls for a narrative.

17              THE WITNESS:  What would you like to know?

18    BY MR. CONE:

19         Q.   Well, did you have any correspondence and

20    discussions with Mr. Nirkondar in the 2007, 2008 --

21         A.   Yes.

22         Q.   -- time frame?

23         A.   Yes, I did.

24         Q.   What were those discussions about?

25         A.   They were primarily phone calls in regards
```

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

Page 13

1    to us, Dropbox, potentially purchasing the domain

2    name Dropbox.com.

3         Q.   Okay.  So Mr. Nirkondar owned a

4    registration of the domain name --

5         A.   Yes.

6         Q.   -- Dropbox.com?

7         A.   He did.

8         Q.   Okay.  And why did you want to acquire it

9    from him?

10        A.   I had started a project, and I was

11   interested in the name Dropbox.  And he was the

12   owner of Dropbox.com, and I wanted to see if he was

13   interested in selling it to us or making some kind

14   of arrangement.

15        Q.   And was he?

16        A.   He was ambiguous.

17        Q.   Okay.  What do you mean by that?

18        A.   Well, he -- he said that he was using it

19   for -- during one conversation, he would say he was

20   using it for a project.  During another

21   conversation, he said he was going to hold on to it.

22             We later had a couple discussions about

23   potentially selling it to us.  So his interest level

24   and story changed from conversation to conversation.

25        Q.   Okay.

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

Page 39

1    Dropbox product provided file synchronization in

2    April of 2013?

3         A.   I'm not very familiar with the specifics

4    of the Officeware product.

5         Q.   Okay.  Was your Dropbox product such that

6    it provided file synchronization in April of 2013?

7         A.   Yes.

8         Q.   Was the software used to deliver your

9    product downloadable in April of 2013?

10        A.   Yes.

11        Q.   And it's still downloadable today?

12        A.   Yes.

13        Q.   As a result of that settlement agreement

14   we looked at -- that we've looked at, Officeware's

15   trademark application was transferred to Dropbox,

16   Inc.

17             Do you have any knowledge of that?

18             MS. BAL:  Objection.  Lacks foundation.

19   Calls for a legal conclusion.

20             THE WITNESS:  Do I have any knowledge of

21   the transfer of the trademark?

22   BY MR. CONE:

23        Q.   Yes.

24        A.   Right?

25        Q.   And the subsequent trademark application?

Page 43

```
 1   name.  Pretty sure I did a Google search, and I

 2   didn't find -- while there were certainly -- yes, I

 3   did.  I went to Dropbox.com, saw that it was taken.

 4   I did a Google search for "Dropbox."

 5   BY MR. CONE:

 6        Q.   What did the Google search show you?

 7        A.   There were no companies or major products

 8   using the name, as far as I could tell.  They were

 9   mostly -- there are some, you know, colleges that

10   had a dropbox page where you could submit your

11   assignments or maybe they're like minor features of

12   different things that were describing kind of, okay,

13   here's a dropbox, a place for files or other things.

14        Q.   Now, at some time you began to consider

15   not using "Dropbox" and to investigate other names.

16   Why was that?

17        A.   Well, we -- it was important to us to have

18   the domain name.  So that was the primary driver of

19   considering other names.

20        Q.   Because Mr. Nirkondar was not cooperating

21   in assigning it to you, right?

22        A.   Yeah.  We weren't sure we could get the

23   domain name.

24        Q.   Okay.  And it was important to you to have

25   the name -- the trademark and the domain name
```

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

```
 1    equivalent?

 2              MS. BAL:  Objection.  Vague and ambiguous.

 3              THE WITNESS:  Yes, we wanted the -- we

 4    certainly wanted -- whatever name we chose, we

 5    wanted the -- the domain.

 6    BY MR. CONE:

 7         Q.   Okay.  Who was or is Ali Partovi?

 8         A.   He is an entrepreneur, an angel investor,

 9    and one of our early investors.

10         Q.   Was an investor in your business, did you

11    say?

12         A.   Yes.  He was one of our early investors.

13         Q.   And one of the names you considered was

14    Fire Share; is that correct?

15              (Reporter request for clarification.)

