IAN K. BOYD, State Bar No. 191434
SISKIND BOYD LLP
Four Embarcadero Center, 39th Floor
San Francisco, California 94111
Telephone: (415) 354-0100
Facsimile: (415) 391-7124
iboyd@siskindboyd.com

JOHN M. CONE (admitted *pro hac vice*)
RYAN A. STARNES (admitted *pro hac vice*)
FERGUSON, BRASWELL & FRASER, PC
2500 Dallas Parkway #600
Plano, Texas 75093
Telephone: (972) 378-9111
Facsimile: (972) 378-9115
jcone@dallasbusinesslaw.com
rstarnes@dallasbusinesslaw.com

Attorneys for Defendant
THRU INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| DROPBOX, INC., a Delaware corporation, | ) | Case No. C 15-01741 EMC |
| Plaintiff/Counterclaim Defendant, | ) ) ) | |
| v. | ) ) | **DECLARATION OF LEE HARRISON IN SUPPORT OF THRU INC.'S OPPOSITION TO DROPBOX, INC.'S MOTION FOR SUMMARY JUDGMENT** |
| THRU INC., a Delaware corporation, | ) ) | |
| Defendant/Counterclaimant. | ) ) | |

I, LEE HARRISON, hereby declare as follows:

1. I am the Chief Executive Officer of Thru Inc. I am more than 21 years old and am competent to make this Declaration.

2. I founded the business that is now Defendant Thru Inc. in May 2002. At that time, it was called Rumble Group. I assembled a small group of investors and we acquired the rights to a digital asset management (DAM) software product developed by Silicon Graphics, Inc. (SGI)

called Studio Central. Studio Central was a tool that allowed tracking and management of digital files.

3. Thru modelled its newly developed software after Studio Central and added uploads, downloads and transfers using what is now referred to as the Cloud. In addition to the DAM software, Rumble Group acquired assets of an Australian-based entity, Rumble Group Pty Ltd, and I/O Partners Inc.

4. Using these assets, Rumble Group came to market in November 2002 with a product that gives businesses the ability to store and retrieve data using the Cloud. Rumble Group called its product File Transaction Hub (FTH). The FTH product was on the market many years before Drew Houston conceived of his file synchronization product that is now the basis of Plaintiff's business.

5. Rumble Group was able to integrate its product with major software tools such as Outlook and Salesforce, partnering with leading software providers including Microsoft, Salesforce and IBM.

6. Since 2002, Rumble Group (which changed its name to Thru in 2006) has invested more than $36 million, on top of the about $44 million previously invested in the product by SGI, I/O and Rumble Group Australia, developing its software products and services.

7. Thru has sold its software services to such major businesses as software suppliers Dell/EMC, VMware, Sage Software, ACI and Manhattan; financial services providers Visa and Macquarie Group; healthcare conglomerates Johnson & Johnson and Bayer; engineering and architecture leaders Stantec and HKS; resource titans Exxon Mobil, Caltex, Kinross Gold; and media companies Outfront Media and Motley Fool.

8. Thru's software services were used in the redevelopment of the Panama Canal and in the construction of many Ritz-Carlton hotels.

9. They are used to secure credit card transactions and medical testing data and are trusted by top high-tech companies, such as ACI Worldwide and Manhattan and Associates to ensure secure communications with their customers.

10. Between June 2004 and June 2005, I presented the FTH product to venture capitalists, but, at that time, the Cloud was not understood and the concept of a business enterprise storing and accessing its files and data on remote, third-party servers, as opposed to the enterprise's own servers, was considered unrealistic and found no backers. I did not succeed in attracting outside capital and was forced to rely on a small group of individual investors.

11. This proved particularly difficult in 2008 when funding essentially dried up and key Thru personnel were let go. The years 2009-2012 were difficult for Thru and resources were concentrated on survival and expanding its customer base.

12. Turning now to Thru's use of DROPBOX as a trademark, in April 2003, Sean-Michael Daly and Daniel Hurtubise proposed adding a feature to the FTH product that allowed customers using it to receive digital files from non-customers. They referred to the feature as "DropBox." A copy of the email containing this proposal is attached as Exhibit 1. This feature was incorporated into the FTH product during the early months of 2004 and has remained part of the product to the present day. As early as May 2004, Thru employees were asked, and in the most part did, include the DROPBOX trademark in their email signature blocks. See email of May 21 2004 from Sean Michael Daly to Thru staff attached as Exhibit 29. While not every email sent by Thru employees from the various devices each used to create emails included DROPBOX in the signature block, many thousands did and while the exact wording varied from user to user and time to time, they all used and promoted the file transfer functionality DROPBOX™.

