UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DROPBOX, INC.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>THRU INC.,<br><br>　　　　Defendant. | Case No. 15-cv-01741-EMC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 97 |

## I.   INTRODUCTION

Plaintiff Dropbox, Inc. ("Dropbox") brought this action for declaratory relief seeking to establish its right to use the term "dropbox" as a trademark. Docket No. 1. Defendant Thru Inc. ("Thru") brought counterclaims for trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), and California common law, and for unfair competition under Cal. Bus. & Prof. Code § 17200 et seq. and cancellation of Dropbox's trademark registration under 15 U.S.C. § 1119. Docket No. 33. Now pending before the Court is Dropbox's motion for summary judgment on Thru's counterclaims. Docket No. 97 ("Motion"). The Court **GRANTS** the motion.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Dropbox is a large software company that produces an application allowing people to store, access, and modify electronic files online. Today, Dropbox has over 500 million users. Docket No. 98 (Vashee Decl.) ¶ 5. As of 2014, the company was valued at $10 billion. The company was founded in 2006. Co-founder and CEO Drew Houston states that he planned to use the name "Dropbox" from the start, having previously used folders called "dropboxes" to share files with other computer users. Docket No. 99 (Houston Decl.) ¶¶ 3-4. Dropbox launched its product in 2008, and it quickly attracted numerous users and significant press coverage. *Id.* ¶¶ 16-

23.  In late 2009, Dropbox applied to the United States Patent and Trademark Office ("PTO") to register the DROPBOX trademark. *Id.* ¶ 24.  Its application was published in March 2011. Docket No. 100 (Slafsky Decl.) ¶ 3.

After this publication, other companies claimed rights in the "dropbox."  In June 2011, a company called Officeware sued Dropbox claiming common law trademark rights in the term, having used it beginning in 2004 to describe functionality similar to that offered by Dropbox.  Ex. 5.[1]  The parties reached a settlement according to which Officeware assigned its rights to Dropbox.  Ex. 7.  Also in 2011, Dropbox received demands from two other companies, YouSendIt and DropBoks, each of which claimed similar rights.  Slafsky Decl. ¶ 13.  Dropbox contended that the term was merely descriptive as used by these companies – indeed, the PTO had already denied a trademark application from DropBoks on this ground – and the companies ultimately did not press their claims.  The PTO issued Dropbox a trademark registration for DROPBOX in February 2014.  *Id.* ¶ 4.

Defendant Thru is a company based in Texas that has, since 2002, offered a file management software program called File Transaction Hub (FTH).  Docket No. 109 (Harrison Decl.) ¶ 2.  In 2004, Thru added a feature that allowed its customers to receive digital files from third parties; it called this feature "DropBox."  *Id.* ¶ 12.  In May 2004, Thru asked all of its employees to include the term in their email signature blocks.  *See* Harrison Decl. Ex. 29.  It also appears that Thru at times – though not always – appended a ™ symbol when it used the "DropBox" designator on documents intended for customers and the general public, indicating its intent to use the term as a trademark.  *Compare id.* Ex. 2 (using the symbol in an FTH user guide) *with* Ex. 3 (using the term DropBox without the symbol on the company web page).

Thru took no action to enforce any trademark rights in the term "dropbox" until December 8, 2011, when Thru's counsel contacted Dropbox for the first time, asserting that Thru had "used its mark DROPBOX continuously since 2004."  Ex. 28.  Counsel stated that Thru was "aware of the current trademark dispute regarding the mark" between Dropbox, Officeware, "and several

---

[1] Except where otherwise noted, "Ex." refers to exhibits attached to the Slafsky declaration, Docket No. 100.

2

other claimants," but asserted that Thru's rights that would take priority to any of those parties. *Id.* Thru asserts that after that point it offered to meet with Dropbox on multiple occasions "to resolve the ownership question." Docket No. 107 ("Opp.") at 19. On February 4, 2014, when the PTO issued Dropbox's trademark registration, Thru filed a Petition for Cancellation, but it did not otherwise take any action until Dropbox initiated the present suit on April 17, 2015. Thru then filed counterclaims for trademark infringement under the Lanham Act and California common law, and for unfair competition under Cal. Bus. & Prof. Code § 17200 et seq. and cancellation of Dropbox's trademark registration under 15 U.S.C. § 1119. Docket No. 33. Following discovery, Dropbox filed the instant motion for summary judgment on Thru's counterclaims.

### III.   DISCUSSION

A.   Legal Standard

"Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (citing *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) (quoting *R.W. Beck & Assocs. v. City & Borough of Sitka*, 27 F.3d 1475, 1480 n.4 (9th Cir. 1994)).

