Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

| | | |
|---|---|---|
| DROPBOX, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | NO. 3:15-CV-01741-EMC (MEJ) |
| THRU, INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) | |
| ----------------------------) | | San Francisco, California |
| and related cross-action. | ) | Thursday, October 27, 2016 |
| _____) | | |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          Wilson, Sonsini, Goodrich & Rosati
                        650 Page Mill Road
                        Palo Alto, California  94304
                   BY:  **DAVID H. KRAMER, ESQ.**
                        **JOHN L. SLAFSKY, ESQ.**
                        **COLLEEN BAL, ESQ.**

For Defendant:          Siskind Boyd, LLP
                        Four Embarcadero Center, 39th floor
                        San Francisco, California  94111
                   BY:  **IAN K. BOYD, ESQ.**

                        Ferguson, Braswell & Fraser, PC
                        2500 Dallas Parkway #600
                        Plano, Texas  75093
                   BY:  **JOHN M. CONE, ESQ.**

Reported By:       Leo T. Mankiewicz, CSR 5297 RMR, CRR
                   Pro Tem Reporter

Thursday, October 27, 2016

                                                          9:53 A.M.

                        P R O C E E D I N G S

        THE CLERK:  Calling case C-15-1741, DropBox versus Thru.  Counsel, please come to the podium and state your name for the record.

        MR. KRAMER:  Good morning, your Honor.  Dave Kramer from Wilson Sonsini for DropBox.  With me are my partners John Slafsky and Colleen Bal, and DropBox's General Counsel Bart Volkmer.

        THE COURT:  All right.  Thank you, Mr. Kramer.

        MR. CONE:  Good morning, your Honor.  John Cone for defendant Thru, Inc. and with me local counsel, Ian Boyd from Siskind Boyd.

        THE COURT:  All right, good morning.

        MR. CONE:  Good morning, your Honor.

        THE COURT:  Let me cut to the critical issue, it seems to me here, and that is the question of laches.  There doesn't seem to be any real dispute that Mr. Harrison of Thru knew about DropBox, the party here, and its use of the mark, its engagement in commerce, et cetera, et cetera, through both 30(b)(6) declaration and e-mails.

        Is there any dispute that Mr. Harrison knew about DropBox as of June or some point in 2009?

        MR. CONE:  Your Honor, it's -- there's no dispute that

he received an e-mail from somebody saying there's this company DropBox, in 2009.  So he certainly knew of it in that sense. He did not know of it as a competitor or anyone who interfered with what he was doing, because this was a company that was giving away free technology to the public, enabling them to share photographs.

So it wasn't seen by Thru or Mr. Harrison as any real threat to Thru's business.  That developed later, your Honor.

**THE COURT:**  Well, but he knew that that mark was being used, it was being used commercially, and he says in the 30(b)(6) deposition that he believed that use of the name was overwhelmingly an obvious violation of what we believe to be our mark.

**MR. CONE:**  Well, I don't think he did at the time, your Honor.  I think that was talking about what he thinks now. At the time it was just not considered, I think, by any of the managing personnel at Thru.  They saw it as a freebie application that may -- might survive, might not survive, your Honor.

It wasn't until later that he began to realize that it had an impact on his business, both because they finally moved into the enterprise area where he was, and because customers started questioning the security of his product because of concerns about security of the DropBox product.  And that was a couple of years later, your Honor, when he started

investigating.

When he did, and he found about the trademark applications, he started taking action on that, but at the time, the trademark application by DropBox, Inc. was being opposed by three different people, one of whom clearly appeared to have superior rights to DropBox, Inc., and that's why nothing was -- could be done effectively at that time.

THE COURT:  What's your view of -- what's the evidence?

MR. KRAMER:  Your Honor, let me tell you what Mr. Harrison and Thru knew in June of 2009.  They knew, through what Mr. Harrison called competitive analysis, that there was a company that was very prominent in the file transfer space, called DropBox.  That was a space that Thru was in, and that's a space that Thru claims it had the right to use the trademark DropBox in, in June 2009.

