**Pages 1 - 23**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

DROPBOX, INC., a Delaware        )
corporation,                     )
                                 )
          Plaintiff/             )
          Counter-Defendant,     )
                                 )
  VS.                            )   **No. C 15-1741 EMC**
                                 )
THRU INC., a Delaware            )
corporation,                     )
                                 )
          Defendant/             )
          Counterclaimant,       )   San Francisco, California
                                     Thursday, February 23, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:           WILSON, SONSINI, GOODRICH & ROSATI
                         650 Page Mill Road
                         Palo Alto, California  94304
                    BY:  **DAVID H. KRAMER, ESQUIRE**

For Defendant:           SISKIND BOYD LLP
                         Four Embarcadero Center, 39th Floor
                         San Francisco, California 94111
                    BY:  **IAN K. BOYD, ESQUIRE**

                         FERGUSON BRASWELL FRASER KUBASTA PC
                         2500 Dallas Parkway #600
                         Plano, Texas 75093
                    BY:  **JOHN M. CONE, ESQUIRE**

**Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR**
               **Official Reporter**

**Thursday - February 23, 2017**                    **1:36 p.m.**

**P R O C E E D I N G S**

**---000---**

**THE CLERK:**  Next, 15-1741, Dropbox versus Thru.

Counsel, please come to the podium and state your name for the record.

**MR. KRAMER:**  Good morning, Your Honor.  David Kramer for Dropbox.

**THE COURT:**  Good afternoon, Mr. Kramer.

**MR. KRAMER:**  Good afternoon, actually.

**MR. CONE:**  Good afternoon, Your Honor.  John Cone for Thru.

**THE COURT:**  Thank you, Mr. Cone.

We are on for Dropbox's motion for fees in this matter. And, as we know, the standard that applies here is whether this is an exceptional case that warrants fee shifting.  And, of course, we look to both the substantive strength of the parties' litigation position or an unreasonable manner in which the case was litigated.

And, as you know, I found here that there was -- that laches applied and that that stemmed from what I found to be a deliberate course, a strategy of delay to leverage Thru's position here, and also found that many of the critical representations made by Thru regarding its knowledge of Dropbox's alleged use of the mark, et cetera, et cetera, was

not credible.

And so I think it's evident that, at least from this Court's viewpoint, this is an exceptional case because of the conduct of Thru, both in terms of conduct in leading up to the litigation, its strategy of delay, as well as its being less than forthright in representations made in this litigation. And so I think that there -- this is a case that qualifies as an exceptional case.

You may want to comment on that.

**MR. CONE:**  I would like the opportunity.

**THE COURT:**  I'll give you a chance to comment, but that's how I see it at this point.

**MR. CONE:**  Yes, Your Honor.  Of course, we don't see it that way, Your Honor.  We don't think it's an exceptional case.

The -- Your Honor was very concerned about this date when we first knew about DBI.  What happened was that we answered an interrogatory that said we first knew about it in the summer of 2011.

At a deposition, Mr. Kramer showed my witness an earlier email, from 2009, where one of the other officers of Thru had mentioned DBI.  And he said, Well, then you knew about them in 2009.

Witness said, Well, I guess that email -- we had that email.  It didn't make any impact on me.  They weren't

competitors of ours.  I didn't know about it.

But he didn't try to pretend that he hadn't read the email or the email hadn't been sent.

And immediately after that we filed an amended interrogatory answer correcting the date.

That was in August, Your Honor.  So I don't think there was any damage to DBI because of that, or any attempt after that email was drawn to our attention to pretend that it wasn't there.

We say that that was not, in fact, the date when laches should have began to run because merely knowing about the use, if you thought it was by somebody who wasn't competitors or wasn't in a competitive state to you, doesn't put you on notice that you need to take any action.

**THE COURT:**  Well, that's what I found also not plausible.

Go back to your first point.  The fact that you're caught with an email that contradicts your sworn testimony and then revise it, that's not exactly good faith.  I mean, sure, maybe no harm was done after it was corrected.  But that's not exactly exemplary conduct.