16         MR. CONE:  Fire.  F-I-R-E, S-H-A-R-E.

17         THE WITNESS:  We considered it, yeah.

18              (Whereupon Exhibit 8 was marked for

19               identification.)

20    BY MR. CONE:

21         Q.   Show you what we've marked as

22    Exhibit No. 8.

23              MR. CONE:  Oh, I'm sorry.  It is -- for

24    some reason, it's attorneys' eyes only.

25              Did you stamp these?
```

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

Page 46

1          Q.   And who is Mr. Alper?

2          A.   He was with Catchword Branding.  He was a

3    branding agency or firm.

4          Q.   Okay.  And had you engaged them to help

5    you find a new name?

6          A.   I don't know if we had engaged him at this

7    point.  I know we -- I'm not sure how closely we

8    worked with these guys versus others, but we

9    certainly -- I don't know if we actually engaged

10   with them.  I know we did look at naming agencies.

11         Q.   Okay.

12              (Whereupon Exhibit 10 was marked for

13               identification.)

14   BY MR. CONE:

15         Q.   Take a look at what we marked as

16   Exhibit 10.

17         A.   Oh, man.

18         Q.   Do you recall seeing this?

19         A.   Let me look at it.  God.

20         Q.   This is like a trip down memory lane.

21         A.   Yeah.

22              I vaguely remember this.

23         Q.   Okay.  Well, can you remember it enough to

24   tell me what -- what you remember it is or what you

25   think it is?

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

Page 47

1        A.   Well, I think this was their early set of
2   suggestions.  I just can't remember if we formally
3   paid them or engaged them or if we just were asking
4   for an initial set of suggestions.  But, yeah, I
5   remember getting a lot of terrible potential names.
6        Q.   Okay.  So Mr. Alper's company at least
7   provided one proposal to you with some names which I
8   gather you didn't think too much of?
9        A.   They delivered in quantity.
10             (Whereupon Exhibit 11 was marked for
11              identification.)
12   BY MR. CONE:
13        Q.   Take a look at what we've marked as
14   Exhibit 11, please.
15             Do you recognize that as a copy of an
16   e-mail that you sent in January of 2008?
17        A.   I don't remember the exact circumstances,
18   but, yeah, this looks vaguely familiar.
19        Q.   Who was Nick Gonzalez?  Or who is Nick
20   Gonzalez?
21        A.   He was a reporter or former reporter at
22   TechCrunch that we had considered as a candidate to
23   maybe get involved with the company, do PR
24   marketing.
25        Q.   I'm not familiar with TechCrunch.  Tell me

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

1    what you mean by TechCrunch.

2         A.   TechCrunch is a technology news site.

3         Q.   Okay.   An online site giving information

4    about technology issues?

5         A.   Yeah.   TechCrunch is -- they're focused on

6    tech, on start-ups.   That was where, if you were a

7    start-up founder, you would go to pitch your

8    start-up and get an early audience.   And Nick was

9    one of the -- I believe he was a reporter or somehow

10   involved.

11        Q.   Okay.

12        A.   And that was exciting to us because we

13   wanted coverage from -- from TechCrunch and other

14   sites.

15        Q.   Okay.   And in -- in your e-mail, you

16   mentioned a number of names that you were

17   considering, one of which was Kava, K-A-V-A --

18        A.   Yep.

19        Q.   -- is that correct?

20             Was "Kava" one of the possible

21   alternatives you considered to replace "Dropbox"?

22        A.   Yes.

23        Q.   Do you recall whether there were any

24   obstacles to your adopting Kava as the replacement

25   name?

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

Page 49

1          A.    I remember we had another hard time with

2    a -- with getting the domain name.

3          Q.    Okay.

4                (Whereupon Exhibit 12 was marked for

5                 identification.)

6    BY MR. CONE:

7          Q.    Please take a look at what we've marked as

8    Exhibit 12.

9          A.    Yeah.

10         Q.    First of all, who's Deborah Wagner?

11         A.    She --

12         Q.    Or Vagner maybe?

13         A.    Maybe.

14               She's with Storyhat, which is one of the

15   branding agencies we worked with.

16         Q.    Oh, okay.  And --

17               MS. BAL:  Take your hand off your mouth.

18   BY MR. CONE:

19         Q.    Okay.  She said:  "A little weird about

20   the Kava people."

21               What was that all about?

22         A.    I don't remember all the specifics.  But

23   the person who -- the guy who owned it was kind of

24   jerking us around, and -- and was very hard to deal

25   with and get ahold of, very slow in responding.

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

Page 50