13. Thru has used the mark DROPBOX in relation to the product and to advertise and promote it as follows. We provide each of our customers with a web portal which the customer uses to access the product. Since 2004, each portal includes a link, identified by the DROPBOX

trademark, by which non-customers can send files to individuals at the customer using Thru's DROPBOX functionality.

14. There have been more than 500 such portals with DROPBOX™ prominently displayed on each. Today, Thru has over 1 million unique users of its product covering all 50 states of the U.S.

15. Thru creates and hosts a public facing portal page for each customer, substantially similar to the one shown for Global Storm IT in Exhibit 2. These are sub-domained as customer.thruinc.net. The DROPBOX mark is displayed on every login page of these portal sites. Representative pages from the website showing use of the trademark DROPBOX on customers' portal pages are attached as Exhibit 31. This site has been ranked by Amazon Alexa as number 138,945 (as of 9/29/2016) out of 80,000,000 active websites in the United States placing it in the top 0.172% of all sites in the United States.

16. This public facing page is seen by each individual who uses Thru's product each time that person accesses the product.

17. Exhibit 2 is a copy of an example of an early User Guide, entitled FTH Quick Start User Guide, that we distributed to our customers in May 2004. The second page of Exhibit 2 shows the appearance of the portal or login page for Global Storm IT, one of Thru's customers at that time. As seen, the symbol ™ is used adjacent the word DROPBOX.

18. A general explanation of the purpose of the DROPBOX™ functionality is given on page 2 of the Guide, while a detailed explanation of how to use the functionality is given on page 3.

19. As explained on page 3 of Exhibit 2, if a user of Thru's FTH product wanted to receive a file from a non-customer, she would direct that person to the login page, shown on page 2 of the Exhibit, and tell him to click on the DROPBOX™ icon. When that is done, a screen, the appearance of which are shown on page 3 of Exhibit 2, opens allowing that person to specify the

address of the recipient, the sender's address and then to upload the file. Once the file is uploaded both the sender and the recipient are notified by email and the recipient can retrieve the file from her DROPBOX™ folder.

20. Each individual using the FTH product at a Thru customer is provided by Thru with a "My Dropbox" folder as part of the initial set up for that customer.

21. In addition, individuals working at Thru's customers were encouraged to, frequently did, include reference to Thru's DROPBOX™ functionality in their own email signature blocks. Our customers did this to encourage and facilitate their receipt of files from outsiders using the Thru DROPBOX™ functionality. While it is impossible to know the number of emails sent by Thru's customers that featured the DROPBOX™ trademark, I estimate that it is in the millions.

22. In April 2004, Thru began to promote its file transfer functionality under the trademark DROPBOX on its website at http://www.rumblegroupusa.com. Exhibit 3 shows the content of that website on April 30, 2004, as captured by the Internet Archive Wayback machine. As seen in Exhibit 3 the website included "Product Tutorials" explaining how to use the functionalities of the product. One of the tutorials was for DROPBOX 4.0.

23. Thru has continued to promote the file transfer functionality under the mark DROPBOX on its website using the trademark DROPBOX through to the present. Exhibit 4 contains copies of Thru webpages showing use of DROPBOX.

24. Through the years, Thru has provided its customers User Guides. Exhibits 5 to 10 show various user guides that Thru has distributed to its customers from 2004 through 2015.

25. Thru has also used DROPBOX as a trademark in numerous presentations to potential customers starting in 2004 and continuing to the present time. Exhibits 11 through 25 are examples of promotional literature Thru has distributed to its customers.

26. Thru's target customers have always been not the general public, but the IT managers of medium size businesses. The techniques we used to do this were person-to-person dialogs and demonstrations. As early as March 2004, customers were shown the FTH product with the DROPBOX feature. Exhibits 26, 27and 28 are copies of emails mentioning customer comments regarding the DROPBOX functionality as early as 2004.

27. Thru's DROPBOX product/service is a secure file-transfer and storage product/service. A number of companies exist that provide similar products under a variety of names, including Google, Microsoft, Egnyte, Accelion, Citrix, and Syncplicity.

28. DBI did not get my attention until 2011, although it now appears that Thru's CTO was aware of DBI in June 2009, his evaluation was that it did not have "enterprise features," Slafsky Decln. Ex 43, so it was not a commercial concern to me. To the extent I knew anything about DBI before 2011, I understood it gave away software that enabled people to share photographs and was not suitable for use by enterprises. As such it had no impact on Thru which was, at the time, struggling to recover from the 2008 economic turndown.

29. As to the suggestion that I should have been concerned in 2010 because a potential customer told Thru's Director of Customer Service that he had chosen to use Dropbox Inc.'s Service instead of Thru's product, Motion p.7 ln. 5-9, the "customer" was the husband of Thru's controller and chose DBI for his personal needs because it was free. The email in April 2011 regarding Yousendit's product was to a former Thru employee who was trying to help Thru sell to his new employer. We were comparing the products and Yousendit called its feature DROPBOX.