"A moving party without the ultimate burden of persuasion at trial" – such as Dropbox in this case – nonetheless "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The moving party may discharge its initial burden by "show[ing] that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016) (quoting *Nissan Fire*, 210 F.3d at 1102). Where "a moving party carries its burden of production, the nonmoving party must produce evidence to support its

3

claim or defense." *Id.* (quoting *Nissan Fire*, 210 F.3d at 1102). The ultimate question at summary judgment is whether "the record taken as a whole could . . . lead a rational trier of fact to find for the non-moving party"; if not, then "there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 287 (1968)); *see also Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005).

Dropbox argues that it is entitled to summary judgment for three reasons: (1) Thru has no trademark rights in "dropbox" because it failed to use it as a trademark and because "dropbox" is descriptive and Thru has not established secondary meaning; (2) even if Thru could demonstrate a protectable interest in "dropbox," Dropbox would have seniority by virtue of its acquisition of Officeware's rights; and (3) Thru's claims are barred by laches.

B.   <u>Laches</u>

The Court first addresses Dropbox's argument that Thru's claims are barred by laches. "Laches is an equitable time limitation on a party's right to bring suit," . . . resting on the maxim that "one who seeks the help of a court of equity must not sleep on his rights." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (quoting *Boone v. Mech. Specialties Co.,* 609 F.2d 956, 958 (9th Cir.1979)). "As the party asserting laches, [Dropbox] must show that (1) [Thru]'s delay in filing suit was unreasonable, and (2) [Dropbox] would suffer prejudice caused by the delay if the suit were to continue." *Id.* at 838. "While laches and the statute of limitations are distinct defenses, a laches determination is made with reference to the limitations period for the analogous action at law. If the plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable. . . . However, if suit is filed outside of the analogous limitations period, courts often have presumed that laches is applicable." *Id.* at 836. "When a federal statute lacks a specific statute of limitations, we generally presume that Congress intended to 'borrow' the limitations period from the most closely analogous action under state law." *Id.* "[I]n determining the presumption for laches, the limitations period runs from the time the plaintiff knew or should have known about his [Lanham Act] cause of action." *Id.* at 838.

The first question, then, is whether Thru has brought its claims within the applicable

1   limitations period.  Thru asserts that the applicable limitations period is four years under
2   California's "catch-all" limitations period, as set out in Cal. Prof. Bus. & Prof. Code § 17208.
3   Dropbox suggests that the more appropriate limitations period might be the two-year limitations
4   period for tort claims under Cal. Code Civ. P. § 339, but argues that Thru's claim is untimely
5   whether the four year period or the two year period applies.  The Court agrees.

6     In an interrogatory response verified by Thru CEO Lee Harrison, Thru stated that "Thru's
7   directors and management first became aware of Dropbox, Inc., and its use of DROPBOX in mid-
8   2011" and that "Thru's directors and management is not aware of any employee that was aware of
9   Dropbox, Inc. and its use of DROPBOX at any earlier date."  Ex. 40.  Record evidence shows that
10  this is not the case.  On June 9, 2009, Thru's Chief Technology Officer sent an email to the
11  Harrison, as well as other officers, informing them about Dropbox, which offered another service
12  "to sync the files across computers."  Ex. 42.  On June 15, 2009, the CTO wrote again, asking
13  "[a]re we ok with web-only write only dropbox or we will need [sic] something like
14  getdropbox.com[2]?  They are very prominent in Mac community."  Ex. 43.  In a sworn deposition,
15  Harrison nonetheless insisted again that he had never heard of Dropbox before the summer of
16  2011, at which point Dropbox had 40 million users.  Ex. 34 at 138:20.  When confronted with the
17  CTO's 2009 emails, however, Harrison conceded that his interrogatory response had been "false."
18  *Id.* at 162:3-4.  In light of this evidence, Harrison's continued assertion that "[Dropbox] did not get
19  [his] attention until 2011" is simply not credible.  "When opposing parties tell two different
20  stories, one of which is blatantly contradicted by the record, so that no reasonable jury could
21  believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for
22  summary judgment."  *Scott v. Harris*, 550 U.S. 372 (2007).  This is especially so where the only
23  evidence supporting them on this point is concededly false.

24    As the above evidence demonstrates, Thru's statement in its briefing on the present motion
25  that "there is no evidence (or at least a factual dispute as to the evidence), that Thru knew or
26  should have known of its claim against [Dropbox] prior to July 2011" is plainly false.  Opp. at 18.

---

[2] At the time of this email, getdropbox.com was Dropbox's web address.