There was a link in two different e-mails to Mr. Harrison containing an encyclopedia of information about my client DropBox, a wiki, and at that time Mr. Harrison testified -- your Honor is correct -- at that time, Thru believed it was an overwhelmingly obvious violation of what Thru now contends --

THE COURT:  "At the time" meaning in 2009.

MR. KRAMER:  That is exactly what he said.  Correct, your Honor, that's the testimony.  And not putting aside, your

Honor, what Thru should have known.  That's what Thru actually knew.

The test for laches is when a party knows or should know of a potential claim, the clock starts running.  That's the *Danjac* case from the Ninth Circuit.  We've already talked about what Thru actually knew in June 2009, but the notion that Thru didn't know DropBox was selling to businesses at that time doesn't make any sense, given the standard.

DropBox had been selling to businesses since its inception in 2008.  In January 2009, the New York Times wrote a detailed piece about DropBox talking all about how it sold to businesses and how companies were living on the DropBox service.

Thru could have and should have just picked up the phone, knowing there was a company in its space using the name "DropBox," and said, "Hello, DropBox, do you sell to businesses?"  It is not entitled to remain ignorant of those overwhelmingly obvious facts.  The law imposes upon Thru an obligation to police its trademark, to conduct a reasonable, prudent inquiry.  That's the *Internet Specialties* case and the *FitBit* case.

Thru is chargeable with the knowledge that it would have learned had it conducted that basic inquiry, and it knew in June 2009 anyway that DropBox was a very prominent service in its space.

The last thing I'd say about that is, a few months after that, in January 2010, Thru lost a potential customer to DropBox.  Thru was trying to woo this customer to use its service, and the customer said, no thanks, I'm going to use DropBox instead.

The fact that it was --

(Building fire alarm sounds.)

**THE COURT:**  We're going to be interrupted, I'm sure, by some announcement, but continue.

**MR. KRAMER:**  The fact that it was the spouse of a Thru employee, according to Mr. Harrison, doesn't help Thru.  It actually makes it worse, because Thru couldn't keep even the spouse of its own employee as a customer despite wanting to, and that spouse of the Thru employee said, I'm going to use DropBox instead.

So in June 2010 -- sorry -- January 2010, Thru actually was losing business to DropBox.  Even if it didn't know or should have known in June 2009, it certainly knew in January 2010.  That triggered a presumption of laches whether the presumption is two years, as *FitBit* suggests, or four years, as Thru suggests.  Thru didn't file its lawsuit for more than six years after it knew or should have known of a potential claim against DropBox.

**THE COURT:**  All right.

**MR. CONE:**  Your Honor, in response, just to flesh out

the facts on it, it was the wife of an employee who said, I really just want to be able to share some photographs with people, files with people, I'm going to go with the freebie service that DropBox gives.

Thru does not provide solely file-sharing materials like that. It offers a suite of programs to an enterprise which enables all the people inside the enterprise to access all their systems, all their programs, from many remote locations and many different devices, your Honor.

So again, it was an indication that someone was prepared to take the service for nothing. It wasn't really a loss of a customer to Thru.

**MR. KRAMER:** Actually, your Honor, what the e-mail says, and this is a customer that Thru was trying to win, was, "No, thank you, Thru. The DropBox service serves my needs both personally and professionally." That's what the e-mail says when the customer rejected Thru and chose to use DropBox.

But again, I think we're further down the road than we should be. June 2009 is the date on which the laches clock starts to run, and a presumption of laches comes into play two years afterwards, or four years afterwards, according to Thru.

**THE COURT:** Well, what is it that has to be shown? What is the knowledge in order to start the clock on laches? That not only use, but does it have to be engagement, commercial engagement and use in precisely same -- I mean

that's what's being suggested here, that if it's done at a discount or free, even if it takes customers away, that doesn't count, that doesn't start the clock.

**MR. KRAMER:**  No, your Honor, that is not standard. The standard is whether you know or should know of a potential claim; whether you know or should know of facts from which a reasonably prudent person would conclude there is a likelihood of confusion.