**MR. CONE:**  Well, Your Honor is right to criticize us for that.  But it was one of many number of emails that no one at Thru remembered.  But we produced it --

**THE COURT:**  I find that hard to believe.  I also find

it hard to believe, which I guess the assertion still persists, that Thru, its officers, believed that Dropbox was not in competition, was not involved in a commercial business, et cetera, et cetera, as of 2011.  I just --

MR. CONE:  Yes.  Your Honor, despite producing all these many thousands if not millions of emails, there was no discussion in any of those emails between 2009 and 2011 about Dropbox.

No one was suggesting, why aren't we doing something about this; these people are a big problem for us.  It wasn't mentioned again until they showed up in this Gartner report in 2011.

So on that, Your Honor, we think that, yes, it was a mistake.  We shouldn't have -- we shouldn't have signed the interrogatory wrongly.  But when we were tasked with it, we admitted it and we made the change.  And that's, in a way, what discovery is for.

Your Honor, we didn't -- it's not true to say that we --

THE COURT:  Normally, discovery is for the other side to find out, not for your own side to find out what you knew.

MR. CONE:  And we did, Your Honor.  We didn't try to hide the email; we produced it.

Then, Your Honor, having told them about our claim to ownership in 2011, we did the thing that we could do as a small company, which is file a Trademark Trial and Appeal Board

proceeding.

And though Your Honor doesn't seem to be giving much weight to that, but the fact of the matter is by filing it on the day of -- or the day that the mark was registered, we were not subject to laches in that proceedings.

The cases -- the jurisprudence in the Federal Circuit is absolutely clear that it doesn't matter if you knew about the use for many years.  As long as you file your cancellation proceedings within the statute of limitation for cancellation proceedings, you are allowed to proceed with it and you're not barred by laches.

We were cutting out (unintelligible) according to costs and what we could afford, Your Honor.  And so we were proceeding with the TTAB proceeding.  We reached out to Dropbox.  We asked to talk to them.  They wouldn't do it.  They wouldn't talk to us.

And then eventually, after the TTAB proceedings had been on file for 14 months, Your Honor, they filed this lawsuit. They're the ones who filed this lawsuit.  They effectively threw away the 14 months of TTAB proceedings and started with this case.

And I think, Your Honor, if you look at it, you'll see that they deliberately tried to force Thru to spend more and more money.  They say this was a very simple open-and-shut case, that we had no type of a case to bring, and yet it took

them two and a half million dollars to establish that, and 11 depositions on their side and two on ours, Your Honor.

They didn't -- when they filed their lawsuit here, they didn't claim that we infringed their trademark. They've never made that allegation. If it was so clear that they had superior trademark rights, why didn't they do that? We don't know, Your Honor.

There was a lot of discussion about words. Dropbox has made a big deal about the use of the term "lottery ticket," which they claim Thru's CEO repeatedly described it as a lottery ticket.

Out of all these thousands of emails, there are two uses of "lottery ticket"; one in 2014, one in 2016, neither of which were cases where the CEO described it as a lottery ticket.

You also, Your Honor, talked about the slow walk, Thru's determination to slow-walk this. But that was a comment made after this litigation was ongoing. We didn't slow-walk this litigation, Your Honor.

You set an initial scheduling order. The trial, I think, was in January of this year. And that was never -- never serious -- we went ahead on that schedule, Your Honor, without a change.

Now, at one point Dropbox tried to bring in a motion to amend and wanted to delay the trial, but it wasn't delayed and we went forward.

On the discovery side, Your Honor, we produced a lot of documents because they asked for a lot of documents.  They may not all have been relevant, but they were responsive to the request.

Then, Your Honor, there was only one case where the parties had to ask the Court to intervene on the written discovery side.  The magistrate judge asked the party to come into her chambers and meet together, and at that stage the dispute was resolved by an agreement.  And the magistrate judge said there should be no sanctions.  There were no sanctions for this.

They can't re-litigate that claim for attorneys' fees based on the discovery when the magistrate judge said, on the only case that came to the Court's attention, that there was no case for sanctions.