```
 1          Q.   Was -- at the time you were considering
 2   Kava, do you recall any other contenders for the
 3   replacement name that you were considering?
 4          A.   Well, we had Deborah's suggestion of
 5   TapIt, which I had some issues with.  And we spent a
 6   bunch of time in the early days looking at a parade
 7   of other names.
 8          Q.   Okay.
 9               (Whereupon Exhibit 13 was marked for
10                identification.)
11   BY MR. CONE:
12          Q.   Take a look, please, at what we've marked
13   as Exhibit 13.
14               Can you tell me what --
15          A.   I might need a minute to read it.
16          Q.   Oh, yeah, please.
17               Okay.  Do you recognize that as an e-mail
18   exchange between yourself and Mr. Arash Ferdowsi?
19          A.   Yes.
20          Q.   Who is Mr. Arash Ferdowsi?
21          A.   He is my cofounder.
22          Q.   He's been with you a long time, then?
23          A.   He's been -- we've been together since
24   May 2007 or something like that.
25          Q.   And what was his background before he
```

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

1    joined you as the cofounder?

2         A.   We studied computer science together at

3    MIT, and he was really interested in programming and

4    start-ups and -- I could tell you a lot about him.

5         Q.   Okay.   And this is a discussion between

6    you and him as to the merits of Kava and TapIt as

7    replacement names, correct?

8         A.   Yes.

9         Q.   If you go three paragraphs up from the

10   bottom of the first page.

11        A.   Okay.

12        Q.   The sentence, "I feel both Kava and TapIt

13   adequately set us apart from the star drives," what

14   does that mean?

15        A.   Where is this?

16        Q.   Oh, I'm sorry.   On the first page, three

17   paragraphs from the bottom.

18        A.   Okay.   Star drives?

19        Q.   Yeah.   What does that mean?

20        A.   That is somewhat technical in nature.

21   "Star" in programming or in computers means it's a

22   placeholder for whatever.   So X Drive, Y Drive,

23   Google Drive.   There are a million drives, drive

24   competitors which we didn't -- we wanted to name

25   ourselves something besides blank drive.

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

Page 52

```
 1          Q.    Oh, okay.   Which is why you didn't like
 2    Flex Drive?
 3          A.    Right.
 4          Q.    Okay.   And looking on the last page, two
 5    or three lines from the bottom, I take it you
 6    weren't seriously considering Shit Fuck as the name
 7    for your product?
 8          A.    I think we would have some problems with
 9    that.
10          Q.    Might not have been legally protectable,
11    right?
12          A.    I'm not a lawyer.
13          Q.    Okay.   Touche.
14                All right.   Do you recall somebody called
15    Chris Moody and Aquent, A-Q-U-E-N-T?
16          A.    I'm familiar with the name, and I vaguely
17    remember him.
18          Q.    What was -- what was your connection with
19    him?
20          A.    I think we were introduced by one of our
21    investors, and I think our investor was maybe
22    interested in getting him to work with us.   But I
23    otherwise don't really remember our conversations.
24          Q.    Okay.   So when you were considering
25    changing from "Dropbox," what did you hope to
```

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

Page 53