30. As to the comment regarding Exhibit 45, in 2011, Scott Richardson, at that time Thru's Regional Sales Manager stated that he was not aware of dropbox.com and Sergey Arutiunov noted that it was a consumer directed tool with no workflow support, which made it of no interest to our customers.

31. Mr. Skybakmoen had no marketing experience when he joined Thru. He had been an analyst at Gartner and I gave him a chance to change careers. It did not work out and he left without giving notice, as his deposition reflects.

32. He told Ms. Fernandez, Thru's former Marketing Director mentioned on p. 5 ln 18 of DBI's Motion that Thru owned the trademark DROPBOX. Cone Decl. Ex 25 Fernandez Deposition p.51 ln.21-p.52 ln.4.

33. Mr. Skybakmoen indeed recommended in 2011 that we make use of the entirely legal Google AdWords program and that we use DROPBOX as one of the search terms. I subsequently discontinued use of that term because, as DBI's product became known, we were attracting too many people who wanted a freemium service. He also recommended that we assert trademark rights in DROPBOX against DBI.

34. Although we had problems in 2011 with customers expressing concerns about security of our DROPBOX functionality because DBI's consumer product was known to be insecure, having no protection against viruses or inadvertent deletion or damage to documents across all the synced devices, it was not until 2015, when DBI launched its Enterprise product that I began to regard it as a commercial competitor.

35. In 2012, Thru began to hear concerns from prospective customers that its DROPBOX functionality was insecure. We were asked whether we were using Plaintiff's file synchronization software. Thru was forced to use ENTERPRISE DROPBOX and SECURE DROPBOX to distinguish from DBI's consumer freemium service which was considered to be too insecure for use by an enterprise, as opposed to the general public. We also had to refer in some way to DBI and its products in order to tell customers that we did not use that technology. One way we did this was to refer to DBI's product as "consumer dropbox."

36. The graphic design of the DROPBOX™ icon used on the client login site to allow files to be transferred to the user has varied over the years, but has always included the word DROPBOX. Exhibit 30 show the various versions of the icon that have been used over the years.

37. When I started to investigate DBI and its file synchronization product, I found out that although it had filed for a trademark on DROPBOX in 2009, its right to that mark was being contested. In fact, four oppositions had been filed against the application. These were by Officeware, Inc., John Horton, YouSendIt, Inc. and Box, Inc.

38. The first three claimed to have used DROPBOX as a trademark before DBI filed its application.

39. Thru could not tell which of these parties had superior rights in the DROPBOX mark and decided to let them fight it out and then pursue the party that the PTO affirmed. It appeared to Thru that Officeware was the most senior user of those parties based on the date of first use, August 2004, claimed in Officeware's trademark application 85/012206 which was several years even before the formation of DBI (2007). Because Thru's rights in DROPBOX predate the date claimed by Officeware, Thru believed that it would ultimately prevail once the smoke cleared and it could pursue its own action in the PTO.[1]

40. At the time I became aware of DBI's trademark application, the short opposition period had expired and Thru could not assert its prior rights. Given the size of Thru, the uncertainty as to who would be successful in the opposition, I decided that my best course was to wait and see.

41. I also discovered that Officeware has not only opposed DBI's application but filed an infringement action in Federal Court. I did not want Thru to be forced to spend the amount of

---

[1] While the district court litigation was proceeding and the oppositions were pending at the PTO, Thru filed its own federal trademark application for DROPBOX. That application was suspended pending resolution of the oppositions. Cone Decl. ¶ 9 Ex 8.

money needed to participate in District Court litigation. I decided, therefore, to inform DBI of my company's early use and invite it to discuss a business solution. This was done in a letter from my attorney to DBI's attorney on December 8, 2011. See Cone Decln Exhibit 9. DBI, despite several subsequent requests, would not agree to a B-to-B discussion.

42. Yousendit did not specify the date of its first use of DROPBOX in its Opposition, but stated that it was founded in 2004 and used DROPBOX before any priority date that DBI could claim. Cone Decln Ex 7.

43. Thru was focused on establishing its rights in DROPBOX through the PTO, because it is much more cost effective than district court litigation.

44. Officeware's product and DBI's product use different technology.  Officeware's product is non-downloadable software (the user accesses and uses the product via a website), whereas DBI's software is and always has been downloadable (the user downloads DBI software onto her device).

I certify under penalty of perjury that the foregoing is true and correct. Executed on September 29, 2016 in Irving, Texas.

_____
Lee Harrison