Thru's officers, including its CEO, corresponded over email about Dropbox as early as June 2009, and Harrison conceded in his deposition that his earlier statement, that the company had not learned of Dropbox until 2011, was "false." Ex. 34. Moreover, Harrison stated in Thru's Rule 30(b)(6) deposition that in 2009, Thru believed that Dropbox's use of its name was "overwhelmingly an obvious violation of what we believe is our trademark." Ex. 39 at 139-141. The evidence is simply uncontestable that Thru actually knew of Dropbox's use of what Thru believed was its trademark beginning in 2009.

Thru asserts that it nonetheless was not required to act at that point because it "believed [Dropbox]'s use to be non-competitive or minimal in light of the customers Thru was targeting." Opp. at 22 (citing Harrison Decl.. Specifically, Thru claims it believed Dropbox was a purely consumer-oriented technology, while it targeted businesses. *See* Harrison Decl. ¶ 28; Docket No. 108 Ex. 24 (Deposition of Thru's Former VP of Marketing and Product Strategy Thomas Skybakmoen). That, too, is not plausible. First of all, an email in the record shows that as early as January 2010, Thru was aware that it had lost at least one customer to Dropbox, which, the customer stated, "serve[d] [his] needs, both professionally and personally." Ex. 44. But in any case, "the law is well settled that, where the question of laches is in issue the plaintiff is chargeable with such knowledge *as he might have obtained upon inquiry*, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." 6 McCarthy on Trademarks § 31:38 (4th ed.) (quoting *Johnston v. Standard Mining Co.*, 148 U.S. 360 (1893)) (emphasis added). It is not disputed that by June 2009, Dropbox had over one million customers, and had been widely covered in the mainstream media, including coverage detailing business use of the product. *See* Ex. 91 (January 2009 NY Times article discussing business applications of Dropbox); Houston Decl. ¶ 20-22 (citing 2009 articles about Dropbox appearing in Forbes, PC Magazine, CNN, The Washington Post, and others and describing the growth in Dropbox's user base during 2009). Even if you were to credit this implausible testimony that it was not aware of Dropbox's commercial business in 2009, it clearly had inquiry notice sufficient to trigger laches. A company such as Thru in the business of providing online file storage and transfer software should have been aware of what was, by then, the preeminent company offering similar products

6

in the field, and that this company posed a competitive threat. No reasonable fact finder could conclude otherwise. The Court therefore concludes that the limitations period began running in June 2009; because Thru had still taken no action in June 2013, when the four-year period expired, laches presumptively applies.

Thru nonetheless argues that its delay was reasonable, first because it took some action during the intervening period, including sending its December 2011 demand letter to Dropbox. Opp. at 18-19. But "the delay, which the defense (of laches) contemplates, is not delay in bringing claims to the attention of the defendant. It is . . . delay on the part of the plaintiff in instituting litigation on his claims." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 953 (9th Cir. 2001) (quoting *Nealey v. Transportacion Maritima Mexicana, S.A.,* 662 F.2d 1275, 1280 n. 6 (9th Cir.1980)).

Thru also argues that it was not required to act because, during 2011, after Dropbox's registration was published, a number of other parties, including Officeware, YouSendIt, and Box.net, opposed Dropbox's trademark application to the PTO and claimed rights in the term "dropbox." Thru argues that it "could not tell which of these parties had superior rights in the DROPBOX mark and decided to let them fight it out and then pursue the party that the PTO affirmed." Opp. at 20. Thru provides no excuse why it did not join the other companies in asserting its own trademark rights before the PTO in a timely way. Indeed, a delay of this sort is precisely what laches is designed to guard against; Thru cannot simply "sleep on [its] rights," allowing multiple other parties to expend significant resources litigating over rights that Thru believes it owns, only to belatedly pursue the victorious party. *See Jarrow Formulas*, 304 F.3d at 835. Such an approach would unfairly prejudice all of the companies who *did* timely join the fray by asserting their claims. Thru cites a case that it claims allowed a similar approach, but in fact the case is inapplicable. *See Novell, Inc. v. Unicom Sales, Inc.*, No. C-03-2785 MMC, 2004 WL 1839117, at *1 (N.D. Cal. Aug. 17, 2004) In *Novell*, this court excused a party's delay in bringing suit when that party was, itself, already engaged in litigation over its right to use a trademark, and thus its right to bring suit was unsettled. Furthermore, the defendant in that case had promised to stop the allegedly infringing use, and the plaintiff promptly brought suit when the defendant broke the promise.