We've got an admission on that point from Thru's corporate designee, in which he said that at that time, DropBox was what Thru considered to be an overwhelmingly obvious violation of what Thru now claims to be its trademark rights. So there is an admission from the corporate designee on this question.

But beyond that admission, they're in the file transfer space, they're selling to businesses, they're extremely prominent, they're very successful.  Even if they were not in direct competition --

**THE COURT:**  That's undisputed in June of 2009, DropBox was in the business of selling.  It was not just a give-away.

**MR. KRAMER:**  Yes, your honor.  In fact, the New York Times article, which came out in January 2009, makes that claim.  DropBox had been selling to businesses since it started in 2008, and that fact would have been readily obvious to anyone on the slightest investigation, like a phone call.

THE COURT:  Would it have been obvious to go to the website and see that?

MR. KRAMER:  It would have been obvious to the website to see that too, your Honor, yes, and in fact, if you go to the Wiki, which is linked to from the e-mails that were exchanged by the Thru executives in June 2009 -- and it wasn't a random person that sent Mr. Harrison this e-mail, it was the chief technical officer of the company, in what Mr. Harrison called competitive analysis -- and in one of those e-mails there is a link to a Wiki, an encyclopedia, of information all about DropBox.

THE COURT:  All right.

MR. CONE:  Your Honor, it is not the law that you have to take action the moment you see something that could be a problem.  The company had many things on its plate.

THE COURT:  Not in the moment, but within the presumptive statute of limitations.

MR. KRAMER:  Yes, your Honor, which we think is four years here.

THE COURT:  Four years plus 2009 is 2013.

MR. CONE:  Yes, when -- at which time we had determined, or Thru had determined that the way that they could proceed best, given their relative financial situation and DropBox's was to bring the matter before the Trademark Trial and Appeal Board, and the Court will remember that that is what

was done.

Now, that couldn't be done until DropBox's application, which had been opposed by three other people, had been cleared and was registered. You can't oppose -- you can't join into an opposition halfway through.

Now, in 2011, they were opposed by three different people. It looked to Thru as though Officeware had the better claim. Officeware claimed to have started using the mark from years before DropBox was even formed.

And so that the prudent thing for them to do was to wait and see which of the parties came out of the Trademark Trial and Appeal Board proceedings ahead, and then to bring a Trademark Trial and Appeal Board proceeding against, which is what they did, and there's no doubt, your Honor, that as to the petition for cancellation and the opposition, there's no laches issue with them, because they were brought immediately the ability to produce them.

THE COURT: Are you suggesting there's sort of a tolling, equitable tolling period that applies, that excuses bringing an action in federal court because of the pendency of these other proceedings?

MR. CONE: No, your Honor. I'm saying I think it's reasonable, and I don't think I will go on to address the issue of prejudice, I don't think there's any prejudice to DBI or that DBI would have acted any differently if we had.

But certainly, as to the counterclaim on the petition for cancellation and the counterclaim on the opposition, that can be no laches as to them, your Honor, because you cannot file them until particular acts occur in the Trademark Office, and they were filed immediately those acts occurred.

MR. KRAMER: Yes, your Honor. With respect to the PTO proceeding and the argument that Thru is entitled to sit back and figure out who was going to be the senior user and then go after them, that's exactly what the doctrine of laches is supposed to prevent.

Here are all these parties spending hundreds of thousands or millions of dollars litigating over rights that Thru supposedly claims to have and is going to sit back and watch that waste of resources, watch that waste of judicial resources, and watch that prejudice unfold.

It's also completely inconsistent with the notion of someone claiming a trademark, which is supposed to prevent consumer confusion. Other parties are known to Thru to be using these marks in Thru space, direct competitors to Thru, and Thru is doing nothing about it.

Thru did not file an opposition to the DropBox trademark registration. It simply ignored the DropBox trademark registration, and to come back later and say, "Well, now my cancellation is timely," presents exactly the situation that was presented in the *FitBit* case, where Judge Conti said

all of your claims, including your request for cancellation, are barred, and there's a reason for that.

Putting aside the fact that laches is an equitable doctrine and putting aside the fact that DropBox's prejudice was manifest and continuing, the problem with the cancellation proceeding is it didn't challenge DropBox's right to use its name.  In fact, Thru made a point of telling the Court that it was absolutely not challenging DropBox's right to use its name.