**THE COURT:**  Well, finding there was no case for sanctions under Rule -- I don't know if it was 37 or whatever, that doesn't necessarily mean that fees can't be recovered that includes time spent on discovery under the broader approach of the fee-shifting statute under exceptional -- for the exceptional case.

**MR. CONE:**  Yes, Your Honor, but it does suggest that the -- that Thru's behavior in this matter was in no way exceptional.  Most cases have the need for the Court to review one or two discovery matters.  There was nothing exceptional

about this one in terms of discovery.

In fact, Your Honor will recall the only other time there was the need for the Court to intervene was when Dropbox were making it difficult to produce their CEO for us to take his deposition, and the Court had to order them to do that.

Your Honor, we don't think this is an exceptional case.

THE COURT:  All right.  What is your response?

MR. KRAMER:  A few things, Your Honor.  First, let me correct a couple of misstatements of record.

There wasn't one email that predated the June 2011 date that Thru claimed was the date on which it first knew about Dropbox.  There were four.  There was two in June of 2009, another in June of 2010, a third in -- a fourth in January 2011.

There was also a host of media coverage about Dropbox and its treatment of business customers.  There was the email in which Thru lost a business customer to Dropbox.

The record is replete with evidence demonstrating that Thru's representations about when it first learned of Dropbox were false.  And we had to go to the burden and expense of uncovering that and establishing it as false.

And that is only one of the many misrepresentations we got from Thru over the course of discovery in this case.

We talked about them in our brief, but there were multiple interrogatories where Thru's sworn answers were simply false

and forced us to enormous burden and expense to refute them.

There were the interrogatories about when -- evidence of actual confusion.  There was an interrogatory where Thru listed hundreds of documents, many of which had nothing to do with this case, some of which were blank, some of which were gibberish, many of which were irrelevant.

And if you look at Exhibit B to my declaration in support of this motion, you'll see the deposition testimony of me asking the Thru corporate representative, how does this prove actual confusion?  How does this prove actual confusion?  It didn't.  It was just a waste of everyone's time.  Our money and our time.

There's an interrogatory about Thru supposedly using the term "Dropbox" in every email it ever sent.  That was just false.  It sounded good for Thru to say that, and Thru swore it was true.  And we had to go through the burden and expense of proving it was false.

The Court is right to focus on the exceptional nature of this case by virtue of the summary judgment of laches.  The *Couveau* case in the Ninth Circuit says that laches is seldom susceptible of resolution on summary judgment.

The Court actually cited that case in its summary judgment order.  And the Court's right, the Ninth Circuit is right, this Court is right, it is a rare case for there to be summary judgment of laches.

But this is that rare case because of Thru's deliberate, strategic, unreasonable delay.  Summary judgment was clear. There wasn't any evidence to the contrary.

We talked in our papers about the utter failure of proof with respect to Thru's claim that it actually had superior rights.  And I'm not going to go into that further because I think we've adequately covered it.

But there's also litigation misconduct beyond the false interrogatories.  There's the motion to dismiss, which I still can't get my arms around.  Thru came to this Court at the outset and said there was no controversy here between the parties while it was surreptitiously plotting to file a lawsuit of its own if this case had been dismissed in Texas.

And they had been plotting for years --

THE COURT:  What's the evidence of that?

MR. KRAMER:  It's actually in the record, Your Honor. It's in the summary judgment record.  There's a document where a member of its board of directors said, Here's what we should do, we should wait and hope we win the motion to dismiss, and if we do, we'll file a lawsuit in Texas.

I can actually get you a cite if I can reach into my bag of tricks here.

THE COURT:  It's cited in the summary judgment papers.

MR. KRAMER:  It is cited in the summary judgment papers.  It's also cited in our motion for attorneys' fees

here, Your Honor.

So there was the motion to dismiss, there was a series of interrogatories, and then there were 2 million pages of documents that we did not ask for, and there's no evidence in the record that we did.  And that imposed an enormous burden on us.

We know, according to counsel's letter to me, that many of those documents that Thru produced had nothing to do with this case.  It's Exhibit A to my declaration in support of this motion.  Thru just dumped on us 2 million pages of documents, including many privileged documents, without even reviewing them.