```
 1        achieve by changing the name?
 2                  MS. BAL:  Objection.  Vague and ambiguous.
 3                  THE WITNESS:  Both Arash and I really
 4        wanted the name Dropbox, but we knew that there was
 5        100 -- there wasn't 100 percent chance we could get
 6        the domain name.  And we thought that maybe if we
 7        changed the name, we wouldn't have to deal with some
 8        of these issues.
 9        BY MR. CONE:
10            Q.  At that time, did you consider that
11        "Dropbox" was protectable as a trademark?
12                  MS. BAL:  Objection.  Calls for a legal
13        conclusion.  Vague and ambiguous.
14                  THE WITNESS:  It was unclear.  We didn't
15        know exactly how the trademark application would pan
16        out.
17        BY MR. CONE:
18            Q.  Had you asked anyone for advice on that?
19                  MS. BAL:  You can answer that "yes" or
20        "no."
21                  THE WITNESS:  Yes.
22        BY MR. CONE:
23            Q.  And was that an attorney?
24            A.  Yes.
25            Q.  Okay.  And then you went ahead in the end
```

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

Page 54

1    and stayed -- stuck with Dropbox as the name for

2    your product?

3         A.   Yep.

4         Q.   Did you feel that you needed to create a

5    generic name to go with the trademark Dropbox?

6              MS. BAL:  Objection.  Calls for a legal

7    conclusion.  Vague and ambiguous.

8              THE WITNESS:  No.

9    BY MR. CONE:

10        Q.   Why not?

11        A.   We could have called it Storage or

12   something, but we wanted to have a name that -- or I

13   certainly knew that if it was truly generic, then we

14   can't protect the name.

15        Q.   So -- but you didn't think it was

16   necessary to have a generic to go with the term

17   "Dropbox"?

18             MS. BAL:  Same objections.  Vague and

19   ambiguous.  Calls for a legal conclusion.

20             THE WITNESS:  Yeah, again, I'm not a

21   trademark lawyer.  I know those words have special

22   meaning so...

23   BY MR. CONE:

24        Q.   Okay.  When did you first become aware of

25   or ever hear the word "dropbox"?

```
 1        Q.   Have you ever been aware of any confusion
 2   caused by Apple's use of Drop Box?
 3        A.   Again, I don't -- I don't know from when
 4   they started using it, when -- if and when they
 5   stopped using it.  I have no -- I'm not aware of any
 6   confusion that's actually been caused.
 7        Q.   Okay.  Thank you.
 8             MR. CONE:  We should let Mr. Harrison back
 9   in.  Break while we do that, please.
10             MS. BAL:  Sure.
11             THE VIDEO OPERATOR:  We are going off the
12   record.  This concludes Media No. 1.  The time is
13   11:08.
14             (Off the record at 11:08 a.m. and back
15              on the record at 11:17 a.m.)
16             THE VIDEO OPERATOR:  We are back on the
17   record.  This marks the beginning of Media No. 2.
18   The time is 11:17.
19             MR. CONE:  Thank you.
20   BY MR. CONE:
21        Q.   Have you heard of a company called
22   YouSendIt?
23        A.   Yes.
24        Q.   Do you know whether YouSendIt ever used
25   "Dropbox" as a trademark?
```

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
DREW HOUSTON - 8/18/2016

Page 59

```
 1              MS. BAL:  Objection.  Calls for a legal
 2    conclusion.
 3              THE WITNESS:  So I know that they -- or I
 4    learned that they had a feature called Dropbox, and
 5    we had some trademark -- some back-and-forth on
 6    trademarks with them.
 7              MR. CONE:  Sorry, Lee.  Out again.  I
 8    thought this was not but it is.
 9              (Whereupon Exhibit 14 was marked for
10              identification.)
11    BY MR. CONE:
12        Q.   Take a look at Exhibit 14, an e-mail
13    exchange between you and -- or at least an e-mail to
14    you from Mr. Partovi.
15              Do you recall receiving this e-mail?
16        A.   I -- this is -- I don't think I've seen it
17    since -- or this is the first time I'm seeing it
18    since -- presumably I saw it and -- and read it.
19        Q.   Okay.  And in this e-mail, Exhibit 14,
20    Mr. Partovi mentioned that YouSendIt used the term
21    "Dropbox"; is that right?
22        A.   That's what he said, yes.
23        Q.   What action did you take at the time when
24    you received this e-mail communication?
25              MS. BAL:  Objection.  Lacks foundation.
```

```
1                    CERTIFICATE OF REPORTER

2           I, MEGAN ALVAREZ, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition was by me duly sworn to tell the

5    truth, the whole truth, and nothing but the truth in the

6    within-entitled cause;

7           That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time and

9    place therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12          That before completion of the deposition,

13   review of the transcript [✓] was [ ] was not requested.

14   If requested, any changes made by the deponent (and

15   provided to the reporter) during the period allowed are

16   appended hereto.

17          I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties thereto.

22        DATED:  Aug 23, 2016

23

24

25        MEGAN ALVAREZ, CSR No. 12470
```