7

Nor can Thru's petition for cancellation of Dropbox's trademark, filed with the PTO on February 4, 2014, salvage its claim. First, that petition was itself filed outside the limitations period. As noted above, it did not timely oppose Dropbox's application to the PTO in 2011. Second, while the 2014 proceeding challenged Dropbox's registration, Thru has conceded that it did *not* challenge Dropbox's right to continue using the mark. *See* Docket No. 19 (Thru's Motion to Dismiss) ("Thru has not and does not contest Plaintiff's use of the DROPBOX mark."). Nothing about the cancellation petition put Dropbox on notice that its name was at risk; instead, Thru continued to delay litigation while allowing Dropbox to expend additional resources developing the value of its brand.

Finally, and perhaps most significantly, the record belies Thru's explanation for the reason behind its delay. Dropbox points to numerous documents that indicate that, in fact, Thru's delay was a deliberate attempt to maximize the value of its claims by leveraging an anticipated initial public offering from Dropbox. Thru had been explicitly contemplating a lawsuit concerning its trademark rights at least since February 2012, when Harrison wrote in an email to an investor: "New development turns out we own the term Dropbox . . . Our IP attorney is talking to Dropbox's attorney about buying the name from us . . . They raised 250M in October 2011 at 1B value. . . . An action could be had soon." Ex. 47. Harrison repeatedly in emails described Thru's claim as a "lottery ticket." Ex. 54 (discussing whether "a portion of the staff [had] no skin in DB lottery ticket game"); Ex. 62 ("Dropbox will be a lottery ticket."). In October 2013 Harrison wrote that "My call is [Dropbox] want[s] us to file a lawsuit and treat us like [Officeware] so they can quietly dispose of this matter anytime they want to . . . The best leverage we have is to sit tight and wait to the IPO announcement and be prepared to file suit that day and make as much noise as we can about it." Ex. 51; *see also* Ex. 57 ("If we wanted to be the first to file we should have done that last year. Time is on our side not theirs. Slow walking this to [Dropbox's pre-IPO] S1 filing is all that is important."). In his deposition, Harrison confirmed that he had felt that a pending IPO "was a leverage point," that "it would be tough for them to file without clear title" to their trademark, and that accordingly Dropbox "would come to us eventually and settle with us." Ex. 34 at 187.

8

These documents demonstrate that Thru purposefully delayed bringing suit in an attempt to increase its leverage over Dropbox and thus the value of its claims. In its opposition to Dropbox's Motion, Thru did not respond to, or even mention, this evidence. At hearing, counsel for Thru merely stated that he did not think the evidence could bear the interpretation Dropbox would give it. The Court disagrees; it is difficult to see what *other* interpretation would be plausible with respect to the references to "slow walking" the case and the admonition to "sit tight and wait to the IPO announcement and be prepared to file suit that day." In light of this evidence, no reasonable fact finder could conclude that Thru's delay was reasonable. If there is a paradigmatic set of facts that warrants laches, this is it.

The only remaining question, then, is whether Thru's delay prejudiced Dropbox. Thru claims it did not because there is "no evidence that [Dropbox] would have done anything differently if Thru had been one of the myriad of companies involved in disputing the DROPBOX mark earlier." Opp. at 24. But as the Ninth Circuit has explained, a party "can make the required showing of prejudice by proving that it has continued to build a valuable business around its trademark during the time that the plaintiff delayed the exercise of its legal rights." *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1105 (9th Cir. 2004). That is precisely what happened here. If a trial resulted in a determination that Thru owned superior rights to the "dropbox" trademark, the costs to Dropbox would be massively greater today than they would have been years ago, because of Dropbox's continued investment in its brand. Thru concedes that during the relevant time period, Dropbox continued to "spend millions of dollars in attempting to build brand recognition" and continued to "build its business." Opp. at 23.

## IV. CONCLUSION

The Ninth Circuit has stated that laches is "seldom susceptible of resolution by summary judgment." *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000). But there are numerous cases in which the Ninth Circuit has affirmed summary judgment determinations of laches. *See, e.g.*, *Grupo Gigante*, 391 F.3d at 1105; *Jarrow Formulas*, 304 F.3d at 833 (citing additional cases). The evidence is overwhelming that Thru's delay in filing suit was unreasonable and prejudiced Dropbox, and summary judgment is therefore appropriate here. The Court

1  accordingly holds that Thru's claims are barred by laches, and **GRANTS** Dropbox's motion for
2  summary judgment on that ground.  Because this determination is sufficient to decide the motion,
3  the Court does not reach Dropbox's alternative arguments for summary judgment.
4      This order disposes of Docket No. 97.
6      **IT IS SO ORDERED**.

8  Dated: November 15, 2016

_____
EDWARD M. CHEN
United States District Judge