That means that DropBox was being told go ahead, continue to invest in your brand, tens of millions of dollars, because we don't have an issue with your use.

If they didn't take action to cut off the prejudice, if they didn't file a litigation, the laches clock doesn't stop.  It doesn't matter whether DropBox was on notice of the potential cancellation proceeding.  That's the *Danjac* case in the Ninth Circuit, your Honor.

**MR. CONE:**  Your Honor, no one was spending millions of dollars on the Trademark Trial and Appeal Board proceedings in 1911 -- I mean, 2011, 2012.  The whole point of the trademark trial and proceeding, or the proceeding, there's no cost to that, your Honor.

We know that at that time, DropBox had been sued for infringement by Officeware.  There was not only a Trademark Trial and Appeal Board proceeding, there was a District Court litigation.  That did not in any way hold up or stop DropBox

expanding their business.  They'll tell you how much it increased, and how far they went at it.  They never for once thought of changing the name DropBox, when they were sued for infringement by Officeware.

There's no reason to think that they would have done differently if we had said, we are going to sue you for infringement, or if we had sued them for infringement.

The proper course for us to do, the sensible course for us to do is not to multiple lots of proceedings, but was to wait to see what the Trademark Trial and Appeal Board decided was the true owner of the DropBox mark, because it did not appear that it was these folks, and then take the matter up with whoever was the victor in that.  It turns out that the money that DropBox had invested in it won the day.

**THE COURT:**  What do I do with the comments in some of the documents that indicate a deliberate intent to sit and wait for the IPO?

**MR. CONE:**  Well, your Honor, I don't think they really bear that interpretation.  What they're saying, and what Thru was saying, they didn't want to sit and wait.  They asked to talk.  They asked to talk to DropBox.  They continually asked to do that, and we were never able to arrange a settlement conference or a conference at a level that we thought appropriate to this situation, but we have never -- Thru has never said that it won't talk about this.  Its whole

approach --

THE COURT:  Well, it contemplated litigation back in early 2012, but there's also an indication that time was on their side.  The best leverage, quote,

"The best leverage we have is to sit tight and wait

for the IPO announcement and be prepared to file suit

that day and make as much noise as we can about it."

MR. CONE:  That was a possibility that someone suggested.  That wasn't what was actually done.

THE COURT:  Well --

MR. CONE:  DropBox itself could have -- I beg your pardon, your Honor.

THE COURT:  "Time is on their -- is on our side, not theirs, slow-walking this to the S-1 filing is all that is important," doesn't that suggest that there was some delay in order to maximize the leverage point?

MR. CONE:  I don't think it was that.  I think it was they wanted to talk to DropBox.  DropBox wouldn't talk to them. They thought that if there was going to be an IPO, DropBox would have to come and talk to them.  It wasn't a question of maximizing the recovery, it was a question of -- and that's -- it's a question of getting meaningful settlement discussions at a senior level of the two businesses.

THE COURT:  What's your interpretation?

MR. KRAMER:  My interpretation, I think, accords with

your Honor's, and I'll add two more to the list.

In deposition, the corporate deposition of Thru, its CEO and designee admitted quote,

"Thru was waiting for DropBox to announce an IPO, so Thru could file a lawsuit that day, because that is what Thru thought would afford it the biggest payoff. The closer to the IPO, the better.  Nothing else will matter.  Court battles mean nothing."

That's Exhibit 58, and that was in response to a question by the Thru board of directors suggesting that Thru find out the truth of the DropBox matter as soon as possible Thru CEO's wrote back, "No, the closer to the IPO the better, nothing else will matter.  Court battles mean nothing."

Another one just to add to the list,

"I need to debate with you the pros and cons of starting an action sooner rather than later, assuming the issue is enforced by an early IPO announcement."

This is delay motivated by avarice and it is unrebutted on this record.  Thru's delay was unreasonable by any calculus.