Well, that imposed upon us a huge burden to store, host, and review those documents in order to uncover the falsehoods that we got from Thru in interrogatories and in depositions.

Finally, with respect to the issue of declaratory relief, the record undisputedly shows that Thru always planned to sue Dropbox and was just biding its time until an IPO announcement in order to maximize its leverage.

That's docket number 100, Slafsky Declaration, Exhibits 51, 53, 56, 57, 58, and a wealth of deposition testimony to that effect.

If Thru really didn't want this lawsuit, if a lawsuit wasn't part of its grand plan to extract hundreds of millions of dollars from Dropbox, Thru could have made this case

disappear at any time by covenanting not to sue Dropbox.

Thru never did that, not even when we suggested that approach in opposition to the motion to dismiss.  The fact that Thru didn't do so undermines this story that we're hearing now for the first time in which Thru claims it was dragged into this case against its will.

This was an exceptional case of a party misusing the court system in the hopes of reaping an unjustified windfall.

THE COURT:  Let me ask about the covenant not to sue.  Was that ever discussed?

MR. CONE:  I beg your pardon, Your Honor?

THE COURT:  It is represented to me now that DBI suggested that if Thru was not interested in litigation, they would give a covenant not to sue.  Is that not accurate?

MR. CONE:  I do not recall that, Your Honor.  I don't think we would have given a covenant not to sue, because we did believe that we had the better right to the trademark.

THE COURT:  Well, then that suggests litigation was inevitable then.  The idea that you're dragged into this, once they asserted their rights, you asserted your rights, I don't know how you can avoid.

MR. CONE:  Your Honor, once they filed this lawsuit, we had no option but to bring a counterclaim.

THE COURT:  Well, what if they didn't file it?

MR. CONE:  Then we would have gone forward with the

TTAB proceeding, which is what we wanted to do and which was a properly-filed timely proceeding that was not barred by laches.

Now, because it's been brought here to this Court, all of a sudden this proceeding is barred by laches.

Your Honor, the motion to dismiss was not improper.  We did not mislead the Court.  We told them the fact -- we told Your Honor the facts what had happened, and we said we don't think this constitutes a case or controversy as that somewhat legalistic term is used.

We also said, and probably more strongly, Your Honor, even if there is a case or controversy, we think you should decline in your discretion to take the case.  It can be left to the TTAB.

The Federal Circuit had recently issued its *B&B Hardware* decision that said that the TTAB was a full and proper place to litigate these type of claims.  And so we asked the Court, in its discretion, to decline to take the case.  There's nothing underhanded or misleading about that.

Your Honor didn't agree.  Your Honor wanted to take the case for various reasons.  But there was nothing misleading or underhanded in filing that motion.

To say that we were plotting all along to file this lawsuit --

THE COURT:  Well, what about the representation about a plan to file suit in Texas if this --

**MR. CONE:**  There's one email from the -- from a director, I believe, after the motion -- after this case had been filed and after the motion had been filed.

I really would ask the Court to focus on what Thru did, not on words that are taken somewhat out of context.

**THE COURT:**  Well, but these words reveal potential motive and good faith or not.  And so if you're representing one thing and -- I don't know how I can avoid looking at the parties' intent in this --

**MR. CONE:**  Well, I think if you had found -- if there had been emails saying, okay, here's what we're going to do, we're going to go out to San Francisco, we'll persuade Judge Chen to drop the case and here's our lawsuit, we're ready to file in Texas.  That's not what happened.  There's one email from a director talking about the possibility of doing that.

But there's no -- Thru, as a company, did not do that and did not decide to do that.  And they had steered away from filing a lawsuit.

We explained to the Court that our financial resources were such that we couldn't afford a lawsuit.  There's no reason to think all of a sudden we would have had those resources.  We didn't, Your Honor.

We were confident that we could go forward in the TTAB and have our case heard and decided there.  And they would have decided the priority of ownership, and that would have been

binding in subsequent -- any subsequent litigation.