And on the issue of prejudice, your Honor, my colleague has the test wrong.  It's not whether something would have been different had Thru filed the lawsuit in 2009 or 2010 or '11 or '12 or '13 or '14.

The question that the laches test asks on prejudice

is, if Thru had filed a lawsuit and won, in 2009, if it had obtained the injunction that it's seeking now, barring DropBox from using its name, what would have been different?

And that's the *FitBit* case, that's the *Grupo Gigante* case, and obviously, if Thru had obtained an injunction prohibiting DropBox from using its name in 2010, DropBox would not have thereafter invested tens of millions of dollars in building the brand.

So the prejudice here is manifest.

**THE COURT:** You disagree that the formulation of that test, the test is measuring if the --

**MR. CONE:** I haven't seen that in the case, your Honor. I think the question is were they, in fact, prejudiced, and this is an equitable test where the Court should look at all the factors here and see whether, in fact, what Thru did --

**THE COURT:** But is the basis of prejudice measured by, what would have happened had the relief been granted as opposed to the mere fact of filing the suit? You disagree with counsel's interpretation of the law?

**MR. CONE:** I disagree with the fact that if they had filed -- he said 2010, and I'm not sure where that date came from, your Honor, but even if they had filed a lawsuit in 2011, we don't know what DropBox would have done. They were sued by --

**THE COURT:** It's not saying that's not the test, it's

not what they have done by the mere filing, but had you prevailed and, for instance, gotten preliminary injunctive relief, followed by permanent injunctive relief.  They would have not continued on their course of expending and investing in that name, because it would have been stopped.

MR. CONE:  Most of the investment, your Honor, is not in the name.  Most of the investment is in the technology and the promotion of the technology.

THE COURT:  You say most.  But I mean, even if you some, how much prejudice is required?

MR. CONE:  Some would have been.  Some would have been.

THE COURT:  How much prejudice is required?  If they spend a dollar, is that enough?

MR. CONE:  No, that's not significant.

THE COURT:  So it has to be a significant --

MR. CONE:  I would say so, your Honor, yes.

THE COURT:  And is measured by what?  How do you measure significance is that a relative concept, is it an absolute concept?

MR. CONE:  I would suggest, your Honor, it's a relative concept when you take into account that the two parties to the lawsuit, or the dispute that you're examining.

THE COURT:  Your view?

MR. KRAMER:  Well, the evidence of prejudice comes

from the Houston and Vachi declarations, your Honor, which are undisputed.  Mr. Vashe testifies that DropBox spent tens of millions of dollars in the brand, promoting and advertising the brand.  So I don't know where the notion that it's mostly in the technology comes from, but it's not in the record.

And that's overwhelming prejudice here in my opinion.

**THE COURT:**  All right, I'll give you a last chance to comment.

**MR. CONE:**  No, your Honor, I think my -- I have made my comments, that I think that Thru acted reasonably in the circumstances of these parties, that it was faced with a situation where it was a small company, it was faced with a number of different companies, all of which were contending for ownership of this trademark.

It waited until that had happened, when they finally saw that DropBox, Inc. had filed the trademark rights for Officeware, and they then immediately went -- we wrote to DropBox, Inc. previous to that, but at that stage, we had an opportunity to take some legal action that was feasible for us to do, and took it, your Honor, by filing the Trademark Trial and Appeal Board suit.  Trademark Trial and Appeal Board, the government agency that is there specifically to sort out trademark registration issues and who has priority of trademark and who should be allowed to own the registration of trademark.

**THE COURT:**  Why don't you respond to that last point,

I think, because he's made that several times, that it was reasonable to wait.

MR. KRAMER:  So the response is several-fold, your Honor.

I think that, as I said earlier, filing a cancellation proceeding in 2014, first, is outside the presumptive period of laches.  It was four and a half years after June 2009, and whether the presumptive period is two years or four years, the cancellation proceeding comes too late.

Second, and perhaps more importantly, it doesn't challenge my client's right to use the term DropBox.  Hence, it didn't cut off the prejudice that my client was suffering. Instead, it was encouraging my client to continue to invest in the brand.

That can't stop the laches clock.  Communications from one side to the other saying, "cease and desist," are not sufficient to stop the laches clock.