The problem with the way the Court has approached it is that TTAB proceedings are now essentially useless because at the end of the day the losing party won't have to face the collateral effect of a TTAB judgment; it will simply say laches. And I don't think, with respect, Your Honor, that can be right.

We're not here to argue that today, Your Honor.

THE COURT: Right.

MR. CONE: But it goes to, I think, our position that we were reasonable in doing this. We may not be right. Your Honor has said we're not right. And that we accept for today. But we did have a reasonable argument and we proceeded reasonably.

THE COURT: All right. Let me ask you to comment on this one point, Mr. Kramer, about the reasonableness of proceedings administratively and not precipitating a federal District Court lawsuit.

MR. KRAMER: So, Your Honor, Thru's executives wrote endlessly about what they were going to do with the hundreds of millions of dollars they were going to extract in a settlement from Dropbox; how to divvy it up, who was going to get what, what bonuses to set aside.

A cancellation proceeding in the TTAB wouldn't have yielded any of that because it wouldn't have affected Dropbox's

right to use the Dropbox name.

Thru's CEO testified that Thru knew all along that to stop Dropbox's use, which was a prerequisite to getting any settlement here, Thru would have to file suit.  That's in the summary judgment record.  The Slafsky Declaration, docket number 100, at Exhibit 34.  Harrison's testimony, 175-20 to 176-5:

"**Q.**  You understood that to get Dropbox to stop using the name, you would have to file a lawsuit against Dropbox in court; correct?

"**A.**  Correct.

"**Q.**  When did you first understand that, sir?  All along; right?  Since 2011?

"**A.**  I would probably say so, yeah."

So the point about Thru having the ability to declare that it had no intention of suing Dropbox remains.  Thru could have exited this lawsuit at any time.  But it had plotted this lawsuit since 2011.

And the documents that I referenced earlier show that. There's the document about an action could be had soon. There's the document saying, if we wanted to be first to file, we should have done that last year.  There's the document that says, the best leverage we have is to sit tight and wait until the IPO announcement and be prepared to file suit that day.

The document that my colleague here referenced about a

board member -- I can quote it -- it's Exhibit 56 to the Slafsky declaration, quote:  "We ask the federal court to throw this action out and be ready to lodge a counterclaim in the Texas court if that happens."

It didn't happen.  Thru didn't file suit in Texas because this Court retained jurisdiction, but it was what they were planning at the highest levels of the company.  And yet, while they were saying that, they filed a motion, docket number 19, that said, quote:  "There is no justiciable case or controversy for the Court to resolve."

That was disingenuous, and it delayed the case by two months, and it cost us the fees that had to be spent in dealing with that motion.

There's more I could say here about the exceptional nature of this case, but I think our papers speak for themselves, Your Honor.

THE COURT:  All right.  Let me get to the question of the amount of fees and then the costs.

As I understand it, the lodestar amount that is asserted here, which is shy of $2 million, reflects -- already reflects two things.  One is a discount of about 400,000 in fees for those who billed less than 90,000 or for those who were short-time participants.

MR. KRAMER:  That's correct, Your Honor.  Two associates that started at the beginning of the case, that left

the firm early on, had their time excluded from our request.

THE COURT:  And it also reflects a billing judgment because the fees were actually paid by Dropbox, and there was some discussion with the client about fees?

MR. KRAMER:  There were, Your Honor.  And it reflects a negotiated discount between our firm and Dropbox.

THE COURT:  How much was the discount?

MR. KRAMER:  More than 10 percent, Your Honor.

THE COURT:  And in terms of the work that was done in this case, there was the motion to dismiss, motion for summary judgment, 13 depositions, documents.

What else can you tell me about why we have a lodestar of $2 million here?

MR. KRAMER:  Well, the first thing I'd say is the stakes, Your Honor.  By Thru's assessment, the brand it was threatening in this case is worth billions of dollars.

I won't tell you what Thru demanded in settlement except to say it's hundreds of times more than what Dropbox is seeking here.  The stakes for Dropbox were very high.  It was not a case in which stones could be left unturned.