THE COURT:  What about the point about waiting for the smoke to clear with respect to the disputes with the office, et cetera?

MR. KRAMER:  That is exactly what laches is supposed to prevent, your Honor.  You don't get to on the sidelines, if you contend you have senior rights to parties who are investing hundreds and thousands of dollars in litigation and who are paying settlements to buy the rights from someone else, you

don't get to sit on the sidelines and say, oh, I'll just take it out on whoever turns out to be the winner years down the road, whenever that is.  That's what laches is supposed to prevent.

And I mentioned also the issue of consumer confusion, which is continuing to fester and be fomented by that delay, assuming -- and I know this is all assuming -- but assuming Thru had any trademark rights in the first place, if you actually had trademark rights, and there are companies out in the word like DropBox and like Officeware, who are using the term.  In the file transfer space, you don't sit on the sidelines and say, well, we'll figure out in a few years who the senior user is, and then we'll go after them, because that's causing consumer confusion.  For you to swoop in years later and say, I know everybody associates the term DropBox with that terrific service in San Francisco, it actually belongs to me.

So I do want to make one point, your Honor, which is, we spent all of our time talking about laches and that's fine. I think that's where I would have started anyway, but Thru has no trademark rights here, because it didn't use the mark as a trademark, because the terms is descriptive and it concedes no secondary meaning, and because Officeware, and thus DropBox would be the senior user.

**THE COURT:**  Right, I'm going to --

**MR. CONE:** I have one point, if I might bring it to the Court. Trademark Trial and Appeal proceedings take several years to conclude. They're not as fast as some court proceedings. What opposing counsel is saying is that if you file a cancellation proceeding because you think you have senior and superior trademark rights to someone, which, but you don't also file an infringement proceeding, you will be held to have delayed too long and laches will prevent you enforcing your trademark even if the Trademark Trial and Appeal Board rules in your favor.

**THE COURT:** Well, he is saying that regardless, there is a laches problem in filing the cancellation.

**MR. CONE:** But you can't file a cancellation, your Honor. The statute doesn't allow you to file a cancellation proceedings until the mark is registered, which didn't happen until, I think it was, sometime in 2013.

Similarly, you cannot oppose an application unless you start to raise your objection within one month from the publication of the application for opposition purposes.

It wasn't that Thru didn't want to do it, they couldn't do it. The law and procedure did not allow them to do that.

**THE COURT:** But Thru had done anything more than file a federal lawsuit.

**MR. KRAMER:** Certainly, your Honor, it could have

opposed the registration application when DropBox filed it in 2009 and when it was published for opposition in 2011.

It also could have at any time instituted a litigation, which is what *Danjac* says it has to do, if it wants to stop the clock running on prejudice.

THE COURT:  All right, I'll take the matter under submission.  You do have a settlement conference still with Judge Spero in this matter?

MR. KRAMER:  We do.  It's scheduled for late November, your Honor.

THE COURT:  All right, and we're also scheduled for -- we're supposed to be scheduled for a bench trial, are we not, in January?

MR. KRAMER:  Yes, we are, your Honor.

THE COURT:  Well, I will take this under submission, and we have a pretrial conference late December, so --

MR. CONE:  Yes.

MR. KRAMER:  Merry Christmas, your Honor.

THE COURT:  I hope you have a productive session with Judge Spero.  This may be your last chance to resolve this case.

MR. CONE:  Thank you, your Honor.

MR. KRAMER:  Thank you, your Honor.

THE COURT:  Thank you.

10:22 a.m.

## CERTIFICATE OF REPORTER

I, LEO T. MANKIEWICZ, a pro tem reporter in the United States Court, Northern District of California, and Certified Shorthand Reporter duly licensed in the State of California, hereby certify that the foregoing proceedings in Case No. 3:15-CV-01741-EMC (MEJ),  DropBox, Inc. v. Thru, Inc., were reported by me, and were thereafter transcribed under my direction into typewriting; that the foregoing is a true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

Leo T. Mankiewicz, CSR 5297, RMR, CRR

Tuesday, November 1, 2016