Beyond -- beyond the things that the Court mentioned, that I guess I would stress the document issue.  Two million pages of paper that need to be reviewed, need to be hosted, stored and searched, that is not a small undertaking.  And we did it.  We did it.  And by doing so, we were able to obtain significant

evidence that helped us on our motions to compel.

I think the Court hit on most of what was done in the course of the case. There was extensive back and forth early on in an attempt to get any discovery at all, which ultimately led not to a suggestion by Judge James that we meet in her chambers but rather an order because Thru would not even meet and confer with us about its responses.

The fact that we have not one, not two, but four amended versions of their interrogatory responses tells you that this was not your typical case where parties seek and obtain evidence directly and forthcomingly from their adversary. It was a painstaking exercise to get the information that we did.

So I don't think there was much in the way of a challenge to the reasonableness of the work that we performed here. Obviously, the stakes are the principal driver. But Thru's conduct over the course of the litigation exacerbated the expenditures that were required.

**THE COURT:** So knowing there had already been some discounts taken and some judgment -- billing judgment exercised, because in the end the client actually paid this amount, so you have a natural check, it seems to me, what is your -- what difference do you have with this?

**MR. CONE:** Oh, Your Honor, it seems strange that on the one hand this was a case that was worthless, meritless, should never have been brought. On the other hand, it takes

three partners, four associates, and $2 million to show that.

We just think it was over-lawyered, Your Honor.  I know that's easy for me to say, but it was, in our view, over-lawyered.  The depositions weren't all necessary.  They managed to refer to many of them in their papers, but that doesn't mean they were necessary.  It means they referred to them in their papers.

And we -- we pointed out in our -- in our opposition, Your Honor, things like expert fees and the hourly rates that were actually -- actually charged, which we think are unduly high given this particular case.

**THE COURT:**  Well, but these are -- in the end these are rates that are actually paid in the marketplace.  I mean, that's certainly one indicator what the market rate is, among other things.

**MR. CONE:**  I understood that the Court made a sort of objective decision as to what was reasonable, not saying, well, the client paid it, therefore it must have been reasonable.  I think the Court will take into account all sorts of things.

We think that these rates were high and that there should be a reduction applied to them both in terms of the hours worked and the hourly rates charged.

**THE COURT:**  And so you think the main inefficiencies were, for instance, in the amount of depositions that were taken?

**MR. CONE:**  Yes, Your Honor, and the amount of time that was spent of different partners of the firm talking together about what they were going to do, which I believe, if you look through the time records, that shows up quite a bit. Although it is --

**THE COURT:**  Do you have a quantification of multiplicity?  That is --

**MR. CONE:**  Yes, sir.

**THE COURT:**  -- how many hours should be deducted due to multiplicity?

**MR. CONE:**  Your Honor, I don't have a number to give you today, but I do think that if you -- when we examined the hourly time records, that showed up a lot.

It was also difficult, because of a time entry that covered many different tasks, to see how much was allocated to a particular task, Your Honor.

**THE COURT:**  Give you a brief chance to respond to the multiplicity.

**MR. KRAMER:**  I'm not aware of anything because nothing was brought to our attention in opposition to our motion.

I can tell you that, as the lead counsel for Dropbox in the case, I'm confident that there was not a multiplicity of work or a needless participation by others.

And every deposition that we took in this case was either taken for purposes of obtaining evidence for summary judgment

or for purposes of trial.

The Court may recall that we were on the eve of trial when the summary judgment orders were entered.  This wasn't simply a case that resolved itself on summary judgment.

Trial was weeks away and we had significant trial preparation underway at the time the case was resolved on summary judgment.  So I guess I should have included that in -- in one of the areas where work was required.

I just don't think there is a needless expenditure of time or work on this case.  And the results obviously were favorable.

THE COURT:  All right.  I'm going to take the matter under submission.  Thank you.

MR. CONE:  Thank you, Your Honor.

MR. KRAMER:  Thank you, Your Honor.

(At 2:07 p.m. the proceedings were adjourned.)

- - - -

### CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Friday, March 3, 2017

*Katherine Sullivan*

_____
Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter